IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EUGENE ALVIN BROXTON, | § |
| | § |
| PETITIONER, | § |
| | § |
| v. | § C.A. NO. 4:11-cv-00315 |
| | § CAPITAL HABEAS PETITION |
| RICK THALER, DIRECTOR, TEXAS | § DEATH PENALTY CASE |
| DEPARTMENT OF CRIMINAL JUSTICE, | § |
| INSTITUTIONAL DIVISION, | § |
| | § |
| RESPONDENT. | § |

**SECOND AMENDED
APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS
BY A PERSON SENTENCED TO DEATH[1]**

Eugene Alvin Broxton, currently confined on death row in the Texas Department of

Criminal Justice, Institutional Division, asks this Court to find that his conviction for capital

murder and sentence of death be vacated and that this Court issue a Certificate of Appealability

pursuant to 28 U.S.C. § 2254, Anti-Terrorism and Effective Death Penalty Act.

**INTRODUCTION**

[1]The State has been served with the original Habeas Petition however has not yet
answered that Petition.  On February 23, 2011 this Court entered an order and abated these
proceedings so that unexhausted claims raised in this petition could be considered by the State
courts.  A revised petition was timely filed in the State district court as ordered by this Court.
The new state petition was sent to the Texas Court of Criminal Appeals pursuant to Art. 11.071,
sec. 5.   Mr. Broxton also filed a motion in the Court of Criminal Appeals to expand the record to
include documents obtained through  open records request s to both the Harris County Sheriff's
Department and the Harris County District Attorney's office to obtain all information concerning
the discovery of the murder weapon, along with a large cache of drugs and money after Mr.
Broxton was originally tried and convicted of capital murder.  On June 8, 2011 the Court of
Criminal Appeals dismissed the successor writ as an abuse of the writ and without any written
order, denied the motion to expand the record.

### Summary of Arguments

Eugene Alvin Broxton  was wrongfully  convicted  of capital murder and sentenced to death in 1992 in the 174th Judicial District Court of Harris County, Texas.  During the original federal habeas proceedings, after several other cases involving the testimony of Walter Quijano, Ph.D., wherein he linked a defendant's race to whether or not the defendant posed a risk of future dangerousness were reversed,  the State stipulated to the fact that Mr. Broxton's due process rights had been violated due to the use of Dr. Quijano's testimony.   On March 28, 2001 this Court reversed the death sentence finding that Mr. Broxton's rights to due process under the Fourteenth Amendment of the U.S. Constitution, and sent the case back to the state courts for resentencing.  This Court's order was upheld by the U.S. Court of Appeals for the Fifth Circuit on January 1, 2002.  The U.S. Supreme Court denied a petition for writ of certiorari on December 17, 2002.

For the resentencing trial, the State court judge who had presided over the original trial reappointed  Tom Moran, one of the original attorneys to represent Mr. Broxton,  along with Skip Cornelius, were appointed to represent Mr. Broxton in the 2003 sentencing retrial.  During the resentencing trial, for the reasons set forth below,  Mr. Broxton was denied his Sixth Amendment right to effective assistance of counsel.  In representing Mr. Broxton during the resentencing tiral, Mr. Moran and Mr. Cornelius were so fundamentally negligent in their efforts in representing Mr. Broxton, and Mr. Broxton was so prejuiced by his trial attorneys' negligent conduct,  that the death sentence that the jury imposed during the resentencing trial was a foregone conclusion.

Fundamental to Mr. Broxton's claim of ineffective assistance of counsel is the decision of Mr. Moran and Mr. Cornelius to call as the defense's own expert witness on the issue of future

dangerousness the same bigoted, racist Walter Quijano, Ph.D., whose testimony for the State had

lead to the resentencing trial.  Perhaps appreciating the very peculiar choice of experts that the

defense had employed on the issue,  the State opted not to call experts witness on future

dangerousness during the resentencing trial.  Instead of calling its own expert on future

dangerousness, the State simply relied on its cross-examination of Dr. Quijano, who repeatedly

testified that Mr. Broxton was a sociopath and would always present a future danger to society.

 For reasons stated more fully below, the defense's choice of Dr. Quijano as their expert on

future dangerous, who under both direct and cross-examination testified at the resentencing trial

that Mr. Broxton was a sociopath who would always be a future danger to society, just as he had

at the original trial.  Vol. 38, May , 1992, p. 89, line 1- p. 131, line 24; Vol. 16, November 13, p.

153, line 17 - p. 170, line 20; p. 305, line 3- p. 327, line 17.

 Besides putting forth the highly prejudicial, wholly inappropriate testimony of Dr. Quijano

during the resentencing trial, as detailed below,  throughout the resentencing trial, defense

counsel failed in fulfilling their duties to challenge the State's evidence concerning extraneous

offenses the State alleged Mr. Broxton committed and by not investigating and presenting any

meaningful mitigation case.

 In addition to the extraordinarily poor efforts put forth by Mr. Broxton's attorneys in

preparing and presenting a mitigation case, Mr. Broxton was denied his rights to due process on

several other points during both the original trial and the resentencing trial.

 First, in both the 1992 and 2003 trials, the key witness against Mr. Broxton was Christopher

Shook.  The State used the testimony of Mr. Shook to link Mr. Broxton to a host of extraneous

crimes, including several capital murders and an attempted capital murder.  Interestingly, despite

3

Mr. Shook's long history of drug abuse, being in actual  possession of stolen property from at least two of the capital murders the State alleged were committed by Mr. Broxton and knowledge of the facts of all of the other extraneous crimes the State alleged Mr. Broxton committed , Mr. Shook was never  charged as an accessory to the crimes.

During period of time between Mr. Broxton's arrest and the original trial, Mr. Shook was arrested and charged with drug possession.   Facing prosecution on drug charges,  Mr. Shook alleged that he was mentally incompetent to stand trial, claiming that he was haunted by auditory hallucinations of Mr. Broxton telling him to go out and commit crimes, including murder, to secure money to purchase drugs.  The trial court appointed a psychiatrist to examined Mr. Shook found Mr. Shook lacked credibility.

During the original guilt/innocence trial, when the defense attempted to introduce that evidence, the State court refused to permit the defense to put on evidence regarding the mental health status without opening the door to permit the prosecution to question Mr. Shook on extraneous offenses during the guilt/innocence phase.

The evidence at issue were psychiatric records that indicated that Mr. Shook suffered from auditory hallucinations of Mr. Broxton instructing Mr. Shook to rob and kill people for money to purchase drugs.  According to Mr. Shook, *he was only sometimes able to resist the auditory hallucinations.*  Had the jury been allowed to hear the evidence,  coupled with  the fact that Mr. Shook  was in actual possession of  property stolen from the Dockens and the eyewitness testimony of Debbie Klinkow,  who placed two men who looked more like Mr. Shook than Mr. Broxton, at the crime scene around the time of the robbery/murder,  the jury would have a strong basis for finding reasonable doubt on the issue of Mr. Broxton's actual guilt or innocence in the

4

Dockens robbery/murder. The trial court's refusal to allow the defense to put the issue of Mr. Shook's mental health and his claims of auditory hallucinations, denied Mr. Broxton of his constitutional rights to due process by denying him a meaningful opportunity to present a complete defense. *Holmes v. South Carolina*, 547 U.S. 319 (2006).

The issue of the admissibility of the psychiatric report was raised on direct appeal but unfortunately, the Texas Court of Criminal Appeals found that the clear error committed by the trial court had been procedurally defaulted because the trial attorneys had failed to preserve it during the trial. The Texas Court of Criminal Appeals found that instead of arguing the constitutional violations under the Sixth and Fourteenth Amendment as the trial attorneys should have done, the trial attorneys argued that the evidence should be admitted under Texas Rule of Criminal Evidence 403. *Broxton v. State,* 909 S.W. 2d 912, 918 (Tex. Crim. App. 1995).   The failure to raise proper objections to the trial judge's action was clearly not an intended trial strategy, but a failure on the part of trial counsel to be prepared and make appropriate arguments and violated Mr. Broxton's right to effective assistance of counsel pursuant to *Strickland v. Washington*, 466  U.S. 668(1984).[2]

_____

[2]The Texas Court of Criminal Appeals also faulted trial counsel for failing to preserve error regarding the first issue raised in the direct appeal on the original conviction. The first issue raised on appeal was that a new trial was warranted because the jury questionaire forms did not appear in the appellate record. The CCA found that the lack of a complete record was due to the failure of trial counsel to take appropriate steps to insure that the record was complete, not an error of the courts. Despite the fact that the CCA found that the error complained of had been waived due to the failure of the attorneys to take appropriate action and provide documentation that the missing documents had actually been designated by them to be included in the record, the CCA addressed the substantive issues raised regarding the juror's fitness to be on the jury and found that no error occurred. What is relevant for the discussion in this habeas petition is that the attorneys failed on two counts to preserve error that at least the appellate attorney believed to be meritorious claims. With regard to the Sixth and Fourteenth Amendment claims concerning Mr. Shook's testimony, the error was not addressed on a substantive level by the CCA and had the

More compelling in raising doubt about Mr. Broxton's actual guilt in the Dockens' robbery/murder that Mr. Shook's claims that he was haunted by auditory hallucinations of Mr. Broxton instructing him to go out and rob and kill people  that he could only at times resist following, was what transpired shortly after Mr. Broxton's original conviction.  Approximately one month after Mr. Broxton was originally convicted in 1992, the Harris County Sheriff's department was called to investigate a possible shooting at an apartment in Channelview, Texas, an area that is relatively close to the east side of Houston where the many crimes that Mr. Broxton is alleged to have committed took place.  At the apartment, the sheriff's deputies found two men and a woman.  In the apartment, the deputies also found a cache of drugs, almost $900,000.00 in cash, and the gun stolen from the Dockens that had been used to shoot and kill Ms. Dockens and shoot Mr. Dockens.  Despite conflicting stories given by the three people in the apartment as to who the money, drugs, and gun belonged to and how the gun came to be in the apartment,  nobody in the apartment was charged with any crimes related to the guns, drugs, or money.

    Acting in clear violation of *Brady v. Maryland,* 373 U.S. 87 (1985) because the discovery of the murder weapon in the possession of others who matched the general description of Mr. Broxton and under any circumstances must be considered potentially exculpatory evidence and impeachment evidence, to this day, the prosecutors have not returned to the State court in Mr. Broxton's case to notify the court or the defense attorneys that the murder weapon was in the possession of at least two men who could have easily matched the extremely broad description

---

error been properly preserved, it would have been a viable claim.  *Broxton v. State*, 909 S.W. 3d 912, 914-915 (Tex. Crim.App. 1995).

that Mr. Dockens had given of the perpetrator of the crimes against the Dockens and two other

men who matched the very broad description matched.[3]

In addition to failing to disclose the discovery of the murder weapon and any information

that came into the State's possession about the weapon and the individuals who had it, as the

prosecutors were obligated to do under *Brady v. Maryland*, the State proceeded with the

resentencing trial and put knowingly put on evidence that was meant to obfuscate the facts

surrounding what really happened in Dockens' motel room and who might have been responsible

for Ms. Dockens' murder.

Clearly, the discovery of the murder weapon in the possession of others who for all obvious

reason appear to have been major drug dealers and dangerous people, was a material fact that the

State was obligated to disclose to the defense.   The State's inaction in failing to disclose the

discovery of the murder weapon was highly prejudicial because had it been disclosed

immediately the attorneys who still represented Mr. Broxton at both the direct appeal and state

habeas proceeding levels, could forced a reexamination of Mr. Broxton's original conviction.

Based on the testimony of Mr. Dockens' during the resentencing hearing and the fact that rather

than risk raising any doubt about whether or not Mr. Broxton had actually stolen the gun from the

Dockens and used it to kill Sheila Dockens, as the State had done during the original trial,

introduced a similar weapon from its own vault to use as an exemplar for the jury to see what

type of gun was involved.   Clearly, had the evidence of the recovered gun, that according to the

---

[3]One of the individuals found with the gun was apparently in jail on the night that the
Dockens were robbed and Ms. Dockens was in the custody of the Harris County jail however in
addition to the other man in the apartment at the time the gun was recovered by deputies, there
were two additional men who were known to have had access to the gun.

police investigation was linked to at least four black males who could all matched the generic description of the Dockens' attacker and the perpetrator of all of the other extraneous offenses Mr. Broxton is alleged to have carried out, i.e., "large black male" the jury would have had more than a sufficient amount of evidence to have reasonable doubt that it was one of the other men who were associated with the Dockens' gun, and not Mr. Broxton, for whom the State had no evidence linking him to the gun, as the actual perpetrators of the crimes.

In failing to specifically notify defense counsel and the original state habeas counsel that the gun had been recovered in the possession of other "large black males", the State effectively deprived Mr. Broxton of a full and fair opportunity to have all seek relief from a wrongful conviction when all evidence was far fresher than it is now, some twenty years later.

State failed to disclose the information concerning the newly discovered gun evidence,  the State violated Mr. Broxton's rights to due process under the Fourteenth Amendment pursuant to *Brady v. Maryland* and *Napue v. Illinois* 360 U.S. 264 (1959).

To the extent that the Sixth and Fourteenth Amendment claims may not have been fully exhausted in the state court habeas proceedings, a showing of actual innocence acts as a gateway through which the federal court can review otherwise defaulted claims. *Schlup v. Delo*, 513 U.S. 298 (1995). To the extent that the claims may have been raised in earlier habeas proceedings and whether or not raising them in this habeas proceeding is barred as a successor writ under the AEDPA, the recent U.S. Supreme Court case of *Magwood v. Patterson*, 130 S. Ct. 2788 (2010), previously unexhausted claims addressing issues from the original guilt/innocence

proceedings may be raised during the habeas proceedings following a resentencing trial and such claims are not to be considered as a second or successive writ that might otherwise be barred pursuant to 28 U.S.C. §2244(b).

Despite the Texas Court of Criminal Appeals refusal to consider the claims in this habeas petition, this Court can still consider the claims and grant relief because to bar the claims on a procedural argument would result in a fundamental miscarriage of justice.   A fundamental miscarriage of justice exception to the successor writ provisions of the AEDPA exists " where a constitutional violation has ' probably resulted' in the conviction of one who is ' actually innocent[.]' " *Dretke v. Haley*, 541 U.S. 386,  393, 124 S.Ct. 1847 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986)).

 During the resentencing trial, by putting forth expert testimony to support a jury finding that Mr. Broxton posed a future danger to society, Mr. Broxton's attorneys were so fundamentally inappropriate in a death penalty case  that the result was an unjust verdict in violation of Mr. Broxton's right to counsel under the Sixth and Fourteenth Amendments of the United States Constitution.  *Strickland v. Washington*, 466 U.S. 668(1984) and *United States v. Cronic*, 466 U.S. 648, 659 (1984).  In short, Mr. Broxton's defense attorneys put on Dr. Walter Quijano who testified that Mr. Broxton was a sociopath who would forever present a threat to society and instructed the jury that the answer to special issue number 2 should be "yes".

Unfortunately, the same misfortune that has marked Mr. Broxton's entire life from his birth, to being raised by the State of Louisiana that could not bother to teach him to read throughout his childhood and young adult life, to being appointed Mr. Moran and Mr. Cornelius

as trial counsel, to ultimately being convicted of crimes and being sentenced to death for crimes that there are sound reasons to believe he did not commit, following the resentencing trial the state court appointed Richilieu Edward Wheelan, as habeas counsel.  Before his death, Mr. Wheelan had achieved a level of notoriety for doing a poor job in habeas cases even on his healthiest day.   During the pendency of the State habeas proceedings, Mr. Wheelan fell ill and died, necessitating the appointment of another attorney, Danny Easterling,  to step in after all pleadings had been filed, who had no real opportunity to modify the habeas petition that Mr. Wheelan had apparently done while he was ill.  *See* Exhibit 3, Easterling Affidavit hereto.

Presumably without any specific intent to harm Mr. Broxton's opportunities of success on viable habeas claims, but because he was suffering from a terminal illness,  Mr. Wheelan did not serve Mr. Broxton by carefully considering the record and filings a petition that raised any claims that were specific to Mr. Broxton's case despite the fact that the claims should have been obvious for any attorney who had been approved to handle capital habeas cases pursuant to Tex. R. Crim. Pro. Art. 11.071.   Due to the failure of Mr. Wheelan to provide effective assistance of counsel in the habeas proceedings,  Mr. Broxton was denied his rights of due process to a full and fair hearing of viable claims that should have been presented in the original state habeas proceedings. *Jefferson v. Upton*, 130 S. Ct. 2217 (2010);  *Miller v. Fenton*, 474 U.S. 104, 111 (1985); 28 U.S.C. §2254(d)(1)-(8).  *See* Exhibit 3, Easterling Affidavit, attached.

 Since the First Amended Habeas Petition was filed in this case, the Supreme Court has taken up two cases to address the issue of whether or not a convicted person facing execution is entitled to effective assistance of counsel under the Sixth and Fourteenth Amendments, including the *Balantine* case cited above.  The issues related to the discovery of the gun are issues that

involved more investigation and discovery and had the State fulfilled its obligations *underBrady*

and Napue, the issues would have been known to Mr. Wheelan and the attorneys who handled

Mr. Broxton's original habeas proceedings following his original trial.  In this habeas proceeding,

the issues regardings the discovery of the gun are not whether trial counsel, and Mr. Wheelan

during habeas, were effective in not discovering the facts related to the recovery of the gun, but

whether the State fulfilled its obligations to turn over the evidence to the defense.  Certainly, both

the trial and habeas attorneys who worked on this matter before the undersigned may have been

able to discover the recovery of the gun and the surrounding facts related to who had the gun,

however viability of computer assisted research between the time the original habeas petition was

done following the original conviction and sentence and the time Mr. Wheelan was appointed to

represent Mr. Broxton in his post-conviction/sentencing proceedings in 2003.[4]

Alternatively,  this Court is fully empowered to consider any  unexhausted claims being

raised here if it would be futile to return the case to the state courts.  *Balentine v. Thaler*, 609 F.

3d 729, 743 (5th Cir. 2010).  As demonstrated over and over again, the Texas State courts fail to

provide any meaningful procedures to prosecute habeas claims by relying heavily on procedural

----

[4]In fairness to Mr. Wheelan,  the Houston Chronicle's search engine to research its online archives is not always accurate and the research done on that website is often lacking , it is possible that Mr. Wheelan had done a search using Mr. Broxton's name and the very small article that the undersigned located on the Chronicle's website might not have come up. The undersigned did several searches and at times the article was shown in the search results and at other times it was not listed.  What is absolute is that the prosecution did not make any express effort to reveal the information about the discovery of the gun and four potential alternative suspects to the defense attorneys at anytime and that even after the undersigned discovered the article and made an open records request, the State produced some, but not all records related to the discovery of the gun, choosing to continue to conceal what would be exculpatory and/or impeachment evidence in violation of *Brady v. Maryland* and failing to fulfill its obligations under *Napue v. Illinois* to insure that a conviction is not based on false evidence or even, by a false impression that was created through state action.

defaults to avoid reaching the merits of a case where an often viable claim has been presented.

As even Mr. Broxton's first trip through the State courts clearly demonstrates, the habeas

process has proven to be futile even in the most obvious cases.[5]

_____

[5]The Texas Court of Criminal Appeals vigorously sought to uphold convictions and sentences where Walter Quijano offered testimony that was race based to support his views on future dangerousness.  Besides Mr. Broxton's case, the federal courts had to intervene in overturning the sentences in *Avalos-Alba v. Johnson*, No. 00-40194 (5th Cir. August 24, 2000); *Garcia v. Johnson*, No. 99cv134 (E.D. TX. September 7, 2000); *Blue v. Johnson*, H-99-0350 (S.D. TX. October 2, 2000); and, despite the State's confession of error that took the case to the U.S. Supreme Court, *Saldano v. Texas*, 530 U.S. 1212 (2000).  As a demonstration of how futile it can be for a capital habeas petitioner's experience can be through the Texas state courts, even after the U.S. Supreme Court remanded the case to the Texas courts in light of the confession of constitutional error, the Texas Court of Criminal Appeals refused to grant relief despite the State's arguments that Mr. Saldano was entitled to relief.  *Saldano v. State*, 79 S.W. 3d 873 (Tex.Crim.App. 2002).  Remarkably, at the same time that Tom Moran should have been preparing for Mr. Broxton's resentencing trial, he was attorney of record in the *Saldano* federal habeas proceedings that lead to Mr. Saldano's sentence being overturned due to the testimony of Dr. Quijano.

