Perez, Ruben

Petty vs Odyssey Marine
Phillips, Leonard

Phillips vs American Elastomer Products

Phillips vs Stone
Plake, Larry

Plocica vs NYL Care
Pylant vs Schoppe
Pollock, Patsy
Poulakis vs. Chase Bank of Texas
Prevot vs Phillips

Printiss v Chem-Aqua Inc.
Puckett vs Stokes
Queen vs Devereaux
Quintanilla, Rosa Maria and Theresa

Ramirez, Jesse

Ramirez, Raul Cruz and Ramirez, Veronica vs Delgado, Peter

Ramirez vs Phillips

Ramirez, Victoria

Ramos, Carlos
Reaves vs Copley Pharmaceutical
Reed vs Jackson

Redmond,Sr., Jason vs Greene's Energy Group,LLC et al

Redmond, Joshua

Redmond vs Cambridge International, Inc., et al

Reynolds, et al vs Luhrs Corporation, et al
Richards, Steve
Riley vs Stephen Miller, Ph.D.

Rios vs American General Life Insurance Company

Rittby vs Susan McChesney, Dr. Luke
Roark, Stenson vs TransOcean

Roberts vs Call

Robichaux, Michael vs Energy Partners, Ltd.,et al

Robinson vs Bridgestone
Roddy vs Beaumont Hilton et al

Rodriguez, Jessica

Rodriguez vs Cooper

Rodriguez vs Falls of Westpark Apartments

Rogers, Su-Lin vs HG Management

Romero vs Cajun Stabilizing

Rose vs Kingwood Hospital
Rosenblatt vs Freedom Life Insurance Company
Rubio vs Crawford Technical Services, et al
Salas et al vs Exxon

Salisbury vs City of University Park
Sanchez vs Montgomery -Kane

Sanchez, Nicole

Sanders, Dekeyion

Sanders Sr. , Lonzbell

Schiff, Michael vs Paul Stewart et al.

Schuett, Jennifer

Schuster, David
Scrimshire vs Privetera

Scrimshire vs Seton

Seago, Jeremy vs BP

Seago, Ricky vs BP
Sellers, Terry

Sevilla vs Ford Motor Company

Seymore vs Penn Maritime

Shabazz, Agyeman

Shields vs Time Warner Communications

Shields vs Coulter

Shephard vs Padre Behavioral Health Services
Schiff vs. Stewart
Shipley, Dorinda vs Brown & Root
Shoemake vs L. R. Clarke, M.D.
Shouse vs Shouse
Show, Alison vs Rice Properties, Inc., et al.

Shuler vs State Farm Insurance Co.
Sigers, Stacie
Sibley,Edward W. et ux vs Whittaker Corporation
Simon, Glenda

Skaggs vs Adelman et al

Smith vs Devereaux Treatment Center, Dr. Saeed
Smith vs Hinkle et al
Smith vs Phillips
Smith vs. Shanti

Smith vs M. Williams, M.D.

Snyder, Brian vs Meadwestvaco Corp et al

Soto, Ana

Sparks vs Fiserv
Stanley vs Calderon, United States District Court

Stanley vs State of California
State Farm vs Sealey

State of Texas vs Abraham, Mary

State of Texas vs Alexander, Tommy

State of Texas vs Alvarado

State of Texas vs Amaya, Reynaldo

State of Texas vs Arenyeda, Tosan

State of Texas vs Atuma, Angel

State of Texas vs Arzola,Esperanza V.
State of Texas vs Avworo

State of Texas vs Baez

State of Texas vs Benge, Cassandra

State of Texas vs Berceda

State of Texas vs Blalock

State of Texas vs Bolden

State of Texas vs Boler

State of Texas vs Bonnery Bey

State of Texas vs Boone, Dennis Dwight

State of Texas vs Branch, Robert Louis

State of Texas vs Broussard
State of Texas vs Buentello

State of Texas vs Bustamante

State of Texas vs Buse

State of Texas vs Bush,Brian
State of Texas vs Carrillo, Anthony

State of Texas vs Carranza

State of Texas vs David Cruz Chavez

State of Texas vs Christmas, Dondrick Deshon

State of Texas vs Clark, Wanda

State of Texas vs Clay, Lonnie

State of Texas vs Clay III, Courtney

State of Texas vs Clemons
State of Texas vs James Colburn

State of Texas vs Coleman, Lee Reginald

State of Texas vs Connelly,Gabriel Anthony

State of Texas vs Conner, Dalon

State of Texas vs Connolly,Mark

State of Texas vs Constante, Anthony

State of Texas vs Cornelius, Donald

State of Texas vs Craig, Steven

State of Texas vs Crawford, Richard

State of Texas V Crenshaw, Anabel Cedillos

State of Texas vs Davis, Adrian

State of Texas vs Day, Gordon

State of Texas vs Delauder,Don

State of Texas vs Diginee, Korkara

State of Texas vs Dunn, Robert

State of Texas vs Earl, Mariki

State of Texas vs Edwards, Ron

State of Texas vs Ellis

State of Texas vs Ellis, Detrick

State of Texas V Flinn, Jeffrey Lynn

State of Texas vs Ford

State of Texas vs Galland

State of Texas vs John David Gambino

State of Texas vs Garlington, Cody

State of Texas vs Floyd, Lee Garner

State of Texas vs Gill, Matthew
State of Texas vs Gilmore

State of Texas vs Girtman

State of Texas vs Gomez, Esdras

State of Texas vs Gomez, Roy

State of Texas vs Gonzalez, Edgar

State of Texas vs Gordon, Ronnie

State of Texas vs Grant

State of Texas vs Griffin, Alexander

State of Texas vs Hall, Dustin Louis

State of Texas vs Hall, Jonathan Carl

State of Texas vs Hannah, Warren

State of Texas vs Hargis, Shane Carter

State of Texas vs Harris, Jimmie Richard

State of Texas vs Haynes, Melvin Lewis

State of Texas vs. Haywood, Kimberly

State of Texas vs Henry, R.

State of Texas vs Hieng

State of Texas vs Hill, Bruce

State of Texas vs Hill, Charlene

State of Texas vs Hill, Kathryn

State of Texas vs Hollins, Fred

State of Texas vs Homan

State of Texas vs Hood

State of Texas vs Huff,Corey

State of Texas vs Hutchinson, Eugene

State of Texas vs Irving

State of Texas vs Johnson-Thomas,Derrick

State of Texas vs Jones, Eddie

State of Texas vs Jarisch

State of Texas vs Jimenez

State of Texas vs Johnson, Christopher Andrew

State of Texas vs Johnson, Kelvin

State of Texas vs Johnson, Sean

State of Texas vs Jones, Charles Ray

State of Texas vs Juarez

State of Texas vs. Junica, Jorge

State of Texas vs Keller, Carl
State of Texas vs Khan

State of Texas vs King, Anthony

State of Texas vs Kluis

State of Texas vs Ketchum

State of Texas vs Kfouri

State of Texas vs Kilmer, Kevin Patrick

State of Texas vs Kritzler

State of Texas vs Landry

State of Texas vs Le, Jr.,Tan Phung

State of Texas vs Lipkins, A R

State of Texas vs Lofton

State of Texas vs Martinez,Felipe

State of Texas vs Martis

State of Texas vs McAfee, Kenneth

State of Texas vs McGinnis, Adam T

State of Texas vs McGowan, Douglas Lee

State of Texas vs Medley

State of Texas vs Mehta

State of Texas vs Mejia,George

State of Texas vs Roberto Mendieto

State of Texas vs Mendez

State of Texas vs Middleton, Joseph Ray

State of Texas V Miller, Angel

State of Texas vs Minchew

State of Texas vs Minks, Johnny

State of Texas vs Mitchell

State of Texas vs Molina,Jr., Herrardo Jose

State of Texas vs Molina

State of Texas vs Moody

State of Texas vs Morlin

State of Texas vs Morvent, Billy

State of Texas vs Morrow, Kelly

State of Texas vs Moseley

State of Texas vs Munoz

State of Texas vs Nisbett, Ryan

State of Texas vs Nettles

State of Texas vs Nguyen, Cuong Van

State of Texas vs Nguyen, Cong

State of Texas vs Nesbitt, Ryan

State of Texas vs Norris, Jr.

State of Texas vs James Newcomb

State of Texas vs Nguyen, Cuong Van

State of Texas vs Nichols, Christina

State of Texas vs Nordberg, Todd

State of Texas vs Raymond Norris

State of Texas vs Oliver, Steven

State of Texas vs Omaya, Reynaldo

State of Texas vs Omoruyi, Richard Lee
State of Texas vs O'Neal,Joseph

State of Texas vs Ong

State of Texas vs Parton

State of Texas vs Paul, Subhash

State of Texas vs Pellerin, Lawrence

State of Texas vs Perez

State of Texas vs Placencia

State of Texas vs Portillo, Jose B

State of Texas vs Powell, Robert

State of Texas vs Prather, William

State of Texas V Quick, James

State of Texas vs Richards

State of Texas vs Rodgers

State of Texas vs Romero

State of Texas vs Russell, Aaron Javey

State of Texas vs Salinas, Patrick

State of Texas vs Santos, III, Isaias

State of Texas vs Scott Sawer

State of Texas vs Scaramozi

State of Texas vs Schilens, Darcy Leeann
State of Texas vs Seitz, John H.

State of Texas vs Serrano, Omero

State of Texas vs Shanklin

State of Texas vs Shaw, Ray

State of Texas vs Shelton

State of Texas vs Shelvin

State of Texas vs Sims

State of Texas vs Skinner

State of Texas vs Smith, Brian

State of Texas vs Smith, Sean

State of Texas vs Starks

State of Texas vs Stringer,Kai Jewenn

State of Texas vs Taylor, Tremaine Lamanuel

State of Texas vs Thomas, Andre

State of Texas vs Thomas Justin Thomas

State of Texas vs Todd, Michael Dugan

State of Texas vs Toon, Jennifer Charlene

State of Texas vs Travers , Kelly

State of Texas vs Turner, Albert James

State of Texas vs Uvalle, Randy Nenenses

State of Texas vs Walton, Audrey

State of Texas vs Washington, Omar K

State of Texas vs Wear
State of Texas vs Welch, James

State of Texas vs Westfall

State of Texas vs Cantu Dvon White

State of Texas vs Williams

State of Texas vs Roosevelt Hughes Williams

State of Texas vs T. J. Williams
State of Texas vs Winter

State of Texas vs Wolf,Sonya

State of Texas V Zavala, Fidencio

State of Texas V Zimmer, Alekos
State of Texas vs Zuniga
Steffan vs Johnson & Johnson

Stephens,William

Stephenson, Robert

Stoner, William
Stottlemire, Bertie vs Walton Roofing

Stovall, G.T.
Stubblefield vs Southern Pacific Transportation Co.
Tatom vs Irvin H. Whitehouse and Sons, et al
Taylor, Carl vs TransOcean
Tenant vs PIA International, et al
Thibodeaux vs Barton Associates et al
Thomas, Mary
Thomas vs Jade
Thompson, Marvin
Torrez vs Thomas
Tovar, Humberto

Trahan, Rachel

Tran, Lydie

Traveler's vs Atlantic et al
Trice, Randy

Turner, Ronald
United States vs Benny Cleveland Davis
United States vs David Jefferson Jennings

United States vs Robert Sacks

Ussin, Dominique
Vasquez vs TVO Realty Part
Veillon

Vela vs Price

Villareal, Hermes

Vitamin Sea

Walden, Chad

Walters, Valerie

Walton vs GMC
Ward vs Gary Young/Star Tool
Warner, Marvin and Charlie Jackson vs Celadon Trucking
Warren, Robert

Webber vs John K. Long
Weidel vs Ashcroft

Welch, Betty Tiner

Whitaker vs State of Texas
White vs Sears et al
Williams, et al vs Walgreens Co., et al

Willis, Cathleenia

Wingo vs Norman Lee Davis, Jr., TAB Temp, Inc., and CBD Investments
Winslett et al vs GM
Winton
Witmer vs Crocker
Wittman, Marilyn
Wolfe vs Hahnny & Ayala
Wood vs Memorial Hermann System

Wright, Colin
Young, Robert
Ybarra vs Furlo Systems Inc.
Ybarguen vs Srs Shopping Center

Yensen vs McGhan, 3M et al

S:WPDOCS/DJB/ADA FORMS/RESUME2005/CASEE LIST.E2506

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EUGENE ALVIN BROXTON, | § |
| Petitioner, | § |
| | § |
| v. | § C.A. NO. 4:10-mc-00048 |
| | § CAPITAL HABEAS CASE |
| RICK THALER, DIRECTOR, | § |
| TEXAS DEPARTMENT OF | § |
| CRIMINAL JUSTICE, INSTITUTIONAL | § |
| DIVISION, | § |
| Respondent. | § |

## **AFFIDAVIT OF KENNETH WILLIAMS**

| | |
|---|---|
| STATE OF TEXAS | § |
| | §\ |
| COUNTY OF HARRIS | § |

BEFORE ME the undersigned notary public appeared Kenneth Williams and upon his oath testified to the foregoing:

"My name is Kenneth Williams. I am over the age of 18 years old and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge and beliefs.

"I am an attorney licensed to practice in the States of Texas and Louisiana. I graduated from the University of San Francisco and hold a law degree from the University of Virginia in 1986. I have been both a law professor since 1989. I am currently a visiting professor at the South Texas College of Law in Houston, Texas and hold a tenured full professor position at Southwest University College of Law in Los Angeles, California. I have been teaching courses in capital habeas law since 1989. I am currently writing a book on capital habeas litigation titled, *Most Deserving of Death? An Analysis of the Supreme Court's Death Penalty Jurisprudence* (to be published by Ashgate Publishing Company, completion expected 2011) that examines the law and application of the death penalty in the United States. Since beginning my teaching career, I have published many scholarly articles addressing issues related to capital habeas litigation, including *Ensuring the Capital Defendant's Right to Competent Counsel: It's Time For Some Standards!*, 51 Wayne L. Rev. 129 (2005) (cited in Congressional Testimony, available at http://judiciary.house.gov/hearings/pdf/Bright090922.pdf at 5 n. 9 (Sept. 22, 2009) and most recently, in 2009, an article focused on the prejudice prong of the *Strickland* test for evaluating claims of ineffective assistance of counsel. *See Does*

*Strickland Prejudice Defendants on Death Row?,* 43 U. Rich. L. Rev. 1459 (2009). I have also taught and lectured on capital litigation as a guest lecturer around the country and overseas and I am regularly called upon by the media to opine, as an expert, on various issues related to capital litigation. My current curriculum vitae is attached hereto.

"In addition to my scholarly work dealing with capital habeas litigation, I have consistently represented death row inmates in Texas since the 1989 and continue to do to today. I am currently the attorney of record in two pending capital habeas cases in the Southern District of Texas.