    Even within the ranks of those judges currently sitting on the Texas Court of Criminal Appeals there is a frustration with that Court's now common practice of relying on procedural arguments to avoid viable, substantive claims.  Justice Holcomb expressed the frustration he has experienced in the way in which his fellow jurists have relied on procedural bars to avoid meritorious claims.  In *Ex parte Smith*, 185 S.W. 3d 455, 477 (2006), Judge Holcomb stated:

> Our state preservation of error laws may not be applied to avoid addressing substantive claims in violation of federal law. *See, e.g., Washington v. Texas,* 388 U.S. 14, 22-23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Nor do I believe that this court may attempt to avoid reversal by cloaking federal constitutional error or harm in purportedly "independent and adequate state law grounds." *See* Concurring op. *supra* at 472-73; *cf. Kunkle v. Texas,* 543 U.S. 1039, 125 S.Ct. 818, 160 L.Ed.2d 605 (2004) (Stevens, J., concurring) (noting that Supreme Court did not have jurisdiction to consider Kunkle's *Penry* claim because it was barred under an independent and adequate state ground, i.e., Tex. Code Crim. Proc. Ann., Art. 11.071, § 5). "Random or inconsistent application of state rules of procedural default will not be regarded as 'adequate and independent state law grounds'so as to bar decision in federal habeas review." *Ex parte Gardner,* 959 S.W.2d 189, 193 (Tex.Crim.App. 1996) (Clinton, J., dissenting) (citing *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988)). Thus, contrary to the concurring judge's reasoning, *see* Concurring op. *supra* at 472-73, we cannot avoid federal review by now holding that Smith did not preserve error because "the question of when and how defaults in compliance with state procedural rules can preclude [federal court's]

   In its order of February 23, 2011 this Court found that good  cause was present to stay and

abate Mr. Broxton's original federal habeas petition so that previously unexhausted claims could

be reviewed in the State courts.  As was expected, the Texas Court of Criminal Appeals, refused

to consider the claims and dismissed them based on a procedural default without explanation or

addressing the issues that lead this Court to send the case back to the State courts.  Further, the

Texas Court of Criminal Court denied Mr. Broxton's motion to expand the state court record to

include documents recently recovered from the Harris County Sheriff's Department and the

Harris County District Attorney's Office concerning the recovery of the Dockens' gun, which are

---

consideration of a federal question is itself a federal question." *See Henry v. Mississippi,* 379 U.S. 443, 447, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965).

Furthermore, a state procedural ground is not adequate unless the procedural rule is strictly or regularly followed. *Barr v. City of Columbia,* 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). *Barr* is instructive on this point. In *Barr,* the Supreme Court declined the invitation to hold that Petitioners did not preserve error on their constitutional claims because the state supreme court "refused to pass on objections" as "the exceptions taken below were 'too general to be considered[.]' " *Id.* In reaching its decision that it was not barred from reviewing the state court's decision, the Court considered the state court's recent treatment of similar cases. *See id.* at 149-50, 84 S.Ct. 1734. Finding that the state court had addressed the merits in five cases, where either identical or similar objections were made below, the Supreme Court concluded it was not prohibited from reviewing the claims on the merits. *See id.*

Our application of error preservation rules, as of late, have been applied capriciously and arbitrarily by this court;[7] therefore, a self-proclaimed "adequate" procedural bar cannot insulate the majority's holding from federal review. *See Henry v. Mississippi,* 379 U.S. at 447, 85 S.Ct. 564; *Barr v. City of Columbia,* 378 U.S. at 149, 84 S.Ct. 1734. It appears to me that this court has been (and clearly is in this case) improperly applying procedural bars to avoid granting substantive relief to defendants who are perhaps guilty but are otherwise entitled to the relief sought. The rule of procedural default should not be used as an ad hoc mechanism to avoid reaching the merits of a particular case.

crucial to a full and fair airing of Mr. Broxton's claims regardless of which court hears the claims.  The futility that has been repeatedly observed in habeas petitioners efforts in having legitimate habeas claims reviewed by the Texas Court of Criminal appeals has been demonstrated by the Texas Court of Criminal Appeals in Mr. Broxton's case.

## Summary of Facts Relevant to the Case

Mr. Broxton was born into poverty in DeRidder, Louisiana in 1955.  His birth was the product of an affair between his mother and a man who was married and had a separate family with another woman at the time Mr. Broxton was conceived.  Mr. Broxton lived with his mother, who was disabled due to physical and mental problems, and his older half sister, Mattie Walters, and his half-brother, Samuel  Terrance Wilson.   Mr. Broxton had little contact with his biological father until he was about eight years old.

When Mr. Broxton was 13 years old he was removed from his mother's house due to neglect and abuse and sent to live at a boys' home until it was closed approximately 8 months later. From there Mr. Broxton was placed in foster care in the home of Hattie Washington .  Mr. Broxton lived with the Washington family for almost a year until he was charged with stealing the Washington family car and sent to the Louisiana youth authority.  From that point on, Mr. Broxton spent virtually his entire life in either the Louisiana or Texas prison system.   At the time Mr. Broxton allegedly committed the Dockens' robbery/murder he had spent only approximately a total of eighteen months of the preceding twenty years in the free world.

In 1990 Mr. Broxton was released from the Texas prison system after serving time for a 1985 conviction for robbery and attempted capital murder of a police officer.  Based on a description of Mr. Broxton's arrest in 1985,  it would not be unfair to say that Mr. Broxton's

behavior suggests that he was perhaps actually attempting to commit suicide by police rather than actually shoot and kill a police officer.  After being chased by the police, Mr. Broxton took a shot at the police officer while in a position where he was clearly an easy target for being hit by return fire had the police officer chosen to return fire.   In a remarkably similar to the confrontation Mr. Broxton had with police when they arrested him in Louisiana after he had robbed a woman at a store in 1985.   In both instances,  Mr. Broxton stood armed as if almost inviting the police to kill him.   The 1985 incident came within months of Mr. Broxton's release from the Louisiana prisons on the 1973 conviction.[6]

   The crime that lead to Mr. Broxton's capital murder conviction was admittedly  brutal in every aspect.  According to Waylon Dockens, *see* Vol. 15, November 12, 2003, pp. 40 - 108,  the surviving victim, after working all day,  Mr. Dockens and his wife, Shelia Dockens went out for a bite to eat and returned to their motel room where shared a pint of ice cream while watching television.  At approximately 10:00 pm,  a man  identifying himself as being from the motel office, knocked on their motel room door.   Mr. Dockens testified that he assumed the clerk was checking on whether or not the Dockens still had their small dog in the room.    Mr. Dockens testified that when he opened the motel room door, someone matching Mr. Broxton's description

─────────────────────

[6]During the retrial, Mr. Cornelius quickly summarized Mr. Broxton's health, physical, and social history for the jury rather than having any particular witness put the history in any particular context that might have been meaningful to the jury as it related to Mr. Broxton's possible sentence.  While Mr. Cornelius' decision to present the evidence in such an abbreviated format in terms of how effective it might have been in convincing the jury that the information was meaningful in terms of mitigation, the summary does provide a good summary for purposes of this habeas petition.  *See* Vol. 16, November 13, 2003, p. 122, line 1 - p. 163, line 11.  It must be noted that during the examination of Dr. Quijano, Mr. Moran did not use any of the exhibits put forth throughout Mr. Cornelius' narrative to correct Dr. Quijano when he would make factual misstatements.

in terms of size, gender, and skin tone, push his way into the room.  According to Mr. Dockens'

testimony, both he and his wife were tied up and terrorized while the intruder was searching for

valuables to steal.  Mr. Dockens testified that he was knocked unconscious after being shot in the

head and that he awoke the next morning to find his wife bound, beaten, and dead and that he too

had been badly beaten.   Mr. Dockens testified that he struggled to get untied and made his way

to call for help.

At trial the State introduced many very gruesome photos of the crime scene and the corpse

of Ms. Dockens, showing her bound and wounded.  There were additional photographs of the

bloody motel room.   None of the photographs  directly link Mr. Broxton to the crime, however

the images were very powerful images and would naturally provoke extremely negative feelings

against anyone who was alleged to have committed the crimes.

There was no physical evidence introduced into the proceedings that directly linkted Mr.

Broxton to the Dockens' robbery/murder.  The State believed it was important for the jury to

understand the nature of the murder weapon and introduced a .44 Magnum gun, similar to the

one Mr. Dockens' testified he had brought with him to Houston and that had been stolen during

the robbery/murder.

Despite the fact that  Mr. Dockens testified that at some point during the crime, the

intruder used the motel room telephone to call someone to let them know that the other person

needed to meet the intruder to escape and the State introduced photographs of the motel

telephone that showed bloody hand prints on it the prints did not implicate Mr. Broxton.  While

the telephone call history that could have easily been obtained by the State could presumably

have been a key evidence to identify both Hollywood and Sunshine, there was no testimony that

any such tracing had been done.  Had someone thought to have traced the call, it might have provided important clues as to who the perpetrator of the robbery/murder who had identified himself as Hollywood, was and who his accomplice, named Sunshine, was.  There was no testimony during neither trial that Mr. Broxton used the nickname of "Hollywood" or that he associated with someone who used the name "Sunshine".[7]   In the police reports documenting the crime investigation, there is no mention of the police looking for someone who had a street name of "Hollywood" or "Sunshine" and there was no testimony throughout either trial that Mr. Broxton was known as "Hollywood" or that he associated with anyone named "Sunshine". Exhibit 5, McKinney affidavit.    The police reports included interview notes from the police questioning of Christopher Shook, Brenda Hice, or Tracey Byrd , all of whom were supposedly close associates of Mr. Broxton and certainly would have known if Mr. Broxton used the street name of Hollywood and who Sunshine was.[8]

There were apparently no fingerprints linking Mr. Broxton to  any of the property found in Mr. Shook's car because there was no testimony to the effect that Mr. Broxton's finger prints were found on any of the property.  According to Mr. Dockens his assailant was particularly focused on the car alarm and keys that were found between the front seats of Mr. Shook's car however there was no testimony about anyone's fingerprints on the keys and alarms.  Mr.

---

[7]In the police reports documenting the crime investigation, there is no mention of the police looking for someone who had a street name of "Hollywood" or "Sunshine" and there was no testimony throughout either trial that Mr. Broxton was known as "Hollywood" or that he associated with anyone named "Sunshine".

[8]It should be noted that these crimes took place in 1991, before there were throw-away cell phones and tracking telephone calls from and to land lines was common place. The telephone was a house phone of the motel and the number could have been tracked through records of the motel and the telephone company.

Dockens did not testify that his assailant was wearing gloves to prevent fingerprints and in fact, the police claim that a partial palm print belonging to Mr. Broxton was taken from the motel room.   Mr. Shooks' testimony of what happened on the night of the crime, along with the timeline he testified to, which did not include any testimony that before Mr. Broxton instructed him to hide the stolen property, Mr. Broxton or anyone else took the time to carefully wipe each item to remove any fingerprints,  the many different items.

In addition to the absence of forensic evidence attaching Mr. Broxton to the crime, a disinterested witness,  Debbie Klinkow, a truck driver who was spending the night at the motel on the night  Ms. Dockens was murdered, testified that approximately two hours after Mr. Dockens testified he and his wife had been attacked by an intruder,  two white males, both approximately 30 years old, knocked on the Dockens' motel room door.  Ms. Klinkow testified that a young woman, who Ms. Klinkow identified the following morning as Shelia Dockens, answered the door in her negligee and allowed the men to enter the apartment.  Ms. Klinkow testified that approximately thirty to forty minutes after the two men were admitted into the Dockens' motel room, she heard what she thought might have been either gun shots or car backfired.  *See* Vol. 32, April 28, 1992, pp. 40 -64.[9]

At the time Mr. Broxton was arrested for the Dockens' murder, Mr. Shook was also taken into custody.  The police obtained a warrant to search Mr. Shook's car.  In the car the police found the auto alarm remote that had been stolen from the Dockens.  The remote was located

---

[9]In a particularly peculiar moment in the trial after the State had passed on further cross-examination of Ms. Klinkow, District Judge McSpaddin,  apparently not completely satisfied with the efforts of the prosecution to impeach the credibility of Ms. Klinkow, made a comment about her testimony, clearly suggesting to the jury that she was not credible.  *See* Vol. 32, p. 64.

between the front seats of Mr. Shook's car.  Also in the car were documents and other items

stolen from the Dockenses.  As an explanation for having the stolen property in his car, Mr.

Shook informed the police that on the night of the Dockens robbery/murder, Mr. Shook had been

visiting a drug dealer named Red at the Econolodge Motel located across the parking lot from the

Magnolia Motel, which is where the Dockens crime had taken place.  Mr. Shook said that he had

gone to the Econolodge with Mr. Broxton and that while Mr. Shook went to do drugs in Red's

room, Mr. Broxton went off in a different direction.  Mr. Shook informed the police that after he

did drugs he went to his car and waited for Mr. Broxton to return.

At that point Mr. Shook's story differed depending on when and to whom he was telling it

to.  In the police report notes, Mr. Shook said that while he was waiting for Mr. Broxton to return

to the parking lot, Mr. Broxton arrived by being driven by an individual named Billy Gibson.[10]

Mr. Shook said that at that point he was given the stolen property from the Dockens crime and

followed Mr. Broxton and Mr. Gibson back to the apartment that Mr. Shook claims he shared

with Mr. Broxton.   In his initial statements to the police, Mr. Shook did not mention Billy

Gibson or that he had been given the stolen property while he was in the parking lot of the

Econolodge.  Instead, he testified that Mr. Shook returned from purchasing drugs from Red to the

_____

[10]Mr. Shook's statements regarding Billy Gibson were made during an interview with the investigator employed by Troy McKinney and Tom Moran in preparation for the original trial. Mr. Shook also testified that it was Mr. Gibson who drove Mr. Broxton back to his apartment at the La Fiesta Apartments after the Dockens murder.  Vol. 16, November 13, 2003, p. 22 -23. According to Mr. Shook, not only was he present when Mr. Broxton had the property he allegedly stole from the Dockens, but Mr. Gibson, Ms. Bryd and Ms. Hice were all present and heard Mr. Broxton's account of where he got the property and what he did to the Dockens.  For reasons unknown, the State only called Mr. Shook in both trials against Mr. Broxton and there was no other witness throughout either trial who testified that Mr. Broxton confirmed any of Mr. Shook's testimony implicating himself in any of the crimes.

La Fiesta Apartment, Mr. Broxton arrived with the stolen property.   Assuming that the telephone call Mr. Dockens testified occurred between Mr. Broxton and someone known as "Sunshine", it is unanswered anywhere in the trial transcript how either Mr. Shook or Mr. Gibson may have gotten the telephone call to retrieve Mr. Broxton.[11]

Mr. Shook testified that after they all returned to the apartment,  Mr. Broxton and Tracy went into the bedroom and after a while Tracy came out of the bedroom with some of the property stolen from the Dockens.  At that point, Mr. Broxton allegedly instructed Mr. Shook to take a garbage bag full of stolen property and dispose of it.   Mr. Shook testified that because it was pouring down rain, he put some of the stolen property in his car and had the foresight to separate some of the property out of the garbage bag and put it in a orange bag that he hid behind a fence behind a dumpster.  Neither the police reports or Mr. Shook's testimony indicate that he was ever asked or volunteered how the car alarm remote ended up stuck between the front seats of his car, separated from the rest of the stolen property, since he never placed Mr. Broxton in his car and made no  mention that he separated any of the property while he was putting it in the car other than putting some of it in the orange bag which was hidden outside the car.

After the jury returned a guilty verdict, in both the original trial and the resentencing, the State put on evidence of several extraneous offenses that the State alleged Mr. Broxton had committed.  At one point, the detective testified that they linked Mr. Broxton to the various crimes because they matched a pattern and took place in the general area of the Magnolia Motel.

In fact, most of  the extraneous offenses the State alleged were committed by Mr. Broxton did not all match the fact pattern of the Dockens crime.   The Dockens crime involved a late

---

[11]In 1991 cellphones were hardly commonplace, even for drug dealers.

night breaking and entering of a low cost motel room in  known as a center  of  drug/prostitution activities on the east side of Houston .  On the other hand, at least two of the extraneous offensives Mr. Broxton allegedly committed were kidnaping/robbery/carjackings took place in broad daylight and outside.   The only similarity between the crimes that took place at night at motels and during the day that started in parking lots was that in all instances the witnesses described the perpetrator of the crimes as being a black male with a darker skin tone .  Although Mr. Broxton was known for wearing heavy, black rimmed eyeglasses, only Mr. Dockens mentioned the attacker as wearing such glasses and then a reference to the glasses is only made in one of the police reports, not in any testimony at trial.  In the lineup that Mr. Dockens and the other victims and witnesses were shown, no one participating in the lineup wore any glasses.

An extraneous offenses Mr. Broxton allegedly committed was the capital murder of John Miller.  Mr. Miller was murdered in broad daylight in front of four witnesses in the parking lot of the Yorkshire Village Apartments,  on the eastside of Houston.   According the only witness that was able to link Mr. Broxton to the crime, Joslin Baxter,  Mr. Broxton and Mr. Miller were seen sitting in Mr. Miller's gold and black Chevy Blazer.  Ms. Baxter, who picked Mr. Broxton out of the police line up claiming that  that while she did not see the actual attack by Mr. Broxton of Mr. Miller, when she was walking to her mailbox she noticed the two men, one black and one white,  sitting and talking in a black and gold Chevy Blazer.  Ms. Baxter testified that there was nothing remarkable about the activities of the two of men in the truck that would cause her to remember them sitting in the truck.  At neither trial did either the defense or prosecution ask her why she would recollect seeing two people sitting quietly in a parked car or why she happened to notice them and remember what they looked like.

21

Four men who actually witnessed what appeared at first to them to be a fight although none of the four men could conclusively identify Mr. Broxton as the attacker who they observed knifing Mr. Miller.  One of the men, Robert Hart, identified someone other than Mr. Broxton. Neither Herman Gardner nor L.C. Godwin were able to identify anyone in the lineup as the attacker of Mr. Miller. The fourth witness, Clyde Francois, was not certain in his identification although he indicated that Mr. Broxton did have a similar skin tone to the attacker.

There were two additional witnesses who identified Mr. Broxton as a man who used Mr. Miller's credit card on the Sunday following Mr. Miller's murder.  These two witnesses worked at different convenience stores.  A month after Mr. Miller was attacked, the clerks at two convenience stores where Mr. Miller's credit card had been used were interviewed by the police Both clerks claimed to be able to pick Mr. Broxton out of the photo lineup.   Both testified that their interactions with Mr. Broxton only lasted for a few minutes.  In testimony that should have sounded ridiculously incredible to anyone who has ever shopped at a gas station,  Sharon Alexander, the clerk at the Exxon store, claimed that not only was she able to identify Mr. Broxton as the man who came into the store a month earlier because he wanted to purchase an entire carton of cigarettes rather than just a single package of cigarettes, as if those who purchase cigarettes never purchase cigarettes by the carton.  More remarkable than Ms. Alexander's ability to identify Mr. Broxton as a onetime customer making a minor purchase of cigarettes a month before, Ms. Alexander testified that she actually had an independent recollection of the name on the credit card that  Mr. Broxton allegedly used to make the purchase.  Ms. Alexander testified that, besides wanting an entire carton of cigarettes,  Mr. Broxton was memorable because he was accompanied by a short woman who appeared to be in a good mood.  Mr. Broxton was known to

22

associate with two white females, Tracey Bryd and Brenda Hice.[12]  There was no evidence in

either trial that Ms. Alexander identified either Ms. Bryd or Ms. Hice as being the woman who

accompanied Mr. Broxton to the gas station to purchase cigarettes or that either woman was a

notably happy person.  There was no evidence at trial or in the police files that Ms. Alexander

was ever asked to review a lineup containing either Ms. Bryd or Ms. Hice.

     Inexplicably, the jury did not learn that the police were provided with videotape

surveillance tapes of the purchase on Mr. Miller's credit card of six packages of Kools or that

Mr. Broxton was not the individual seen as using the credit card even though there is reference to

the videotape in the police files.   The police report states that  the "person making that purchase

was not on them."  Presumably  the report reference to the  "person making that purchase" meant

that the police were referring to Mr. Broxton since Ms. Alexander had identified Mr. Broxton as

the user of the credit card and it was Mr. Broxton who fit into the narrative the police were

writing for the Miller murder.[13]

---

[12]Police interviewed both Brenda Hice and Tracey Bryd at the police station after Mr. Broxton was arrested.  *See* Vol. 15, November 12, 2003, p. 203 -206, testimony of Robert Tonry, one of the officers who investigated the case.  Officer Tonry testified that the officers had no contact with either Ms. Bryd or Ms. Hice after the investigation despite the fact that it was their statements that the search warrant for Mr. Shook's car was based on and that Mr. Broxton allegedly gave a ring and bag stolen from Sheila Dockens to Ms. Bryd on the night of the murder. Vol. 15, November 12, 2003, pp. 212-215.