"I have been asked to review certain issues related to the Eugene Broxton case. In particular, I have been asked to review the case that the defense attorneys put forth on behalf of Mr. Broxton in his sentencing trial that took place in 2003, after this Court overturned Mr. Broxton's original death sentence due to the improper testimony of Walter Quijano, Ph.D.. The primary questions that I have been asked to opine on is whether or not, Mr. Broxton received effective assistance of counsel as required by the Sixth Amendment of the U.S. Constitution.

"After reviewing the materials, I am of the opinion that Mr. Broxton did not receive effective assistance of counsel during his second sentencing trial and that his trial attorneys and his habeas attorney failed to meet the standards of performance set forth in and suffered prejudice as a result of the attorneys' deficient performance satisfying both prongs of the *Strickland v. Washington*, 466 U.S. 668 (1984), test to evaluate claims under the Sixth Amendment for ineffective assistance of counsel.

"During the original trial in 1992 Dr. Quijano testified as a prosecution witness. For a period of many years, Dr. Quijano became a popular and well known prosecution witness who was known for being able to deliver testimony to support the prosecution in case after case. Dr. Quijano's legitimacy as an expert witness came into serious question when it became his practice to include race as a legitimate factor in forming his opinion on the issue of future dangerousness. As noted above, this Court reversed Mr. Broxton's original sentence after finding that Dr. Quijano's testimony was so inappropriate that the State's use of the testimony constituted a violation of a defendant's right to due process under the Fourteenth Amendment.

"What is particularly troubling about this case is that given the background of Dr. Quijano that was well known within the criminal defense bar at the time of Mr. Broxton's second sentencing trial, and the fact that Dr. Quijano had actually testified as a state's witness against Mr. Broxton during the original trial, the defense counsel made the very curious decision to rely on only Dr. Quijano to testify on behalf of Mr. Broxton on the issue of his mental health and any risk he posed to society, i.e., the answer to the second special issue a jury must answer in the affirmative before the death sentence can be imposed under Tex. Code Crim. Pro. Art. 37.071, sec. 2(b)(1). Dr. Quijano's testimony at the original trial had been very effective and damaging and it would have been very

difficult avoid any effort to impeachment by the state during the second trial under even the best of circumstances had Dr. Quijano changed his opinion in any material way. Unfortunately for the defendant, his attorneys during the second trial were never put to the test of having to overcome the State's efforts to impeach a reformed Dr. Quijano because Dr. Quijano proved to be as strong of a witness for the State in the retrial as he had been during the original trial. The defense attorneys made the extraordinarily decision to put on their own expert witness to testify that their client was a lying, manipulative sociopath who would forever pose a danger to society. Fom a review of the testimony of both Dr. Quijano in both trials and the testimony of the original defense expert in the first trial, Dr. Wendell Dickerson, there were other choices that could have been made that may have benefitted Mr. Broxton. Being charitable, presumably Dr. Quijano's testimony was the result of failure of trial counsel to adequately investigate and prepare for trial rather than a calculated decision to use a witness who would prove the most essential element of the State's case for the death sentence and Mr. Broxton's rights under the Sixth Amendment to effective assistance of counsel were due to negligence and ineptness and the courts should question the propriety of including them on the list of death penalty qualified counsel. On the other hand, if the trial attorneys take the position that they were fully aware of what Dr. Quijano's opinions regarding their client before he testified and they decided to use him anyway, their choice in calling Dr. Quijano would have been an intentional violation of their client's rights to counsel under the Sixth Amendment and in clear violation of Texas Code of Professional Conduct, which imposes a duty on an attorney to zealously represent their client and disciplinary action is probably appropriate since they intentionally put forth evidence that was diametrically opposed to the purpose of their role as defense counsel. Coupled with other questionable actions by the trial attorneys in the presentation of the defense case, the attorneys' failure to render effective assistance of counsel is even more clear and obvious and the prejudice caused to Mr. Broxton overwhelming.

"Specifically, during the original trial Dr. Dickerson testified that Mr. Broxton had long suffered from significant periods of depression that required medical intervention including a litany of psycho-tropic drug therapy. In the original trial, Dr. Dickerson testified that despite Mr. Broxton's mental illness, Mr. Broxton exhibited a great deal of empathy for the suffering of others to the point of being overwhelmed at times and regularly breaking down in crying fits. Dr. Dickerson specifically testified that Mr. Broxton *was not a sociopath and offered very solid testimony to explain why he believed that to be the case.* Dr. Dickerson's opinions were based on a review of Mr. Broxton's extensive prison records including both his disciplinary records and his health records that extended over a period of approximately twenty years. Dr. Dickerson made a very strong witness for the defense.

"On the other hand, at the original trial, Dr. Quijano testified that Mr. Broxton was a sociopath suffering from a personality disorder that rendered him a cold, detached serial killer who would kill again if the opportunity arose. Although many points about Dr. Quijano's methodology and views were questionable and suspect, Mr. Broxton, along with many other defendants that Dr. Quijano had testified against, had his sentence

overturned because one of the several factors that Dr. Quijano relied upon in formulating his opinion was that the fact that Mr. Broxton is a Black male, something that Dr. Quijano testified was a legitimate factor in predicting future dangerousness.

"In his testimony during the second sentencing trial Dr. Quijano was able to testify to the same conclusions he had reached on the issue of future dangerousness however both Dr. Quijano and the prosecution were careful to avoid inserting the issue of race into the factors that he considered in formulating his opinions about Mr. Broxton. The bottom line of Dr. Quijano's testimony in the second sentencing trial was identical to his opinion in the first trial, i.e., that despite significant evidence to the contrary, Mr. Broxton is a sociopath who will always pose a future danger to society. In reviewing the questioning by both sides, it is clear that Mr. Moran had not prepared himself or his witness for the case. Instead, of focusing on the actual language of the special issue on future dangerousness that would be submitted to the jury, Mr. Moran appeared to be operating under the mistaken notion that the term "society" was limited to the prison setting rather than society at large, as it the context in which the term is used in the special issue. To the question of whether or not Mr. Broxton posed a future risk of danger to society at large, in other words, the special issue that the jury was called upon to answer, Dr. Quijano stated without equivocation that the jury should answer the special issue in the affirmative, meaning that if the jury answered the other special issues in the affirmative the death sentence was automatic.

"Mr. Moran was clearly unprepared for Dr. Quijano's opinion on the ultimate issue in the case. In addition to Dr. Quijano's very damaging answer on the ultimate issue in the case, on cross-examination, the State quickly and very effectively lead Dr. Quijano through a series of questions regarding his diagnosis of Mr. Broxton as a sociopath and what exactly that means in how he interacts with people and why he will always be a future danger to society that was as damaging as his testimony had been when he had been called as the State's own witness during the original trial. Dr. Quijano testified that under all other conditions of confinement or in society at large, which is the focus of the special issue, Mr. Broxton would most certainly pose a high risk of being a danger to others. Dr. Quijano was allowed to testify that in his opinion, Mr. Broxton was a cold blooded, callous sociopath who had only refrained from violence while living on death row to manipulate the system and maintain a good disciplinary record so he could enjoy certain perks and privileges that are awarded to prisoners who stay out of trouble. Dr. Quijano testified that if left to his own devices, Mr. Broxton would pose a high risk of danger to society.

"On re-direct it Mr. Moran complete lack of preparation was apparent. Mr. Moran repeatedly attempted to rehabilitate Dr. Quijano's testimony however Mr. Moran was attempting to get Dr.Quijano to answer special issue number two in the negative using an incorrect definition of the term "society". Further, based on the view of a clinical interview and psychological standardized testing, it was impossible for the defense to make an effort to treat Dr. Quijano as a hostile witness and impeach him based on his methodology and long expressed racist views, since the defense had sponsored his

testimony and elicited many of the most damning the answers before the State asked a question.

"Whether the problem was a lack of preparation or that Mr. Moran was tricked by Dr. Quijano into being called as a defense witness, given Dr. Quijano's long standing reputation as a compliant, racist prosecution witness, his theories of determining future dangerousness made him completely inappropriate as a defense witness under any circumstance. Had Dr. Quijano somehow managed to bring himself to testify in a favorable way on behalf of Mr. Broxton, given Dr. Quijano's history and his own admittedly unprofessional analytic practices, he could have been easily impeached by the State had they thought it was necessary to do so. Given Dr. Quijano's long and soiled history in capital murder cases, it was objectively unreasonable for the defense to attempt to utilize Dr. Quijano as their own witness. It was particularly unreasonable to utilize him without knowing exactly what he was going to testify to and that he was absolutely committed to opinions that would sway the jurors in favor of Mr. Broxton rather than serve as the nails in Mr. Broxton's coffin.

"What makes the choice of Dr. Quijano a very puzzling and troublesome choice for Mr. Moran to have made is that along with his partner Stanley Schneider, Mr. Moran had represented a habeas petitioner in *Saldano v. State*, 70 S.W. 3d 873 (Tex.Crim.App. 2002). In the *Saldano* case, Justice Price likened Dr. Quijano's testimony concerning race in determining future dangerousness to a skunk on the jury room that emits a stench that cannot be removed under any circumstances and makes all other issues secondary. While this Court's own opinion in Mr. Broxton's first habeas proceedings is far less colorful in its description of Dr. Quijano's work, presumably Mr. Moran would have been aware of the strong words that Justice Price had about Dr. Quijano and his theories and avoided Dr. Quijano at all costs.

"The problems with Dr. Quijano's testimony were only compounded by additional highly questionable decisions that were apparently made by defense counsel that demonstrate that little or no thought was engaged in to develop and present a meaningful and coherent defense. Instead of presenting detailed testimony of Mr. Broxton's history. including his early life of being raised in squalor by a disabled mother who neglected and abused him to the point where the authorities removed him from his family without explanation to him, contributing to a life of believing he was unloved and unworthy of the love of others causing sever depression and finding that life in prison was more comfortable for him than life in the free world where he had no life skills to adapt and lead a crime free and productive life. all of which was readily available and had been compiled for the original trial, Mr. Broxton's trial attorneys simply entered the thousands of pages of records into evidence and Skip Cornelius quickly summarized the records, inviting the jury to take the records into the jury room and examine them more thoroughly if they saw fit to do so. Neither trial attorney made any effort to put the information into any context through the use of an expert witness who could explain what the life experiences Mr. Broxton had suffered through might have caused him to end up in court facing a death sentence.

"The testimony of both of Mr. Broxton's siblings speak volumes about the complete lack of preparation and stategy that trial counsel had for presenting a defense case in the second sentencing trial. Trial counsel first called Mr. Broxton's sister, Mattie Walters, who is a minister in Houston, Texas. Ms. Walters testified that the day after one of the murders the State alleged Mr. Broxton had committed was reported on the television news, she picked up Mr. Broxton to go to her church with her. Under direct questioning Ms. Walters was ask to explain how Mr. Broxton had a cut on his hand and how she observed him speaking with the head minister and breaking down in tears as if he might be responsible for the killing. Ms. Walters testified that Mr. Broxton did not confess to the murder but the impression her testimony left was that at least she clearly was under the impression that Mr. Broxton had committed the murder and was discussing it with the minister. In the first trial, through the testimony of Dr. Dickerson, the jury learned that Mr. Broxton had a long documented mental health record and that he suffers from clinical depression and he easily cries upon hearing unpleasant news. During the second trial defense counsel did not introduce any testimony on this point and it would have been up to the jurors to dig through the mental health records to find that information on their own. It also did not appear to occur to trial counsel that such evidence might be a strong counter to Ms.Walters' testimony that left the jury to believe that Mr. Broxton had been sobbing when speaking to the minister because he had killed someone the day before.

"The only other family member the defense called as a witness was Mr. Broxton's older brother. From the testimony it appears the sole purpose of calling him as a witness was to testify that if Mr. Broxton was executed it would make him sad and he would miss having Mr. Broxton as his brother. The State quickly impeached the brother's testimony and further diminished Mr. Broxton's importance in this world by asking the brother how much time had passed since the two had communicated with each other. The answer of sixteen years most likely suggested to the jury that the relationship between brothers was not so significant that Mr. Broxton's execution would give his brother a moment of sadness or longing for his company.

"In a review of the files from Troy McKinney and Tom Moran from the original trial. it also appears that the police investigative reports contain information that in at least one of the extraneous capital murders Mr. Broxton is alleged to have committed, that of John Miller. the police had tips that at least four other individuals should be suspects in the case. These included a tip from a police officer who notified the detectives that the image shown on a television spot resembled a drug dealer in the neighborhood the police officer worked. Another tipster was a parole officer who had notified the detectives that the image resembled one of his parole clients. The other two identifications might have been considered less reliable than those coming from law enforcement officers however the records do not reflect any investigation that the detectives conducted to clear any of the four possible suspects. The defense attorneys did not question the investigating detectives on the possible alternative suspects and what they did to actually clear those individuals. Additionally, the police report records reveal that there the detectives had available to them a videotape from a convenience store where Mr. Broxton allegedly used one of Mr. Miller's stolen credit cards to purchase cigarettes. While one of the

employees allegedly could identify Mr. Broxton as the individual using the Miller credit card, the videotape was not mentioned at trial by the defense or the prosecution. It is understandable that the prosecution did not introduce the tape because it shows someone other than Mr. Broxton using the card. Had the defense attorneys introduced evidence regarding the alternative potential perpetrators and the videotape showing someone other than Mr. Broxton using the card, the defense could have very effectively impeached the state's case on the Miller extraneous murder which very likely would ahve caused the jury to be demanding than they appear to have been in examining the extraneous offense evidence.

"I have also been asked to review issues related to ineffective assistance of counsel as they relate to the introduction of psychiatric testimony of Christopher Shook during the original trial concerning his allegations that he committed crimes because of auditory hallucinations he claimed to have of Mr. Broxton telling him to commit robberies and murders to obtain drug money. Had the defense been able to use the Shook evidence in the limited way they intended, it is possible that the outcome of the original trial may have been different because Mr. Shook would have been a very viable alternative suspect that the defense attorneys could have pointed to for purposes of raising reasonable doubt. The issue of admissibility of the evidence was raised on direct appeal as a violation of the confrontation clause and the due process clause of the U.S. Constitution. The Texas Court of Criminal Appeals refused to consider the error on appeal because at trial the defense attorneys had failed to preserve the error under the Constitutional claims, instead that the trial judge's actions were in violation of a Texas Rule of Evidence. Clearly, the failure of the trial attorneys to preserve what was a very legitimate error by raising the appropriate arguments causing the error to be procedurally barred on appeal was ineffective assistance of counsel under the Sixth Amendment.

It is my opinion that given the history of the case, from the outset in 1991, Mr. Broxton appears to be a person who has suffered from a true miscarriage of justice and that he should be allowed to raise all of the previously unexhausted claims raised in his current petition at this time. In addition to the claim regarding Mr. Shook, Mr. Wheelan, was truly inadequate in only raising claims regarding the constitutionality of the death penalty and its application in Texas, issues that would provide little opportunity for relief, while for various reasons, the claims raised in the current habeas petition all show true viability and warrant this Court granting a motion to stay and abate these federal proceedings and sending the case back to the state courts for exhaustion pursuant to *Rhines v. Weber*, 544 U.S. 268, 276 (2005). To the extent that the claims may have been raised in earlier habeas proceedings and whether or not raising them in this habeas proceeding is barred as a successor writ under the AEDPA, the recent U.S. Supreme Court case of *Magwood v. Patterson*, 130 S. Ct. 2788 (2010), previously unexhausted claims addressing issues from the original guilt/innocence proceedings may be raised during the habeas proceedings following a resentencing trial and such claims are not to be considered as a second or successive writ that might

otherwise be barred pursuant to 28 U.S.C. §2244(b).  To bar the claims at this point, would be a fundamental miscarriage of justice.