[13]During the original sentencing trial the State also called a witness, Virginia Salazar. Ms. Salazar testified that on April 21, 1991 she was working at a convenience store in Channelview.  Ms. Salazar testified that a man attempted to use a credit card issued to John Miller to purchase cigarettes.  Ms. Salazar testified that the credit card was rejected and she received an instruction to confiscate the card, which she did.  Ms. Salazar testified that the man was accompanied by a black female.  She also testified that approximiately a month after the fact she was able to select Mr. Broxton out of a lineup array as the man who had attempted to use the Miller credit card.  On cross-examination, Ms. Salazar testified that between five and ten credit cards are rejected on her shift each month and that she has no recollection of what the name on

Inexplicably, despite the fact that there was much discussion of it in the police files, the jury did not hear any evidence regarding the Miller murder that the police had received three City Under Siege tips after a television spot aired, in which three separate individuals were identified by tipsters as the perpetrator of the Miller murder.  One of the tipsters,  police officer, A.E. Chapman, Badge No.86205, identified the perpetrator as a drug dealer working in the Fifth Ward who went by theme of "Red" and had a history of stealing Blazers and Astrovans.  Officer Chapman provided the police with an address where "Red" could regularly be found.  Even though the detectives had been told by Mr. Shook that he purchased drugs from "Red" on the night of the Dockens robbery/murder, thereby placing "Red" in the immediate vicinity of the Magnolia Motel, the police files fail to indicate that there was any investigation into whether or not Red was the person who had robbed and killed Mr. Miller and Sheila Dockens.   There is no indication in the files or the testimony that the detectives even included "Red", the drug dealer, in the photo array that was shown to Mr. Dockens and the clerks at the conveniences stores.

John Clauson,  a parole officer, provided another tip in response to the City Under Siege clip.  Officer Clauson identified the suspect as Billy J. Duncan, who was on parole for murder.  Neither the police files nor the trial testimony indicates that there was any investigation into the tip concerning Billy Duncan.  The third tipster was an  anonymous caller who identified the perpetrator as James Curtis Singletary, who had an arrest record.   A fourth tipster, Robert Allen

---

the credit card of the person whose card was last rejected was or the names or appearances of any other customers whose credit cards were rejected.  She testified that the only instance she has any distinct recollection of concerning a rejected credit cards was when Mr. Broxton used Mr. Miller's card, because she got a "bad vibe" during the less than five minute interaction. *See* Vol. 37, May 4, 1992, pp. 88 - 98.  No mention was made in her testimony that she was asked to identify any women who may have accompanied Mr. Broxton.

East, who was in jail when he called in the tip identified the perpetrator as an individual who went by the name "Big Lee" who Mr. East said lived with a white prostitute named Diane, as Mr. Broxton did. Mr. East provided a general location of where "Big Lee" could be found and that he had a history of stealing vehicles in the area of the Yorkshire Village Apartments.   Neither the testimony at either trial nor the police investigation reports do not indicate that there was any effort made to o follow up on any of the tips that may have lead to a suspect other than Mr. Broxton.

Although several of the individuals who had been identified by the tipsters as the perpetrator of the Miller murder had police records and whose mug shots should have been readily available to use in the photo array, none of their images were included and it does not appear from the police reports in the matter that the police followed up on any of the tips, instead being satisfied that the perpetrator was Mr. Broxton.  *See* Affidavit of Troy McKinney, Exhibit 2.   The jury did not hear about the tips directing the police to men other than Mr. Broxton who could be responsible for the Miller killing.

Although Mr. Broxton reportedly stole Mr. Miller's gold and black Chevy Blazer, there was no testimony that the truck was recovered and contained any forensic evidence placing Mr. Broxton in the truck.   According to Mr. Shook, Mr. Broxton sold the stolen Blazer to two women for ten dollars.[14]  This information came from Mr. Shook however no women were

---

[14]Although the truck and camper allegedly stolen by Mr. Broxton during the Anderson carjacking/murder was recovered, there apparently were no fingerprints or other forensic evidence linking Mr. Broxton to the crime, or at least none put before the jury.  According to both Mr. Anderson, the victim, and Mr. Cherry, the crime involved a physical altercation between the two men at which time DNA could have readily been transferred from one man to the other however there was no DNA evidence linking the two men presented to the jury.  *See* Vol. 36, May 1, 1992, p. 14.  It should also be noted that the van Mr. Shook claimed Mr. Broxton

identified as the individuals who paid the $10.00 for the Blazer.

Mr. Broxton allegedly also carjacked and attempted to kill Grady Anderson.  Mr. Broxton allegedly approached Mr. Anderson's truck when Mr. Anderson was waiting outside of the Wal-mart on the east side of Houston.  According to the testimony from Mr. Anderson given in the original trial and read to the jury in the retrial,  Mr. Broxton forced his way into Mr. Anderson's truck, directed him to drive to a remote area down Penn City Road, in Harris County, Texas, forced Mr. Anderson out of the truck whereafter Mr. Broxton stabbed, beat and shot Mr. Anderson, leaving him for dead after the attack was interrupted by Johnny R. Cherry, who was driving down the remote road.  *See* Vol. 14, November 11, 2003, p. 124 - 150.

Neither Mr. Anderson nor Mr. Cherry described the assailant as wearing glasses.  Mr. Cherry's claim that he could identify the attacker  after seeing him for only seconds through his rear view mirror while backing up his own truck and being shot at by whoever had attacked Mr. Anderson.  Vol. 14, November 11, 2003, pp. 150-186.

As noted above, Tom Moran and Skip Cornelius had been appointed to represented Mr. Broxton in the resentencing trial.  Gina Vitale was employed by the defense attorneys to work on the case as the mitigation specialist.  The defense also retained the services of two experts, the same Walter Quijano, Ph.D.,  that had testified on behalf of the prosecution during the original sentencing phase of the trial, and Larry Fitzgerald, the former spokesman for the Texas Department of Criminal Justice, to testify about prison confinement issues and, to a lesser extent,

---

confessed to stealing in the course of a carjacking/robbery/murder referenced in his statement as having been stolen from an individual A. Kreeger was not also not recovered even though Mr. Shook provided a detailed story about how Mr. Broxton gave the van and credit cards to two friends of Mr. Shook, who were supposed to use the credit cards to purchase as many cartons of cigarettes as they could so that Mr. Shook could sell them on the street for $10 a carton.

Mr. Broxton's own past prison history and the issue of "institutionalization" of prisoners who have lived the bulk of their lives within the prison system and their adaptation to prison life versus their ability to adapt to life in the free world.  The testimony of both experts will be discussed further below.

During the resentencing trial, the defense only called three other witnesses in addition to Dr. Quijano and Mr. Fitzgerald.  They put on testimony of  Mr. Broxton's half siblings, and Joanna Vaughn, a school teacher from Austin, who at that time had been visiting and corresponding with Mr. Broxton for approximately four years and who met Mr. Broxton through her church.

 Strangely, the direct testimony elicited by the defense from Mattie Walters, Mr. Broxton's half-sister,  was peculiar at best.   Rather than spend a great deal of time asking Ms. Walters questions about Mr. Broxton's sad youth of neglect and abuse while living in his mother's home, the defense attorneys asked Ms. Walters about an incident of picking up Mr. Broxton to take him to the church where she was the assistant pastor.  Under direct examination, the attorneys elicited testimony from Ms. Walters that implicated Mr. Broxton in another extraneous capital murder the State was attempting to prove, the murder of Gary Stuckwisch.  Ms. Walters did not testify that her brother had confessed to killing Mr. Stuckwisch, but testified that shortly after the decaying body of Mr. Stuckwisch was found and the murder became public, she observed a cut on her brother's hand and noticed that while he was speaking with the pastor of the church, he seemed very upset and was crying and that in her mind, her brother's conduct raised questions about whether he might be responsible for Mr. Stuckwisch's death.

The testimony of Mr. Broxton's older half brother was equally puzzling in that it was  no more beneficial to make a case for the jury to arrive at an answer to the mitigation special issue

27

that would help Mr. Broxton escape the death penalty.  It appears from the testimony that the idea

behind calling the brother was to have him testify that it was important to him, the brother, that

Mr. Broxton not be executed.  While he did testify to how he would miss Mr. Broxton if he was

executed, the State was able to destroy any credibility that Mr. Wilson might have had with the

jury by simply asking how long it had been since he communicated with his younger brother.

The answer was that the brothers had not communicated with each other in approximately 17

years.

The only witness who was left to bolster Mr. Broxton's case to spare his life was Joanna

Vaughn.  While Ms. Vaughn certainly came across as a sincere and earnest person and that her

concern for Mr. Broxton was genuine, the prosecutors apparently found her testimony so weak

that they did not bother to cross-examine her.

As might be expected, the jury returned a verdict that dictated that Mr.Broxton be sentenced

to death.

## **ARGUMENT AND AUTHORITIES**

_____**I.**   **DURING THE GUILT/INNOCENCE TRIAL  MR. BROXTON'S CONSTITUTIONAL RIGHT'S  TO A FAIR TRIAL UNDER THE EIGHTH  AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE TRIAL JUDGE'S REFUSAL TO ALLOW LIMITED USE OF THE MENTAL HEALTH EVIDENCE CONCERNING CHRISTOPHER SHOOK COMPOUNDED BY RECEIVING INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS.**

a.  The trial court's refusal to allow limited cross-examination on the issues related to Mr. Shook's allegations of suffering from auditory hallucinations was in violation of Mr. Broxton's rights under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment

As noted above, Mr. Broxton's actual guilt in the Dockens' murder should not have not

necessarily a foregone conclusion since there was clearly at least one other known person who should have been a very likely, and perhaps more appropriate suspect, Christopher Shook.  Mr. Shook was the one who clearly provided the authorities with the necessary narrative to link Mr. Broxton to not just the Dockens' murder but all the extraneous offenses that the State alleged Mr. Broxton committed, clearing from the books several additional violent crimes.    Although the police had interviewed Mr. Broxton's girlfriend, Tracey Bryd and another woman, Brenda Hice[15], both of whom supposedly linked Mr. Broxton to some of the crimes, neither woman was called to testify that Mr. Broxton confessed to them or that they had received stolen property from him.

Mr. Dockens' identified Mr. Broxton during a viewing of a videotaped lineup shown to him in the privacy of a hospital room while Mr. Dockens was recovering from very serious wounds received during the course of the attack on himself and his wife and short of admissions by any of the three people present that there was some manipulation of the identification, the reality is that Mr. Dockens' could have been mistaken in his selection of Mr. Broxton.  There is a reasonable basis to conclude that the identification by Mr. Dockens was flawed in a significant way.  There is clearly other evidence in the Dockens case that point to others who may have committed the crime and that would have raised a reasonable doubt had the jury been presented with a more complete picture of what the state of the investigation was.

First, had the jury been allowed to hear the complete evidence,  particularly Mr. Shook's statement that he heard Mr. Broxton's voice telling him to go out and rob and kill people and the

_____

[15]Mr. Broxton had hit and injured Ms. Hice sometime before he had been accused of these crimes and arguably, when presented with an opportunity to implicate him in various crimes, she may have been motivated to retaliate against him and take the lead of others by doing so regardless of the actual facts.

false statements he had made to the psychiatrist concerning his drug history, claiming that it was Mr. Broxton who had turned him to drugs even though Mr. Shook had a long history of addiction before ever meeting Mr. Broxton.

First, Mr. Shook was in exclusive possession of stolen property taken from the Dockens couple.  Mr. Shook's explanation for having the stolen property had inconsistencies depending on when and to whom he was offering the explanations.  Further, Mr. Shook clearly a few motives to lie about how he came into possession of the stolen property.  If the robbery/murder had not been committed by Mr. Broxton then clearly Mr. Shook was the most likely suspect, particularly in light of the testimony of Debbie Klinkow, identifying two white males of Mr. Shook's general description being admitted to the Dockens' motel room by Sheila Dockens, followed by what sounded like shots being fired.   Mr. Shook also admitted to being in the immediate vicinity  of the crime scene with a drug dealer named "Red", who the police had been informed matched the description of another murder Mr. Broxton allegedly committed.

Mr. Shook's apparently relationship with Red provided two motives to lie by implicating Mr. Broxton.   First, by deflecting attention from himself and onto Mr. Broxton, Mr. Shook escaped being charged with the murder of Sheila Dockens.  Second, by implicating Mr. Broxton instead of "Red", Mr. Shook no *doubt was able to curry favor* with his dealer "Red".

Mr. Shook and Tracey Bryd were the individuals who were in actual possession of property stolen from the Dockens and had very personal motives for lying about their involvement in the robbery/murder and deflecting attention away from themselves and towards Mr. Broxton.   Yet, Debbie Klinkow,  a totally disinterested individual,  testified that she observed two white males knock on the Dockens' motel room door and be admitted to the room by a woman who Ms.

30

Klinkow later identified as Shelia Dockens.  Ms. Klinkow, along with three other witnesses

testified that it was after Mr. Shook testified Mr. Broxton was already back at his own apartment,

sounds that could have been either gunshots or car backfire, were heard at the Magnolia Motel.

During Mr. Broxton's original trial, Mr. Shook was a key witness against Mr. Broxton since

it was through Mr. Shook that Mr. Broxton had been linked to the Dockens' case.  Without Mr.

Shook's statement and testimony, the State could not have linked Mr. Broxton to the stolen

property found in Mr. Shook's locked car.

After Mr. Shook was taken into custody in connection with the Dockens' murder,

interviewed, and then released after providing his statement on May 29, 1991 in case no. 91

05170385,  implicating Mr. Broxton.  Several months later Mr. Shook was again arrested on drug

charges in Cause No. 614521 in the 174th District Court of Harris County, Texas  for possession

of cocaine.

In the course of Cause No. 91-05170385,  the drug case, on November 5, 1991 a joint

motion for psychiatric examination to determine Mr. Shook's competency was filed based on

allegations that Mr. Shook was hearing voices in his head to commit crimes.  The motion was

granted and a psychiatric examination was conducted by Dr. Edward Silverman of the Forensic

Psychiatric Services of the Harris County Jail.  On December 12, 1991 Dr. Silverman issued a

report.  During his clinical assessment with interview with Dr. Edward Silverman, Mr. Shook

reportedly made the following statement:

> He stated that shortly after he got out of jail, he started hearing Eugene's voice telling
> him, "here's the money. Go get some cocaine. Go get some rocks." He stated that the
> voice started telling him to kill people and do crazy things. He stated that sometimes he
> can resist the voice and sometimes the voice has him convinced that these things are not
> wrong.  He stated, "I feel like a Dr. Jekyll and a Mr. Hyde."  He stated that the voice gets

mad if he doesn't do what it says.  He stated that he gets headaches and feels like a time bomb about to explode. He stated that the night he got arrested, he had not done any drugs. He stated, "this is happening in a drug free environment.  He stated that the voices in his head will tell him to go get some cocaine.

During the guilt/innocence phase of Mr. Broxton's trial in 1992 the defense attorneys sought to introduce the report and cross-examine Mr. Shook about the auditory hallucinations and his statement that it was only sometimes that he was able to resist the voices telling him to kill people and do other crazy things.  The testimony was clearly both material and relevant to the defense of Mr. Broxton on the issue of guilt/innocence.  Coupled with the extensive knowledge that Mr. Shook had with the facts of the Dockens' murder/robbery and the fact that it was Mr. Shook and not Mr. Broxton who was in possession of the Dockens' stolen property and other evidence, such as the testimony of Debbie Klinkow, and lack of forensic evidence linking Mr. Broxton to the murder/robbery.

The State objected to the use of the report to cross-examine Mr. Shook unless the court would allow the State to question Mr. Shook during the guilt/innocence phase on the many extraneous offenses the State planned to prove Mr. Broxton committed during the punishment phase of the trial.  The defense attorneys argued under Rule 403, Texas Rules of Criminal Evidence that the State should be barred from questioning Mr. Shook to elicit testimony about certain statements made by Mr. Shook.  The State responded that under Rules 107 (optional completeness) and 612 (impeachment) if should be allowed to go into Shook's explanation for hearing the voices, which would include Mr. Shook's allegations that Mr. Broxton had repeatedly told him about the various crimes.  The trial court agreed with the State and given the difficult choice of allowing the State to raise unproven extraneous offenses during the

guilt/innocence phase and being able to cross-examine Mr. Shook on the voices and his own actions . As noted above, the trial attorneys did not argue any constitutional basis for allowing them to use the Shook statements on a limited basis.

What is very clear from the arguments made at the time they unsuccessfully argued concerning the limited use of the testimony and that appellate counsel then argued as a basis for overturning the conviction on direct appeal, was that the excluded  evidence had been considered a necessary and an integral, material  part of their overall strategy in defending Mr. Broxton.  The attorneys went so far as to make certain that the evidence became part of the official record by making a bill of exception to preserve error.  What the attorneys failed to do, and clearly did not take the action due to any overall reasonable trial strategy, was assert the correct objections to actually preserve the error that would be argued on appeal.

On direct appeal, appellate counsel raised as error the refusal of the trial court to allow the limited use of the Shook statements in the context of the trial court's action being a violation of Mr. Broxton's rights under the Sixth and Fourteenth Amendments of the U.S Constitution and Article 1, Section 10, 13 and 19 of the Texas Constitution.  On appeal, no doubt due to the realization that the evidence was clearly admissible under the Sixth and Fourteenth Amendments of the U.S. Constitution, rather than argue that the error was pursuant to the trial court's misreading of Rule 403, appellate counsel correctly framed the trial court's action as a denial of the right to present a defense under the Sixth Amendment and the right to due process under the Fourteenth Amendment and the Texas constitution.  The Court of Criminal Appeals rejected the claims without addressing the merits of the claims stating:

We hold that appellant's complain on appeal does not correspond to the objection made

at trial, and thus appellant did not properly preserve error. *See Ellason v. State*, 815 S.W. 2d 626, 656 (Tex.Crim.App. 1991)(appellant did not preserve error where objection to excusal of venireperson at trial was based on various constitutional provisions and complaint on appeal was that trial court improperly excused venireperson *sua sponte*); *Johnson v. State*, 803 S.W. 2d 272, 292 (Tex. Crim. App. 1990)(appellant did not preserve error where objection at trial to admission of bag of cocaine was that the State did not show that appellant exercised custody or control over the evidence and complain on appeal was that admission of evidence violated Tex.R.Crim.Evid. 404(b)). ***Accordingly, we will not review the merits of appellant's third and fourth point of error.***

*Broxton v. State*, 909 S.W. 2d at 918.[16]

The Supreme Court has held that the exclusion of third party guilt evidence violated a defendant's right by denying him a "meaningful opportunity to present a complete defense.

*Holmes v. South Carolina*, 547 U.S. 319 (2006). While the Supreme Court acknowledged that "[S]tate and federal lawmakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials,

> This latitude has its limits . . . whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'

*Id*. at 324. The rules concerning impeachment and optional completeness infringed upon Mr. Broxton's right to present evidence which was relevant to his guilt/innocence because the evidence of Mr. Shook's actions in response to auditory hallucinations and his credibility regarding that matter as well as his testimony against Mr. Broxton went to the heart of the State's

---

[16]The action of the Texas Court of Criminal Appeals in refusing to address a very viable constitutional claim on the merits by opting to find the claim procedurally defaulted for one reason or another is yet more evidence that the practice noted by Judge Holcomb in his dissent in *Ex parte Smith*, 185 S.W. 3d 455, 477 (Tex. Crim. App. 2006), quoted in footnote 2 above.

case against Mr. Broxton.  The Supreme Court has long held that a defendant must be allowed to

put forth their case and that state evidentiary or procedural rules cannot be used to prevent a

defendant from doing that without some rational basis for such rules overriding the constitutional

guarantees of the Sixth and Fourteenth Amendments.  *Crane v. Kentucky*, 476 U.S. 683, 689-690

(1986); *Rock v. Arkansas*, 483 U.S. 44 (1987); *California v. Trombetta*, 467 U.S. 479 (1984);

*Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983);; *Chambers v. Mississippi*, 410 U.S. 284,

302-303 (1973), *Washington v. Texas*, 388 U.S. 13 (1967); and *Spencer v. Texas,* 385 U.S. 554,

564 (1967).