"Affiant sayeth no more."



KENNETH WILLIAMS

SWORN AND SUBSCRIBED TO before me, the undersigned notary on this 22nd day of January 2011.

NOTARY BY AND FOR THE STATE OF TEXAS

My commission expires:_____

STEPHENIE SHAPIRO
Notary Public, State of Texas
My Commission Expires
September 07, 2011

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EUGENE ALVIN BROXTON, | § |
| Petitioner, | § |
| | § |
| v. | § C.A. NO. 4:10-mc-00048 |
| | § CAPITAL HABEAS CASE |
| RICK THALER, DIRECTOR, | § |
| TEXAS DEPARTMENT OF | § |
| CRIMINAL JUSTICE, | § |
| INSTITUTIONAL DIVISION, | § |
| Respondent. | § |

## AFFIDAIVIT OF GINA VITALE, LMSW

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME the undersigned notary public appeared Gina Vitale and upon her oath she testified to the following:

"My name is Gina Vitale. I am over the age of eighteen years old and I am in all ways qualified to testify to the matters contained herein based on my personal knowledge. "I currently live in Houston, Harris County, Texas. Since 2000 I have worked as a mitigation specialist in capital murder/death penalty cases around Texas. Over the past 10 years I have worked as part of the defense team in many capital murder cases in the State of Texas. I hold a B.S. degree in psychology from Tulane University and an M.S.W. degree in social work form the University of Houston. I am a licensed Master of Social Work in the State of Texas and I have advanced training in forensic social work. I am a member of the National Association of Social Workers, the National Association of Sentencing Advocates, and I have been presented in numerous programs on the work of mitigation specialists in criminal cases. In 2003 I received a Letter of Commendation from the National Association of Sentencing Advocates for the work I performed in the Washington v. Herbert Ray Riggins case.

"Over the past ten years I have worked with many attorneys appointed to represent defendants in capital murder/death penalty cases. While each case is different and requires different levels of participation by each member of the defense team, it is my experience that the most effective attorneys in such cases regularly meet with the investigators, mitigation specialist, and mental health experts to develop a strategy of presenting a defense case that will offset the often horrific facts of the crime for which the defendant has been charged and shift the focus away from the facts of the crime and the victim to the life history of the defendant. During the presentation of the defense case during punishment the goal of the defense team must be to offer the jury reasons why, despite having found the defendant guilty of having committed a capital murder, the defendant's life does have value and that the death penalty is not warranted. I have found that the most effective way defense attorneys can do this is by insuring that there is

sufficient communication between all members of the defense team. It is necessary for defense attorneys to insure that information gathered by all members of the defense team is assembled in a coherent, meaningful manner to tell the jury the entire narrative of the defendant's life so that the jury will see the defendant as a fellow human being, who are often themselves victims of brutal and cruel circumstances, untreated mental illness, drug addiction, or other circumstances often beyond their own control. Whatever crimes they have been found to be guilty of may be either wholly or in part a symptom of the defendant's circumstances and that the defendant would himself either be a victim of crime or live a life of crime that might lead to their own death. Further, as a mitigation specialist, it is my job to help develop a case that addresses the special issue asking the jury whether the defendant poses a future danger to society and ideally, develop a case that would persuade the jury to answer the special issue in the negative.

"In 2003 I was employed to work on behalf of Eugene Broxton by Skip Cornelius and Tom Moran. Mr. Broxton's life experiences that lead up to the time he was charged with the capital murder of Sheila Dockens are unfortunately all too common in my line of work. In my work on the Broxton case, I had little contact with Mr. Moran. Although I did discuss Dr. Quijano's presence in the case with Mr. Cornelius, I did not have any direct dealings with Dr. Quijano. While I do not meet with every defense expert or investigator in every case, I generally do have an open line of communication with them, as well as the attorneys, so that whatever I am working on is shared by the others on the defense team.

"Part of my work as a mitigation specialist is to gather the medical, school, prison, military, and any other documentation of the defendant's life that might shed light on how he got to the point of being a capital murder defendant. I did assist in doing that in Mr. Broxton's case. According to the records that were available, Mr. Broxton was removed from his mother's home by the welfare authorities in a small town in Louisiana due to his mother's neglectful and abusive conduct towards him. Mr. Broxton was placed in a home for boys that was shut down within a year of his placement. From there he was placed in the foster care of Hattie Washington. Ms. Washington took care of Eugene for approximately a year before Eugene was arrested for having taken the Washington family car without permission and wrecking it. From there Eugene was sent to the Louisiana youth authority where his life in the criminal justice system began and where he continued to live for the rest of his life, save and except short periods of time when was paroled only to get into trouble and be sent back into the system. The records I reviewed from both the Louisiana and Texas prison systems portray a man who was able to maintain relatively good conduct throughout his years in confinement despite having significant mental illness, in particular severe depression that was generally untreated despite Mr. Broxton's request for treatment. What the records also show is that not only did Mr. Broxton not receive the mental health treatment he needed, but that he had been promoted throughout grade school until he was fourteen years old, despite never learning to read. Mr. Broxton's history demonstrated that he had the ability to live peaceably in prison. However, without the strict structure of prison life, he floundered and committed crimes resulting in being reincarcerated. Unfortunately, despite having taught himself to read and write during his early twenties, he still had no opportunity to learn the basics of what it takes to succeed in the free world. This inability to manage a life in the free world compounded by Mr. Broxton's mental health issues and his need to self-medicate, he quickly found himself in legal trouble which resulted in being returned into the structured prison life that he appears to be most comfortable in.

"In the Broxton case, at no time did Mr. Moran directly consult me about what experts I thought might be most appropriate in developing the narrative to tell the complete story of Eugene Broxton, despite a mitigation specialist's unique access to a pool of resources and knowledge of which experts are available and which experts are best tailored to the facts of the particular case. Not all experts are appropriate for every case. Although I did have some discussion with Mr. Cornelius about expert witnesses, Mr. Moran never spoke to me concerning the use of Dr. Quijano. Given Dr. Quijano's testimony that Mr. Broxton was a future danger to society in the earlier case and by the time of the second trial, his well known racial biases that informed his opinions on the issue, there were other mental health experts that I could have recommended and worked with who would have been more appropriate than Dr. Quijano proved to have been.

"In my work as a mitigation specialist, other than in the Broxton case it has not been my experience for defense counsel to put on a mental health expert to testify, as Dr. Quijano did in the retrial, that the defendant is and always would be a future danger to society. It is my view that such testimony would be considered counterproductive to the best defense of the client.

"Affiant sayeth no more."

_____
GINA VITALE

     SWORN AND SUBSCRIBED To before me the undersigned notary on this $22^{ne}$ day of
January 2011.

NOTARY PUBLIC BY AND FOR THE STATE OF TEXAS

JUDITH VARGAS
My Commission Expires
July 20, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EUGENE ALVIN BROXTON,                        §
                                             §
            PETITIONER,                       §
                                             §
v.                                           § C.A. NO. _____
                                             § CAPITAL HABEAS PETITION
RICK THALER, DIRECTOR, TEXAS                  § DEATH PENALTY CASE
DEPARTMENT OF CRIMINAL JUSTICE,              §
INSTITUTIONAL DIVISION,                      §
                                             §
            RESPONDENT.                       §

## HABEAS CORPUS PETITION-EXHIBITS(SECTION 3)

2.    Affidavit of Troy McKinney -with attachments

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EUGENE BROXTON, | § |
|          Petitioner. | § |
| v. | § C.A. NO. 4:10-mc-00048 |
| | §  CAPITAL HABEAS CASE |
| RICK THALER, DIRECTOR, TEXAS | § |
| DEPARTMENT OF CRIMINAL JUSTICE. | § |
| INSTITUTIONAL DIVISION, | § |
|          Respondent. | § |

## AFFIDAVIT OF W. TROY MCKINNEY

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

Before me, the undersigned notary public, appeared W. TROY MCKINNEY, and after

being duly sworn testified to the following:

"My name is W. Troy McKinney. I am over the age of 18 years old and I am in all ways
competent to testify to the matters stated herein.

"I am an attorney who is licensed to practice law in the State of Texas. I maintain an office
at 440 Louisiana, Suite 800, Houston, Texas 77002, and am a shareholder in Schneider &
McKinney, P.C.

"In 1991, I was appointed to represent Eugene Alvin Broxton in a capital murder death
penalty case along with Tom Moran, who also works for our firm. During the time I
represented Mr. Broxton, the practice of the District Attorney's office was to permit defense
attorneys only to review offense reports and other documents connected with a case at the
District Attorney's office (or in the courtroom). where attorneys were permitted to take notes
of items in the file but not permitted to actually copy the documents, though there were
occasions when copies of some documents were provided. It was my practice to review the
files and take notes, including at times, handwriting portions of police reports. On occasion.
individual assistant District Attorneys would allow defense attorneys to dictate portions of
the files into a recording device. I sometimes had my handwritten notes typed and always
had anything I dictated typed. Attached hereto as Exhibit A and B are true and correct copies
of typed notes or dictation (or a combination of both) that I (or my co-counsel Tom Moran)
took in the Broxton case. Though parts of the typed material appear to be verbatim, the vast
majority of it is my notes and is not verbatim. As is the ordinary course of my practice and
the manner in which we conduct our business, the typed notes have been maintained in Mr.

Broxton's file since the notes were originally typed.  I have had non-exclusive control over the notes since the notes were originally typed and placed in the file.

"Affiant sayeth no more."

W. TROY MCKINNEY

SWORN AND SUBSCRIBED BEFORE ME, the undersigned notary public on this 24

day of January, 2011.

NOTARY PUBLIC
STATE OF TEXAS

NOEMI INFANTE
MY COMMISSION EXPIRES
October 17, 2013

JOHN GORDON MILLER
HPD OR #38887911K

DATE: 4/19/91
LOCATION: 12221 Fleming
TIME: 1300 hours

Witnesses:

1.   Robert Hart
     470 Maxey Road #705
     455-9600(h)  674-3333(o)

2.   Clyde Francois
     504 Woodsmoke
     455-6374(h)  450-2840(o)

3.   L.C. Gordon
     12221 Fleming #1807
     455-2229(h)

4.   Ruth White
     12221 Fleming #1010
     453-8314(h)

5.   Shirley Ann Hatton
     12221 Fleming #1807
     455-2229(h)

6.   Joslin Baxter
     12221 Fleming #1209
     451-5620

7.   Herman Gardner
     507 Coolwood
     453-2832(h)

Vehicle:   1989 Blazer, black and gold, 5531TD
           VIN 1GNC518ZOK8221867

Property recovered:  Included pair of complainant's glasses

Scene Officer:  T.E. Lankford, #41474

### SCENE SUMMARY

East driveway and parking lot of Yorkshire Village apartments,
12221 Fleming.   Complex  includes  numerous  two-story  brick

1

*Ex. A*

buildings. Offense was on NE corner of U-shaped driveway at extreme north end of east driveway. Offense in front of building 1901-1908.

A pair of men's glasses was found in driveway 61 feet south of the northeast corner of the mail building, south of west curb of driveway. Marks on gravel indicate struggle had taken place around the glasses. A Timex watch was found south of the glasses.

A large amount of blood along was nearby and to the east there was a 6-inch blood splatter. A trail of blood leads southeast from that mark to a bloody bare footprint.

Complainant was wearing no shoes or socks. Had on casio watch.

SUMMARY

The complainant and the suspect were seen together about 1 p.m. in a Blazer just talking. A witness saw them parked on the west side of the project between the 901-916 building and the 1101-1108 building next to a dumpster.

At 1:10 p.m., 911 was called for a stabbing. The complainant was walking north from the postal boxes and the suspect ran up behind him and started stabbing him. The complainant tried to fight back and picked up rocks from the gravel driveway and threw them at the suspect.

There was a chase and the complainant ran across the driveway. The suspect caught him and stabbed him several more times with a large butcher knife. The suspect then walked calmly to the Blazer and saw a crowd of witnesses. He drove out of the complex and a witness followed him in a car. He drove east in Interstate 10 from

2

Federal Road.

HART: He was visiting a friend, Herman Gardner. He saw the parked Blazer and the fight. He described the suspect as a BM, late 30s, 6-foot-1, 170 pounds with dark complexion, clean shaven. Low cut hair.

FRANCOIS: Gave no description.

GOODWIN: Saw a black male stab a Latin American male and heard screaming. Description: BM, late 30s, dark skinned, 6-foot-1.

WHITE: Coming out of apartment 1807 with Shirley Hatton, saw BM and WM tussling. Saw BM stab him several times and walk off. Description: BM, about 40, short and stocky, 190-200 pounds with little Afro. White later picked Braxton at lineup and said suspect was stockier. Also said was a 4 on a scale of 1-10. Now, Lambright says she cannot identify the suspect.

HATTON: She called 911. Gave no description.

BAXTER: Saw suspect and complainant in the Blazer. The complainant was in the passenger seat.

PERSON WANTED: BM, 33-38, 6-foot to 6-foot-2, 160-200 pounds, black short afro.

### CRIME SCENE UNIT

Complainant's body 48 feet from the watch and glasses. The watch was a Timex.

### SUPPLEMENTS

4/20/91 Roy Floyd, 580-6131, identifies the complainant. He is the complainant's brother-in-law. Complainant lives at 12806

3

Chamberlin, 870-0031. Complainant is a magazine salesman for Murdock Magazines. He is a route manager who goes from store-to-store. His widow, Kay Miller, said he was working the East End. When he did not come home, the family called the police and were told to call the morgue. They identified him from a morgue picture.

The glasses found at the scene were the complainant's. He also wore a gold chain and a ding with a 1/4 carat diamond.

Boyd Smith called his boss, Jay Frier, 463-1602. He said that Miller's route on April 19 was

1. Appletree, 1050 Federal Road.
2. Fiesta, 12201 East Freeway.
3. Target, 12001 East Freeway.
4. Krogers, 11035 East Freeway
5. Seller Brothers, 10901 Market.

He had set up at the Appletree but not at the Krogers, indicating that he had not been there.

At the Appletree, Regina Prices seemed to remember the complainant coming in but does not know his name. Linda Mendiola, who was working the cashier's booth, said she had seen a BM mid-30s, 5-foot-8, come in, act suspicious, stay a while, then leave.

At the Fiesta, off duty HPD Officer A.E. Chapman, #86205, was working an extra job. He said that the suspect's description matched "Red," a big dope dealer in the Fifth Ward. He said Red steals Blazers and Astrovans and gives them to kids to run dope. Red hangs out at 4208 Collingsworth.