The evidence that the defense attempted to use in the trial included the following language

from Dr. Edward Silverman's report:

> On a mental status examination, Mr. Shook was alert and oriented for person, place, and
> time.  He related to the examiner in a cooperative manner throughout the evaluation.  His
> speech was clear and coherent with no evidence of circumstantiality, tangentiality, or
> loose assocations. Mr. Shook reported that he is experiencing auditory hallucinations.
> There was no evidence of any other manifestations of psychosis.  Mr. Shook's affect was
> generally appropriate throughout the evaluation and his mood appeared to be neither
> significantly elevated nor significantly depressed.  His memory appeared to be relatively
> intact for both recent and remote events.

> In conclusion, Mr. Shook reports that he was experiencing auditory hallucinations at the
> time of the alleged offense that commanded him to purchase the cocaine.  ***When viewed
> in the context of Mr. Shook's current clinical presentation, his minimal psychiatric
> history, his extensive history of drug abuse, and his history of anti-social behavior, this
> possibility that Mr. Shook is malingering must be considered.***  If Mr. Shook was,
> indeed, experiencing auditory hallucinations, it is quite probable that these hallucinatory
> auditory experiences were a consequence of his rather chronic use of cocaine.  Most
> importantly, even if Mr. Shook was experiencing auditory hallucinations of a functional
> origin, there is no evidence to clearly indicate that his mental status was sufficiently
> impaired at the time of the alleged offense to prohibit him from appreciating the
> wrongfulness of the alleged behavior.  Therefore, it is the opinion of this examiner that
> Mr. Shook should be considered legally sane on or about the time that the alleged offense
> occurred.

*See* Exhibit 5.

Clearly, had defense counsel been allowed to aggressively cross-examined Mr. Shook about his long term drug use that pre-dated ever meeting Mr. Broxton, given Mr. Shook's detailed, although sometimes confused, extensive knowledge of the crimes that Mr. Shook implicated Mr. Broxton in and his somewhat fantastic explanation for how Mr. Broxton came to share the information with him, the undisputed fact that Mr. Shook was in actual possession of items stolen from Mr. Broxton's alleged victims, and, perhaps most importantly, Mr. Shook quickly realizing that if he provided the authorities with information to assist them in clearing many, very serious crimes from their books by implicating Mr. Broxton, he could escape jail, the results during the guilt/innocence phase of the trial would more likely than not been very different. Short of Mr. Dockens' identification of Mr. Broxton, based largely on the fact that Mr. Broxton was a black male and little more, the authorities had far more reason to suspect that Mr. Shook was the individual who killed Mrs. Dockens, particularly when one takes into account the testimony of Debbie Klinkow who placed white males in the Dockens' motel room that night, and the testimony of several others that all confirmed the approximate time that the shots that killed Mrs. Dockens and wounded Mr. Dockens were heard.

The refusal of the trial court to allow the defense to question Mr. Shook concerning the auditory hallucinations he allegedly had, along with pursuing any other evidence that addressed Mr. Shook's role in the Dockens robbery/murder within the context of the Dockens' evidence during the guilt/innocence without ruling that by doing so the door would be opened for the State to follow such evidence up with all of the extraneous offense evidence that the State hoped to use during the punishment phase clearly violated Mr. Broxton's rights under the Sixth and

36

Fourteenth Amendments.

      b. Mr. Broxton was denied his right to effective assistance of counsel under the Sixth Amendment by his trial attorneys' failure to prepare themselves on the evidentiary issue related to the Shook psychiatric evidence, limiting their ability to make the correct arguments to prevail over the State's objections and causing a procedural default of an otherwise winning appellate point.

      The constitutional errors committed by the trial court in refusing to allow questioning about the auditory hallucinations and the Silverman report were further compounded by the failure of trial counsel to render effective assistance of counsel by making the correct arguments for the admission of the evidence at the time of trial, further compounded by their failure to preserve error to insure that viable constitutional claims were preserved for appeal. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

      Pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) ineffective assistance of counsel in violation of the Sixth Amendment of the U.S. Constitution occurs if (1) trial counsel's performance was deficient and (2) where the deficient performance caused prejudice to the defendant's right to a fair trial. Prejudice has been defined as being where "there is a reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 694.

      To satisfy the reasonable probability test, the Court held that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.* at 693. The Court said that " . . . the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relief on as having produced a just result." *Id.* at 686. In sum, "[a] reasonable probability" that the outcome of the proceeding would have been different but for counsel's professionally unreasonable performance is "a probability sufficient to undermine confidence in

the outcome." *Id.* at 694.

The Supreme Court's interpretation of the prejudice requirement for *Brady v. Maryland*, 373 U.S. 83 (1963) is helpful in interpreting the *Strickland* prejudice requirement.  The Supreme Court has emphasized that the reasonable probability standard "is not a sufficiency of evidence test." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  A showing of reasonable probability does not require a "demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal.*"  Id.* at 434.  The Supreme Court stated that "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434.

In this case, at trial Mr. Broxton's attorneys clearly thought that the evidence they wanted to put forth about Mr. Shook's allegations of auditory hallucinations and the fact that Dr. Silverman thought that he might be malingering by claiming to hear Mr. Broxton directing him to commit violent, illegal acts, was important to a properly prepared defense involving a material evidentiary matter.  Given the importance of the evidence, and presumably their intent to argue the evidence during the closing arguments of the guilt/innocence phase of the trial, they should have been well prepared to argue on the point of the admissibility of the evidence and the limitations that they believed were necessary to protect their client from being prejudiced by the extraneous offenses that the State would not have to prove beyond a reasonable doubt at that point in the trial.

Clearly, the trial attorneys' arguments under Rule 403, Tex.R.Crim.Evid. versus arguing that the evidence, with limitations regarding the right of the State to raise extraneous offenses

during the punishment phase, thereby failing to preserve the error for appellate purposes was not an informed strategic decision.  To the contrary, the failure to lodge the proper arguments on evidence that the attorneys argued was central to their defense to impeach the State's primary witness to link Mr. Broxton to the Dockens' murder as well as every other crime the State alleged Mr. Broxton committed, was due to a lack of preparation on an issue that any defense attorney would have briefed before hand and been prepared to argue using the correct legal theory to prevail,  if not at trial, on appeal.

While strategic decisions made by counsel during the course of trial are entitled to substantial deference on federal habeas review, when the record reflects that the decision of trial counsel was not made as a ***conscious and informed choice***, finding that the trial attorneys actions or inactions were strategic would be wrong and instead lead to a determination that the defendant's rights of counsel under the Sixth Amendment were violated.  *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997); *Garland . Maggio*, 717 F. 2d 199, 206 (5th Cir. 1983); *Daniels v. Maggio*, 669 F. 2d 1075 (5th Cir. 1982).

The State's argument at trial concerning the "right" to introduce the extraneous offenses to explain how Mr. Shook came to have the auditory hallucinations was disingenuous, if not simply dishonest, and should have been rejected by the trial court.   The issue was not whether or not Mr. Broxton the auditory hallucinations were fact based and truthful because they were hallucinations, which by definition are not fact based and truthful.  The defense should have been permitted to cross-examine Mr. Shook regarding his alleged hallucinations and his attempt to blame his drug use on the voice of Mr. Broxton telling him to use the drugs.  The defense should have been able to prove that Mr. Shook was a junkie with a long list of arrests for drugs long

before having ever met Mr. Broxton and establish that Mr. Shook certainly did not need Mr. Broxton haunting him and compelling him to go out and commit violent crimes and use drugs. Had the jury been able to hear about Mr. Shook's efforts to shift responsibility onto the hapless Mr. Broxton the defense attorneys could have rightfully argued that it was Mr. Shook who robbed and killed Sheila Dockens after she willing allowed him to enter her motel room, just as Debbie Klinkow testified Ms. Dockens had done.  Had the defense been allowed to impeach Mr. Shook with his false claims of auditory hallucinations, coupled with the fact that it was Mr. Shook who had stolen property in his possession from both the Dockens crime and the Mr. Kreggers' car keys locked in his own car, the jury may very well have found there was reasonable doubt to convict Mr. Broxton.

A fault with the prejudice component of the *Strickland* test is that short of retrying the case before the same jury under circumstances were the attorneys' failures are erased and the trial proceeds without the errors, it is impossible to know absolutely what the outcome would have been.  But what is clear is that had the trial court been faced with ruling on the evidence in the appropriate legal context admitted the evidence for the purpose that the trial attorneys wanted to use it for and not allowed the State to scare them away from the evidence under the threat of trying the extraneous offenses during the guilt/innocence trial, the appellate issue would have been dealt with differently and a ruling in Mr. Broxton's favor would have been dictated by the actual law.   It is impossible to know how the jury would have responded to the State's case had their key witness been impeached by his claims of auditory hallucinations to avoid criminal responsibility for his long standing drug abuse but presumably the evidence would have benefitted Mr. Broxton.

What is not impossible to know from what transpired is that due to the ineffectiveness of counsel in failing to make informed, conscious decisions in how they were planning to confront the State's false arguments, the trial attorneys denied Mr. Broxton a right to effective assistance of counsel at a pivotal point in the guilt/innocence trial. The trial judge may have allowed the trial attorneys to proceed if the proper arguments had been presented and if he had not not ruled in their favor, at the very least the error would have been preserved for appeal. The trial attorneys thought the evidence was important enough to introduce it through a bill of exceptions so clearly they thought it important to the case they wanted to put on. By moving forward on the bill of exceptions, it is also clear that they thought they had a winning issue they just had not done the work to understand why.

It is also more than reasonable to conclude that had the jury heard that a trained forensic psychiatrist employed by the State, as Dr. Silverman was, was malingering in his claims that Mr. Broxton's voice was haunting him, the effect would had been that at least one juror would have considered that when Mr. Shook was faced with having to answer for how the property stolen from the Dockens found its way into Mr. Shook's locked car, he found it more convenient for his own future welfare to point the finger at Mr. Broxton. More probable than not, at least one juror would have wondered, to the overall benefit of Mr. Broxton, why Mr. Shook would continue to be roommates with Mr. Broxton after Mr. Broxton allegedly admitted to the first through fifth capital murders instead of waiting until the police arrived after the Dockens murder/robbery to have an issue with Mr. Broxton's allegedly violent streak. More probable than not, at least some of the jurors would have demanded that there be an actual discussion about who really killed Sheila Dockens and beat up and shot her husband before robbing them and hiding their stolen

41

property in his locked car.

Unfortunately, on the day when the jury should have heard the evidence, Mr. Broxton's attorney came to court unprepared to make the winning argument that was theirs to make. And more unfortunate, even if the trial judge was not disposed to follow the law on the point and admit the evidence with the limitations that should have been placed on the State, the trial attorneys were so unprepared that they failed to preserve the error for appeal so that it could be corrected and Mr. Broxton could have a fair trial with an outcome that would be reliable and trustworthy based on the actual evidence and not simply the emotional impact of the many horrific images of the crime scene, the battered corpse of Sheila Dockens, and the very sad evidence of Mr. Dockens' injuries and recovery.

What is known with absolutely certain is that the Court of Criminal Appeals refused to even consider the correct arguments raised for the first time on appeal because Mr. Broxton's trial counsel failed him by not preserving the error. In that failure the trial attorneys rendered ineffective assistance of counsel in violation of Mr. Broxton's right to effective counsel.

      b.    Mr. Broxton maintains that he is innocent of the murder of Sheila Dockens, for which he was convicted of capital murder and sentenced to death.

Since being arrested for the murder of Sheila Broxton almost twenty years ago, Mr. Broxton has maintained his innocence of that crime and all other crimes that the State introduced as extraneous offensives during the punishment phase of his trial. In fact, there is significant and compelling evidence that supports Mr. Broxton's claim of actual innocence that the jury either did not hear due to the violation of his rights under the Sixth and Fourteenth Amendment as regards to the evidence regarding Christopher Shook caused by the trial court's erroneous rulings

42

coupled with his trial attorneys' failure to preserve error by making proper objections and arguments concerning evidentiary points, both matters fully addressed herein. In addition to the issues related to Mr. Shook and his involvement with the Dockens murder and at least one additional capital murder that the State alleged Mr. Broxton committed solely based on the stories told by Mr. Shook, there is compelling evidence that there are at least three others who may fit the extremely vague description of the perpetrator of the Dockens murder who have been connected to the murder weapon used to kill Ms. Dockens, and who appear from the evidence to have been heavily involved in drug trafficking. Sustaining the conviction of Mr. Broxton on the murder of Shelia Dockens would be in violation of Mr. Broxton's rights under the U.S. Constitution.

II. **MR. BROXTON'S RIGHT TO DUE PROCESS WAS DENIED BY THE STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE CONCERNING THE DISCOVERY OF THE GUN USED TO SHOOT AND KILL SHEILA DOCKENS, WHILE THE APPEAL, PREVIOUS HABEAS PROCEEDINGS AND RESENTENCING LITIGATION WERE PENDING.[17]**

---

[17]*Concurrent with the filing of the amended habeas petition, Mr. Broxton filed a motion to compel production and conduct discovery to obtain all information that the Harris County Sheriff's Department, the Houston Police Department, the Harris County District Attorneys' Office, and any other law enforcement agencies that were engaged the investigation into the discovery of the gun and money. It is vital to the protection of Mr. Broxton's rights under the Fourteenth and Eighth Amendment to due process and to be free of cruel and unusual punishment that this information be exposed and brought to light. There was nothing in the record that suggested that Mr. Broxton had any connection to drug dealers who operated at a level where they would have collected almost $900,000.00 in money believed to be from street level drug dealing or how Mr. Broxton disposed of the gun he allegedly used to kill Ms. Dockens and shoot her husband, Waylon Dockens.*

*In responses to Open Records Act requests made by Mr. Broxton to both the Harris County Sheriff's Department and the Harris County District Attorney, the State has now produced some documentation concering the discovery of the gun, however the cover letter accompanying the documents produced by the Harris County District Attorney's Office it is specifically noted that*

43

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963) the prosecution has an affirmative duty to notify the defense of any exculpatory or impeachment evidence that is known or becomes known to the State, even after a conviction may be obtained if the evidence may raise a question about the integrity of the conviction.

Approximately two months after Mr. Broxton was convicted in the Dockens' murder case, in a very short article in the Houston Chronicle, it was reported that the gun used to shoot and kill Ms. Dockens and injure her husband, Waylon Dockens, was found along with almost $900,000.00 in small bills was located in an apartment in Channelview, a small town on the east side of Houston.  According to the news report, the money and gun went unclaimed although there were two people in the house at the time the money was discovered.  It is unclear from the article who the two people were, what connection they had to the house and the contents of the house, and, most curiously, whether or not they were even charged with any criminal activity related to the discovery of the gun and the money.  The article clearly does not indicate why they were not considered suspects in the Dockens case despite being in possession of the gun allegedly used to kill Ms. Dockens and shoot her husband, Waylon.

Clearly, the discovery of the gun along with what was reported to be an exceptionally large cache of money over a year after Mr. Broxton had been arrested for the shooting of the Dockens and the murder of Ms. Dockens is exculpatory evidence or could lead to potentially exculpatory

---

*certain undescribed documents are being withheld on the pretext that the documents are excluded from the Act because they related to pending litigation, namely this habeas litigation. In addition to the documents Mr. Broxton seeks to compel discovery to question various individuals involved in the case, obtain documents that have not previously been produced, and otherwise investigate the history of the gun from the moment it came into possession of Waylon Dockens through today.*

44

evidence.

The fact that the gun was found a year after the fact in the possession of two individuals who for unknown reasons apparently never became suspects in the Dockens case raises many questions that must be answered before Mr. Broxton can be executed.  Had the information been available to the defense during the pendency of the original case, through the appeal and habeas process, the information certainly would have raised doubt about Mr. Broxton's guilt in the Dockens' crimes.  Admittedly the information was not known to the prosecution at the time of the trial however the prosecution has a duty to make the disclose at anytime they learn of the potentially exculpatory evidence and make affirmative efforts to insure that a false conviction has not been obtained.  The prosecution made no timely disclosures to anyone connected to the defense.[18]

Since Mr. Broxton filed his First Amended Habeas Petition in this Court and following this Court's order sending the case back to the State courts, a limited amount of information was produced by the Harris County District Attorney's Office and the Harris County Sheriff's Department pursuant to Open Records requests Mr. Broxton made in an effort to more fully

---

[18]It is relevant to note that the article in the Chronicle was not a lengthy article that might attract a great deal of attention and was published long before there was widespread use of the internet or even a website for the Chronicle.  To discover the article would have required defense counsel to scour the daily papers for information about their various clients on a daily basis or it would have been missed.

The State did respond to an Open Records Act request for all documents in its possession related to the discovery and investigation of the gun and related matters that the undersigned made to both the Harris County District Attorney's Office and the Harris County Sheriff's Department.  The documents that were produced by both state offices, shed a great deal of light on what transpired concerning the discovery of the gun however according to the District Attorney's transmittal letter that accompanied the documents, the records are not complete because the District Attorney determined that due to this habeas litigation, they are not required to produce all of the files.

Case 4:11-cv-00315   Document 9   Filed in TXSD on 07/05/11   Page 46 of 101

develop the claims related to the undisclosed gun evidence. Although the cover letter from the Harris County District Attorney's Office that was sent with the documents reflects that the State was withholding some of the information in its files claiming that the documents are not subject to the Open Records request specifically because they are related to this habeas litigation. Even without the documents that the State now claims are privileged and not subject to discovery under the Open Records Act, the documents that were produced raise many questions about the legitimacy of Mr. Broxton's conviction and his actual involvement in the Dockens' murder.[19]

What is clearly compelling about Mr. Broxton's claim of innocence is the fact that shortly after he was originally convicted of the murder of Sheila Dockens in May 1992, the murder weapon was discovered in an apartment along with $888,598.00, a second gun, and a quantity of cocaine. At Mr. Broxton's trial, there was no evidence linking Mr. Broxton to the gun other than the testimony of Ms. Docken's husband, who had testified that the person who broke into the motel room the Dockens were staying in stole the gun along with other items.

During the resentencing trial, in order to avoid having to inform the defense of the recovery of the actual gun used in the killing of Sheila Dockens, and thereby opening up the issues related to how the gun found its way from the Dockens' motel room to the house with the cocaine, large stash of cash, and another gun and clearly giving the defense an opportunity to point the finger at the large black males of Mr. Broxton's approximate age that the records indicate some connection to the gun as the killer of Sheila Dockens rather than Mr. Broxton, at

---

[19] At the time that Mr. Broxton filed the federal habeas he filed a Motion to Conduct Discovery however because the federal court stayed and abated the case before the State had an opportunity to answer the habeas petition or the discovery motion, no discovery, enforceable by court order or with the aid of subpoenas, could be conducted in the federal proceedings.

trial the State offered a gun (State Exhibit 108) from the prosecutor's collection that was of the same type and caliber as the gun Mr. Dockens claims was stolen from him. *See* RR Vol. 15, p. 74, line 6 - p. 75, line 7 (November 12, 2003).  The State then went on to offer testimony of a ballasitics expert who testified that the bullet casing left behind in the motel room matched the bullet casings that Mr. Dockens' mother had furnished to the State during the initial investigation. *See* RR Vol. 15, p. 179, line 21 - p. 193, line 5.  The testimony of C.E. Anderson concerning the attempts to match the shell casings to the stolen gun provides no clue to anyone listening that the actual gun was found shortly after Mr. Broxton's original conviction in May 1992.[20]

      To further the charade that the Dockens' gun was still at large and the coverup that it had been recovered eleven years and six months earlier, the State apparently even failed to notify Mr. Dockens that the weapon used to murder his young wife had been recovered in the hands of someone other than Mr. Broxton.  On cross-examination by Mr. Broxton's attorney, Skip Cornelius, Mr. Dockens the following exchange took place concerning the gun:

Q:    The gun that was shown you earlier, are you saying that was or was not your gun?

The Court:    He testified it was similar.

The Witness:  Same or similar.

Q:    (By Mr. Cornelius) Okay. I'm just trying to pin you down.  Same or similar?  So that might have been actually your gun?

---

[20]To take the State's efforts a step further to avoid disclosing that the actual gun had been recovered in the possession of someone other than Mr. Broxton, the State offered a motion to substitute a photograph for the weapon that they introduced as Exhibit 108, so that the weapon could be returned to the State's cache of weapons.

A:      Could have been, yes.  Might not have been.

Q:      Was that gun, the one that was shown to you in court today, ever returned to you

        as being your gun?

A:      No gun was ever returned to me.

Q:      Where did you obtain the gun?

A:      I bought it from a Louisiana wildlife and fishing agent.