4

Smith found that by going east from the Target on Interstate 10 service road, a block south is Centerwood, a street running north. it is 0.3 miles north on Centerwood to Fleming and 0.2 miles east on Fleming to the apartment complex.

No prints found on watch or glasses.

5/16/91 Progress report

On 4/30/91, Russel Miller, the complainant's son, called and said that the family had received the complainant's Exxon bill. There were several charges after his death.

1.  4/20/91, 3000 Decker, Baytown $20.02

2.  4/20/91, 100 S. Alexander, Baytown, $18.84.

3.  4/21/91, 6012 Interstate 10 E, Baytown, $21.30 - Exxon

4.  4/21/91, 6203 Decker, Baytown, $20.36

5.  4/21/91, 6203 Decker, Baytown $19.29.

    5/17/91                                    Shows - Hl arrunk.

Chevron station, 704 Sheldon, Miller's credit card used at 2:09 p.m., 4/21/91. It was confiscated. Virginia Jones identifies Broxton from photo spread.

5/7/91

Miller case is on City Under Siege and shows composite drawing of suspect. Police get following calls:

1.  Anonymous caller says it is James Curtis Singletary, BM 1/29/49, HPD #285218. He was arrested 3/3/91 for assault.

2.  John Clauson, parole officer, 957-5700, says it is one of his clients, Billy J. Duncan, 12/11/62. He was on 35-year parole for murder. Paroled 1/1/90 to Harris County. Lives at 1615 Twinbrook.

5

Santikos Exxon at 6012 gives HPD surveillance tapes of purchase on Miller's credit card. Purchase was for six packages of Kools.  Clerk, Sharon Alexander, 421-3068, says purchaser was 5-foot-7 to 5-foot-8 BM who came in with BF.  Tapes were viewed and person making that purchase was not on them.

Robert Allen East, 7/29/56, in jail for UUMV calls police. He was arrested 4/22/91.  Says it was Big Lee who stole vehicles in Fleming area and told East that he had trouble with one theft. Said Big Lee matches composite.  Lee lives on Freeport Street apartment complex Apt. 8 (no better address).  Lives with white prostitute named diane.

5/14/91

McCorvey and Johnson tell homicide that Broxton matches description of person doing robberies.  He is charged in the robbery of Daniel Culpepper, Cause No. 598173.

Smith gets mug shot and puts together photo spread.  Takes it to Daniel and Gail Vance, OR#48184191.  They say Johnson and McCorvey have already shown them a photo spread.

Virginia Jones, a clerk at the Chevron, 704 Sheldon Road, identifies Broxton from photo spread.

Sharon Alexander, clerk at Exxon on Interstate 10 E at Main Street in Baytown, identifies Broxton from photo spread.  Another clerk with her, Mike Peterson, 576-5812, says he saw BM driving a black and gold blazer. BF in blazer. He cannot identify anyone in photo spread.  He said the man Sharon identified was the driver.

Descriptions:    BM, 28-30, 5-foot-10, 165 pounds, light

6

moustache. BF, 20s, 5-foot-5, slim.

Drove east bound on Interstate 10.

5/22/91

Fingerprint examiner gives positive identification of Broxton in Stuchwinsch murder.

5/23/91

Sgt. Stephens and Shirley go to Circle Pawn Shop, 1205 Federal Road. Get sales from Broxton:

5/6/91: 1 man's yellow ring with 1 20 point diamond and 4 2 point diamonds, man's ring with 3 pt. diamond and 1 diamond missing, 20-inch gold chain. Clerk, Andrew Valdez identifies Broxton. Broxton bought a .380 pistol. Did not pull ATF forms at that time.

5/22/91

Interview with "Sally," Linda Diana Klatt, 2/16/55, described as having tatoos all over body and "lives anywhere." Said was prostitute at the Key Truck Stop for 13 years.

Said five or six months before, went with Red to Broxton's apartment. Tehy partied and did dope. She moved in with Broxton for a short time. My notes do not reflect this but I remember that her statement (which I only skimmed) said she was afraid of Broxton. About a month after moving in, Broxton had $700-800 and told her he had "jacked" somebody. She had seen Broxton with an Exxon credit card that he said was stolen.

Broxton had a .38 or a .22 and also had a stun gun. She had seen him at the Key truck stop with a Blazer.

7

5/24/91

Lineup at county jail. We have the tape.

People in Lneup:

1. Johnny Davis, BM 25, 5-foot-11, 180 pounds

2. Alan Robinson, BM 28, 5-foot-8, 190 pounds

3. Broxton, BM 36, 5-foot-8, 180 pounds

4. Raymond Jackson, BM 28, 6-foot, 175 pounds

5. George Hicks, BM 43, 6-foot, 185 pounds.

Witnesses:

1. Robert Hart: Not sure, thinks #5.

2. Clyde Francois: Looks like #3, not sure, right color.

3. L.C. Goodwin: No identification, too far away.

4. Shirley Hatton: Thought #3, #1 is right size.

5. Joslin Baxter: #3, 100 percent sure.

6. Herman Gardner: Too far away, no identification.

6/3/91

Williamson gets call from Donald Myles in Jail. 6/4/91, interviews him in jail. Says Broxton has bragged in jail about killings and also kidnapping, raping and robbing two grils off west Montgomery Road. Said one was a cheerleader.

Lambright says he does not plan to use Myles and asks that we not give his name to Broxton.

8

BROXTON

Excerpts of police and offense reports

Sheila J. Dockins - white female, DOB 11-26-70

Waylon H. Dockins - white male, DOB 12-12-68

Location of the offense:  16945 I-10 East on May 17, 1991

HPD case no. 91-05170385

Report of Deputy Roy W. McDonald, Harris County Sheriff's office

7123 - Identification division

On 5-17-91 he was advised by Corporal P. Schroedter, Unit 7107, that an ID unit was needed at the location of the offense. He arrived at the location at 8:30 a.m.  On arrival, he met Sgt. C. D. Springboard, Unit 431, Deputy W. L. Hutton, Unit 4301, Deputy M. Simpson, Unit 4309.  More units arrived later.  Det. R. Tonery, Unit 3104, Det. O. Muir, Unit 3103, Corporal P. Schroedter, Unit 7107.

On arrival, he was advised by Deputy Hutton that a white female was in room 11 and that a male had been transported to the hospital for medical attention.  The location was the Magnolia Hotel on the north side of I-10.

In front of room 11 in the parking lot was a red two door Ford Tempo GL, Louisiana license plates 600X505, VIN 2FAPP31X5JB187393.

The room is 11'10" wide (east to west) and 15'10" deep (north to south).  The bathroom is in the northeast corner.  The entrance to the bathroom being the south wall of the bathroom.  The dressing area is located between the bathroom and the west wall of the room.

1

Exhibit B

Several drops of blood were on the sidewalk outside the entrance to the room. The west door jamb had smears of blood. On the door were several smears of blood. Inside the door were several smears of blood. Inside the door knob contained smears. The inside east door frame and wall near the frame contained smears. A chair was located inside the doorway in back of the west wall. Under the chair on the floor was a pair of white canvas shoes that had stains of blood. On the west wall behind the chair were spatters of blood on the wall.

East of the entrance against the south wall was a bed. The bed covers were pulled back from the south end of the bed exposing the south end of the mattress. Two pillows were on the south end of the bed containing blood stains on the bed covers and the mattress.

A pair of brown work boots was on the floor west of the bed near the south wall between the door and the bed. On the floor west of the bed and north of the chair was a multi colored bed spread containing blood stains.

On the floor west of the bed in front of the chair was a black canvas type gun rug. On the floor under the south side of the gun rug was what appeared to be blood. On the floor north of the gun rug was a piece of blue flannel shirt and a white sock and a piece of blue flannel shirt was also on the floor south of the gun rug.

On the floor east of the bed was the body of a white female who was on her back with her head to the north. Her arms were tied behind the back. Her legs were at the south with the legs bent at

2

the knees with the feet under the body toward the east. The deceased was clothed in a pair of black panties. A white sock was tied around the left ankle of the deceased. A white towel was on the right arm of the deceased. A white sock was on the floor near the left shoulder of the deceased. What appeared to be the leg of a pantyhose was tied around the neck of the deceased. Two pieces of blue flannel shirt were on the floor north of the deceased's head. What appeared to be blood drops were on the body and face of the deceased.

| Items | Dist. S.E. Corner | Dist. S.W. Corner |
|---|---|---|
| head | 6'7" | 11'10" |
| l. hand | 4'11" | 11'3" |
| R. hand | 5'2" | 10'6" |
| l. foot big toe | 4'5" | 12'2" |
| R. foot big toe | 3'9" | 11'3" |

On the southeast corner of the room was nightstand with a drawer. The nightstand was facing north. On the nightstand was an iron, a blow dryer for hair, an electric alarm clock, empty ice cream container with two plastic spoons, a pair of eyeglasses, a contact lens container and a telephone. On the headset of the telephone were smears of blood. On the floor north of the nightstand was one beige colored bra and one black bra. The two bras had what appeared to be blood stains on them. On the floor west of the two bras was a piece of blue flannel shirt.

On the east wall near the nightstand was what appeared to be a bullet hole. The hole was located approximately 18 inches from

3

the southeast corner and approximately 18 inches above the floor. The door to the bathroom was located north of the deceased's head. The door was in an open position against the east wall. On the door to the bathroom were several smears and spatters appearing to be blood. The shower stall was located against the north wall of the bathroom. On the shower stall door and door frame were smears of blood. South of the shower against the east wall was a commode. The seat of the commode was in the down position. On the seat of the commode and in the commode were stains and drops of blood. South of the commode against the east wall was the sink. On the sides of the sink and in the sink were several drops of blood and smears of blood. In the southeast corner of the bathroom was a wastebasket. In the wastebasket was a piece of blue flannel shirt.

Over the sink against the east wall was a mirror. On the mirror were smears and stains of blood. On the west wall was a mirror. Under the mirror was a countertop. The countertop and mirror contained smears and stains. On the floor under the counter were several white towels and a pair of white jockey type underwear. The towels and underwear were damp and appeared to be bloodstained.

In the dressing area located in the northwest part of the room were several pieces of clothing and bags containing clothing. The closet was located in the north end of the east wall of this area. A jacket was hanging in the closet on the east wall. South of the closet was a shelf. On the shelf were several cosmetic items. Under the shelf was an opening. A piece of wall paneling under the

4

shelf was removed and two syringes were located inside the wall. The syringes appeared to be free from dust as if they had been recently dropped.

The inside of the room was processed for latent prints. Several prints of possible value were developed on the walls of the room and the mirror over the sink on the east wall of the bathroom. The following were recovered as evidence.

1. One plastic trash bag from the wastebasket in bathroom.
2. One piece of blue flannel shirt with a leg of pantyhose tied to it from item number 1.
3. Several pieces of tissue from item number 1.
4. One plastic drinking cup from item number 1.
5. One "Fruit Punch Sunkist" soft drink can from item number 1.
6. Four white towels from bathroom floor.
7. Two sheets from bed.
8. One piece of mattress from mattress on bed.
9. One comforter from floor west of bed.
10. Two white washrags from bathroom floor.
11. One pair of white jockey type shorts from bathroom floor.
12. One black gun rug from floor west of bed.
13. One white hand towel from right arm of deceased.
14. One white sock from floor near left arm of deceased.
15. One door knob from door inside of entrance.
16. One cardboard ice cream container from table in southeast corner of room.

17. Two white plastic spoons from item number 16.

18. One pink bra from floor east of bed.

19. One black bra from floor east of bed.

20. One green pullover shirt from floor east of bed.

21. One piece of blue flannel shirt from floor east of bed.

22. Two pieces of blue flannel shirt from floor north of bed.

23. Two pillowcases from pillows on bed.

24. One piece of blue flannel shirt from bed.

25. One pair of white panties with blue trim from floor west of bed.

26. Three pieces of blue flannel shirt from floor of room.

27. One white hand towel from floor west of bed.

28. One plastic envelope containing hairs removed from body of deceased.

29. One button from floor west of bed.

30. One piece of glass tube containing white powder substance from under bed.

31. Blood sample from floor of main entrance.

32. Two syringes from east wall of dressing area.

33. One piece of sheetrock with bullet hole from east wall.

34. One fired projectile from east wall.

35. One mirror from east wall of the bathroom.

Upon returning to the office, the latent prints on item number 35 were photographed. They processed items 4, 5, 15, 16, and 17 for latent prints. No latent prints containing sufficient ridge detail for identification were developed. Latent prints and

6

photographs stored in ID Division.  Evidence was stored in property
room.

GET COPY

AUTOPSY REPORT

Case No. 91-3230

May 17, 1991

Sheila Janele Dockins, 100 Dockins Drive, Many, La. signed by
Jachymick and Bellas

Next of kin were notified by the ER physician at LBJ Hospital
which is apparently where Mr. Dockins was taken.  The information
on the investigators report and the autopsy says that according to
Deputy Hunton, he found the decedent dead at 7:50 a.m. on 5-17-91
after responding to a 911 call.  On arrival, he found the room door
closed but unlocked.  Mr. Dockins was laying across the only bed in
the room bleeding profusely from a head injury.  Dockins told
deputies the incident occurred at 1:00 a.m. when he opened the door
when someone knocked on the door and identified themself as the
manager.  When he opened the door an unknown black male attacked
him and hit him over the head with something.  When he came to, he
was tied up.  He called 911 when he finally freed himself.  Deputy
found the decedents body on the floor between the bed and the east
wall of the room.

7

BOUND OFFENSE REPORT FROM HARRIS COUNTY SHERIFF's DEPARTMENT
DETECTIVE BUREAU.


Investigators - O. L. Muir and R. T. Tonery


CASE SYNOPSIS

Witnesses:

Erin Nolen, White female, 31, DOB 11-6-59, LA drivers license
436114574, address: Route 1, Box 233, Hornbeck, LA. Home telephone
no. 318-565-4829.


Roy Klinkow, White male, 32, DOB 3-9-59, TX DL #0822262442, Route
7, Box 54, McAllen, Texas. No work or home telephone.

Time of Occurrence - 10:00 to 11:00 p.m.

Narrative: Sometime between 10:00 p.m. and 11:00 p.m. there
was a knock on the door. Waylon answered the door. He was
confronted by a black male with a pistol who robbed them of money,
jewelry, car keys, a Smith & Wesson  .44 magnum revolver and
personal clothing. He tied up both complainants using strips of
clothing, socks and a ladies hose. He then struck complainants
with possibly with complainants revolver. Complainant awoke the
next morning around 7:15 a.m. and found his wife dead. He notified
the motel office who in turn connected him to the sheriff's office
and ambulance. On 5-18-91, the suspect was developed and on 5-24-
91, defendant was filed on for capital murder and attempted capital
murder. The recording deputy is W. L. Hunton, Unit 4301, Badge

8

1180.    Waylon Louie Dockins, Louisiana Drivers License no. 002994853. Home address and telephone number are unknown. The dispatch call was received at 7:43 a.m. arrived at 7:50 a.m. Mr. Dockins was found lying face down on the bed. Channelview EMS made the scene. Sgt. Springborn arrived on the scene and was notified of the facts. Hunten located the two witnesses who heard the gunshots around 1 or 2 a.m. Tonery arrived at the scene and the scene was released to him.