Q:      Okay. And Smith & Wesson pistols have serial numbers, correct?

A:      Yes, they do.

Q:      If somebody had recovered your gun, it would be pretty easy to determine whether

        it was your gun or not, wouldn't it?

A:      Yes, sir, it would.

Q:      But you never made that comparison with the gun that they showed you today in

        court?

A:      No.

        Ms. Cabaniss:  Your Honor, for the record, we will stipulate that's a gun out of the

        State's gun vault.  It's just the same or similar for demonstrative purposes only.

        We'll stipulate to that.

        Mr. Cornelius:          That's fine.

 Besides the testimony of Mr. Dockens, the only other evidence linking Mr. Dockens to

the murder of Ms. Dockens was the testimony of a drug addict, Christopher Shook, who was

found to be in possession of the property stolen from the Dockens, who claimed that he was

ordered by Mr. Broxton to dispose of the property and some property in the possession of a

48

woman who was Mr. Broxton's girlfriend at the time.  According to Mr. Shook, he lived with

Mr. Broxton at the time of the Dockens' robbery/murder and owed Mr. Broxton rent money so it

is not at all unreasonable to believe that it was Mr. Shook who robbed and murdered Ms.

Dockens and gave a purse and piece of jewelry to Mr. Broxton's girlfriend in trade for rent or

drugs, since Mr. Shook was clearly a drug addict and Mr. Broxton was a small time drug dealer.

After all, Mr. Shook actually resembled one of the men that an eye-witness, Debbie Klinkow,

testified knocked on the Dockens' motel door and was admitted into the room, without incident,

by a scantily clad Ms. Dockens shortly before Ms. Klinkow and others testified that they heard

what sounded like gunshots.

Further, it is reasonable to conclude that had the State disclosed the fact that

the gun was found in the possession of a black male other than Eugene Broxton, namely Kobie

Mendenhall, who went by an alias of Eric Goins. *See* Exhibit 2, attached hereto, Mr. Goins may

have been a plausible suspect in the robbery/murder of Sheila Dockens, but for the fact that Mr.

Mendenhall was actually in the Harris County Jail on May 16, 1992.  The fact that Mr.

Mendenhall was in custody on the date of Sheila Dockens' murder does not cut off any

connection he may have had to the robbery/murder.  It appears from the records of the Harris

County District Clerk available online and the records that have been recently produced by the

Harris County Sheriff's Department and the Harris County District Attorney in response to an

Open Records Request, Mr. Mendenhall was not completely truthful about the weapon found in

his possession and that was allegedly used in the murder of Sheila Dockens.

At the time of his arrest on June 12, 1992, when the deputies from the Harris County

Sheriff's Department responded to a call that someone had been killed at 250 Uvalde, Apt. 95,

49

Channelview, Texas.  The records indicate that the apartment was being held under a lease by a woman named Carla J. Smith.  After the Harris County Sheriff's Department received a call that a shooting/murder had taken place at th residence, several officers went to the apartment and forced their way in. Once in the apartment, the deputies found two guns, including a .44 Magnum, Smith & Wesson.  Although Mr. Mendenhall was somewhat younger than Mr. Broxton at the time of the robbery/murder of Sheila Dockens, given the enormous stress that Mr. Dockens was under at the time of the attack, robbery and murder, he could clearly have been mistaken about the assailant's approximate age.

But if not Kobie Mendenhall *alias* Eric Goins, as the assailant and murderer of the Dockens, then who?  A very reasonably suspect revealed by the discovery of the murder weapon is an individual named Carl Anthony Smith, at the time a drug dealer.  According to the investigative notes related to the seizure of the gun, cash and cocaine, Mr. Carl Anthony Smith was the brother of Carla J. Smith, the lessee of the apartment where the gun, money and cocaine were found.  Ms. Smith claimed that she had no knowledge that the locked closet of her own apartment contained a safe with $888,598.00.  According to the sheriff's report on the raid on the Uvalde Street apartment,

> "Detective Tonry asked Mendenhall who owned the gun (.44) he shot earlier in the day. Mendenhall said the gun was not his and that Carol told him that the gun would be in a dresser drawer if he needed it.  Detective Tony advised him that the gun was stolen from a complainant who as later shot and his wife was shot and killed.  Mendenhall became real nervous and said Carol Anthony Smith was Carol's brother, who was shot and killed on the freeway in March 1992.  Mendenhall said Carl was a "big time" drug dealer" and that "Smitty" came across stolen guns all the time.

In connection with the actual innocence claim that Mr. Broxton has brought in his

successor writ that his rights to due process under the Fourteenth Amendment of the U.S. Constitution were violated pursuant to both *Brady v. Maryland*, 373 U.S. 87 (1985) and *Napue v. Illinois*, 360 U.S. 264 (1959).  The State purposefully withheld information concerning the discovery of the gun after Mr. Broxton's original trial to avoid questions raised about who had actually robbed and murdered Ms. Dockens.  The case is riddled with deception through silence by the State who opted to get into bed with drug dealers, murderers, and others to secure the $888,598.00 at the expense of Mr. Broxton's freedom.  For anyone who is a regular at the criminal courthouse in Harris County, Texas, it is the exceptional day that someone who is discovered in a house with $888,598.00, a stolen gun used in a capital murder, and cocaine was not charged with any crime however there is no explanation in the records why Mr. Mendenhall or the female who was with him in the house at the time of the raid were not charged.  There is also no explanation why Carla Smith, the lessee of the apartment was not charged with any crimes for having possession of a stolen gun and cocaine locked in her home, despite the fact that Mr. Mendenhall informed Detective Tonry that Ms. Smith had informed him that the stolen gun was located in the dresser should he need one.  Further, as discussed below, there is nothing in the records produced thus far to explain why Detective Tonry apparently accepted as true that Carl Anthony Smith had been murdered in March 1992 when apparently he had not been murdered and was still a "big deal drug dealer".   These are indisputable facts that should give pause to anyone familiar with the ways of the criminal justice system and suggest that before Mr. Broxton is executed, a closer look must be taken as to exactly what really happened because what is certain to anyone with criminal law experience, something is wrong with the picture in its current state.

Contrary to Mr. Mendenhall's claim that "Smitty" was murdered in a freeway shooting in March 1992, it appears from the Harris County District Clerk's office that he was alive and well and committing crimes, including dealing crack cocaine, well after his "death". *See* Exhibit 3. Mr. Broxton's attorneys would have had no way of knowing about Mr. Medenhall or Carl Smith and their connection to the gun, however the State clearly knew about them both.  The same Detective Tonry that interviewed Mr. Mendenhall was a key player in Mr. Broxton's trial and testified in both 1992 and 2003.  During his testimony at the 2003 sentencing trial, Detective Tonry continued the fiction that the exemplar gun that the State had introduced as Exhibit 108 was necessary because the actual gun was unavailable.  Apparently, the need to keep the discovery of the gun was so important to the State's attorneys trying the case that nobody connected to law enforcement notified Mr. Dockens that his own gun that had been used to kill his young wife had been discovered along with a large amount of drug money and drugs in the possession of someone other than Eugene Broxton, perhaps out of concern that Mr. Dockens might make a claim for the $888,598.00 or perhaps just so Mr. Dockens continued to have no doubt that he had mistakenly identified Mr. Broxton as his assailant rather than Mr. Smith, who again was of a similar race, age and build as Mr. Broxton.  Whatever the motive in not disclosing the discovery of the gun to Mr. Dockens or Mr. Broxton's attorneys is uncertain until the prosecutors in the case and the detectives responsible for investigating the crimes can be cross-examined under oath and asked the questions taht are clearly raised by the discovery of the gun and the acceptance of the of the Smith clan's story.  The State filed a fortfeiture lawsuit to secure the money for the state's uses and perhaps the District Attorneys office and the Sheriff's department were so anxious at the prospect of keeping the money without any questions being

52

asked, they chose to look the other way at the criminal activity of the Smiths and Mr.

Mendenhall.   *See* Exhibit 4.  The forfeiture  however the State failed to disclose the discovery of

the gun which clearly raises issues of potentially exculpatory evidence and impeachment

evidence.

The one explanation offered in the records produced in response to the open records

request was a statement from a known criminal named Thaddious Goins, who apparently stated

that he had purchased the gun from Eugene Broxton, whom he recognized from the television

news.   Again, strange coincidences or facts that really are connections are raised by the inclusion

of Mr. Goins in the chain of custody presented by the records.   They are:

a.  Harris County District Clerk records reflect that Mr. Mendenhall uses the name Eric

Goins as an alias, the same last name as Thaddious Goins, and not a particularly common

name.

b.  At one point, Mr. Goins, Carla Smith and Carl Smith  were all attorneys who worked

for the same law firm as retained counsel, not appointed counsel.

c.  There is no indication in the records how Thaddious Goins happened to come into

contact with Carl Smith whose sister was apparently close enough to Mr. Mendenhall that

she would turn over the keys of her apartment that contained $888,598.00 in cash,

cocaine, and a stolen gun used in a capital murder that she was making available to shot

at people who might break into the apartment.

d.  That all of law enforcement apparently had so little interest in getting to the bottom of

how there happened to be a shoot out at 250 Uvalde, Apt. 95, that there was no follow up

to determine the who, what and why Mr. Mendenhall came to be taking shots at two

masked men who broke into the apartment demanding money and drugs earlier in the day on June 12, 1992.

Clearly, the Smith/Goins/Mendenhall gang were engaged in dangerous, high level drug dealing and for some inexplicable reason when it came to pursuing the true answers to how they came into possession of the gun stolen from Mr. Dockens, law enforcement chose to remain ignorant or at least not document and prosecute anyone who a jury in Mr. Broxton's case should have certainly heard about. It was information that should have been immediately turned over to Mr. Broxton's original defense attorneys, appellate attorneys and original habeas attorneys and it was not turned over to them when the information was fresh and leads could have been pursued when people were still available. Instead the State breached their ethical and legal duties to disclose the information under both the Code of Professional Conduct and *Brady v. Maryland*. When the retrial of the sentencing phase took place and the State went forward with presenting a case involving testimony concerning the gun that clearly left a false impression with the jury about the possible history of the gun, the State violated its obligations under *Napue v. Illinois* and the cases that have followed it which place a heavy penalty on the State for creating or allowing a false impression actual falsity to be left with the jury.

At this point, the solution is that this Court allow the record on the successor writ that raises these issues to be expanded to include all information currently available concerning the gun that was recently produced in response to Mr. Broxton's open records request. This Court must also order the State, and any agency that might have information concerning these matters to stop playing hide and go seek with the records it has chosen to withhold from production in response to the open records request. This Court must also send the successor writ back to the

54

trial court to allow for full and fair consideration, with direction to the trial court that Mr.

Broxton must be allowed to conduct discovery by enforceable subpoena to compel individuals

and agencies to comply with the requests, and after full discovery is allowed, including providing

funds for an investigator to assist in the discovery efforts, a full and live hearing where witnesses

can be cross-examined, he held to get to the actual truth.

Had a jury been exposed to the extremely material facts disclosed in the article, it is

reasonable to conclude that the outcome of the trial would have been different and Mr. Broxton

would not have been convicted without the prosecution showing a clear, unbroken line of

possession of the gun between Mr.  Broxton and the unidentified people who were found with

the gun a year later.   Short of the State producing evidence directly linking Mr. Broxton to the

gun, the prejudice prong of Brady should be considered presumptively established because

without such a link, reasonable doubt that Mr. Broxton was the killer must be considered a

foregone conclusion, just as the two people who were later found in possession of the gun should

be considered the primary, most appropriate suspects in the Dockens' crimes.

Further, had the jury been allowed to hear the far-fetched claims of Mr. Shook and

learned more of his motivation to be a compliant witness against Mr. Broxton, testifying to fill in

whatever gaping holes that were in the prosecution's case in not only the Dockens' crimes but

the extraneous offensives that Mr. Broxton allegedly committed, coupled with the evidence about

the gun being located a year later with a large quantity money with the prosecutors have no

explanation for how the gun allegedly owned by Mr. Broxton came to be in the house a year after

he had been arrested and detained in the county jail,  it would have been impossible for the

prosecution to overcome its burden of proof beyond a reasonable doubt that Mr. Broxton was

55

the perpetrator of any of the crimes.

Had the information concerning the gun been presented to the defense attorneys in a timely fashion, they presumably would have responded in an appropriate manner and demanded that a full and complete investigation be conducted to determine how the gun came to be in the possession of the two individuals and been in a position to attack the legitimacy of the conviction when the evidence was fresh and leads could be developed. Now, almost twenty years after the fact, it is time that a grievous injustice, i.e., Mr. Broxton's wrongful conviction, be corrected and that the downward spiral that has been Mr. Broxton's life since the moment of his conception to a life of poverty, neglect, and misfortune be corrected.

> ii.  The State violated Mr. Broxton's rights under the Fourteenth Amendment under *Napue v. Illinois* by failing to disclose the evidence concerning the gun

In addition to the duty imposed by *Brady v. Maryland* to disclose exculpatory and/or impeachment evidence or evidence that might lead to exculpatory or impeachment evidence, the prosecution has a more profound duty to insure that individuals are not falsely convicted pursuant to the *Napue v. Illinois* and the line of cases addressing intentional prosecutorial misconduct. Like the duty of disclosure under *Brady v. Maryland*, the duty under *Napue v. Illinois*, 360 U.S. 264 (1959), is a continuing duty, even after an individual may have been convicted.

While the State will no doubt argue that its failure to disclose all evidence concerning the discovery of the gun and money shortly after was inadvertent, requiring Mr. Broxton to meet the heavier burden of proof of prejudice required under Brady v. Maryland than the less demanding test under the Napue line of cases, the Harris County District Attorney's Office does have a history of withholding evidence that could prove exculpatory and damaging highly prejudicial to

its ability to secure and maintain an otherwise false conviction.

Only a few years prior to Mr. Broxton's original trial, in a very similar situation to what appears to be the case in Mr. Broxton's case, the State prosecuted an individual named

Anibal Garcia Rousseau.[21]  Despite Mr. Rousseau insistence that he was not the person who committed a capital murder in Houston, the Harris County District Attorney's Office obtained a conviction and death sentence against Mr. Rousseau.  Years later, while Mr. Rousseau languished on death row, his federal habeas counsel learned that the gun the actual gun that had been used in the murder Mr. Rousseau was convicted of committing was not the gun that had been introduced at trial and had been used in another murder by someone while Mr. Rousseau was already in jail.  Chuck Rosenthal, one of the attorneys responsible for trying Mr. Rousseau, did not fulfill his ethical and legal duty to reveal the evidence that would have exculpated Mr. Rousseau of the murder.  Mr. Rousseau died on death row of natural causes prior to a legal conclusion of his habeas proceedings putting an end to the proceedings but what is known is that the ballistic testimony used by the State at his original trial was false and although the prosecution did not necessarily know that the testimony was false, upon learning it was false after Mr. Rousseau had already been sent to death row, the prosecution failed to fulfill its duty to bring the falsity to light to insure that corrective action could be taken.

The Harris County District Attorney's Office was also responsible for the introduction of false ballistic testimony being introduce in the capital murder trial of Nanon Williams.[22]  In the

---

[21]See Exhibit 7, attached hereto.

[22] *See Williams v. Thaler*, 756 F. Wupp. 2d 809 (S.D. Tex. 2010).

Williams case, even after it became clear that the HPD weapons examiner had lied about the weapon the State alleged Mr. Williams used to commit a capital murder, the State continued to argue that the conviction must stand and attempted to deny any complicity in the matter.  After spending seventeen years (half of his life)  in prison and protracted habeas litigation, in November 2010 Mr. Williams conviction was finally overturned by the U.S. District Court.

### III.    IN THE COURSE OF THE RETRIAL OF MR. BROXTON'S SENTENCE, MR. BROXTON SUFFERED A DENIAL OF HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL PURSUANT  TO THE SIXTH AMENDMENT

In *Strickland v. Washington*, 466 U.S. 668(1984), the U.S. Supreme Court held that a claim of ineffective assistance of counsel requires a defendant to show that (1) counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defendant by depriving him of a trial whose result was reliable.  *Id.*, at 687. Certain errors of counsel amount to a Sixth Amendment violation only if a reasonable probability exists that, but for counsel's unprofessional errors, the outcome of the proceedings would have been different. *Id.,* at 694.  The Supreme Court explained in *Strickland* that, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The standard of ineffectiveness of counsel under the Sixth Amendment was further expounded upon by the Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995).  In *Kyles*, the Supreme Court held that the "touchstone" of the prejudice test in ineffective assistance of counsel claims is not whether or not there would be a reasonable probability of a different result, but whether the defendant received a fair trial, understanding that to mean a trial resulting in a

verdict worthy of confidence. *Id.*, at 434.  The Court further stated that the resulting prejudice from ineffective assistance of counsel is not determined on a point by point examination of the record but by a review of the entire record considered collectively, to gauge defense counsel's overall performance and the effect the collective errors had on the trial. *Id*., at 436.

The prejudice issue was further clarified by the U.S. Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495 (2000), wherein the Supreme Court found that the state court's decision "turned on its erroneous view that a 'mere' difference in outcome is not sufficient to establish constitutional ineffectiveness of counsel. *Id.*, at 1515.  The Supreme Court additionally found that the state court's decision was an unreasonable application of *Strickland* because the state court failed to evaluate the totality of the available mitigation evidence adduced at trial and I the habeas proceedings, although the Supreme Court affirmed the conviction because it found that in the particular case before it, the unpresented mitigation evidence did undermine the prosecution's death-eligibility case or the finding of future dangerousness.  The Supreme Court however stressed that in other cases that it may very well be appropriate to present a broad range of mitigation evidence during a punishment trial.  The Supreme Court stated, "[M]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id.*, at 1516.

The question for habeas review is what to what degree of evidence of prejudice a habeas petitioner demonstrate to support a finding of ineffective assistance of counsel that would violate the petitioner's right to counsel under the Sixth Amendment related directly to the *performance* of trial counsel versus to what the habeas reviewing court can presume prejudice.  The courts have held that in certain circumstances, where trial counsel's conduct is so deficient, prejudice

must be presumed.  In *United States v. Cornic*, 466 U.S. 648 (1984), the Supreme Court held

that:

> The right to effective assistance of counsel is . . . the right of the accused to require the
> prosecution's case to survive the crucible of meaningful adversarial testing.  When a true
> adversarial criminal trial has been conducted - even if defense counsel may have
> made demonstrable errors - the kind of testing envisioned between adversaries, the
> constitutional guarantee is violated.  As Judge Wysanski has written: "While a criminal
> trial is not a game in which the participants are expected to enter the ring with a near
> match in skills, neither is it a sacrifice of unarmed prisoners to gladiators. *United States
> ex rel. Williams v. Twomey*, 510 F. 2d 634, 640 (7th Cir.), *cert. denied sub nom. Sielaff v.
> Williams*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed. 2d 109 (1975).

*Id.*, at 657-58.

The Supreme Court reaffirmed its position regarding the presumption of prejudice under

certain circumstances in *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843 (2002).  Since *Strickland*,

the litigation has focused on exactly what the standards are  that the Supreme Court set under

*Strickland*.  In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003), the Supreme Court

clarified what level of performance is expected of defense counsel in a capital case where the

defendant is facing death.

It is notable that in *Wiggins*,  the Court made a specific point that the its decision in *Wiggins*

was not an announcement of any new rules but was reiterating its previously held view that since

*Strickland* and under the AEDPA, the ABA *Guidelines* for Appointment and Performance of

Counsel in Death Penalty Cases (1989) were the guideposts for reviewing trial counsel's efforts.

The Supreme Court made a specific point of making clear that the lower courts were not to rely

on *Teague v. Lane,* 489 U.S. 288 (1989) in barring claims that relied in part of *Wiggins*.   In

*Wiggins*, the issue before the Court was "whether the investigation supporting counsel's decision

not to introduce mitigating evidence of Wiggins' background *was itself unreasonable*."  *Id.*, at

2536. The Supreme Court stated:

> In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.' *Id.* (Quoting *Strickland,* 466 U.S. at 688).  In this case, where counsel had only limited records available and did not investigate further, counsel's conduct 'fell short of the professional standards that prevailed in Maryland in 1989', because no 'social history report' was prepared even though counsel had funds available to retain a 'forensic social worker.

*Id.,* at 2536.

In *Wiggins*, the Supreme Court went on to say:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) - standards to which we have referred as "guides to determining what is reasonable."  *Strickland*, *supra*, at 688.; *Williams v. Taylor*, *supra*, at 396.  The ABA Guidelines provide that investigations into mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases 11.4.1©, p. 93 (1983)(Emphasis added).