9

REPORT OF M. W. SIMPSON

Unit 4309

Badge 2173

He was dispatched at LBJ Hospital ER and arrived at approximately 9:45 a.m. Spoke to Waylon Dockins. Mr. Dockins signed a voluntary consent to search and the form was taken back to the scene and given to Tonery. Mr. Dockins stated that they checked into the hotel on 5-16-91. At 10:30 to 11:00 p.m. there was a knock on the door and Mr. Dockins asked who it was and was told "office" or "its the office." Dockins opened the door, observed black male, 30 years old, 5'10", 150 pounds, short black hair, unshaven, mustache, wearing a red/gray t-shirt, blue jeans and holding a short barrel, black revolver, possibly a .22 in his right hand. The suspect forced his way in and demanded money. Suspect started going through their property and found Dockins Smith & Wesson .44 magnum with the 6 inch barrel. Dockins stated suspect took suspects weapon and placed it either in his pocket or waist band. Suspect then tied both Dockins and wife. The last thing Dockins remembers is being struck in the head with something which knocked him out. When Dockins awoke, he worked himself loose and contacted the Sheriff's Department. Dockins had never seen suspect before and believes he would be able to identify the suspect.

Simpson returned to the scene at the hotel and assisted in the search around the hotel. Several dumpsters were checked in the surrounding area. Nothing was found. The Citgo station at 19 E.

10

feeder was checked and an employee advised that no suspicious males had been seen in the area during the night, during the early morning hours of 5-17-91.   Simpson returned to service.

SUPPLEMENTAL REPORT

of Tonery, Unit 3104, Badge 607

and Muir, Unit    , Badge

On 5-17-91, at 8:05 a.m., Sgt. Oliver advised Det. Tonery and Muir that district three patrol units were at the scene. Tonery went in route to scene at 8:11 a.m. Arrived at 8:31 a.m. Met with 1) Capt. Satcher, Unit 71, ID Division, 2) Sgt. C. Springborn, Unit 431, 3) Deputy Hunton; 4) M. W. Simpson; 5) McDonald, ID Division. Muir arrived on the scene at approximately 8:55 a.m. Channelview Ambulance #32 had already left the scene prior to Tonery's arrival.

## SCENE SUMMARY

Describes physical layout. There were no signs of forced entry to the room. Hunton advised Tonery the room was closed but unlocked. There were spots of blood on the outside doorstep. A black pistol case was on the floor approximately three feet inside the door. A white female was found on the floor east of the bed with her head facing up with her head facing the bathroom (north).

## DETAILS OF INVESTIGATION

Tonery met with Hunton. Hunton advised he entered the room and yelled Sheriff's Department and heard a man moan. Saw a white male faced down at the foot of the bed, forehead on his hands, head faced east, feet faced west. Hunton tells Tonery that Channelview BFD #32 arrived shortly after he found the white female. Hunton said he found car keys to the Tempo and entered the car in an

12

attempt to locate identification. Found white male's wallet in coin box, LA TDL 002994853, DOB 12-12-68, SS# 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. Hunton advised that Sgt. Springborn and Deputy Simpson had also made the scene. Hunton advised Tonery that he located one witness in room #5 and three witnesses in room # 13.

Tonery then spoke to Ronnie Allen and Ben Banta. They were the Channelview BFD ambulance crew. Allen's DOB 12-5-56. TDL 01697990. Phone 452-5782. Allen advised they received a call at 7:42 a.m., arrived 7:52 a.m. White male appeared assaulted because of the blood and his left eye was swollen. Waylon told him that he was tied up and Allen said hospital found that Dockins was shot as well as assaulted. The interview with Banta, DOB 12-25-68, TDL 13277210. Dockins told Banta that it hurt to talk. Dockins said he was hit in the head and went out and that it happened before midnight. END OF INTERVIEW

Tonery met with BHURAT DAHYA PATEL. Indian male. DOB 7-6-60. TDL 08152741. The only address is 16945 East Freeway. Phone 452-1593. He is the motel owner. Patel said Dockins registered on the evening of 5-15-91. Patel called the Sheriff's Department because the man in room 11 had called and said to connect him to the police so he did. The man told him nothing else. Tonery got the registration information from Patel for the rooms surrounding room 11. No one was in room 10.
Room 12 - David Dickerson, Route 5 370, Lucedale, Mississippi, 39452, works Affolter Co., registered on 5-14-91 to 5-21-91.
Room 13 - Debbie Klinkow

13

Room 14 - Rick Roedl - RR #2, Box 287, Altamonte, Illinois, 62411, 1979 Dodge, Illinois License WF1161, Registered 5-10-91 to 5-17-91.

Room 15 - Harold Polson - 306 Queenstown, Houston, Texas, 77015, 83 Pontiac, License No. 474 CQE, registered 5-15-91.

Room 16 - Ed Criddle - 760 Pointtsea, Ingleside, Texas, TDL 08401944, Tex. License 597-WS

Muir observed the sign while the ID unit processed room 11. Tonery went to work interviewing witnesses. Tonery met with Nolen in Room 5 and had an oral interview. Nolen phone 318-565-4829, Route 1, Box 233, Hornbeck, LA., DOB 11-6-59, white female. Nolen told Tonery she went to bed 11:00 p.m. on 5-16-91. Between midnight and 1:00 a.m. Nolen said she heard a woman "holler" loud but muffled. She then heard two loud pops. She said it seemed she heard one pop, a few seconds later another pop. When she looked out the window and saw nothing and thought it had been a backfire. At 2:30 a.m. she heard the fire alarm go off outside. Her husband woke up and went outside, saw nothing, except a guy named Paul looking out of his door from room number 2. They went back to sleep. Nolen's husband did not hear any shots. He left for work at 6:30 a.m.

In room 13, Tonery met with Debbie Klinkow, her husband Roy "Chip" and their friend Eddie Lavrets. All of them later gave written statements.

Tonery met with William Edward Criddle, white male, DOB 5-21-64, TDL 08401944, 760 Pointtsea, Ingleside, Texas, 512-776-2713. work no. 512-289-8242 and Johnathon C. Coulter, white male, DOB 3-

14

22-67, TDL 12118617, 321 W. Cleveland, Ingleside, Texas. 512-758-3448, work 512-289-8242. They were in room 16. Criddle and Coulter went to a bar called Sharp Dance in Pasadena and then to a friends house in Pasadena. They returned at about 1:00 a.m. and went to sleep. Between 2:30 and 3:00 a.m. they heard someone knocking at doors. Criddle looked out the window and saw this small thin woman wearing white spandex pants with a black stripe that looked like a hooker at room 15. Saw nothing else and didn't hear any shots. Criddle said he saw the woman in room 11 while he was there but the hooker was not here.

Tonery met with Harold Boyd Polson Jr. DOB 10-8-57, TDL 05869138, 451-5439, 306 Queenstown and Dennis Allen Yarter, DOB 10-30-55, Tex. ID card no. 15099774 in room 15. Polson said he heard two shots but didn't know what time and that he and Yarter came and went several times during the night and went to sleep at 4:00 a.m. All he knows is that the shots were before 4:00 a.m. Yarter did not hear any shots at all. Yarter works at the Key Truck Stop on the other side of the freeway. He went back and forth to number 15 three or four times during the night.

Investigator Jay Payton of the ME's office made the scene. At 4:00 p.m. on 5-17-91, Muir and Tonery met with Waylon at Ben Taub hospital ER. Dockins had a gunshot wound to the right side of his head and a large cut over his left eye brow. His left eye was swollen. Dockins said he checked into the motel on Monday morning and paid $140 rent. He is mill right for Brown and Root working a shut down at the Champion Paper Mill at Highway 90. He and

15

Sheila were married on 2-14-91. Their home phone number in LA was 318-256-0209.

On 5-16-91, he got home from work at about 5:15 p.m. and took a shower. They went to the Econo Lodge for dinner. They went to a friend's house in Northshore after dinner and then stopped at a convenience store at Wallisville and Sheldon and bought a carton of Blue Bell ice cream. They returned to hotel and watched television. Between 10:00 and 11:00 p.m. they heard a knock at the door. The voice said "it's the office." A black male holding a blue steel revolver pushed his way into the room. Sheila was laying on the east side of the bed and Waylon sat down next to her. The black male said "give me your jewelry" and took their watches, wedding rings, Sheila's engagement ring, and her purse. The black male found his .44, took it out of the gun case. Waylon kept getting off the bed to show the black male where his stuff was. The black male tied him and his wife up with socks and panties and stuffed a sock in his mouth and his wife's mouth. The black male had a key ring with an alarm remote control and asked Waylon if the alarm in the car was on and Waylon said no that the alarm was on his truck in Louisiana. The black male made a telephone call from the room and said something to effect that its me, you know who this is, its me, sunshine, meet with me at the regular spot.

Before leaving the room, the black male pulled the bed sheet over Waylon's head and hit him on the head. Waylon said he then heard his wife scream and felt the bed shake as he was hit. That is all he remembers until he woke up at 7:15 a.m. When he woke up

16

he was no longer tied up. Sheila's head was lying by the bathroom door and her feet were by the nightstand. He called the office and they called the police.

Waylon was tied at first with the blue flannel shirt that was cut using Waylon's knife. The black male said he would come back and kill them if the alarm went off. His wife's watch was a Gucci brand. It was bought at Walmart. It was black with gold trim. His wife's purse was white with a brown strap. Dockins car was towed by Dire and Dylers wrecker. 671-2142

Muir also talked to Belas, the ER doctor at Ben Taub. The LA plate on the Tempo is 600X505 returned an 88 Ford Tempo registered to Sheila Leone, 132 Noble, LA, 71462.

SUPPLEMENTAL REPORT FROM MUIR

On 5-17-91 Muir went to the ME's office to view the autopsy. Ligature on the neck had not been used to choke. Ligatures on the arms were removed. They were loose and caused no damage. Deceased had three blunt trauma blows to the left side of the head. One was two inches above the ear. One was just above the left ear and one below involved the left ear. All were prior to death. No projectile was found in the body from the gunshot wound to the arms and chest. Tract was left to right, head to toe and slightly front to back. The bullet entered the left chest through the fifth rib on the left side and exited the right chest through the seventh rib. There was also a large bruise to the left shoulder area.

17

SUPPLEMENTAL REPORT BY MUIR

He met Tonery and they jointly interviewed Dockins at Ben Taub, Surgical Intensive Care Unit. Description given by Dockins to Muir was 5'10" tall weighing about 165 pounds. Short black hair and was wearing thick framed plastic glasses. Possible burnt orange or brownish in color. They then left to meet with Dr. Buck Durham, The doctor advised that Dockins had 5 to 10 blunt trauma wounds above the left eye and a gun shot would above and behind the right ear that traveled through the ear canal and down through the neck and lodged in the base of the neck and shoulder area. The bullet was not to be removed unless it caused unforeseen problems. The doctor said, in his opinion, the wound could not have been self inflicted due to the angle in which the bullet entered and the path it followed. Doctor advised there was a small amount of powder burn around the wound less than __ in diameter.

Dockins advised that the suspect had been very calm, and acted cool. Until the very end he thought the guy was going to take the stuff and just leave. Regarding the car alarm, the suspect said if you are lying, I'll come back and kill you. He said that when he was about to leave he had gone back to hit him and when his wife yelled don't he had stopped and threw the sheet over their head and then hit him over the eye. Before he conked out, he felt the force of the suspect hitting his wife. Dockins said his wife was wearing a "pink teddy."

18

SUPPLEMENTAL REPORT BY TONERY on 5-18-91

On 5-18-91, at 3:37 a.m. HCSO communications Johnson advised Tonery that Sgt. Walker was around Market and Normandy with an HPD patrol unit who was trying to look at a black male and had wanted Tonery at the scene. Tonery went in route at 3:55 a.m. and arrived at 4:10 a.m. Sgt. Walker advised that HPD unit had defendant in custody for aggravated robbery warrants. Walker advised that a girlfriend of Def. gave HPD patrolman a purse and felt that Broxton could possibly be suspect in Dockins case.

Tonery met with Officer R. T. Johnson and T. J. McCorbey. Unit 9C43 on Normandy just north of Market. Johnson told Tonery that at 1:50 a.m. on 5-18-91, he and McCorbey went to La Fiesta apartment complex to arrest Broxton on warrants. Broxton had fled. He was arrested on Normandy near Market a few hours later. While fleeing, Broxton dropped a blue steel .22 revolver. Two white females approached Johnson on scene. One identified herself as Tracy Byrd and said she was Broxton's girlfriend. The other was Brenda Hice. They went back to Broxton and Bird's apartment at 12845 Market #26. A search for the suspect. At apartment Hice told officers that at 4 a.m. on 5-17-91, Broxton returned to apartment with ladies purse, wallet, cash and about $200 worth of crack cocaine. Officers got purse and wallet from Byrd. Tonery took possession. Tonery saw Broxton in custody of Johnson and Broxton was wearing a black watch with gold trim.

Johnson transported Broxton back to the apartments and Tonery followed. Tonery called Muir. Outside the apartment Tonery met

19

with Byrd, white female, DOB 6-5-70, SS# 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, and Brenda Hice, white female, DOB 10-14-56, SS# 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. Byrd said she lived with Broxton but was not on the lease and the lease was in Broxton's name. Tonery met with Broxton and read him his warnings. Broxton agreed to consent to search apartment witnessed by Byrd and Johnson. Tonery and Officer McCorbey searched Broxton's apartment.

Tonery recovered three pairs of eyeglasses, one pair with black frame, the other two with gray frames from the top dresser drawer in the bedroom. A stun gun was found by McCorbey in the bedroom behind the bed. Tonery found an address book, a TDL license no. 08519779 for Janice Corley Richardson in a brown bag in the hall closet. Also in the hall closet was a men's flower designed shirt, one pair of blue jeans, one pair of white jeans in a brown suit case in the hallway, McCorbey found several receipts and photographs. Tonery found a box of Windchester 22 ammunition in the kitchen's closet. These were listed on a property receipt form later signed by Broxton. A knife was found on a corner in the bedroom it was a 6" blade. McCorbey told Tonery that Hice had earlier said that Broxton cleaned up the apartment Friday and taken the "trash" out and put it in a car owned by Chris Shook. The car is white Ford Pinto station wagon, license 699QTZ, the car is facing west in the parking lot, just outside the apartment. Hice told Tonery that Shook was a friend of Broxtons' and left the apartment after she and Byrd left to check on Broxton. Tonery found HCO traffic ticket #E-31669 issued to Lyndon Paul Shook, white male, dob 6/8/57, in a clothing bag in the living room.

20

Shook was never seen in the apartment.

Muir arrived at apartment at 5:30 a.m. Shook's car was towed to 12934 Highway 90 by Pierce and Pierce Wrecker Service. Johnson's report is case number 048184191W.