*Id.*  The Supreme Court went further in explaining its reasoning in assessing whether or not,

given the nature of the performance of counsel in conducting such things as investigations into

mitigation issues, the record  reflects evidence that whatever claims that the approach taken by

counsel was based on some strategic reason, is reasonable.  The Supreme Court stated:

> In assessing the reasonableness of an attorney's investigation, . . ., a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.  Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.*, at 2538.

The Supreme Court reasoned that counsel must be in a position to make a reasonable

strategic choice that is supported by evidence that was developed after a thorough investigation so that trial counsel's ultimate strategy was based on informed decision making and not simply by gut reaction or routine. *Id.,* at 2543. The Supreme Court stated that in "[A]ssessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id.,* at 2542. Citing to its earlier decision in *Williams v. Taylor*, the Supreme Court said that in reviewing the cases, the courts must "[E]valuate the totality of the evidence – 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s]'". *Id.,* at 2542.

Ultimately, the Supreme Court in *Wiggins* stated that the determination by the courts must be whether a state court review of the conduct of counsel at trial was objectively reasonable in applying the *Strickland* standards (under AEDPA standards). In reviewing the lower court's decisions, the Supreme Court stated that the state courts had been objectively unreasonable in its application of *Strickland* because the state court did not:

> conduct an assessment of whether the decision to cease all investigation . . . actually demonstrated reasonable professional judgment. The state court merely assumed that the investigation was adequate. In light of what the . . . [available] records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully formed decision with respect to sentencing strategy impossible.

*Id.* The state court decision was also found to be an unreasonable application of the facts to the law because the state court erroneously concluded there was evidence that was proven incorrect by clear an convincing evidence as required by 28 U.S.C. § 2254(e)(1). *Id.,* at 2539.

Within the framework set forth by the Supreme Court in *Strickland* and the subsequent cases cited above, this Court must examine the conduct of defense counsel in this case to determine if the representation of Mr. Broxton at trial was reasonable and within the bounds of the guidelines established by the ABA, cited with approval by the Supreme Court, most recently

in *Wiggins v. Smith,* 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005).  The only reasonable conclusion that this Court can reach after a review of the actions, or inactions, of defense counsel at both stages of the trial, was that defense counsel failed to provide meaningful, effective assistance of counsel on the most fundamental level.

Following the analysis required by *Strickland* and its progeny, this Court must determine whether or not the failure to meet the most basic standards of representation so that the result was unreliable, the effect of which was that Mr. Broxton now awaits execution.  The only reasonable conclusion that can be reached by this Court is that Mr. Broxton's right to counsel under the Sixth Amendment was violated.

As in every case that receives the level of scrutiny a death penalty case receives through both the appellate and  the habeas process, habeas counsel can sift through the record and pick apart what trial counsel did or did not do at trial to develop a narrative that makes a case for an ineffective assistance of counsel claim by second guessing every decision that trial counsel. Many argue habeas counsel would not be doing their job if they fail to make such a claim because no litigant in any type of case has a perfect trial even when there may be an acquittal. However, creative lawyering is not necessary in this case.

This is a case where the actions of the defense attorneys were so patently negligent that the old tort law concept of *res ipsa loquitor* is the only appropriate way to view what transpired at trial.   This is a case where the lack of effort by trial counsel, or perhaps the decisions they made were so fundamentally flawed, that this Court must once again step in and overturn a conviction and/or sentence because the record reflects that Mr. Broxton truly was not represented by counsel at trial even when though his attorneys were present in court.

It has been said that the right to counsel requires that the prosecution's case survive the crucible of meaningful adversarial testing. *United States v. Cronic*, 466 U.S. 648 (1984), *citing to United States ex rel. v. Williams v. Tomey*, 510 F. 2d 634, 640 (7th Cir.), *cert. denied sub nom. Sielaff v. Williams*, 423 U.S. 876, 96 S. Ct. 148, 46 L. Ed. 2d 109 (1975). That was not done in this case. Instead of putting forth a meaningful defense that tested the State's arguments that Mr. Broxton would pose a future danger to society despite his long history of near perfect behavior behind bars in a setting where not walking fast enough or having too many soap bars in their cell can be cause for disciplinary action, Mr. Broxton's attorneys put forth evidence to prove the State's case on future dangerousness by relying on the same expert that the State had used to prove the point in the original sentencing trial and whom a judge on the Court of Criminal Appeals had only a year earlier referred to as a skunk in the jury room that emitted a stench so strong it could not ever be removed. *Ex parte Smith*, 70 S.W. 3d 873, 893 (Tex. Crim. App. 2002).

In this case, the trial counsel on the retrial were faced with a difficult task of representing a defendant who had already been found guilty of a very serious crime and the focus should have been two-fold. First, trial counsel should have aggressively made every effort to limit as much damning testimony concerning the actual crime as possible, coupled with putting the State to the task of actually carrying their burden of proof on each and every extraneous offense that the State introduced to vilify Mr. Broxton. The second effort had to be to bring forth sufficient evidence that would convince at least one juror that Mr. Broxton's life was worth sparing. The evidence is clear that defense counsel had no strategy in achieving either of these goals.

Clearly, there were lapses by counsel in their efforts to put the State to task to *actually prove*

the extraneous offenses the State would be relying upon to prove future dangerousness,  the efforts to put forth a meaningful mitigation case will be discussed first because the error was  so profound that arguably, it would not have mattered how successful the defense was in defending against the extraneous offenses, had the expended such efforts, they would have been negated by their own case for  mitigation.

The State's case during the punishment trial should have held no surprises because the State had already put on its best effort during the 1992 trial.  What the defense was presented with was a do-over to carefully examine the State's case and develop the mitigation case using a more modern approach than what may have been expected in 1992 since over the eleven years that elapsed between the two trials, the nature of capital defense had dramatically shifted.[23] Rather than seize the opportunity that his Court handed the defense in its 2002 grant of a new sentencing trial,  the defense attorneys assumed the mantle of the prosecution to assure that the ultimate result would be the same as if this Court had not intervened.

a.      Previous counsel was ineffective in not discovering the recovery of the gun.

As more fully discussed hereinabove, while the government clearly had a duty under both *Brady* and *Napue* to make certain that as soon as the gun was discovered and the investigation into the gun established that there were at least four other men who were in some way associated

---

[23]Mr. Broxton's own case reflects some of the significant changes in capital habeas litigation.  While testimony such as the constitutionally offensive testimony Dr. Quijano or that of James Grigson, M.D., who became known as "Dr. Death", *see Law: They Call Him Dr. Death*, Time Magazine, June 1, 1981,  regularly gave in support of the prosecution in case after case easily passed muster at the time of the 1992 case came to be recognized as being wholly inappropriate and unacceptable.  Other major shifts in what was constitutionally accepted took place making it no longer acceptable to send the mentally retarded and under-aged to the death chamber.

the gun used to kill Ms. Dockens, the information should have been fully disclosed to the defense

and any false impressions that had been made due to the belief that Mr. Broxton had stolen the

gun after using it to kill Ms. Dockens should have been corrected and Mr. Broxton should be

granted a new trial on guilt/innocence and punishment based on those violations.   The reality

however, as demonstrated in the *Williams v. Thaler* case, to the very limited extent that relief is

ever granted in capital habeas litigation, it is apparently more palatable for the courts in the Fifth

Circuit to find fault in defense counsel for failing to uncover prosecutorial misconduct as the trial

is progressing than find that prosecutors and various state agents do not always act in accordance

with the defendant's right to a fair trial and due process.

   While it may not be realistic to hold original trial and habeas counsel accountable for

failing to discover that the authorities had recovered the gun stolen from the Dockens and used to

kill Ms. Dockens, by the time of Mr. Broxton's sentencing retrial, computer assisted research and

the availability of information online had progressed to the point that Mr. Cornelius, Mr. Moran,

and Mr. Wheelan should have discovered the information and used it to their client's advantage

although given that the evidence concerning the gun goes to the integrity of the original

conviction, which had not been overturned by this Court, it is unclear exactly what avenues of

redress may have been available at the time had the attorneys had the information.   It is also

unclear whether or not the State courts would have compelled the state to turn over the entire

files regarding the gun and given the State's conduct in the *Williams* case and others where there

has been demonstrated evidence of prosecutorial misconduct, making the State habeas process

meaningless and futile.   The State apparently does not believe and has never believed that the

discovery of the murder weapon in the hands of others who were clearly engaged in serious

criminal activity demonstrates that the State's idea of what compliance with *Brady* and *Napue* requires and it far different than what most defense counsel would consider acceptable compliance.

To the extent that trial and previous habeas counsel failed to discover and aggressively litigate the issues related to the discovery of the gun, they failed to provide Mr. Broxton with effective assistance of counsel.  Previous counsels' failures in discovering the gun evidence clearly prejudiced Mr. Broxton on many levels.  Had trial and/or habeas counsel from the original proceedings discovered the gun evidence Mr. Broxton would have been in a position to challenge his conviction on a very meaningful level when the evidence was new and fresh and leads could have been followed.  Twenty years later, following up on the leads provided by the old police files is difficult at best, with memories faded and witnesses no longer available.

Had previous trial counsel learned of the gun evidence in preparation of resentencing trial, had the gun evidence been available, the State's case would have likely been far different since much of the State's case relied upon reintroducing the same case that had been put on during the guilt/innocence phase of the original trial, coupled with the extraneous offense evidence that the State introduced.  As noted in the discussion above concerning the *Napue* and *Brady* claims arising out of the gun evidence, the integrity of the State's guilt/innocence case would have been highly suspect if defense counsel could have pointed to at least four other potential killers, in addition to Mr. Shook, by putting the State to the task of establishing a chain of custody of the gun between Mr. Dockens and those that were in the apartment in Channelview, that in someway clearly involved Mr. Broxton.  If the State could not have put the gun in the hands of Mr. Broxton and getting it to the Channeliew group, the defense counsel could have successfully

67

have challenged the integrity of all of the extraneous offenses because the jury would have been far more receptive to the idea that Mr. Broxton had been wrongfully convicted years before.

In any case, the relevant issue is not whether the gun evidence was not available because the Government violated Mr. Broxton's rights to a fair trial and due process by suppressing the gun evidence or that Mr. Broxton's right to effective assistance of counsel was violated because his previous counsel did not discover the prosecutorial misconduct in a more timely manner and aggressively fight to hold them accountable, the relevant issue is whether or not the conviction and death sentence can stand when there were the entire adversarial process was broken, as happened in this case for the past twenty years.   All evidence points to the fact that someone other than Mr. Broxton committed the robbery/murder of Sheila Dockens and the conviction and death sentence must be overturned.

>           b.        Defense counsel was wholly ineffective by relying on Dr. Walter Quijano

Perhaps the most egregious and truly puzzling aspect of the defense case presented during the 2003 sentencing trial was the decision by defense counsel to engage Dr. Walter Quijano as the expert witness to testify on Mr. Broxton's mental health status and provide the jury with the answer to the most critical issue of in a capital murder/death penalty case:  does the defendant pose a future danger to society.  For the death sentence to be imposed,  the jury must answer in the affirmative and history shows that typically once that question is answered yes,  whatever mitigation evidence that might be considered under the third special issue short of proof of mental retardation,  a defendant in Harris County is going to receive the death sentence.[24]

Although both attorneys who represented Mr. Broxton during the punishment retrial must

---

[24]Tex. C. Crim. Proc. requires that the jury answer the following special issues:

bear full responsibility for what took place throughout the entire trial,  from the record, it appears

that Tom Moran was the attorney in charge of marshaling the evidence related to the two experts

that the defense put forth to mitigation evidence to offset the State's case on future

dangerousness.  *See* Vol. 16, Nov. 13, 2003, pp. 171-217(testimony of Larry Fitzgerald) and pp.

153 - 171 and 304 - 326(Testimony of Walter Quijano, Ph.D.).  These two witnesses were the

only witnesses during the retrial that Mr. Moran questioned.  In reviewing any trial from start to

finish, varying degrees of fault can be found with any attorney's efforts.  Mistakes are made

during a trial, however what transpired during the testimony of Dr. Quijano, under both direct,

cross and redirect, was remarkable in the scope of its inappropriateness for any defense witness.

*See* Exhibit 2, Affidavit, Kenneth Williams, attached hereto.

　　At the time of Mr. Broxton's retrial, Mr. Moran had a history with Dr. Quijano that went

beyond Mr. Broxton' case.  Not only had Mr. Broxton and several other capital murder

defendants had their conviction overturned due to the constitutionally offensive testimony of Dr.

Quijano, all of whom Mr. Moran should have had at least a general awareness of,  Mr. Moran

had also represented Victor Hugo Saldano, in habeas litigation that involved the State sponsored

testimony of Dr. Quijano.

　　In *Saldano v. Texas*, 530 U.S. 1212 (2000) the U.S. Supreme Court vacated the judgment

against Mr. Saldano and sent the case back to the State courts based on the confession of error by

the State arising out of the same constitutionally offensive testimony of Dr. Quijano had provided

in Mr. Broxton's original trial.  In *Saldano*, the State had taken the almost unheard of action of

confessing constitutional error.   On remand, despite the State's confession of error, the Texas

Court of Criminal Appeals continued to skirt the issue of the violation of Mr. Saldano's

constitutional rights to a fair trial, rejecting the State's confession of constitutional error despite earlier rulings of the federal courts on the issue relying on a procedural argument.[25]

In developing a trial strategy for presenting Mr. Broxton's defense in the retrial, Mr. Moran should have been fully informed by what had lead to the retrial, as well as the very profoundly unusual language concerning Dr. Quijano that is found in Judge Price's dissenting opinion in the Saldano case. It is rare for an attorney doing capital habeas cases to work on a case where language such as that used by Judge Price in his dissent in the *Saldano* case ever appears in support of a habeas petitioner's case. The language used by Judge Price to describe Walter Quijano's testimony in the Saldano case is the type that becomes legend amongst habeas attorneys and often, beyond that small group and into the mainstream. In *Saldano*, in describing Dr. Quijano's testimony, Judge Price stated the following:

> The majority beings by discussing the Attorney General's authority to represent the State and to confess error in proceedings before the United States Supreme Court. I think we need not address these issues. ***Dr. Quijano's testimony during the punishment phase of the appellant's trial drew a correlation between the appellant's race and incarceration rates. I would hold that the admission of this evidence was fundamental error, which should be reviewed even in the absence of a trial objection.***

> The only relevant inference to be drawn by the jury from the evidence at issue was an impermissible one. Hispanics are dangerous because they are over rpresented in the prison population. The appellant is Hispanic. Therefore, the jury could have concluded,

---

[25]The majority opinion in *Saldano v. Texas*, 70 S.W. 3d 873 (Tex.Crim.App. 2002) is yet another excellent example of how meaningless, non-productive, and truly futile a trip through the Texas state court habeas process can be in a capital murder/death penalty case can be. In *Saldano,* the majority of the judges on the CCA, including Judge Holcomb, used procedural arguments to deny relief in a case that even the Attorney General was arguing should be reversed. Remarkably, the CCA put the burden on the Attorney General to actually argue that he had the legal authority to fulfill his ethical duties not to argue positions contrary to the law, and defend a death sentence that the Attorney General agreed was obtained in violation of the U.S. Constitutional guarantee to a legitimate trial and then rejected the Attorney General's arguments and denied relief.

the appellant constitutes a future danger.

*The analogy of a skunk in the jury box is instructive.  Racial prejudice can sneak into the jury box while making the jury's verdict on punishment seem legitimate.*

*By design, the decision that a capital sentencing jury makes is a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.'" This range of discretion creates "a unique opportunity for racial prejudice to operate but remain undetected."  We need to guard jealously the sentencing phase of a capital trial to keep prejudice from ruining the process.*

*It is our job to be sure that racial prejudice is not, in any way, a component of the jury's decision to impose the death penalty.  Texas Rule of Evidence 103(d) provides a vehicle by which we can review fundamental error, we explained that, in our system, three kinds of rules exist: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request."  If the right to a capital sentencing proceeding without the tied of racial prejudice is not right that requires, at least, an affirmative waiver, it out to be.*

*That the State did not emphasize this unfairly prejudicial evidence in its closing arguments does not affect the analysis.  A skunk whether hurled or merely tossed into the jury box still fouls the air.*

*That there may have been ample evidence supporting a finding of future dangerousness and that there were factors other than race included in Dr. Quijano's testimony are of no moment.  If a skunk is allowed into the jury box, nothing will remove its stench.* [Cites omitted, emphasis added].

*Saldano v. Texas,* 70 S.W. 3d 873, 893 (Tex.Crim.App. 2002).

Clearly, it is possible for a busy attorney such as Mr. Moran, who works on both trials, direct appeals, and habeas  to miss an opinion issued by the Texas Court of Criminal Appeals.  It can happen to any attorney.  It is even more possible for even a well regarded attorney to skip over a random dissenting opinion, unless of course they were actually the attorney of record in the case where the dissenting opinion was issued, as was the case of Mr. Moran and Judge Price's dissenting opinion in *Saldano.* Mr. Moran represented Mr. Saldano in the federal habeas proceedings that followed the State proceedings referenced above, where Mr. Moran succeeded

in obtaining a reversal of Mr. Saldano's sentence due to Dr. Quijano's testimony.  *Saldano v. Cockrell*, 267 F. Supp. 2d 635 (E.D. Tex. 2003).

Despite having prevailed in the *Saldano* case, Mr. Moran apparently decided that there would be no expert better to call in defense of Mr. Broxton than the same Walter Quijano who had been described just a year earlier as a sunk in the jury room who had emitted a stench so strong and offensive that could not be removed. Mr. Moran made this decision without consulting with Gina Vitale, the mitigation specialist that had been employed to assist the trial attorneys in putting together the mitigation portion of the trial, including to assist in dealing with psychiatric experts.   According to Ms. Vitale  she had no direct dealings with Mr. Moran concerning work on the case. *See* Exhibit 4, Gina Vitale, affidavit.

Judge Price described the stench as being so strong that he was moved to find that whatever extraneous offenses the defendant may have committed, became secondary to the stench of the offensive testimony of Dr. Quijano.  Yet, despite the stench carried by Dr. Quijano in both the *Saldano* and Broxton case, Mr. Moran made the inexplicable decision to employ him to testify on behalf of Mr. Broxton on the very same issue that he had offered his offensive, racist testimony during the retrial.

In assessing whether or not defense counsel fulfilled their obligations to provide effective assistance of counsel, this Court must first consider the time table of employment of the defense team, including not only the attorneys, but the investigators, experts, and mitigation specialists that would be needed to assist in the preparation of a complex case such as one where the defendant is going to plead guilty to a crime that may carry the death penalty, meaning all energy must be focused on developing a mitigation case on punishment.  *Wiggins, supra.*  and *Rompilla*

72

*v. Beard,* 545 U.S. 374 (2005)(holding that due process demands that under the Sixth

Amendment, trial counsel must fully investigate and prepare a defense).

In this case, it must be assumed from the very beginning of Dr. Quijano's testimony that Mr.

Moran did little to prepare himself for the testimony his handpicked key expert witness would

testify to.  Early in the direct examination, after Dr. Quijano was asked about his "qualifications"

the following testimony was provided under Mr. Moran's questioning suggests that if there was

any discussion between the attorney and the expert, it was as superficial as is possible:

> Q:    Have you previously testified in the case of the State of Texas versus Eugene
>       Alvin Broxton?
>
> A:    Yes.
>
> Q:    That was when?
>
> A:    About 12 years ago.
>
> Q:    Who asked you to testify at that time?
>
> A:    At that time, I was requested to testify by the State.
>
> Q:    In fact, one of the two prosecutors was Mr. Hawkins sitting right there, wasn't it?
>
> A:    I don't remember Mr. Hawkins, but - - I know him, but I don't remember he was
>       involved in that case.
>
> Q:    Okay.  And I was one of the defense lawyers back then?
>
> A:    Oh, I did not know that either.
>
> Q:    I thought I made a better impression on you then.

*See* Vol. 16, November 13, 2002, p. 157, lines 10-25.

This exchange raises question about the extent to which Mr. Moran engaged in any

dialogue that would normally be expected between an attorney preparing any case, much less one where the stakes are the life and death of the attorney's client, and the primary witness. One must ask in what world it is that Mr. Moran lives, where the fact that they had both participated on the opposite side of the same case is apparently not even mentioned until the witness is actually testifying.   It should be equally troubling to this Court that in his preparation of his own testimony,  Dr. Quijano apparently did so little work that he himself did not realize that Mr. Moran and represented Mr. Broxton in the earlier trial.