Muir and Tonery transported Byrd and Hice to HPD Homicide. Sgt. Pelk interviewed Hice and she gave written statement regarding Broxton driving a dark colored chevy blazer. Muir went to HCDAO to get a search warrant for the car. Tonery released the knife and stun gun to Johnson because of a possible connection of a robbery cases. Tonery transported Brenda Hice to HCSO Homicide, 601 Lockwood, Byrd gave written statement, Tonery transported Brenda Hice back to the apartment. In the interim from when they were on their way to search Shook's car, Hice called HCSO and said that Shook had returned to the apartment and was asleep. Sgt. Walker and Deputy Merchant met Tonery at the apartment, Shook in the bedroom padded down for weapons. Shook transported to District Three Substation by Merchant for investigation.

Tonery interviewed Shook, he gave his correct name. Tonery read Shook's warnings and told him his car had been towed. Shook said his real name is Christopher Jewels Shook, dob 5/1/63. He lied about his names on the tickets because he has not reported to his parole officer Lyndon Shook is his brother. Shook gave written statement. Shook was put into jail on TDC blue warrant. Muir and McDonald then went to search Shook's car.

Shook said he saw Tracy Byrd with the ring she said she got from Broxton Friday morning. Muir and Tonery went back to the

21

apartment, Byrd said that Broxton had given her a ring and she took it off her finger and gave it to Tonery. She said she got it the same time as the purse. Tonery spoke to Williamson HPD Sgt. regarding one of the robbery cases that is suppose to be a pair of loafers. Muir and Tonery recovered a pair of men's brown shoes from the bedroom closet, the gold ring from Byrd, a polaroid camera Byrd said she didn't know where it came from, property receipt completed.

SUPPLEMENTAL NARRATIVE - 5/18/91

HPD Offense Report No. 048184191 - In regards to a aggravated robbery that occurred at 12769 Mimitz at the Sheffield Apartments on May 13, 1991, Complainant's name is Danial Walter Vanze. Office 01 - R.T. Johnson, 02 - T.J. McCorbey. Johnson is employee no. 61574, McCorbey is 82486. Both work shift three.

Officers have warrant for Broxton, went to the La Fiesta Apartments, at 1:35 a.m. on May 18, 1991. Broxton charged in 598223 in the 176th and in two additional cases 46957191 and 29371691 under case number 598173 and 598223 respectively. The only warrant was 598173.

As Officers entered the apartments they observed Broxton walk out of the apartment. Johnson got out and identified himself. Broxton immediately started running west along Market toward Normandy, Johnson pursued on foot, McCorbey pursued in the car. Broxton tried to run south across Normandy but ran into the car McCorbey was driving and then he continued west along Market. Broxton continued fleeing about fifty yards further along Market and turned around south along side of tin building 12700 block. Johnson observed Broxton digging at his waist band as he turned the corner Broxton slipped and fell as he got up and continued but had dropped the pistol. The officer continued to pursue him south and west across an open field to an old pipe yard that joins the southwest intersection of Sheffield and Market. Officer's lost visual contact. Other officers responding to call for assistance

23

to cover other escape routes from that location.

At 4:10 a.m. DPS Troopers Kent Authier and Chris Tibbits saw Broxton in the pipe yard after a short chase and struggled Broxton was arrested.

During the search the two women approached Officers because they were concerned for Broxton's safety and concerned that the police were going to hurt him.

Johnson and C.J. Jones along with Sgt. Snook and the two witnesses went to the apartment where Byrd said she was his fiance and she lived with him. Officers searched the apartment for Broxton, Hice told the Officers that Broxton left their apartment on the night of May 16, 1991, Thursday, and returned about 4:00 a.m. with the purse, the ladies wallet, and about $200.00 in crack cocaine and an undetermined amount of cash. He refused to tell them where he got the money and told them that he had gotten the purse and wallet from a girlfriend of a friend who told him to give to her. (Byrd).

Officers contacted Tonery and advised him they had a possible suspect in the Magnolia Motel case. Johnson and Jones transported Broxton to Central HPD and to the Homicide Division to talk with Detective Pelk. Broxton turned over to Pelk at Homicide, Johnson recovered the pistol where Broxton had dropped it and was tagged in HPD property room.

At the apartments Johnson asked Byrd where she had gotten the black pursue and red wallet, she told him that Broxton had given to her in the early morning hours of May 17. She said there had been

24

nothing in the purse and she would give it to the officer if he needed it. The purse and wallet were tagged in the police property room.

At the time of arrest Broxton had in his hand a black gold trimmed men's watch it was seized and tagged in the HPD property room.

The pistol is an RG model .23 caliber blue steel revolver four inch barrel serial number T706278. The six live rounds .22 caliber amo. The ladies purse is a white with brown trimmed strap "pacific connections". The ladies red clutch wallet "classic v.r. collections." The watch is a "advanced" black with gold trim model v.p. 32.

25

The property receipt form has listed three pairs of glasses, one box of 22 Winchester amo, on Texas Driver's License No. 08(2)519779, two pairs of pants, one man's shirt, assorted photographs and receipts, one address book, one traffic ticket HCO 31-6691, one stun gun, and one knife.

The property receipt form from Tracie Byrd, one pair of men's shoes brown, one polaroid camera, one ladies gold ring.

SUPPLEMENTAL REPORT FROM MUIR ON 5/18/91

This report is Muir's description of the events of the arrest on May 18. McCorbey called HPD Homicide and have someone ask Broxton to sign a consent to search on the vehicle. They called ADA Intake and spoke with ADA Pennington who said consent to search was enough to take the bag. Pennington called back and said the safest way was to get a search warrant. The 80 Ford Pinto, 2 door station wagon, March 91 tags, Texas 699-QTZ, VIN 0T12A159228, towed to Pierce and Pierce wrecker at 12934 Highway 90.

ADA Susan Brown drafted the search warrant. Judge Bill Harmon signed it at 2:00 p.m. on May 18, 1991.

SUPPLEMENT REPORT WRITTEN BY MUIR FROM SEARCH OF PINTO

Muir waited until Roy McDonald of the I.D. Division arrived and then slim jimmied the vehicle open. McDonald took pictures of the vehicle and the following property was recovered:

```
3 socks
1 black glove
5 pairs of mens pants
1 pair of pajamas
2 sweaters
3 long sleeved pullover shirts
2 pairs of tennis shoes
1 gold colored necklace
1 black wallet with assorted papers and ID card for
Christopher Jules Shook.
1 social security card #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
Pictures, personal papers and tickets in the name of
Linden Paul Shook, assorted letters, assorted phone
numbers,
1 pair of cutoff pants
3 bottles of Portofino cologne
key ring with 13 keys
key chain with four keys and 2 alarm remotes and a reg. tag
1 Charo Tequila bottle with pennies in it
1 button up shirt
1 pair of boxer shorts, wet
1 towel
1 wash cloth
```

29

SUPPLEMENT REPORT BY MUIR ON 5-20-91

On 5-20-91, Muir, Tonery and HPD Homicide Sgt. Bell went to Ben Taub Hospital to show Dockins a video lineup. Bell set up a television and VCR. Bell started the tape. The tape ran for several seconds and Dockins said "thats' him, thats him" and pointed to the suspect, Eugene Broxton, in the number one position in the lineup. Dockins said he was positive. Bell said "you need to hear the voices." Dockins said "not really but he would listen." Bell played the audio portion of the tape and Broxton said some things and Dockins said again "that's him, I'm positive." Bell turned off the tape. Muir asked Dockins if he was missing any clothing or shoes or boots. Dockins advised that the black male had picked up his gray snakeskin boots but he was unsure if they were gone or not. The camera was not his. Dockins told him that David Slaughter had the serial number with him. That Slaughter told Muir the Smith and Wesson Model 29-3 .44 magnum caliber revolver, blue in color with wooden grip, bearing serial number N-893047 with a six inch barrel.

Lineup contained the following people.

1. Broxton wearing grey shirt, blue jeans and black shoes.

2. Byron Washington, Black male, 28, 5'6", 130 pounds, wearing white t-shirt, green shorts, black shoes.

3. George Tillman, Black male, 37, 5'10", 200, wearing maroon t-shirt, blue jeans, white shoes.

4. Kenneth Phillips, black male, 34, 5'10", 175, wearing black and

30

white shirt, grey shorts, white shoes.

5.   Jerry Winfrey, black male, 35, 6'2", 187, wearing maroon t-shirt, blue jeans, and no shoes.

6.   Roger Neville, black male, 31, 5'9", 203, wearing plaid shirt, blue jeans and black boots.

They then went back to the apartment to talk to Byrd and Hice about the boots.  Byrd and Hice said they could take anything they wanted.  Muir went in the master bedroom and found a pair of grey snakeskin boots, brown leather like bag containing two pair of work type gloves in plastic bag with Crazy Eddies logo on it.  The video line up is retained by HPD under Case No. 38887991, Complainant's last name - Fleming.

31

MUIR SUPPLEMENT REPORT ON 5-20-91

Muir made a return on the search warrant on 5-20-91. On 5-21-91, Muir called records to have the Dockins weapon placed on NCIC and TCIC. The IC number for the entry is 563387376.

32

MUIR SUPPLEMENTAL REPORT 5-22-91

Muir spoke to investigator Rose Raupp at HCME's office regarding toxicology return. Drug screen negative drugs and alcohol. Lab number at ME's office is CO91-0325.

MUIR AND TONERY SUPPLEMENT REPORT 5-24-91

They met at 176th with ADA Debra Hawkins.   Also present HPD Homicide Sgt. K. R. Williamson, Sgt. J. W. Bell and Sgt. B. Smith. The primary purpose was to set up charges on other cases.

MUIR SUPPLEMENT REPORT ON 5-29-91

Muir received two rap sheet packages on Broxton. One from the Sabine Parrish Sheriff's office and one from Leesville, Louisiana Police Department. Also contained Broxton's fingerprints,. Packages show different dates of birth, different social security numbers. They took them to ID and gave to Roy McDonald. McDonald confirmed Louisiana prints of Broxton.

TONERY REPORT FROM 5-28-91

Tonery was told by HCSO communications that Dockins was having surgery at Methodist to remove the bullet. Dockins would be out of surgery at approximately 9:30 a.m. Tonery got the bullet at Methodist from Dr. Naranjan's nurse and took it to pathology department where it was released to Tonery by Kay Ann Jenkins. Tonery gave the bullet to HCO ID property room.

5-29-91

Sgt. Williamson, HPD Homicide, called Tonery regarding a conversation with Chris Shook at HC jail, Shook had said that when he took the garbage bag out of the apartment, he took some property out of it and threw it over the back fence. Williamson said at the crime scene he would check the area. Shook made a written statement to search and Smith and Williamson on May 29, 1991.

While HPD Tonery met with HPD Crime Scene Officer J.R. Davis, 52642, who gave him a list of things recovered on May 29, 1991, from the apartment complex. These are, near the dumpster an:

1. orange bag with one blank check in the name of Waylon and Sheila Dockins
2. one piece of paper
3. one spiro memo pad
4. two plastic bank books
5. one blue address book
6. two cartage cases
7. one brown paper bag

Second category of stuff is stuff Officer Davis found over the fence near the middle building:

1. one envelope labeled Harthford Worker's Compensation Houston Office, May 7th post marked.
2. one plastic renunitz air filter
3. one plastic Circle K bag
4. one color photograph

Davis gave all the items to Tonery. Williamson gave Tonery the purse, wallet, watch and pocket knife. They have been recovered by Johnson. Corbey on 5/30/91. HPD case no. 54799691H applied to the above information.

37

BRENDA KAY HICE'S STATEMENT ON MAY 18, 1991, AT 11:00 A.M.

34 year old white female, list her address as Broxton's apartment, unemployed, no TDL, dob 10/14/56, ssn 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.

She has known Broxton since December of 1990. Lived in the Normandy Motel, she lived in #168 with Lawrence Emerson and Broxton lived in apartment #138 across the courtyard. Broxton lived there for a week, but got kicked out because they thought he was dealing drugs because of all the traffic going in and out. She stayed with Broxton for about a week when he moved to the Market Apartment. The beginning of March Broxton hit her and crushed her left jaw because he said she owed him $40.00. She said she paid him earlier but did not remember because he had used up all the money on crack. He hit her with his fist and broke the whole left side of her face. She then moved to 114 Beth Lane, Channelview, Texas with a friend named Mary Thacker.

Around April 19th or 20th she was at the Key Truck Stop when she saw Broxton drive up in a dark model blazer. Every girl at the truck stop that does cocaine was in his truck. He was driving over near the Econo Lodge, because that is where all the dope dealers are at. He had a girl named Linda Klutt, a/k/a Sally, white female, 26, in the blazer at one time and she later told me that the blazer was stolen.

Hice states that she knows Broxton's girlfriend Byrd and that Byrd is pregnant. Every time Broxton left his apartment he would carry a large butcher knife with him. He would put the knife inside his pants with the handle pointing out to his right hand.

38

"Yesterday morning, Eugene left sometime around midnight and came back, then he left again.  He returned sometime after 4:00 a.m. and he had over $200.00 worth of crack cocaine, we then smoked the dope.  He had a white purse with brown trimming and gave it to Tracie.  He told him that his dealer's girlfriend gave it to him.  Somebody came over and he sold about $60.00 worth of crack.  He would trade the rings and jewelry for dope all the time.  Instead of going to the pawn shop he would sell jewelry to his dealer, a guy by the first name of Billy, he lives way out Market Road.  I saw on news yesterday that there was a murder at the Magnolia Hotel.  I then knew right away that Eugene had committed it."  She says that she asked Chris Shook, "a red headed white guy" how Broxton was getting his money, Chris said that he knew but would not tell her.  Broxton cleaned out his whole bedroom yesterday and put things in a big old dark green heavy duty trash bag and gave them to Shook and told him to get rid of it.

End of statement.  It was given May 18, 1991 and was given to Sgt. J.W. Bell.

39

STATEMENT BY EDDIE EUGENE LAVRETS, WHITE MALE, 34, DOB 11/5/55, SSN 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, NO TDL, RESIDES IN PHOENIX, ARIZONA WITH HIS MOTHER, BETTY JO LAVRETS ON THOMAS AND 45TH STREET, TELEPHONE 602/956-4031, PRESENTLY UNEMPLOYED.

He was staying at the Magnolia Motel on May 16, 1991, around 10:30 or 11:00 p.m. he was asleep in room 13 with his friend Chip Klinkow and his wife, Debbie, and didn't hear any gun shots because he was asleep, but before he went to sleep, two white males came to the door of room number 15, and knocked, he was coming in from the store and the white males asked if he knew where the people in room 15 were.  He told them he didn't know.  He went to bed, when he woke up the next morning Chip said that he thought that he heard some gun shots last night.

One of the white males outside room 15 was 5'7" and built, mustache, light complexion, blue shirt, blue jeans, and he looked to be a street person.  He appeared to not have had a bath in a week or so.  The other white male was 5'8" or 5'9", lightly heavy, cleaned shaved and light complected, brown coat, jeans and he also appeared to be a street person, or have not bathed in a while.