While the fact that Dr. Quijano was apparently unaware that Mr. Moran had represented Mr. Broxton during the first trial does not speak to the actual substance of Dr. Quijano's testimony, it does explain the debacle that followed when Dr. Quijano and Mr. Moran got into the actual substantive issues Dr. Quijano had been engaged to address in his testimony.  Even under the direct questioning of Mr. Moran, the State could not have sought out a better witness to make its case for future dangerous had hired Dr. Quijano as its own witness.

First, under direct questioning by Mr. Moran,  Dr. Quijano seized the moment to inform the jury no testing of the kind that Dr. Axelrad believes is mandatory in a case such as Mr. Broxton social and medical history dictates because Mr. Broxton would have manipulated the results to caste himself in a better light.  The following exchange took place on the point under questioning by Mr. Moran:

Q:      And let's talk about your evaluation of Eugene specifically for a minute. Okay, Doctor?

        I understand you didn't conduct any testing; is that correct?

A:      That is correct.

Q:     Did you feel you needed to conduct any standardized testing?

A:     No.  The testing was not called for in the question I was asked. ***And testing at this stage is not reliable because he has a very good incentive to look good in the testing process. So, the validity of those tests are questionable anyway, so – and they cost money, so I did not do any of them.***

Q:     What else did you do with Eugene?

A:     I talked to him and I made sure that there was no mental illness or emotional illness.  I talked to him about life in prison and then I reviewed his disciplinary records to make sure what he was telling me was accurately reflected in the files.

Q:     And was it?

A:     Yes.

*See* Vol. 16, November 13, 2003, p. 162, line 24 - p. 163, line 19.

So, under direct questioning by Mr. Moran, Dr. Quijano was able to testify that despite finding that Mr. Broxton to be reliable witness in talking about his prison life, he would not be reliable on standardized testing because he *would* manipulate the results, or in short, be the manipulative sociopath that Dr. Quijano testified he Mr. Broxton was during the State's cross-examination. *See* Vol. 16, Nov. 13, 2002, p.  305, line 3 - p. 327, line 13.   It would be a very unusual trial strategy being made by a fully informed defense attorney that would include putting on a mental health expert to offer testimony that the defendant was a manipulative liar that has no regard for human life, acts out impulsively, shows no remorse for the harm he inflicts on others, and basically an individual that offers nothing positive to the world.  Had the State asked Dr. Quijano whether Mr. Broxton was a rabid animal that the jury must put down for the good of

society it is doubtful that Dr. Quijano would have answered "no".

This brief exchange also raises the question of how much work Mr. Moran did and what information he provided Dr. Quijano to testify since Dr. Quijano's testimony was not even factually or legally accurate.  Besides the legal fact that under *Ake v. Oklahoma*, 470 U.S. 68(1986), the courts must provide adequate funds for the defense to employ mental health professionals needed to prepare a defense,  Dr. Quijano's his answer implies that Mr. Broxton had no history of mental illness, which is directly contradicted by his mental health records from the prison system and the very detailed testimony that Dr. Wendell Dickerson had given in the original trial. Vol. 38, May 5, 1992, pp. 14 - 67, line 10 *and see* Exhibit 1, Report of A. David Axelrad, attached hereto.

Perhaps Dr. Quijano missed Dr. Dickerson's earlier testimony and the prison mental health records that indicate that Mr. Broxton suffered from depression.  Maybe Dr. Quijano was also unware that in 1986 the Supreme Court held that the courts must provide adequate funds for mental health experts. Or, more likely, as demonstrated by some of the rest of Dr. Quijano's testimony suggests,  he answers were more calculated,  and that the stench of racism that Judge Price said could never be cleansed from the jury room,  so informs Dr. Quijano's thought process and attitude twards defendants of color, that he simply cannot help himself.  Consider the following testimony that followed:

Q:      Let's look at Gene's record's from the last 12 years, from the time he was

sentenced to death in this court in 1992 through today.  Do you know about – tell

the ladies and gentlemen of the jury about the work-eligible program on death

row.

A:      Before the escape of the Texas seven and the escape of a death row inmate a death

row inmate named Valudy (phonetic), the death row inmates were in the Ellis

Unit in Huntsville and they divided them into two groups, the so-called work-

eligible and those who were in segregation.

Those in segregation were left in their cells 23 hours a day and were let out

one hour a day for what is called large muscle relaxation recreation one at a time.

One inmate per cage.  Those who were work-eligible were screened by the

disciplinary committee at the Ellis Unit and were able to work in the garment

factory. So those people have been cleared to work, work-eligible death row

inmates. ...

and

Q:      Do you know which group Gene was in?

A:      Gene was in the work-eligible group.

Vol. 16, p. 163, line 20 - p. 164, lines 1 - 12 and 19 - 20.

Had Mr. Moran spent time preparing both himself and Dr. Quijano to testify, would he

really have put on a witness who felt a need to preface his answer concerning  Mr. Broxton's

history of good behavior that qualified him to work in the garment factory with a reminder that

even prisoners on death row escape.[26]

------

[26]The prosecution clearly appreciated Dr. Quijano's injection of the issue of the potential
of prison escape into the case, going back to it during the cross-examination of Larry Fitzgerald,
without any objection by Mr. Moran, even though there is absolutely no evidence that in this long
history of being incarcerated, he has never attempted to escape.  *See* Vol. 16, November 13,
2002, pp. _____.

The question has to be asked of why did Dr. Quijano believe it was necessary to put inject the idea that escape from prison is a reality of death row life when he knew that the whole purpose of his testimony was to bolster the case for sparing  Mr. Broxton from the death penalty.  Equally unnecessary language during the exchange was referring to Mr. Broxton and others who in the past were able to earn the opportunity to work in the garment shop rather than live in segregation as "so-called work eligible" and the need to explain that recreation time outside the cell means, "One inmate per cage" as if needing to remind the jury that prisoners are like animals who belong in cages and even when they have outstanding disciplinary records such as the one Mr. Broxton has maintained, they are only "so-called work eligible" as if the classification is not completely legitimate.

 Further, on direct examination, Dr. Quijano left the impression with the jury that it was only shortly before the 2003 trial that Mr. Broxton began to understand how to successfully live within the structure of prisons when in fact Mr. Broxton had been living in a penal environment successfully since he was fourteen years old.  Witness the following exchange:

Q:      In your discussions with him – admittedly it was a fairly short discussion – did you talk to him about any changes he has had in his attitude over the years?

A:      It was not a short discussion.  It was about an hour and a half, and we ran out of things to talk about.

        I asked him what the greatest change is that he has had since he has been in prison twelve years and four years before that and another term in Louisiana.  He said he has learned not to argue with anyone.  He rightly said that the institution will win and the guards would always be right, so he has learned not to be so

argumentative anymore. ***Why it took him so long, I don't know, but at least he***

***got there.*** That the institution will not change, you have to change.

Vol. 16, Nov. 13, 2003, p. 167, lines 3 - 17.

Dr. Quijano then took the opportunity further raise doubts about Mr. Broxton's ability to be

truthful, despite not being able to pinpoint any dishonest statement Mr. Broxton made during

their meeting. The following testimony about a defendant's veracity should never come from a

defense witness who purports to be an expert on mental health and future dangerousness:

Q:     No. Okay.

       Of the factors that you are relying upon for your opinion, is the most

       important factor his track record in prison?

A:     The interview contributes very little to decisions like this because of course, the

       answers are self-serving. You do not expect a person in his position to talk bad

       about himself. And so, the crucial decision, in my opinion, is his track record in

       the last 12, 16 years in prison. He has managed not to commit a violent

       disciplinary offense.

Vol. 16, November 13, 2003, p. 168, lines 3 - 14.

It is unclear from the direct testimony exactly what the purpose of Dr. Quijano's testimony.

Mr. Moran did not know how long Dr. Quijano interviewed Mr. Broxton for. He apparently had

not taken a moment to reacquaint himself with Dr. Quijano before calling him as a witness to

determine if the antipathy towards anyone facing a possible death sentence had changed over

time so that he could give an open-minded assessment . The forensic psychiatry community of

experts are so committed to the belief that in order to do a proper assessment of a defendant in a

capital murder case, a thorough clinical interview must be conducted to make an assessment of a defendant in a capital murder case and the failure to conduct an interview is a violation of the ethical standards of the profession. *See* Exhibit 2, Alexrad Affidavit, attached hereto. So, while Dr. Quijano apparently suffered an hour and a half interview with Mr. Broxton it was simply so he could testify in round two that he fulfilled that element of his duties, but be apparently believes that while he may conduct the interview, it is a meaningless exercise since all defendants will lie during the interview.

On cross-examination, Dr. Quijano took the opportunity to reenforce his view about defendants, lumping Mr. Broxton with all defendants, as manipulative liars. On cross, Dr. Quijano was again asked why he disregards the results of the clinical interview and does not did not conduct standardized testing. He responded:

Q: First of all, you mentioned as far as the interview with the Defendant that an hour and a half was more than enough time for you to talk to him. Is that a fair statement?

A:      Yes.

Q:      And why is that?

A:      Because defendants in their situations would present themselves in a socially favorable light and the test would be invalid.

Q:      A socially favorable light, is that what your said?

A:      Yes. They were indoors items in the test that are socially acceptable and it would skew the test towards what is called faking good.

Q:      If I understand you correctly, as far as a Defendant in these circumstances talking to you or being tested by you, you don't necessarily believe what they have to say.

Is that a fair statement?

A:      That is fair.

Q:      As a matter of fact, the motivation to lie in that situation is incredible, is it not,

Doctor?

A:      It is very high.

Vol. 16, November 13, 2003, p. 305, line 15 - p. 305, line 16.

The question must be asked of Mr. Moran: exactly why he would put forth an "expert" witness who is so baised against his own client that the expert lumps the client in with all defendants as a liar when the defense attorney is then going to put his client on the witness stand to testify on his own behalf to try to convince the jury not to impose the death sentence?

Not surprisingly, given Dr. Quijano's testimony in the earlier trial and the fact that he had demonstrated to this Court and many others over a long period of time his racist views, the testimony only became more damning.  On cross examination Dr. Quijano was asked to opine as to whether or not he could make any diagnosis of Mr. Broxton and not unexpectedly, he was able to reconfirm his diagnosis from the earlier trial.  The following is Dr. Quijano's testimony:

Q:      And there is also something in there [referring to the Diagnostic and Statistic

Manual] that we used to call a sociopath, isn't there?

A:      Yes.

Q:      What is that?

A:      It is now called anti-social personality.

Q:      And with your review of the records, could you tell whether nor not you believe

the Defendant to be a person with an anti-social disorder?

81

A:      Yes.

Vol. 16, November 13, 2003, p. 310, lines 15 - 23.

It was not enough however for Mr. Moran to put on a witness who labeled his client a lying manipulative sociopath despite the fact that there was nothing in his mental health records over the years to suggest that diagnosis and in the earlier trial, Dr. Dickerson had specifically testified that Mr. Broxton did not meet the diagnostic criteria for that condition.  Mr. Moran put on an expert would, when given the opportunity to fully explain to the jury just how loathsome a sociopath could be, jumped at the opportunity, insuring that the death penalty would be assessed regardless of whatever other evidence might be brought forth to sway the jury in the other direction.  Again on cross-examination, and it should be noted without any objection from the defense, Dr. Quijano laid it on heavy for the State:

Q:      Could you tell us what characteristics that lead you to that conclusion?

A:      The requirements for anti-social personality are engagement in repeated violations of rules, regulations, the law repeated violations of the rights of others, the failure to profit from experience and punishment, and again, a general sense of irresponsibility, failure to hold onto a job and support people he needs to support, a general lack of conscience.

Vol. 16, November 13, 2003, p. 310, line 24 - p. 311, line 7.

An attorney who is proceeding in a reasonable manner who had just heard his own witness give such damning testimony may have jumped up and asked to take the witness on *voir dire* as a hostile witness, hoping that the trial judge would give allow the reasonable defense attorney an opportunity to remind Dr. Quijano and the jury that in fact, only a few minutes before, Dr.

82

Quijano had testified that Mr. Broxton's long prison record did not portray him to be any of those things that would lead to a diagnosis of a sociopath. *See* Vol. 16, November 13, 2003, p. 163, lines 12 - 19.  During the *voir dire*, an attorney acting reasonably who had been fully prepared and informed of the evidence that had already been put before the jury that in every way contradicts the now hostile witness, most likely would have asked a series of questions based on that evidence, to establish that it was the hostile witness, who had turned on the defense, that was not reliable and honest.[27]   Not so with Mr. Moran.  In fact, he apparently thought it best to just let the testimony go on uninterrupted describing in painful detail all of the negative personality characteristics that a sociopath has to insure that the jury got a full picture of just what a loathsome, dangerous person Dr. Quijano believes Mr. Broxton to me.  In fact, during his redirect questioning, Mr. Moran did not even see fit to ask Dr. Quijano how the testimony he

---

[27]Just before Dr. Quijano's cross-examination, Larry Fitzgerald, who had been the long time official spokesperson for the Texas Department of Criminal Justice had given very favorable testimony about Mr. Broxton, referring to someone with a prison history such as that Mr. Broxton had accumulated over the many years he had been incarcerated as "a good citizen." *See* Vol. 13, November 13, 2003, p. 171, line 21 - p. 182, line 12; p. 208, line 18 - p. 209, line 3.

The assessment of Dr. Quijano also is clearly contradicted by the testimony that had been given during the 1992 trial by the then defense expert, Wendel Dickerson, Ph.D., who specially testified that Mr. Broxton was not a sociopath and explained that his true psychiatric problems were, placing his own opinions in the context of Eugene Broxton's life history based on prison records, medical records, social agency records, etc.  *See* Vol. 38, May 5, 1992, p. 14, line 1 - p. 67, line 6.

Although Mr. Broxton does not believe that the manner in which is prison and medical records were utilized by the defense attorneys during the retrial because the documents were simply admitted into evidence without any trained expert testifying directly about the life history reflected in the records, the records in question do contain volumes of evidence that had Mr. Moran used the records to confront Dr. Quijano, would have impeached his testimony.  In addition to the testimony of Dr. Dickerson from the 1992 trial and Mr. Fitzgerald during the 2003, *see Mr. Cornelius' summary of the records and the exhibits referenced therein at Vol. 16, November 13, 2003, p. 122, line 19 - p. 153, line 11.*

gave under direct questioning that Mr. Broxton had succeeded living peaceably in prison because

he had learned the important lesson that the prison always wins and it is best to submit to the

rules fit into the diagnosis of Mr. Broxton being a sociopath.  *See* Vol. 16, November 13, 2003,

p. 310, line 24 - 327, line 13.

As if portraying Mr. Broxton as a lying, manipulative sociopath did not get the

prosecution case to the point where it needed to be, to insure that there was no mistake confusion

in the jurors' minds about Dr. Quijano's opinion on the issue of future dangerousness left by his

original testimony on direct examination, the following exchange was put before the jury:

Q:      Your original opinion when you testified back in 1992 was that there is a

            probability that the Defendant, Eugene Broxton, would commit criminal acts of

            violence that would constitute a continuing threat to society.  Is that correct?

A:      Yes.

Q:      And that opinion hasn't changed at all, has it, Doctor?

A:      No, it hasn't.

Vol. 13, November 13, 2003, p. 323, lines 4 - 12.

And to insure that there was absolutely no mistake, on recross-examination, the trial just

and the prosecutor gave Dr. Quijano to frame his answer more directly in the context of Special

Issue No. 2, that would be submitted to the jury to determine if Mr. Broxton would forever be a

future danger to society.  The following exchange took place:

Q:      Doctor, there is not a decrease at all in what you think of him being a violent

            person, is there?

A:      No.

84

Q:        As far as the answer to that particular special issue, with or without a crystal ball,

the answer is still yes; is that correct?

MR. MORAN:         Asked and answered, Your honor.

THE COURT:          You may. One more time.

Q:      With or without the crystal ball, is the answer to that special issue still yes?

A:      Yes.

Vol. 16, November 13, 2003, p. 326, lines 6 - 22.

The testimony of Dr. Quijano clearly demonstrates that Mr. Moran put forth no effort in

learning who his own witness would testify to once on the witness stand because if he had, he

certainly would not have relied on Dr. Quijano to testify on "behalf" of his client.  Mr. Moran's

reliance on Dr. Quijano was so fundamentally flawed that no reasonable attorney, charged with

representing a defendant in a capital murder trial who was facing a death sentence, would have

called upon Dr. Quijano.  Any reasonable attorney would have concluded that given Dr.

Quijano's track record in death penalty cases would have disqualified him as a potential defense

witness.  Dr. Quijano was such a toxic witness that the State did not even call him as their own

witness but certainly must have been delighted to learn that he would be acting as a defense

witness.  *See* Kenneth Williams, Affidavit, Exhibit 1 and Danny Easterling, Affidavit, Exhibit 2.

As unreasonable as it was to decide to call Dr. Quijano, it was even more unreasonable to

not take every step necessary to insure that Dr. Quijano had somehow gained a level of

professionalism and appreciation for his ethical duties in properly assessing the defendant that

were so absent in Mr. Broxton's original trial and the many other cases he had testified in on

behalf of the State, that lead to reversals and new sentencing trials.  Mr. Moran failed on this

point as well.  Dr. Quijano brought no more professionalism and dedication to his profession than he had in the original trial.  *See* Exhibit 3, A. David Alexrad, Affidavit.  The only difference between the first and second trial was that instead of the State sponsoring his wholly inappropriate testimony, it was the defense who was giving its seal of approval to Dr. Quijano.

As noted above, the decision to rely on Dr. Quijano as a defense expert witness on Mr. Broxton's mental health status and the issue of future dangerousness and then the way that both the defense attorneys put forth their own case through Dr. Quijano and miserably failed to even attempt to take corrective measures once it became clear that they had made the State's case for the State, once the prosecutor began his cross-examination,  is not simply nitpicking a defense attorney's performance at trial, second guessing the trial attorney on every objection, piece of evidence, or comment made through a difficult trial, playing a Monday night quarterback to argue that trial counsel was so deficient in their performance that the defendant is entitled to a new trial under the *Strickland* standard.    There is simply no way to reconcile the actions of the defense attorneys in this case with the notion that Mr. Broxton received anything approximating effective assistance of counsel as required under the Sixth Amendment of the U.S. Constitution.

     c.     Trial counsels' performance was constitutionally deficient in failing to challenge the State's case throughout the punishment retrial in 2003.

The State had a long list of extraneous offenses that it introduced during both the original punishment trial in 1992  and the retrial in 2003.   During the 2003 retrial the trial attorneys failed to challenge the State's evidence in any meaningful way that would have prevent irrelevant, immaterial and highly prejudicial evidence from being used against Mr. Broxton and failed to present evidence that would have lead the jury to question the integrity of the State's

case on extraneous offenses.

Mr. Broxton recognizes that during the retrial his attorneys were faced with the challenge of having to present a case to a jury that already knew that Mr. Broxton had been previously sentenced to death and that given the way that juries in Texas are chosen, are predisposed to voting for the death sentence however even with those challenges, believes that his trial counsel failed to provide effective assistance of counsel given the availability of evidence at the second trial that would have exculpated him in at least two of the extraneous offenses, and raised doubt in the remaining offenses.

First, without objection, the State was allowed to present gruesome photos and witness after witness dealing with the robbery/murder of Sheila Dockens, just as though the issue of guilt had not already been resolved and more importantly, evidence that did nothing to point to Mr. Broxton as the actual perpetrator of the crime.  The only real evidence that the State had to convict Mr. Broxton was the identification of Mr. Broxton by Mr. Dockens and the testimony of Mr. Shook.  There was no reliable forensic evidence that linked Mr. Broxton to the murder scene and it was Mr. Shook who had possession of the property stolen from the Dockens. In the eleven years between the original trial and the retrial, significant discussions had taken place about the legitimacy and reliability of eyewitness identification testimony.[28]

The failure to explore the issue of identification testimony was also clearly evident in connection with the extraneous capital murder of John Miller.   Although there were five "eyewitnesses" at the scene of the murder, the only one who identified Mr. Broxton actually did not see the altercation between Mr. Miller and his assailant.   Of the four witnesses to the actual

---

[28]http://www.innocenceproject.org/docs/Eyewitness_ID_Report.pdf

altercation, one of the witnesses selected someone other than Mr. Broxton out of the lineup and another witness made inconclusive identifications of Mr. Broxton and another man in the lineup. Only Joslin Baxter, who claims that she was able to identify Mr. Broxton as one of two men sitting in Mr. Miller's Blazer prior to the altercation, was able to pick Mr. Broxton out of the lineup. Under questioning she testified that the two men sitting in the truck were not doing anything suspicious to make seeing them so remarkable however Mr. Broxton's trial attorneys made no effort to raise doubt her testimony that would lead the jurors to question the reliability of her identification.