40

STATEMENT OF ROY DOUGLAS KLINKOW.  It is regarding case number 91-0517-0385, May 17, 1991, at 12:30 p.m.  He is a white male, 32, dob 3/9/59, born in Virginia, ssn 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, TDL 08262442, presently resides at Route 7, Box 54-A, McAllen, Texas, 78504, with his mother and her boyfriend and his wife and the telephone number there is 512/383-7579. Presently unemployed.

On May 16, 1991, at 5:30 p.m. he, his wife and a friend, Eddie Lavrets, checked into the Magnolia Hotel in room 13, they were in and out of the motel two or three times.  At 10:30 p.m. they got backed and stayed for the night.  As they pulled up they saw two white males knocking on the door to room number 16.  Both were in their middle late 30's, both dirty looking, one had long hair, one had a black and white baseball cap.  About 20 minutes later heard two gunshots, sounds like two pops from a small caliber gun. Didn't think "nothing of it and we didn't know where the shots came from."  The only other thing is a maroon car pulling out of space number 12 and it had a cb antenna on the trunk on the right hand side.

41

STATEMENT DEBBIE WOOD KLINKOW, 5/17/91, 1:00 p.m., white female, 37, dob 1/25/54, born in Louisiana, Louisiana driver's license number 003445396, permanent address 500 North Spruce, Hampton, Louisiana 70401-000, which is her mother's address. She presently resides at the McAllen address with husband. Currently unemployed.

May 16, 1991, 5:30 p.m., checked into the hotel, left about 11:00 p.m. and went to the door to get some beer and cigarettes, came back at 11:15 p.m. Two men at a door or two doors down number 15, she was concerned that the men might try and steal something because they had knocked on the door for a long time, she went back and opened the door. The men went to room number 11 and knocked three times. There was a woman in the room and she opened the door. The woman was small, petite, with dark hair. I think she was wearing shorts when she opened the door they rushed in the door. The two men where white males, late 20's or early 30's, both wearing blue jeans, one of them was wearing a baseball cap, one had either a beard or mustache, which was dark brown or black, the other guy was dark blonde with a mustache. One of them had a plaid short sleeves shirt. They were both between 5'9" and 5'11, average weight 160-180, between the next half hour, she heard two gun shots, heard some loud going on after the shots, but didn't pay much attention to it. It did not sound like it was coming from that room. End of the statement.

42

STATEMENT OF TRACIE MICHELLE BYRD on May 18, 1991, at 1:01 p.m., white female, 20, dob 6/5/70, born in Mississippi, ssn 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, residence address 12845 Market #26, Houston, Texas 77015, presently unemployed.

She met Broxton on April 23, 1991, Brenda Hice introduced her to him. She had been living with him at the apartment on Market ever since. Broxton has been using and dealing rock cocaine. On May 16, 1991, she spent the day at the apartment, Broxton came to the apartment and left the apartment off and on. He came back just after dark, but left again about 10:15 p.m. She went to sleep at about 12:00 and woke up about 11:00 a.m. and Broxton was in bed. She doesn't know what time he came back in. He was awake in bed and he was wearing a t-shirt and underpants. She did not bother to ask him where he was.

On May 17, 1991, at approximately 11:30 p.m. Broxton left out to go get some dish washing liquid. He left the house with his umbrella and a gun, which I did not know he had at the time. He was gone for almost an hour to an hour and a half. I then heard two gunshots they sounded like they were right outside the door. When he left earlier he said he would do something to let me know that he was back. I thought that when I heard the shots, I thought that was him. When I heard the shots I left out and went to look for him on Normandy at the red light. I asked the police officer if he had seen a black male with an umbrella and gray button down shirt. The officer asked what the man's name was and he asked me mine. The officer had called another unit to come down and he told

43

me to sit in the car until they found him. This is when I heard on the radio "we have the suspect's girlfriend in the car". We were then transferred back and forth in and out of police cars. They said that they said Gene on the corner of Normandy and Market. This is when he lost his gun, umbrella and his glasses. Gene had gotten away and the police caught him later on.

Friday before Gene left out last night he and Chris Shook cleaned up the apartment. Chris was trying to find his needle to shoot up. They cleaned up some of Gene's old clothes that he did not longer wear. During different time that I have known Gene he would bring home a lot of money. One time I asked him if he robbed somebody, killed somebody or something. He would not say anything. Friday morning we went shopping and I saw $120.00 in Gene's wallet. When he went to pay for the stuff that we got he gave the lady a $100.00 bill. END OF THE STATEMENT.

44

STATEMENT OF CHRISTOPHER JULES SHOOK on May 15, 1991, at 5:04 p.m. statement was given to Tonery.

I have only known Eugene Broxton for about 2 weeks. I met him at the Key Truck Stop. He offered to pay me gas money for a ride, so I gave him one. I had gotten in a fight with my girlfriend, Cindy, and she kicked me out. I was staying at the Bayou Motel. (tape 3)

He said he was short of money so I gave him $80.00 and he let me stay at his apartment. He makes his living doing mechanic work, does not know what Broxton does for money. Broxton told him he was in _____ prison for murder. _____ not going to get in his business.

On Thursday night, May 15, 1991, he drove to the Econo Lodge with Broxton they got there about 11:30 p.m. He was visiting a girl name Cherri. Broxton stayed in his car. When he came back to the car about 20 minutes later Broxton was gone. He waited another hour for him, he never came back. He didn't want to wait any longer so I went back to the La Fiesta Apartments were he was staying. About 1:00 to 1:30 a.m. Broxton came back to the apartment and went straight to his room with Tracie and closed the door. He didn't tell him how he got back to the apartment and didn't say where he went to. The next morning I went to the work on the other side of town. I got back to the apartment around midnight. Broxton was cleaning up the apartment. Around 12:30 a.m. he gave the green trash bag and told me to throw it in the dumpster. It was poring raining outside, so I wasn't going to walk

45

to the dumpster, I just threw the bag in the back of my car and I ended up locking the keys in by accident.

I went back in the apartment after that Broxton left the apartment to get dish soap. When I threw the trash out about 10 minutes after coming back in, me, Tracie and Brenda heard two gunshots. Tracie and Brenda went outside to look but didn't come back. I took a bath while they were out. When I finished and got dressed I saw they still hadn't come back. I went outside to look and went to the front of the complex. I saw about three cop cars at the intersection of Normandy and Market. I turned around and walked back to my apartment then I saw a cop car pass with Tracie and Brenda in the back seat. They slowed down, but didn't stop. I then went to the Bayou Motel and spent the night with a girlfriend of mine.

I had loaned Eugene my car a couple of times during the time I stayed at his apartment. He never told me where he went, but at least he would always put gas in it for me when he returned it.

46

STATEMENT OF SHOOK's on Wednesday, May 29, 1991, at 1:45 p.m.

ADDRESS:    13932 Victoria #17, phone number 453-0084

Mrs. Bryant, 451-8608 - Linda,

Employment:  A & A High Tech Import Auto Clinic, Thompson Road,

Baytown, Texas; 424-2356

TDL:   03925131

SSN:   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

DOB:   5/1/63


He has been living in Houston for about 18 months, about a month or so ago he met "a Niger" named Gene at Pete's Truck Stop. Later learns that his name is Eugene Broxton. He was their with a girl named Nellie Jo Wallis. He met Gene who was with a black girl named Sally. Gene was fixing to call a cab. He gave Broxton a ride for $5.00 and took him to the Econo Lodge on I-10 where he went to "Reds" room, she is a black drug dope dealer. Gene was going there to pick up his girlfriend Tracie who is white. They picked up Tracie and then Gene had him drop them off at the La Fiesta Apartments on Market. Next day or so Gene came by his room at the Bayou Motel. He was with Gina, she is black girl, he was stating he was wanting to buy a rock. I didn't have any so he left to go get some money. Me and Gina then left to go get a rock. We were gone about 45 minutes. When we came back there were police everywhere. As I got out of the car a police officer came up and told me that if he had been in my room. He said that a man had told the police that a black man who had robbed someone had been

47

seen in my room before the robbery then described the black man the description fit Gene.   The Police said that a man had been beat up and robbed there at the Bayou Motel by this black man.   I saw the man that who was beat up walking around the motel.   He is a black male in his 20's.   He looked to me like he had been in a car wreck.

Gene came back to my room later that same night, I told him to get out because the police were looking for him.   The next day Gene told me he had beat the black man and pistol whipped him and locked him in the bathroom with a chair.   I had seen Gene with a .22 caliber revolver and a 3L automatic before this robbery.   He told me that he had bought the guns from a pawn shop with his own I.D.

Soon after that Gene came to my room and wanted me to go to his apartment with him.   When I got there he showed me a blue full size chevrolet van.   This man was parked right out in front of his apartment La Fiesta.   This van was about a 1978 or 80 model and it had red Arizona license plates on it.   The guy in the van I saw had a wheel chair in the back of it.

He told me that night he was $80.00 short on his rent.   I told him that I would give him $80.00 if I could move in with him.   He agreed and I gave him the $80.00.   I went to Beaumont the next day or so to see my family.   While I was there a guy with two friends of mine named Martin Dupries or Duprius and the other one his name is Joe, I don't know his last name.   Joe's friend named Noble Jarrett.   He lives in Beaumont _____.

Joe, Martin and Chris, all went back to Gene apartment, the blue van was still there.   That night Broxton wanted to go and

48

charge some gas, and cigarettes on some credit cards that he had. They were in the name of Albert Krigger, a shell card and a mobile card. Chris refused, but Joe said that he would. Chris told Martin to go with Joe. Joe and Martin got into the van with the credit cards with Krigger's name on them. Gene told them to go get gas and all the cigarettes they could buy, this is because I can sell cartons of cigarettes for $10.00 a carton.

Joe and Martin left in the blue van. That is the last time he ever saw Joe and Martin when they didn't come back I asked Gene if he thought his friend could had been arrested in the van or for using the credit card. He told me no because the man that had the van and the cards was dead. I asked him what was the deal. He got pissed off when I asked him that, but then he told me that he had robbed and killed the man who owned the van. I think he told me that he strangled the man, but I am not sure. I said that I saw a wheel chair inside this van, the wheel chair was folded up in the back, I also saw a _____ metal box in the van with the latch that had pink supplies in it like an artist would use and little paint brushes and utensils and little bottles of paint. There was one of those label tapes on this box with the name A. Krigger.

While living with Gene I found out that no matter how upset he is or gets he never hollers or goes off in anyway so you know that he is mad. No matter how mad he gets he always talks in a very calm voice with normal level. He don't holler. Broxton would often pretend to be Jamaican and speak with Jamaican accent. When he robbed people he also talked Cajun.

49

A few days later after the Krigger's van two girls pulled up in a gray of silver chevy pickup. They were both obviously lesbians. Both white girls are both tall and slender, passenger had dirty blond, driver had dark hair. The masculine one the driver called the other one Kelly, both in their mid 20's. First time he had ever seen the girls on another occasion he saw them at a place called Little Mexico. Little Mexico and this apartment complex is located on Dell Dale. The girls came over and asked if I wanted to buy a quarter ounce of marijuana for $10.00. I told them I didn't smoke marijuana, but I thought Gene might want to buy the dope, so I went inside and told Gene about it. Gene bought the dope and asked the girls if they would give him and ride and pay her. They agreed and left and came back 45 minutes later. Gene was then driving an 88 or 89 dark blue and light blue two tone pickup Ford with a camper on the back and an extended cab. Gene then told me to get the guys out and give the ignition keys to the girls and give Gene the rest of the keys. Later when he was arrested some of the keys to the Ford truck where in his car. The Sheriff's Office has them all the truck keys where given to the two lesbians.

The two lesbians then gave Gene a .16 of cocaine and 10 tellers for the truck. A sixteenth is suppose to be a gram and three-quarters, but he really didn't get that much and then left with both trucks and saw the girls several days later at Little Mexico. This was the last time he ever saw them.

Gene told him that the truck came from a guy at the Wal-Mart

50

parking lot on Uvalde that "Jack dude" had been shot and then stabbed him. Said that while it was happening another truck drove by and he took a shot at the other truck after he had shot the man he "dumped in the bushes."

A few days later Gene had a little black S-10 pickup an 80 or 81 model. He said Jack got forced and used a stun gun that it didn't kill the guy. He made the guy take his shoes off so he could use the stun gun on him and it wouldn't be grounded this happened in the Normandy Inn and had pictures of the guy. Looked like a short Mexican guy there were also pictures of the guy with some women with some kids. He also had the man's watch a silver colored watch that looked like a diver's watch with a dial that twist around, I think it looked like a sieko, he also had the man's pager. That night Gene left in the truck and when he came back he did not have the watch, but he had some cash. Then Chris, Jean and Gene got in the truck, Chris was driving to the Thorn Tree Apartments. Sheriff's started following behind them, got the hell out and ran so did Gene and Jean. Chris ran to a friend's apartment in the Thorn Tree.

Several days later he went with Gene to the Econo Lodge to see Red, also knows Red as Sharee. Red ran him off because she doesn't like Gene. Chris stayed in over 30 minutes. Came back out Gene was gone. He waited around for Gene for around 40 minutes, got tired of waiting and left. He went back to Gene's apartment, Gene shows up an hour later came in carrying a couple of duffel bags and about $200.00 worth of rock, he was bragging and pulled out his

51

wallet and showed a wad of money with at least one one hundred dollar bill. Gene gave Trish a gold ring that was oblong and real fancy, he gave her a little wallet. She left the room, Gene told him that he had just killed two people. He said he shot them both with a .44, he didn't tell me where the got the .44. He showed me a high school ring with the name Sheila on it. I know that Gene had a .22 with him, but I never saw a .44. Gene went through the bags in the closet, put some things in a plastic garbage bag and told me to throw them away in the dumpster. In the garbage bag I saw two spinned 44 shells and some papers and photos. Some of the papers had the name Waylon Dockins on them, some of them had the name of Sheila Dockins, we saw some of them with their addresses on it. On Dockins driver's Louisiana.

When he saw all of this he decided not to throw it in the dumpster because he knew sooner or later if he got caught he need it for evidence. Went and got the orange bag out of the dumpster and put the plastic bag which Gene gave to me to throw away inside the orange plastic bag. I then threw the plastic bag over the fence right behind the dumpster in the northeast corner of the La Fiesta Apartments. When he went back to the apartment Gene told him that he had thrown some stuff over the fence right down from the apartment.

When he met with Smith and Williamson he told them all this and drew them a map where the things were at. One time Gene told him that the black man of the Normandy Inn suspected him of killing a white man at the Normandy Inn. At that time Gene did not admit

52

of killing the man, but later he told him that he did kill the man
and that he got $1,500.00 off the man. Doesn't remember when Gene
told him about this.

## SUPPLEMENTAL REPORT BY TONERY

On May 29, 1991, Tonery released three pair of eyeglasses in their case to Williamson.  These were the glasses recovered from the Market Apartment.  Property released forms shows two pairs of black plastic frames, one gray plastic frames even though the earlier reports says two grays and one black.