Two other "eyewitness" witnesses identified Mr. Broxton as the individual who used Mr. Miller's credit card at convenience store/gas stations. Their identification of Mr. Broxton was a month after the fact. One of the witnesses testified that while the most remarkable thing about the incident when the credit card was used was that the person using it wanted to purchase an entire carton of cigarettes, as if that would have been such an extraordinary event for a convenience store sales clerk that not only did she have a clear memory of the man using the card, she even remembered that the name on the card was Mr. Miller's. Besides not having an identification expert that would have explained to the jury how absurd and unlikely it would be for a convenience store clerk to remember any specific transaction involving the sale up a carton cigarettes in such detail that she recalled the name of the person on the credit card, the trial attorneys apparently saw no purpose in questioning the detectives involved in solving Mr. Miller's murder whether or not the videotape showing the purchase on Mr. Miller's credit card showed Mr. Broxton as the one using the card. According to the police report, while the sale was on the videotape, it was a sale of less than a carton of Kool cigarettes and they could not identify

88

the purchaser of the cigarettes as Mr. Broxton.  *See* Exhihit 5, McKinney affidavit, attachments.

The Miller case is particularly troublesome because it is the extraneous capital murder that the police had received four tips identifying men other than Mr. Broxton as the assailant yet there nothing in the police report that suggests that any of those identified were investigated.  There was also no attempt by defense counsel to cross-examine the detectives regarding the men who were the subject of the tips.  *See* Exhibit 5, McKinney affidavit, attachments.  One of the of the individuals, James Curtis Singletary,  who had been identified by a tipster arguably resembles Mr. Broxton enough that had the problems that are now recognized with identification witnesses been explained to the jury, the jury would have had very little confidence in the State's allegations that Mr. Broxton had committed the crime.  *See* Exhibit 6, *compare photos of Eugene Broxton and James Curtis Singletary*.

While it may sometimes be counterproductive to raise questions about the character of a victim in a brutal crime, in connection with the Miller case, there was a question that was not raised that should have been raised which was, if Ms. Baxter testimony was accurate, that she saw Mr. Broxton and Mr. Miller quietly sitting in Mr. Miller's truck how did that happen in the first place.  What was Mr. Miller, a middle-aged TV Guide salesman devoted husband and wife, doing sitting quietly talking to a drug dealer/pimp, in an unsavory part of town?  There was no testimony that Mr. Broxton had kidnaped Mr. Miller and made him drive to the apartment project.  There was no testimony that Mr. Miller appeared to be in any kind of danger while sitting in the truck speaking to Mr. Broxton.  There was no testimony that Mr. Miller even tried to reach out in someway for help from the four men who actually witnessed his murder.  While these matters did not necessary have to be raised to disparage Mr. Miller, the absence of any

evidence linking Mr. Broxton to Mr. Miller, or answering how they allegedly came together the

day Mr. Miller was murdered, may very likely have pointed to one of the other individuals who

had been identified by the tipsters as the perpetrator of the murder, or even pointed to someone

completely unknown.  The questions should have been put to the detectives.

   The evidence attempted murder of Mr. Anderson could have also been discredited as well

by an identification expert who could have called into question the testimony of both Mr.

Anderson and Mr. Cherry.   Mr. Anderson, the victim of the crime, was clearly traumatized by

being kidnaped and brutally attacked, including being shot in the face.  Mr. Cherry claimed to be

able to identify Mr. Broxton despite having seen him for literally seconds at a significant

distance.  At best, he testified that the attacker was the approximate size and had the same skin

tone as Mr. Broxton.  It was hardly a sufficient enough description of the attacker that he could

have possibly made a reliable identification.

        In both the Miller case and the Anderson there was no testimony that Mr. Broxton was

linked to the attacks by any evidence other than the "eyewitness" identifications and those

identifications could not reasonably been considered reliable and had an identification expert

been offered to explain why the identifications were unreliable, the State could not have proven

those extraneous crimes even by a preponderance of the evidence.

   In each of the extraneous offenses, questions such as those raised in the Miller and

Anderson should have been raised by questioning the State's evidence.

    During the testimony of Mattie Walters, for reasons unknown, trial counsel put on

testimony from Mr. Broxton's sister that on the Sunday after Mr. Stuckwisch's body was found

she picked up Mr. Broxton to take him to church.  Ms. Walters testified that Mr. Broxton had a

cut on his hand, leaving the impression that the cut on his hand was somehow inculpatory evidence in the Stuckwisch case. The State certainly must have appreciated this testimony since it apparently could find no DNA evidence that linked Mr. Broxton to the murder even though Mr. Broxton's sister concluded that he must have cut his hand while killing Mr. Stuckwisch. Despite the HPD crime lab scandal playing itself out before Mr. Broxton's retrial, it apparently did not occur to either of Mr. Broxton's trial attorneys to demand an opportunity to conduct DNA testing to determine if any of the blood from the crime scene was linked to someone other than Mr. Broxton because the State did not claim Mr. Broxton had left DNA behind. Had he cut his hand during the commission of the crime, presumably there would have been some DNA, either in Mr. Stuckwisch's apartment or in his car, where Mr. Broxton's partial palm print was allegedly found and there was no effort to test or challenge the partial palm prints that the Houston Police Department crime lab supposedly tied to Mr. Broxton. At the time of Mr. Broxton's retrial integrity of the HPD crime lab was clearly shattered and there is no evidence in the record that Mr. Broxton's trial counsel made any effort to not just exploit that situation, but take any steps to find out if Mr. Broxton was yet another victim of the lab's highly suspicious and questionable practices. For Mr. Broxton's trial attorneys, they apparently did not think to even ask the same questions that every other defense counsel was asking at the time.

Mr. Broxton in fact had a reasonable response for why his palm print may have been on Mr. Stuckwisch's car but what was not asked is what connection Mr. Stuckwisch's girlfriend may have had to do with the crime, if anything. Instead, the detectives claimed that by the time Mr. Broxton was arrested they did not know how to locate the girlfriend when in fact, she was in the county jail.

Overall, had the trial attorneys made any effort to challenge the integrity of any of the extraneous offensives with the evidence that pointed to others besides Mr. Broxton, it most probably would have slowed the jury down and made them pose serious questions about the entirety of the State's case and the results could have been very different.

The failings of trial counsel to challenge the State's evidence on the extraneous offensives were not the result of reasoned choices made after careful investigation and thought. The defense simply did not do the work.  There is no indication that defense counsel during the second trial even attempted to make an effort.  They made no effort to limit one gruesome image after the next that the State used to hammer Mr. Broxton even though the images did not contain any evidence that actually link Mr. Broxton to the murders.  The images simply inflamed the jury and prejudiced Mr. Broxton.  No effort was made to employ forensic experts who could have been used to challenge the eyewitnesses and the fingerprint analyst put forth by the State so it was impossible for defense counsel to make an informed strategy decision since they did not bother to investigate the integrity of the State's case on their own.  It cannot be argued that they did not have fair warning as to what the issues were before the trial.  Mr. Broxton's retrial was not a case where because of limited discovery rules for defendants in Texas criminal cases, the attorneys were caught off guard because the State had laid out their entire case during the original trial. Mr. Moran had eleven years to reconsider how best to defendant Mr. Broxton however there is no indication from the record that he did anything to use advances in forensic science to attack what had always been a weak case to begin with.

      d.      Trial counsel failed to fulfill their duties in investigating and presenting meaningful mitigation evidence.

In regards to the paltry mitigation case that the defense attorneys put forth they were were completely deficient in light of the law regarding mitigation evidence.  In *Tennard v. Dretke*, 124 S. Ct. 2562, 159 L.Ed. 2d 384 (2004), the Supreme Court, citing to its earlier decision in *McKoy v. North Carolina*, 494 U.S. 433, 440-441, 108 L.Ed. 2d 369, 110 S.Ct. 1227 (1990), stated that the relevance standard applicable to mitigating evidence in capital cases is to view the term relevance in the most expansive terms.  The Supreme Court stated:

> We established that the 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context, and thus the general evidentiary standard – "'any tendency to make the determination of the action'".  We quoted approvingly from a dissenting opinion in the state court:' Relevant mitigating evidence is evidence which tends to logically prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.  Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find it warrants a sentence less than death."[Citations omitted].

*Tennard*, 124 U.S. at 2570.

In stronger terms, the Supreme Court, citing to its long held precedent, stated in *Tennard*, that the Fifth Circuit's interpretation of previous case law is simply not and was not the law at the time of Mr. Broxtons' trial.  The Supreme Court rejected the Fifth Circuit's view of mitigating evidence in the following terms:

> The Fifth Circuit's test is inconsistent with these principles.  Most obviously, the test will screen out any positive aspect of a defendant's character, because good character traits are neither 'handicap[s]' nor typically traits to which criminal activity is 'attributable'.  In *Skipper v. South Carolina*, 476 U.S. 1, 5, 90 L.Ed. 2d 1, 106 S.Ct. 1669 )1086), however, we made clear that good-character evidence can be evidence that '[u]nder *Eddings* . . . may not be excluded from the sentencer's consideration.' We observed that even though the petitioner's evidence of good conduct in jail did 'not relate specifically to petitioner's culpability for the crime he committed, there is no question but that such [evidence] . . . could be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.' *Lockett*, *supra*, at 604, 57 L.Ed. 2d 973, 98 S. Ct. 2954, *id*. at 4-5, 90 L. Ed. 2d 1, 106 S.Ct. 1669 (citation omitted).  Such evidence, we said of a 'defendant's disposition to make a well-behaved and peaceful adjustment to life I prison is . . . by its nature relevant

93

to sentencing determination.' *Id.*, at 7, 90 L.Ed. 2d 1, 106 S.Ct. 169.  Of course, the Texas courts might reasonably conclude that evidence of good conduct in jail was within the jury's effective reach via the future dangerousness special issue.  *See Franklin v. Lynaugh*, 487 U.S. 164, 177 -178, 101 L.Ed. 2d 155, 109 S. Ct. 2320 (1988)(plurality opinion); *Id.,* at 185 -186; 101 L. Ed 2d 155, 108 S. Ct. 2320 (O'Conner, J. concurring in judgment). But under the Fifth Circuit's test, the evidence would have been screened out before the time came to consider that question.

*Id.*, at 2571.

The engagement of Dr. Quijano as a mental health expert was clearly inappropriate and there can be no reasonable explanation for having put him forth to the jury as the defense's own witness.  *See* Exhibits 2 and 3, Affidavits of Williams and Easterling, respectively. Had the defense carefully considered the psychiatric evidence that they had available to them to use to convey the narrative of Mr. Broxton's life history and how he came to be in the position he was it, the results of the retrial would have been different.  The affidavit testimony of Dr. Axelrad's preliminary work in this case makes clear that Mr. Broxton has a mental health history that needed to be fully investigated and presented to the jury.[29]  Contrary to Dr. Quijano's testimony that he did not conduct any standardized testing of Mr. Broxton because there were no funds available, the fact is that had the attorneys sought out the funds to employ a competent expert to perform the tests, the trial courts were obligated to provide the funds pursuant to *Ake v. Oklahoma..*

    e.    Trial counsel failed to provide effective assistance of counsel in their use of  Mr.

---

[29]Mr. Broxton has pending a Motion for Supplemental Funds for additional psychiatric work and for a neuropsych examination.  Dr. Axelrad has testified that the failure to conduct this work was deficient performance.  The testimony of Dr. Quijano cited to above makes it clear that Dr. Quijano was incapable of performing a proper psychological work up on Mr. Broxton because he clearly has a lack of appreciation for accepted methodology and standards of practice of legitimate forensic psychiatry and such contempt for defendants in capital murder cases that he has no place working in the field.

Broxton's siblings as mitigation witnesses.

No discernible informed trial strategy can be found in the trial attorneys decision to put on testimony of Mr. Broxton's half-siblings, Terry Wilson and Mattie Walters.  Instead of taking the opportunity to use witnesses that would generate some empathy for Mr. Broxton by helping tell the story of his life, the trial attorney's called Mr. Broxton's sister who would better be considered a witness for the State.  Ms. Walters, an associate minister at a church in Houston, had nothing particularly nice to say about here younger brother.  In fact, the most compelling testimony she gave was relating a story of how she picked up Mr. Broxton to take him to church after she had learned of Mr. Stuckwisch's murder.  Ms. Walters testified that after noticing the cut on Mr. Broxton's hand, she then thought he appeared to be nervous and that she observed him speaking with the minister and crying.  While Ms. Walters did not actually testify that she believed that her brother was responsible for Mr. Stuckwisch's murder, her testimony most certainly implied that she suspected him of the crime.

It is unclear how such testimony could have possibly been seen as being mitigation evidence that would swing a jury away from imposing the death penalty.  What is also unclear is how the trial attorneys concocted a meaningful, informed trial strategy to save their client's life that would have included such testimony.

Likewise, it is puzzling how the decision to put on testimony from Samuel Terrance Wilson (Terry Wilson), Mr. Broxton's older half-brother. Vol. 16, November 13, 2003, p. 233, line 5 - p. 237, line 5.   It appears that the purpose in calling Mr. Wilson was to inform the jury that he would be sad if his younger brother was executed based on their relationship. Unfortunately, the State was able to discount the testimony with a very brief cross-examination

wherein Mr. Wilson testified that he had not seen his brother in approximately fifteen years.  Had

the trial attorneys taken the time to carefully interview Mr. Wilson they would have presumably

learned enough about the brothers' relationship that would lead Mr. Wilson to drive to Houston

from DeRidder, Louisiana to testify on behalf and that despite the fact, as established by the

prosecution that the brothers had not seen each other, Mr. Wilson still felt very close to his

brother.  Because there were no extensive interviews conducted by the defense attorneys before

the trial there was no way for the trial attorneys to alter the impression left by Mr.Wilson.   There

was no conscious, informed strategy employed by defense counsel in putting Mr. Wilson  to

testify as he did.  His testimony offered the jury nothing to hold on to that even Mr. Broxton's

brother genuinely cared if he lived or was executed.  The impression Mr. Wilson actually left

with the jury was that he had written off his brother many years before.

> f.    Trial counsel failed to provide effective assistance in presenting Mr. Broxton's
>       record of mental illness and prison conduct.

The impression that Mr. Wilson had written off his brother was reenforced by the actions of

his attorneys in the way that they presented Mr. Broxton's long history of mental health problems

and his prison records which demonstrate that contrary to the assertions that Mr. Broxton had

difficulty in adapting to prison life and was a continuing threat to society and was a sociopath

incapable of demonstrating empathy for anyone, portray Mr. Broxton as a long time depressive,

longing for someone to love and be loved, who was described by Mr. Fitzgerald as a good

citizen.  *Compare* Vol. 38, May 5, 1992,  p. 14, line 1- p. 67, line 10(testimony of Wendel

Dickerson), to Vol. 38, May 5, 1992, p. 89, line 1-p. 132, line 3, (Testimony of Walter Quijano)

Vol. 16, November 13, 2003, pp. 304 - 327; and,  Exhibit 1, Axelrad affidavit.

Instead of presenting the evidence in a coherent manner that the jury could understand and appreciate, during the retrial, Mr. Cornelius simply summarized the mountain of records and invited the jury to sort through it themselves.  At one point he allows that he himself is not going to go over them for the jury and that while the documents are not in chronological order, he does want the jury to be aware of the documents "***in case they decide to read them***."  Vol. 16, November 13, p. 123, lines 20-24, *and see generally,* p. 122, line 1- p. 153, line 7.   Clearly Mr. Cornelius knew that the jurors were not going to sit in the jury room and search through hundreds of pages of documents to find something in them to justify sparing Mr. Broxton's life and his message could not have been clearer.  It is relevant to ask, what jury would find it important to sift through stacks of documents and figure out Mr. Broxton's life history to determine whether or not there was evidence to mitigate against sentencing him to death, when his own attorneys did not feel it important to take the time to present a coherent narrative based on the documents to them as part of the case in chief.

Clearly, the overall effect of the work done by trial counsel failed to meet the standards of professionalism demanded by the Sixth Amendment, as defined by *Strickland v. Washington,* and its progeny.  While the failure of trial counsel in their decision to rely on Walter Quijano and infuse into the trial his long standing, racist, unprofessional methods, opinions, and attitudes, each of the other issues raised concerning counsels' efforts or failure to take action must be considered cumulatively to appreciate how miserably Mr. Broxton's attorneys failed him.

**IV.   MR. BROXTON WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS HABEAS PROCEEDINGS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS**

The Supreme Court has recently taken up two cases involving the question of whether or

not a convicted person is entitled to effective assistance of counsel on collateral review of their convictions and sentences.[30]  To the extent that the Supreme Court should find that a habeas petitioner, such as Mr. Broxton, has a right to effective assistance of counsel at the state court level during habeas proceedings, Mr. Broxton's right to such counsel was clearly violated by the actions and inactions of Mr. Wheelan.

Without attacking someone who is now longer alive to offer reasonable explanations as to what strategy was followed in preparing and presenting the habeas petition that Mr. Wheelan filed in Mr. Broxton's case, in addition to the wholly inadequate habeas petition that Mr. Wheelan did file on behalf of Mr. Broxton, which largely was limited to claims challenging the constitutionality of the death penalty and other claims that were inappropriate for habeas relief, while notably leaving out any claims related to the failure of defense counsel to prepare a defense to the State's punishment case,

Anticipating the State's argument that a claim for ineffective state habeas counsel has not been previously exhausted through the State courts and therefore procedurally defaulted, any such arguments by State must be rejected because the procedural grounds on which the State court denied Mr. Broxton's federal claims were not adequate and there is cause and prejudice to

---

[30]*Martinez v. Ryan*, No. 10-1001, now pending in the U. S.Supreme Court on Petition for Certiorari from the U.S. Court of Appeals from the 9th Circuit.  Mr. Martinez was not sentenced to death.   After accepting for consideration the *Martinez* case, the Supreme Court recently granted a last minute stay of execution in *Balentine v. Thaler*, No. 10-11036, now pending in the U.S. Supreme Court on Petition for Certiorari from the U.S. Court of Appeals for the 5th Circuit. In both cases, the lower courts held that a habeas petitioner has no right to effective assistance of counsel under the Sixth and Fourteenth Amendment during state habeas proceedings.  The Supreme Court's interest in revisiting the issue of effective assistance of state habeas counsel is the key issue and where the petitioners did not prevail on their claims in the lower courts, suggests that there is great interest by at least four members of the Supreme Court in extending the right to effective assistance of counsel to habeas litigation.

excuse any procedural default of Mr. Broxton's ineffective assistance of counsel claims.

After this Court stayed and abated this case so that Mr. Broxton could return to the State courts to exhaust the other claims raised in this petition, Mr. Broxton also filed with the Texas Court of Criminal Appeals a Motion to Expand the Record asking that the recently recovered documents from the Harris County District Attorney's Office and the Harris County Sheriff's Department, among other documents, including the public records reflecting the criminal histories of the individuals who were associated with the recovered gun, without explanation the Texas Court of Criminal Appeals denied the Motion to Expand the Record.  That Texas Court of Criminal Appeals also rejected Mr. Broxton's efforts to have the claims returned to the state trial court, pursuant to Art. 11.071, sec. 5 so that the new claims could be fully and fairly developed, without explanation other than to find that despite this Court's own findings that illness and death of state habeas counsel constituted good cause for Mr. Broxton's failure to exhaust his claims in the earlier state habeas proceedings, the new application was an abuse of the writ pursuant to Art. 11.071, sec. 5(c).

## CONCLUSION

The conviction and death sentence against Mr. Broxton was obtained in clear violation of the U.S. Constitution.  The record reflects that Mr. Broxtons' rights under the Sixth and Fourteenth Amendments of the U.S. Constitution were violated consistently and flagrantly throughout the trial and he is entitled to relief from both his conviction and death sentence. .

Respectfully submitted,


 /s/Robert M. Rosenberg

ROBERT M. ROSENBERG
Attorney-At-Law
Texas State Bar No. 17272100
3303 Main Street, Ste. 305
Houston, Texas 77002
(832)816-2955-Telephone
(713)528-4888-Facsimile
attyrose3@gmail.com

ATTORNEY FOR PETITIONER,
EUGENE ALVIN BROXTON

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served via email to Georgette Oden, in the Office of the Attorney General for the State of Texas, at her email address of Georgette.oden@oag.state.tx.us on the 5th day of July 2011.

_/s/Robert M Rosenberg_____

100