SUPPLEMENTAL REPORT TONERY & MUIR

On June 4, 1991, time 8:15 a.m. time we received a call from Waylon's mother and Dockins. Waylon was to be leaving the hospital and would be returning home. Tonery advised that he would meet them at the hospital to show them some items to see if Waylon could identify the items. Tonery brought the white purse, wallet, watch, and knife that he received from HPD. He also brought a brown zipper bag and a pair of gray boots which were recovered from Market Apartment. The Dockins viewed the items and said the purse and wallet were his wife's, the watch and knife was his and the bag and boots were not his.

On September 6, 1991 at 3:10 p.m. Tonry submitted a bunch of stuff to the M.A's office they were to be check for blood, hairs, r.h.'s semen, gunshot residue. The laboratory submission form that immediately follows the M.A. stuff is not readable. The laboratory submission form is the stuff that the pocket planner, the address book, air freshener and that stuff that was earlier seized from Broxton's apartment. The stuff in this record Muir and Tonry, 6691, Muir and Tonry submitted property to the Harris County Forensic Center including one pair of green and white men's undershorts, one white undershirt, one white wash cloth, one pair of white panties, one pair of blue panties, one pink pullover shirt, one pair of pink and black shorts, one pink (fushia) top (teddy) and matching shorts, one pair of white pants, one pair of blue jeans, one multi color shirt, one white towel.

The above items were submitted for check for hairs and blood and gun shot residue. Also, submitted their i.d. for prints, are one envelope, two paper bags, one plastic bag, one air freshener, one voided check, one bank book, one pocket planner, one address book, one note pad, one piece of paper (with designs), two plastic bags, two spinned 44 shells.

56

ANOTHER SUPPLEMENTAL REPORT NO. 6791 BY Muir

He submitted the following property I.D. for property room safe keeping, one pair of gray boots, one box of 22 shells, one box of assorted papers, one cringe, one key ring pertaining 10 keys, one polaroid model 600 camera, one blue address book, one i.d. card for Christopher Jewels Shook, one TDL 08519779 to Janice Corley Richardson, one brown leather liked bag, one plastic sack, two pairs of work gloves gray color.

SUPPLEMENTAL REPORT MUIR

On June 12, 1991, he was met at his office by Dockins for him to give a written statement. He also picked some personal property, picked up the crime scene involved in the case. Muir also obtained several clear plastic envelopes with Dockins hair samples.

### WAYLON'S STATEMENT

White male, age 22, dob 12/12/68, Maney, Louisiana, lives at Rt. 1, Box 2610, Florine, Louisiana with his parents. His phone number is 318/586-4429. Employed at Brown & Root on Clinton Drive, phone number is unknown. Louisiana driver's license no. 002994853, ssn 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. On May 16, 1991, between 10:00 and 10:30 p.m. he was at the Magnolia Motel with his wife. They had laid down to go to bed, a man came to the door, said he was management and needed to speak with him. He had had a talked with management the day before about the dog, so I presumed this was what he was wanting to speak to me for. I went to the door and cracked it open and he pushed his way into the room told him to sit on the bed. The first thing he asked for was our jewelry and the money. He had a gun in his hand. After Waylon sat down on the bed Broxton walked to the foot of the bed and found Waylon's gun. Broxton looked it over to see if it was loaded, came back to the bed and began to tie them up. Sheila was laying down on the bed and she never moved. He tied Waylon's hands first and then her's. Broxton began to look around the room and picked up Waylon's watch, Sheila's watch and he found her key ring in her purse and Waylon's key ring laying on the dresser. Broxton asked them which vehicle was theirs. Waylon told him and the key ring had a remote control on both of them from the truck at home. Broxton asked them if the alarm was on the car outside. Waylon told him no, Broxton asked him again if he was sure, Waylon told that the alarm was for the truck. Broxton said

59

he was going to go out to the car and if the alarm went off he was going to come back and kill both of them. Broxton started out the door two or three times, but never made it out the door. Came back in and tied Waylon and his wife at the feet and gag both of them. He started out the door again, and then started motioning like he was going to hit Waylon with the pistol. Waylon's wife screamed, "no", Broxton told her to shut up and he pointed the gun at her. Broxton jerked the sheets up over Waylon's head and hit him with the gun. This is the last thing he remembers is until he woke up the next morning at 7:15 a.m. Waylon was laying across the foot of the bed on his stomach untied looking down at his wife on the floor. He reached out to touch her and she didn't move and she didn't say anything. He popped out of bed and fell back on the floor. He reached out to touch her again and she still didn't move. He pulled himself back up on the bed by the sheets and dialed zero to the front office. He told them that they were hurt and he had been robbed and needed the police. Waylon talked to the Sheriff's Department and told them where he was and that he had been robbed and that they were both hurt. He fell on the bed and the next thing he knew was that the police busted down the door.

The man was a black male, approximately 5'9", 150 pounds, dress in slacks and a nice shirt. The gun looked like a small caliber gun. While he was in the hospital Muir and Tonery and another officer came to the room and showed him a video tape of several black men in it. The black man that did all this was in the tape, first man on the left. He is positive this is the man

60

that did it with no doubt in his mind.  They also let him hear his voice on the tape.  He is certain that's his voice also.  In other words "there is no doubt in my mind, I am 100 percent positive that this is the man."

**EXHIBIT 6**

http://www.chron.com/CDA/archives/archive.mpl/1992_1061788

# chron

NEWS  SPORTS  BUSINESS  ENTERTAINMENT  LIFE  TRAVEL  H OGS  JOBS  HOMES  CARS  BUY & SELL

Mobile : SMS

New
90

## Deputies find guns, cash in drug raid

ERIC HANSON STAFF

Harris County Sheriff's investigators found nearly $900,000 in cash in in a Channelview-area house along with a pistol used last year to shoot two people, one

"There is no doubt in my mind this money came from drugs," Sheriff Johnny Klevenhagen said Monday, and since nobody has claimed the cash — one of the largest seizures here in recent history — it will be used to aid his department's drug-fighting efforts.

Units from the Sheriff's Hotspot narcotics enforcement team were sent to the house in the 200 block of Uvalde Friday to investigate a report that several people had been shot there.

Klevenhagen said officers found numerous bullet holes in the windows and front door, but no shooting victims.

Officers found two weapons and a man and woman at the residence. The pair permitted the officers to search the home, and they found $888,598 in a safe.

Officers also found a small quantity of cocaine and another pistol. They discovered it was used in the May 1991 motel shootings here of Sheila Dockens, 20, and her husband, Waylon, 23

She was killed, but her husband survived. He testified against Eugene A. Broxton, who was convicted last month of capital murder of Sheila Dockens during a robbery and sentenced to death.

Klevenhagen said detectives are still trying to determine how the pistol used in the Dockens shootings came to be in the house.

Charges against the two people arrested Friday are pending further investigation.

The pair said they didn't know anything about the money, Klevenhagen said. If anybody claimed it, they could be taken to court to explain its source and could be prosecuted by the Internal Revenue Service for not reporting it.

Usually seized drug money is mostly $50 and $100 bills. But a large portion of these funds was in $5, $10 and $20 bills, indicating it may have been proceeds from direct street sales, Klevenhagen said.

He said most of the money will be used to purchase equipment for his department.

Copyright notice: All materials in this archive are copyrighted by Houston Chronicle Publishing Company Division, Hearst Newspapers Partnership, L.P. or its news and feature syndicates and wire services. No materials may be directly or indirectly published, posted to Internet and intranet distribution channels, broadcast, rewritten for broadcast or publication or redistributed in any medium. Neither these materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

Copyright © 2009 The Houston Chronicle

HEARST newspapers



**EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| EUGENE ALVIN BROXTON, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | H-11-315 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

<u>Order Granting Petitioner's Motion To Stay And Abate Habeas Proceedings</u>

Petitioner Eugene Alvin Broxton has filed a motion to stay and abate the proceedings on his habeas corpus petition to allow him to return to state court to raise several unexhausted claims. Broxton states that his state habeas counsel became ill and died during the course of state habeas proceedings, and failed to raise several claims Broxton now wishes to raise in this Court.

"Because granting a stay effectively excuses a petitioner's failure to present his claims first to state courts, stay and abeyance is only appropriate when the district court determines there is good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Broxton's petition raises claims that the State failed to disclose exculpatory evidence,

and that the trial court improperly excluded evidence bearing on a key prosecution witness's credibility. He also contends that some of this evidence establishes that he is actually innocent of the capital murder. The illness and death of his state habeas counsel appear to constitute good cause for his failure to exhaust claims, and it cannot be said at this early stage of these proceedings that his claims are plainly meritless.

Accordingly, IT IS ORDERED that Broxton's Motion To Stay And Abate Habeas Proceedings (Docket Entry 2) is GRANTED;

IT IS FURTHER ORDERED THAT Broxton may file a successive habeas corpus application in state court within 30 days of the date of this Order; and

IT IS FURTHER ORDERED THAT Broxton shall inform this Court of the outcome of his state court proceedings within 30 days of the conclusion of such proceedings, including any appeals.

SO ORDERED

Signed _____ Feb 23 , 2011, at Houston, Texas.

Vanessa Gilmore
United States District Judge

2

**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EUGENE BROXTON, | § |
|        Petitioner, | § |
| | § |
| v. | § C.A. NO. 4:10-mc-00048 |
| | §  CAPITAL HABEAS CASE |
| RICK THALER, DIRECTOR, TEXAS | § |
| DEPARTMENT OF CRIMINAL JUSTICE, | § |
| INSTITUTIONAL DIVISION, | § |
|        Respondent. | § |

## AFFIDAVIT OF DANNY EASTERLING

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE me the undersigned notary public appeared Danny Easterling, and upon his oath

he testified to the following:

"My name is Danny Karl Easterling. I am over the age of eighteen years old and I am in
all ways competent to testify to the matters contained here based on my personal
knowledge and beliefs.

"I have been licensed to practice law in the State of Texas since 1980. I have been
admitted to practice in the United States District Court for the Southern District of Texas
since 1985. I currently maintain an office under the name Easterling & Easterling at 1018
Preston St., Houston, Texas 77002. I am board certified to practice criminal law.
Additionally, I was named a Super Lawyer in the category of criminal defense work by
Texas Monthly Magazine in 2003 through 2010. I have an AV rating from Martindale-
Hubbell, I was named lawyer of the year for the year 2003 by the Harris County Criminal
Defense Lawyers Association. From 1999 through 2005 I served on a grievance
committee for the State Bar of Texas. I was the president of the Harris County Criminal
Defense Attorney Association during the 1999-2000 term and I have been on the board of
the Texas Criminal Defense Attorney Association from 2000 through 2010. I have been
an instructor each spring at the Texas Trial Lawyers College at Sam Houston State
University, Huntsville, Texas and lectured widely on issues related to criminal law. I am
certified and peer reviewed for appointments to capital murder death penalty cases by the
Texas Court of Criminal Appeals, the 9th Administrative District Court and 22 District
Court Judges of Harris County, Texas.

r

I became acquainted with Eugene Broxton when I was appointed to take over the representation of Mr. Broxton during the pendency of his state court habeas proceedings after his attorney, Richard Wheelan became terminally ill and ultimately dying. At the time I took over the Broxton habeas proceedings as the attorney-in-charge, the habeas petition and all other documents had been filed.

"The habeas petition that Mr. Wheelan had filed on behalf of Mr. Broxton addressed only one claim that might be considered tailored to Mr. Broxton's actual case rather than simply claims that could be considered boilerplate at this point, attacking the constitutionality of the death penalty and how it is administered in the State of Texas. Unfortunately, based on what I have since learned of the case, it is clear that additional claims should have been raised in the state court habeas proceeding that were not raised. In particular, I have reviewed the testimony of the expert hired by the defense attorneys during the second trial, Walter Quijano, Ph.D.. Given Dr. Quijano's record in linking future dangerousness to race and ethnicity and his own testimony in Mr. Broxton's original sentencing trial when Dr. Quijano was a witness for the State, as someone who has been charged with the responsibility of representing defendants in capital murder/death penalty cases, it is inconceivable to me that Mr. Broxton's attorneys during the second sentencing trial would have employed Dr. Quijano and relied upon him as a defense witness under any circumstance.

"Dr. Quijano's testimony during the resentencing trial is a textbook example of when a trial attorney does not properly prepare himself and his witness for trial. During his testimony, under both direct examination and cross-examination, Dr. Quijano was asked to offer his "expert" opinion on whether or not Mr. Broxton would be a future danger to society which tracks the language of Tex.C.Crim.Pro. Art. 37.071, sec. 2(b)(2)(1). In each instance, Dr. Quijano answered in the affirmative. It is my opinion that no trial attorney, acting reasonably and professionally and within the bounds of the standards of practice for attorneys practicing capital defense work, would have developed a strategy that would include the defense's own expert witness opining that the defendant would be a future danger to society and that the appropriate answer to the future dangerousness special issue is "yes". The testimony of Dr. Quijano basically insured that, regardless of whatever other evidence may have been presented at trial, Mr. Broxton would receive the death sentence. Clearly, the testimony of Dr. Quijano was the most damning testimony throughout the sentencing trial because, by calling Dr. Quijano as a defense expert, the defense attorneys were themselves sponsoring a witness who held the opinion that the defendant should receive the death sentence.

"The trial record is studded with other examples of when the defense attorneys failed to effectively represent their own client, as in putting forth testimony of Mr. Broxton's sister and brother, neither of whom provided favorable testimony on behalf of Mr. Broxton despite being defense witnesses. The trial attorneys also failed to call an expert witness in mental health issues who could have testified as to Mr. Broxton's long history of

mental illness and the effect of drug use on him, which was actually done in the original trial through the testimony of Wendel Dickerson. In fact, given the passage of time between the original trial when Dr. Dickerson testified and current views of the effects of crack cocaine on a person, the defense could have offered more powerful testimony on behalf of Mr. Broxton, however they failed to do so. In fact, rather than have a mental health expert go into detailed testimony of Mr. Broxton's long documented mental health history of severe depression, the trial attorneys simply stacked the records on the table for the jury to review on their own, without any direction or the necessary information to put the medical evidence into a proper context.

"It is my opinion that Mr. Broxton's trial attorneys failed to render effective assistance of counsel in representing Mr. Broxton at trial. It is also my opinion that during the State habeas proceedings, because Mr. Wheelan had not raised these issues in a timely manner, Mr. Broxton was not afforded effective assistance of counsel and is entitled to either have those additional claims heard and considered in the federal courts because it is probably futile to pursue any habeas claims in the state courts at this point or have the case returned to the state court where the claims can be fully exhausted.

"Affiant sayeth no more."

_____
DANNY EASTERLING

BEFORE ME, the undersigned notary public, appeared Danny Easterling, and after being duly sworn did testify to the matters contained above on this 27 day of January, 2011.

AMANDA K. PEREZ
Notary Public, State of Texas
My Commission Expires
July 20, 2014

_____
NOTARY PUBLIC BY AND FOR THE
STATE OF TEXAS
My commission expires: July 20, 2014

**EXHIBIT 5**