IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EUGENE ALVIN BROXTON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 4:11-cv-00315 |
| WILLIAM STEPHENS, Director, | § | **DEATH PENALTY** |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION
AND MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH BRIEF IN SUPPORT**

Petitioner Eugene Broxton[1] was convicted of capital murder and sentenced to death for the May 16, 1991 intentional murder of Sheila Dockens during the course of a robbery.  He currently petitions for habeas corpus relief from his 1992 conviction and 2003 death sentence on retrial of punishment. ECF No. 9. The Court should dismiss claims that are moot or constitute an unauthorized successive petition and summarily deny habeas corpus relief on Broxton's time-barred, procedurally defaulted, and meritless claims.

### BROXTON'S ALLEGATIONS

1.  During the guilt-innocence stage of the capital murder trial

    a.  Broxton was denied his Eighth and Fourteenth Amendment right to a fair trial and his Sixth Amendment right to present a defense when the trial

---

[1]     Respondent Stephens is referred to as "the Director."

court refused to limit the State's re-direct examination of Christopher Shook to the content of his auditory hallucinations;

b.   Broxton was denied his Sixth Amendment right to effective assistance of counsel when his attorneys failed to argue constitutional grounds for limiting the State's re-direct examination and defaulted an otherwise winning appellate point; and

c.   Broxton is actually innocent of the capital murder of Sheila Dockens.

2.   The State's failure to disclose that it recovered the murder weapon after Broxton was convicted

a.   violated his right to due process as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963); and

b.   violated his Fourteenth Amendment rights under *Napue v. Illinois*, 360 U.S. 264 (1959).

3.   Broxton was denied his Sixth Amendment right to effective assistance of counsel by his attorneys'

a.   failure to discover that the murder weapon had been recovered by police;

b.   calling Dr. Walter Quijano to testify on retrial of punishment;

c.   failure to challenge the State's case through retrial on punishment in 2003;

d.   failure to investigate and present meaningful mitigation evidence;

e.   failure to make better use of Broxton's siblings as mitigation witnesses; and

      f.     presenting Broxton's record of mental illness and prison conduct during the punishment phase.

4.     Broxton was denied the effective assistance of counsel during state habeas proceedings in violation of his Sixth and Fourteenth Amendment rights.

*See* ECF No. 9 at 28-99.

## STATEMENT REGARDING THE RECORD

The Director filed a CD containing the state-court record of Broxton's direct appeal, direct appeal on retrial, and three state habeas proceedings.  ECF No. 14.  A copy of the CD was also provided to Broxton's counsel.

## TABLE OF ABBREVIATIONS

The Director utilizes the following abbreviations to represent the state-court record and federal habeas exhibits:

| | |
|---|---|
| **CR** | Clerk's Record of pleadings, orders, and documents from Broxton's trial |
| **R-CR** | Retrial - Clerk's Record |
| **RR** | Reporter's Record of transcribed hearings, voir dire, trial testimony, and exhibits from trial |
| **R-RR** | Retrial - Reporter's Record |
| **CX-, DX- or SX-** | Court's Exhibit, Defendant's Exhibit or State's Exhibit from trial |
| **SHCR-** | State Habeas Clerk's Record from Broxton's initial (SHCR-01), second (SHCR-02), or third state habeas proceedings (SHCR-03) |

**SHRR**     State Habeas Reporter's Record of transcribed testimony from the 1999 evidentiary hearing

Where possible, citations are preceded by volume number and followed by page reference or other identifier.

## STATEMENT OF THE CASE

### I.     Original Trial and Appeal

The State of Texas charged Broxton by indictment with the May 16, 1991 capital murder of Sheila Dockens. CR 16. Broxton was represented by court-appointed counsel Troy McKinney and Tom Moran. *Id.* at 10, 26. On April 30, 1992, a Harris County jury returned its verdict, finding Broxton guilty as charged. *Id.* at 143. Following separate punishment-phase proceedings, the jury answered affirmatively the special sentencing issues on deliberateness and future dangerousness, and answered negatively the issue on mitigation. *Id.* at 165-68.[2] In accordance with the jury's answers, on May 6, 1992, the trial court sentenced Broxton to death. *Id.* at 189-90.

The Texas Court of Criminal Appeals ("TCCA") affirmed Broxton's conviction and sentence on direct appeal. *Broxton v. State*, 909 S.W.2d 912 (Tex. Crim. App. Oct. 4, 1995), *rhrg denied* (Nov. 15, 1995). Broxton did not file a petition for certiorari review.

---

[2]     Tex. Code Crim. Proc. art. 37.071 §§ 2(b)(1)-(2) & (e) (West 1991) (current version at Tex. Code Crim. Proc. art. 37.0711 §§ 3(b)(1)-(2) & (e)(West 2011).

On April 24, 1997—one year following enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214—Broxton, through appointed state habeas counsel James R. Reed, filed a writ application raising four claims. SHCR-01 at 2-199. The trial court conducted an evidentiary hearing and subsequently issued findings of fact and conclusions of law recommending relief be denied. *Id.* at 251-67. The TCCA adopted the findings and conclusions in their entirety, and denied Broxton's writ application. *Ex parte Broxton*, No. WR-42,781-01 (Tex. Crim. App. Oct. 27, 1999).

Broxton timely petitioned for federal habeas relief on March 3, 2000. *Broxton v. Johnson*, No. 4:00-cv-01034 (S.D. Tex.) at ECF No. 11. He later supplemented the petition with a claim alleging that it was fundamentally unfair for the State to call Dr. Walter Quijano who testified during the punishment phase about racial and ethnic stereotypes. ECF No. 14. The Director confessed error and urged the Court to grant the writ for the claim involving Dr. Quijano and to deny relief for all claims concerning the guilt-innocence phase of trial. ECF No. 20 at 27-28. On March 28, 2001, the Court issued an order conditionally granting the writ and vacating Broxton's death sentence.[3] ECF Nos. 25, 26. At the same time, the Court rejected all claims aimed at the guilt

---

[3]    The Court ordered that Broxton's death sentence be vacated unless he was provided a new punishment hearing or else his sentence was commuted to life imprisonment within 180 days. ECF No. 25 at 39.

finding, declining to upset the verdict and judgment finding Broxton guilty of capital murder, and denied Broxton a COA. *Id.* The Fifth Circuit also denied COA. *Broxton v. Cockrell*, 278 F.3d 456 (5th Cir. Jan. 2, 2002), *cert. denied*, 537 U.S. 951 (Oct. 15, 2002).

## II.   Retrial of Punishment and Appeal

The trial court appointed R.P. "Skip" Cornelius and Tom Moran (who served as second-chair counsel during Broxton's original trial) to represent Broxton on retrial. Following a new punishment hearing, on November 14, 2003, a Harris County jury answered the three special issues on deliberateness, future dangerousness, and mitigation in a manner which resulted in the trial court again sentencing Broxton to death. 4 R-CR 1331-34.

The TCCA affirmed Broxton's death sentence in an unpublished opinion on direct appeal. *Broxton v. State*, No. AP-71,488 (Tex. Crim. App. June 29, 2005), *cert. denied*, 546 U.S. 1142 (Jan. 17, 2006).

Broxton, represented by court-appointed counsel Dick Wheelan, filed a state habeas application on August 12, 2005, raising six claims challenging the validity of his sentence. SHCR-02 at 2-101. The State answered the claims, *id.* at 231-74, and filed proposed findings of fact and conclusions of law (which were later amended). *Id.* at 282-353, 363-447. On April 9, 2008, Mr. Wheelan moved to withdraw due to his medical condition. *Id.* at 355-57. The trial court granted

the motion and appointed Danny Easterling as his replacement. *Id.* at 358, 360. Unpersuaded by Broxton's showing, the trial court adopted the State's proposed amended findings of fact and conclusions of law, and recommended that relief be denied. *Id.* at 387-88 (adopting *id.* at 343-447). Agreeing with the recommendation, the TCCA adopted the findings and conclusions without alteration and denied habeas corpus relief. *Ex parte Broxton*, No. WR-42,781-02, 2010 WL 360438 (Tex. Crim. App. Jan. 27, 2010).

On January 24, 2011, Broxton filed a federal habeas petition. *Broxton*, No. 4:11-cv-00315 at ECF Nos. 1, 3. He also moved to stay and abate the habeas action in order to exhaust claims in state court. ECF No. 2. On February 21, 2011, Broxton filed a first amended petition, moved for leave to conduct discovery, and submitted additional exhibits. ECF Nos. 4, 5, 6. Two days later, the Court granted Broxton's motion for stay and abeyance, finding that "[t]he illness and death of his state habeas counsel appears to constitute good cause for his failure to exhaust claims, and it cannot be said at this early stage of these proceedings that his claims are plainly meritless." ECF No. 8.

Broxten filed a successive state habeas application on March 16, 2011 raising four claims. 1 SHCR-03 at 6-95. He also moved for leave to expand the record and conduct further discovery. 2 SHCR-03 at Motion. The TCCA denied the motion and dismissed his successive application as an abuse of the writ. *Id.*

at cover; *Ex parte Broxton*, No. WR-42,781-03, 2011 WL 2366901 (Tex. Crim.

App. June 8, 2011) (citing Tex. Code Crim. Proc. art. 11.071, § 5).

On July 5, 2011, Broxton filed a second amended federal habeas petition.

ECF No. 9 (Petition), Nos. 9-1 to 9-6 (Exhibits).[4]   The Director's motion to

dismiss and partial motion for summary judgment now follows.

## STATEMENT OF FACTS

### I.   Evidence of Broxton's Capital Crime

In May of 1991, Waylon and Sheila Dockens were newlyweds who lived in

Louisiana where Waylon worked for Brown & Root. 28 RR 65-66. When the

company assigned Waylon to temporarily work in Houston, he took his young

bride with him. *Id.* at 67-68. On May 12, 1991, the couple drove to Houston and

checked into the Shady Glen Motel on Interstate 10 East. *Id.* 68-69. After a two-

night stay, the couple moved across the interstate and checked into Room 11 at

the Magnolia Motel, which was less expensive. *Id.* at 68-70.

On the evening of May 16th, Waylon and Sheila drove to the nearby Econo

Lodge for dinner. 28 RR 75-77. They returned to their room around 9:00 p.m.,

readied themselves for bed, and started watching television. *Id.* at 77-78.

---

[4]      (1) Affidavit, report and resume of Dr. A. David Axelrod; (2) Affidavit of
Professor Kenneth Williams; (3) Affidavit of Gina Vitale, M.S.W.; (4) Affidavit of Danny
Easterling; (5) Affidavit of Troy McKinney plus two sets of transcribed notes; (6)
Article from the Houston Chronicle; (7) the Court's order granting stay and abeyance;
and (8) Broxton's successive state habeas motion to expand the record and conduct
further discovery.

\* \* \*

Christopher Shook and his roommate, Broxton, drove to the Econo Lodge that same evening to buy crack cocaine. 31 RR 49-50. Broxton, who took a .22 caliber pistol with him, waited outside while Shook went to buy a rock of cocaine from a girl named "Red," otherwise known as Sherry. *Id.* at 52-54, 67-68. Shook smoked part of the cocaine in her room and was there for twenty to forty minutes. *Id.* at 54. When he returned to the car, Broxton was gone. *Id.* at 55.

\* \* \*

Between 10:30 and 11:00 p.m., the Dockens's heard a knock on their motel-room door. 28 RR 79. Waylon asked who was there and a man answered that he was from hotel management. *Id.* at 80-81. When Waylon eased the door open, Broxton shoved his way in, carrying a small caliber pistol. *Id.* at 81-83. Broxton was alone, and made no attempt to conceal his appearance. *Id.* at 84, 183-84.

Broxton ordered Waylon to sit on the bed and demanded the couple's jewelry and money. 28 RR 84. Waylon and Sheila complied, handing over their wedding rings and Sheila's engagement ring. *Id.* at 85. Broxton took the money from Waylon's billfold, including a one hundred dollar bill, and money and credit cards from Sheila's billfold inside her purse. *Id.* at 86-87. At that point, Broxton found Waylon's loaded Smith & Wesson .44 Magnum pistol laying on the dresser. *Id.* at 87-88. Broxton picked up the .44 and pocketed his own smaller pistol, as well as the couple's watches, car keys, and pocket knife. *Id.* at 89.

Using Waylon's socks and Sheila's stockings, Broxton tied the couple's hands. 28 RR 90, 92. Broxton cut one of Waylon's blue flannel work shirts into strips and used to also tie the couple's hands. *Id.* at 92. Although the only light that had been on was the light of the television, Broxton turned on an additional light before continuing his search through the Dockens' belongings. *Id.* at 94-95, 184. He picked up a pair of Waylon's snakeskin boots and looked through Sheila's purse where he found the rest of her jewelry, rings, and earrings, which he put in his front pocket. *Id.* at 95. Broxton dumped out the contents of a luggage bag and placed the boots and purse inside. *Id.* at 98-99.

Broxton also found the couple's car keys and noticed that there were remote controls for a car alarm on the key rings. 28 RR 95-96. He asked Waylon if their car had an alarm, and Waylon told him the remotes went to their truck in Louisiana. *Id.* at 96-98. Broxton seemed dissatisfied with the explanation, and was growing increasingly nervous. *Id.* at 97-98, 101. At one point, Broxton started out the door to go check on the car, but then shut the door and threatened the couple that if the alarm went off, he kill them. *Id.* at 151-52.

Broxton ordered Waylon to lay down on the bed beside Sheila and told them he was going to tie their feet and gag their mouths. 28 RR 102. The Dockens offered no resistence because they were afraid for their lives. *Id.* Broxton used socks, stockings, and pieces of the flannel shirt to tie the couple's

ankles and gagged them by placing a long, cotton sock inside their mouths and another sock around their heads to keep the gag in place. *Id.* at 102-03, 175.

When he finished tying them, Broxton made a two to three minute telephone call, identifying himself as "Hollywood" and asking someone on the other end to pick him up "down the street." 28 RR 104-07. After hanging up the phone, Broxton cracked the door open and looked outside. He then closed the door and approached Waylon, who was still lying on the bed. *Id.* at 107. As Broxton pulled the bedsheets over Waylon's head, Waylon saw that he was holding the .44 Magnum by the barrel and raising it upwards. *Id.* at 107-110. Sheila screamed loudly, however, and Broxton pulled the sheet back down, pointed the gun at her, and ordered Sheila to "shut up." *Id.* at 111-12. Then, Broxton pulled the sheet back over Waylon's head and pistol whipped him. *Id.* at 112. Waylon lost consciousness during the assault and has no recollection what happened afterward. *Id.* at 112-13.

*       *       *

Shook spent about thirty minutes smoking another rock of cocaine as he waited in the car for Broxton to return. 31 RR 56. Finally, a friend of Broxton's named Billy Gibson drove up in a truck. *Id.* at 56-57. Broxton arrived shortly thereafter, carrying two tote bags, and jumped into Gibson's vehicle. *Id.* at 57. Shook drove back alone to the apartment he shared with Broxton and smoked

part of his cocaine with Broxton's girlfriend, Tracy Byrd, and her friend, Brenda. *Id.* at 57-58. Gibson pulled up at the apartment and Broxton came inside, carrying the two tote bags, and headed straight back to the bedroom with Tracy. *Id.* at 59-61. A while later, Broxton came out and showed Shook a wad of money, including a one-hundred dollar bill. *Id.* at 61-62. Tracy Byrd showed Shook a wallet and a ring that she did not have previously. *Id.* at 62. Shook asked Broxton where he had gotten these things and Broxton said that he robbed a couple at the Magnolia Motel, tied them up, pistol whipped them, and shot them with a .44 Magnum. *Id.* at 63-64, 67.

*    *    *

When Waylon Dockens awoke at 7:15 a.m., he was lying across the foot of his bed. 28 RR 117. His head was hanging off the side and Sheila was laying on the floor directly beneath him. *Id.* at 118. After trying to wake Sheila, Waylon attempted to stand, but instead fell to the floor dazed as blood poured out of the right side of his head. *Id.* at 119. Finally, he pulled himself onto the bed, crawled to the telephone, and called the motel office to ask the manager to call for help. *Id.* at 121-23. Waylon made his way to the door and looked outside, but then collapsed back onto the bed. *Id.* at 123-24.

Harris County deputy sheriff William Hunton was dispatched to the Magnolia Motel at 7:43 a.m. 27 RR 133. He looked inside Room 11 and saw

Waylon lying at the foot of the bed, with blood all over the room. *Id.* at 136. Deputy Hunton called for more assistance and waited until EMS arrived. *Id.* at 137-38. When he entered the motel room with ambulance personnel, he discovered Sheila Dockens's lifeless body on the floor near the bed. *Id.* at 142-43. The paramedics determined that she was extremely cold, her left eye was open, and she had no obvious signs of life. *Id.* at 193-94, 201-02.

Upon examining Waylon, the paramedics noticed several lacerations to both sides of his head that were so deep his skull was visible. 27 RR 196-97. It was also clear that he had been beaten severely. *Id.* at 198. After they stabilized Waylon, he was taken by ambulance to LBJ Hospital where emergency room personnel tried to clean the blood and assess his wounds. *Id.* at 146, 194, 200-01. As they were doing so, a physician discovered that Waylon had been shot in the head. *Id.* at 202, 212. Within a few hours, Waylon was transported by ambulance to the Ben Taub Trauma Center. 28 RR 128. During an interview at Ben Taub, Waylon told officers that the man who shot and robbed the couple at the motel was a black male, approximately five-foot-nine, weighing one hundred and fifty pounds, dressed in dark colored slacks and a nice, dark colored shirt with flowered design. *Id.* at 152, 227-28.[5]

---

[5]     Waylon remained at Ben Taub for ten or eleven days before being transferred to Methodist Hospital where surgery was performed to remove a bullet fragment from his skull. 28 RR 128-29; 29 RR 137-38; 43 RR at SX-128.

On May 18, 1991, Broxton was arrested on a warrant for two unrelated cases of aggravated robbery. 30 RR 7-9, 47, 60-62, 67-79; 41 RR at Pretrial SX-3. At the time of his arrest, police found evidence linking Broxton to the capital murder of Sheila Dockens. Broxton was wearing Waylon's watch (SX-106) and had Waylon's knife (SX-107) in his pocket. 29 RR 82-83; 30 RR 5-6, 75-76, 103-04, 117-18. Police recovered Sheila's purse (SX-104), red clutch wallet (SX-105), and ring (SX-109) from Broxton's girlfriend. 29 RR 87-89; 30 RR 39-40, 44, 90-91. Police also recovered a bag from behind a fence at Broxton's apartment that contained *inter alia* Sheila's calendar book (SX-117), the Dockens's savings account book (SX-118), a voided check in the name of "Waylon H. or Sheila J. Dockens" (SX-119), Sheila's address book (SX-120), a small notepad with Sheila's handwriting (SX-121), and two Remington .44 caliber shell casings (SX-101).[6] 30 RR 93.[7] Waylon Dockens was subsequently shown a videotaped lineup during

---

[6] Christopher Shook testified that Broxton gave him a bag full of clothes to throw in the trash bin; that Shook put the bag inside his (Shook's) car because it was raining; that Broxton also gave him a small bag to throw away; that he looked inside the smaller bag and saw two spent .44 shell casings and identification papers with the name "Dockens"; that he placed the items in an orange bag and threw them behind a fence at their apartment; and that he did so figuring Broxton would be caught sooner or later and police would need the items as evidence. 31 RR 68-73. Shook provided a statement to police and drew a map to the location of the orange bag. *Id.* at 75.

[7] One set of car keys with remote alarm (SX-111) were recovered from Shook's car. 28 RR 153-55, 157-66; 30 RR 124-26. Shook testified that Broxton gave him a set of keys with remote alarms, that Broxton said the keys came from the Magnolia Motel, and that Shook tossed the keys into his car. 31 RR 70-71.

which he positively identified Broxton as the man who robbed the couple at gun point and pistol whipped him. *See* 28 RR 153; 31 RR 165-69.[8]

The police obtained three shell casings (SX-126) that had previously been fired from Waylon's .44 Magnum. 29 RR 4-10. A Houston Police Department firearms examiner testified that one of the two shell casings (SX-101)—previously identified as recovered from the orange bag behind the fence at Broxton's apartments, 30 RR 93—was consistent with the three shell casings fired from Waylon's gun (SX-126). 30 RR 231-34.

Dr. Eduardo Bellas, an assistant medical examiner for Harris County, performed an autopsy on the body of Sheila Dockens. 31 RR 81. He first noticed that Sheila's hands were tied behind her back with a piece of cloth, that a sock was tied around her left ankle, and another sock was tied around her neck. *Id.* at 82-83. He also found three deep lacerations to the left side of her head that were caused by blunt force. *Id.* at 82, 88. According to Dr. Bellas, the cause of Sheila Dockens's death was a gunshot wound that entered her upper left arm, perforating several vital organs before leaving her body. *Id.* at 95-96.

---

[8]    During a pre-trial hearing, Waylon testified that he picked Broxton out immediately from the lineup; that he told officers to stop the videotape because he did not need to look at the rest of the lineup since he was positive of his identification; and that at the officer's request, he went ahead and listened to the audio portion and again identified Broxton. 3 RR 58-61, 64-65, 107-09.

## II.   Evidence Admitted During Retrial on Punishment

### A.   The State's case-in-chief

The State's case focused on Broxton's extensive history of violent criminal behavior.  Broxton's primary motive appeared to be robbery, and that motive spurred him to commit a string of crimes in which he killed three people and attempted to kill three others, including a police officer.

#### 1.   Broxton's prior criminal convictions

The State presented evidence establishing that on July 16, 1972, Broxton was convicted for burglary of a motor vehicle and sentenced to three years probation. 21 R-RR at SX-149.  His probation was revoked in October 1972 after he was arrested on criminal charges, and his sentence was reformed to two years in prison. *Id.*

On September 10, 1976, Broxton was convicted in Louisiana for armed robbery and theft, and sentenced to twenty years. 21 R-RR at SX-148. Broxton was discharged in February 1986, after serving nine years at the Louisiana State Penitentiary at Angola. *Id.*

Less than three months after his release, on May 2, 1986, Broxton committed an aggravated robbery at a convenience store in Pasadena, Texas, and shot at a police officer to avoid getting caught. Walter Hayes, a retired police officer, testified that he attempted to stop a car driven by Broxton who matched

-16-

the description of the person who had just committed an aggravated robbery at a Diamond Shamrock gas station. 13 R-RR 17-22. Although Broxton initially stopped his car and pulled over when the officer activated his emergency lights, Broxton drove away at a high rate of speed when the officer approached on foot. *Id.* at 22. As Broxton sped away, he lost control on the wet road and spun out into a parking lot. *Id.* at 23. The officer pulled his patrol vehicle in front of Broxton and ordered him to get out of the car. *Id.* at 24. Broxton did so, then began shooting at Officer Hayes. *Id.* at 24-26. Broxton again fled in his car, crashed into another car, and fled on foot. *Id.* at 26-28. Broxton was ultimately arrested at a nearby apartment complex following a police search. *Id.* at 29-32. Broxton pleaded guilty to aggravated robbery and attempted capital murder and was sentenced to thirteen years in prison. 21 R-RR at SX-150.

### 2.     Broxton's unadjudicated offenses

The State presented evidence that in the weeks leading up to the murder of Sheila Dockens, Broxton began a robbery spree on the eastern side of Houston, Texas, in which he killed at least two other people.

### a.     March 24, 1991 aggravated robbery of Elbert Madden

The State's case-in-chief included evidence establishing that Broxton forced his way into Elbert Madden's residence and robbed him at knifepoint. Madden testified that on March 24, 1991, he was home alone at his apartment

on 12769 Nimitz Street when he heard a knock at the door around 7:30 p.m. *Id.* at 44-45. When he opened the door slightly, Broxton rammed his arm through and shoved Madden to the ground. *Id.* at 46. Broxton, carrying an open pocketknife with a three- or four-inch blade, ordered Madden to stay on the floor. *Id.* Broxton demanded Madden's money, tied his arms and legs together, and took $1,300 from Madden's wallet that he had been saving to buy a set of false teeth. *Id.* at 46-50. Madden was later shown a photo spread and identified Broxton as the man who robbed him. *Id.* at 53-55, 77.

### b.    April 1991 capital murder of Gary Stuckwisch

The State presented evidence establishing that Broxton stabbed Gary Stuckwisch to death and stole his car. The murder and robbery occurred at the Holiday Forest Apartments located at 11888 Dawnwood. 13 R-RR 105-06, 142. On April 6, 1991, a security guard for an went to investigate a foul odor coming from Stuckwisch's apartment and found his decomposing body in the bedroom. 13 R-RR 116-17, 142, 144. Stuckwisch's pants pockets were turned inside out and blood spatters, consistent with coming from a knife being used to stab someone, were on the apartment wall. *Id.* at 117-22. Also transfer blood stains from a hand were found on the bedroom wall. *Id.* at 121. Stuckwisch's car, a 1976 Ford Granada, was missing from the parking lot. *Id.* at 145, 158-59. On April 7, 1991, Stuckwisch's car was recovered by police and Broxton's fingerprint was

-18-

found on the interior of the driver's side window and the interior of the passenger window. *Id.* at 175, 180-81, 200-02, 206. Broxton's partial palm print matched the bloody print that was recovered from the wall of Stuckwisch's apartment next to where his body was found. *Id.* at 204, 206.

The medical examiner testified that the cause of Gary Stuckwisch's death was multiple stab wounds to the chest. 15 R-RR 159. The deceased had four stab wounds penetrating his left lung, numerous stab wounds to his back, and three sharp force injuries to the back of his neck. *Id.* at 115, 156.

### c.   April 19, 1991 capital murder of John Gordon Miller

Further evidence presented by the State established that Broxton stabbed John Gordon Miller to death during a robbery on April 19, 1991 at the Yorkshire Village Apartments at 12221 Fleming in Houston, Texas. 13 R-RR 229. Joslin Baxter, a resident of the apartments, testified that she saw Broxton and Miller sitting in a Chevy Blazer when Baxter went to get her mail. 14 R-RR 45-47. Baxter positively identified Broxton as the man she saw with the victim during a lineup in April of 1991, but could not identify anyone in the courtroom during retrial in 2003. *Id.* at 50-52.[9]

---

[9]      On May 24, 1991, six potential witnesses in the Miller case (Baxter, Hart, Goodwin, Francios, Hatton, and Gardner) attended a live lineup conducted by the Harris County Sheriff's Department during which Broxton was in the third position. 6 RR 30-31, 96. During the videotaped lineup conducted on May 18, 1991, by the Houston Police Department, Broxton chose to be in the first position. *Id.* at 5-8.

Herman Gardner, a visitor at the apartment complex, testified that he saw a young black man and an older man, identified as Miller, and initially thought they were fighting. 14 R-RR 18-20. When he looked closer, he realized that the black man was stabbing Miller. *Id.* at 20-21. The assailant, who continued to wildly stab at Miller even after he was on the ground, jumped into a Blazer and drove off as Gardner and his friends got closer. *Id.* at 23-24. Gardner's friend, Clyde Francois, also witnessed Miller's stabbing and murder. *Id.* at 34-35. Although Gardner was not able to identify Broxton as the person who stabbed Miller, Francois identified Broxton as having the same features, dark skin coloring, and physical build as the assailant, but testified that he could not be absolutely positive because Broxton may have a twin. *Id.* at 25, 36-38.

Following the robbery and murder, Broxton used Miller's stolen credit card to buy cigarettes at Nick's Exxon station in Baytown and then left driving a Chevy Blazer. 14 R-RR 56-57, 63-64. Sharen Alexander, the store clerk, identified Broxton from a photo spread as the person who used Miller's credit card to buy cigarettes. *Id.* at 67-68.

The medical examiner testified that John Gordon Miller died as a result of multiple stab wounds to his chest; four of the wounds were independently life-threatening because three perforated his lung and a fourth perforated his heart. 15 R-RR 139, 159-67.

### d.   May 10, 1991 aggravated robbery/attempted murder of Grady Andrews

The State's case included evidence of Broxton's aggravated robbery and especially brutal attempted murder of Grady Andrews in eastern Harris County. Testimony previously given by Andrews was read aloud to the jury. Andrews testified that on May 10, 1991, he drove his wife and son to the Wal-Mart located on Interstate 10 East and sat in the parking lot in his Ford pickup truck while his family went inside. 14 R-RR 125, 128. He stated that his driver's side window was down when Broxton approached and asked for the time. *Id.* at 128.  Broxton walked to the back of the truck but soon returned carrying a .22 caliber pistol. *Id.* at 129-31.

Anderson testified that Broxton told him to move over, got into the truck, and drove off with Andrews in the passenger seat. 14 R-RR 131. When they got to the Penn City Road, Broxton ordered Anderson to get out of the truck, walk to the back, empty his pockets, take off his boots, and kneel. *Id.* at 135-36. Broxton shot Andrews in the mouth; beat him over the head with the gun when it would not fire a second time; and stabbed him, cutting his gall bladder and liver. *Id.* at 136-38, 140-41. Andrews testified that Broxton stole his money, ring, and watch, and drove away in his truck. *Id.* at 132-34, 142. He later positively identified Broxton from a videotaped lineup. *Id.* at 139, 196-97.

Johnny Cherry was heading down Penn City Road to a job site when he saw Broxton beating Andrews on the side of the road next to a pickup truck. 14 R-RR 156. Cherry started to approach but after hearing a gunshot, drove off because he thought Broxton was firing at him. *Id.* at 161. When Broxton drove away, Cherry drove back to see if he could help. *Id.* at 162-63. Andrews had been shot, stabbed, and beaten, and his intestines were exposed. *Id.* at 164-65. Cherry called for help on his two-way radio and waited with Andrews until EMS arrived. *Id.* at 165-66. Cherry also identified Broxton as the person who assaulted Andrews and shot at him. *Id.* at 173-175, 197-98.

### 3. Broxton's May 16, 1991 capital murder of Sheila Dockens and unadjudicated aggravated robbery/attempted murder of Waylon Dockens

The State presented testimony from Roy McDonald, a retired Harris County Sheriff's Deputy, regarding the crime scene investigation including his viewing of the body of Sheila Dockens, how she was tied, and the injuries she sustained, 14 R-RR 208-10, 213, 216; his description of where blood was found throughout the motel room, *id.* at 217, 219-23; his finding a bullet hole in the wall and locating the projectile, 15 R-RR 25-27; his examination of blood smears to find possible fingerprints, which was unsuccessful, *id.* at 30; his finding identifiable prints that matched Waylon Dockens, *id.*; and his looking for, but not finding, a gun in the motel room, *id.* at 36.

Waylon Dockens testified as he did during the during the guilt-innocence stage of the original trial. 15 R-RR 41-97. On retrial, Waylon added that his wife Sheila had just turned twenty years old when she was murdered, he was twenty-two years old at the time, and the couple had only been married since Valentine's Day which had been three months and two days. *Id.* at 88. He also testified regarding his severe injuries from being pistol whipped and shot in the head by Broxton, his being hospitalized for nearly a month, his undergoing surgery to remove a bullet from his skull, and his being permanently affected by having total deafness in his right ear. *Id.* at 83-86, 99.

Benjamin Banta, a paramedic, testified about being dispatched to the Magnolia Motel, immediately ascertaining that Sheila Dockens dead, and assisting in transporting Waylon Dockens to LBJ Hospital. 15 R-RR 109-18. An operating room nurse testified about observing a neursurgeon remove a bullet from Waylon's head and placing it in a container which she delivered to the Harris County Sheriff's Department. *Id.* at 120-124. Dr. Dwayne Wolf, the Deputy Chief Medical Examiner for the Harris County Medical Examiner's Office, summarized the results of the autopsy on Sheila Dockens and reported that her death was caused by a gunshot wound to the chest. *Id.* at 139-50.[10]

---

[10]    Dr. Wolf also reviewed the autopsies of John Gordon Miller and Gary Stuckwisch and testified that both men died from multiple stab wounds to the chest. 15 R-RR 139, 159, 167.

Ann Dockens, Waylon's mother, testified about sending three shell casings from her son's .44 Magnum to the Houston Police Department's Firearms Lab. 15 R-RR 176-178. Retired Houston Police Officer Charlie Anderson, who spent thirty years as a firearms examiner, testified about the results of his examination that were presented during the original trial. *Id.* at 179-92.

Harris County Sheriff's Deputy Robert Tonry testified about his observing Broxton at the La Fiesta Apartments following his arrest on an unrelated case; his seeing Broxton wearing a black watch with gold trim (SX-106) later identified as belonging to Waylon Dockens; his interviewing Tracy Byrd after which she turned over a ring (SX-109) that belonged to Sheila Dockens; and his being present when Waylon Dockens picked out Broxton from the videotaped lineup and again from the audio recording. 15 R-RR 193-208. Deputy Tonry's partner, Orman Muir, testified about finding a set of keys with two alarm remotes when he searched Christopher Shook's white Ford Pinto station wagon pursuant to a warrant. *Id.* at 214-215, 219-20.

Christopher Shook testified similarly to his original trial testimony about how he met Broxton and came to live with him at the La Fiesta Apartments; the events on the night of May 16, 1991, at the Econo Lodge and afterwards at their apartment; Broxton's giving Shook a trash bag and smaller bag to throw away; Shook's placing the items in his car or into an orange bag that he threw over a

fence; and Shook's telling the police about the orange bag and drawing a map thereto. 16 R-RR 16-32.[11] Sergeant Ken Williamson testified about the recovery of the orange bag and the contents, which included memo pads, assorted papers, personal checks, and two .44 caliber spent cartridges. *Id.* at 71-72.

Houston Police Officer Roland Johnson testified that on May 18, 1991, he and his partner, Thomas McCorvey, executed an arrest warrant for Broxton for the aggravated robbery of Elbert Madden. 16 R-RR 77-78.[12] The officers took an unmarked police car to the La Fiesta Apartments on Market Street in order to see the layout and determine whether potential escape routes existed. *Id.* at 79. As the officers pulled into the apartment complex, Broxton walked in front of their vehicle, carrying an umbrella. *Id.* at 80-81. Officer Johnson got out of the car and said, "Police, don't move," at which time Broxton turned and ran. *Id.* at 81-82. The officer gave chase. *Id.* at 83.

Officer Johnson testified that during the course of the chase, he saw Broxton reaching into the waist area of the front of his pants and then, as Broxton was about to turn a corner, he (Broxton) slipped and fell and rolled a

---

[11]     Shook also testified that Broxton told him he got into a man's truck at a Walmart in 1991, drove some distance, then robbed, shot, and stabbed the man. 16 R-RR 67. The State's evidence of Broxton's unadjudicated aggravated robbery/attempted murder of Grady Andrews is summarized above.

[12]     The State's evidence of Broxton's unadjudicated aggravated robbery of Elbert Madden is also summarized above.

couple of times. 16 R-RR 84. The officer said that he pointed a shotgun at Broxton and held a flashlight on him. *Id.* Officer Johnson testified that it looked like Broxton was feeling around on the ground for something and then he noticed a pistol lying on the ground less than a foot from Broxton's hand. *Id.* at 84-85. The officer told Broxton not to move, but Broxton rolled over and started running again. *Id.* at 85. After the officer kicked the gun into some weeds, he continued the chase. *Id.* at 85-86. Although he lost sight of Broxton, *id.* at 86, other officers located Broxton in a pipe yard and took him into custody. *Id.* at 93. Officer Johnson then went back and retrieved the gun that Broxton dropped—a loaded .22 caliber pistol. *Id.* at 93-94; SX-113 (gun) & SX-114 (bullets).

Kenneth Authier, a trooper with the Texas Department of Public Safety, testified that on May 18, 1991, he and his partner chased Broxton through a pipe yard, found him, and handcuffed him. 16 R-RR 103-106. During a pat-down, the officer found a knife (DX-7) in Broxton's front pocket. *Id.* at 106-107. The officer positively identified Broxton in court. *Id.*

### 4.    Broxton's records

The State re-introduced Broxton's medical, prison, and jail records from the original trial proceedings and rested its case-in-chief. 16 R-RR 111-12.[13]

---

[13]    21 R-RR at SX-127 (medical), SX-128 (medical); 23 R-RR at SX-260 (TDCJ disciplinary); 24 R-RR at SX-261 to SX-263 (jail); 25 R-RR at SX-264 (TDCJ medical).

### B.    The defense's case-in-chief at punishment

Joslin Baxter was re-called and testified that during the previous trial, she said Broxton was in the number-one position in the lineup instead of the third position. 16 R-RR 116-17. She further testified that she could not remember Broxton's actual position. *Id.* at 116.[14] Sergeant J. W. Belk, Houston Police Department, was also re-called and testified that he spoke with Broxton before the videotaped lineup on May 18, 1991, that Broxton was cooperative, and that Broxton began to cry during the interview. *Id.* at 120-21.

Defense counsel presented records of Broxton's criminal history, and medical/mental health history[15] and published entries that highlighted aspects of Broxton's background and family upbringing including:

- Broxton's mother had two children by her first husband, the Reverend John Wilson, who was thirty-three years her senior, *id.* at 136;

- When Reverend Wilson died, the family became disorganized, *id.* at 136;

---

[14]    Defense counsel's transcribed notes of police reports currently furnished by Broxton to this Court regarding the May 24, 1991, lineup at the county jail state "Joslin Baxter: #3, 100 percent sure." ECF No. 9-2 at 37.

[15]    25 R-RR at DX-47 (pen packet for 1973 Louisiana conviction for theft and armed robbery), DX-48 (pen packet for 1972 Texas conviction for theft), DX-49 (TDCJ records and pen packet for 1986 Texas conviction for aggravated robbery and attempted capital murder), DX-50 (parole certificate), DX-51 (psychological report), DX-52 (psychological report), DX-53 (mental status exam), DX-54 (TDCJ records), DX-55 (TDCJ social history), DX-56 (parole board case summary), DX-57 (halfway house), DX-58 (TDCJ records), and DX-59 (TDCJ medical records).

- Broxton was born out of wedlock, *id.* at 136, 141;

- Broxton's biological father had a wife and children when he sired Broxton, *id.* at 136, 141;

- Broxton's father contributed little or no help in rearing Brixton, *id.* at 141;

- Broxton's mother had very poor eyesight, hypertension, hyperthyroidism, and extreme obesity, *id.* at 136-37;

- Broxton's mother was unable to manage a household or rear her children properly, *id.* at 137;

- Due to Broxton's mother's physical ailments and infirmities and her small welfare income, the house-keeping standards were very poor and the home had only the barest essential furnishings, *id.* at 138;

- Broxton's academic progress was low because of poor attendance and he was socially promoted from grade four to grade five, *id.* at 140;

- Until Broxton became a teenager, he attended a Baptist church in DeRidder regularly with his mother, *id.* at 140;

- By the time Broxton was thirteen, "it was obvious" his mother could no longer control him, *id.* at 137;

- Broxton received his first arrests at age thirteen for drunkenness, shop lifting, breaking and entering, and theft, but the cases were overshadowed by the child negligence and were not brought to the court, *id.* at 141, 143;

- On December 30, 1968, Broxton was placed in the custody of the Louisiana Department of Public Welfare because of child negligence, *id.* at 143;

- Broxton was placed in the Don Boscoe's Boys Home, a school for wayward boys on January 6, 1969, *id.* at 137, 141;

- When the school closed later that year, Broxton was placed in foster care, *id.* at 143;

- After his placement in a foster home, Broxton made limited progress in school and remained behind his grade placement, *id.* at 140;

- Broxton's incorrigibility in the foster home, capped by his taking the foster parents' automobile without consent and wrecking it, resulted in his being committed to the Louisiana Training Institute (LTI) in July 1970, *id.* at 137;

- Broxton was paroled from LTI on December 30, 1970, when he was fifteen-years-old and went to live with his sister and brother-in-law in Houston, *id.* at 137, 141;

- Broxton presented some disciplinary problems, was expelled from school on three occasions, and only advanced as far as the seventh grade by age fifteen, *id.* at 140;

- Broxton spent all of his time prior to his first incarceration as a welfare recipient, *id.* at 141;

- Broxton's November 12, 1973 aggravated robbery conviction was for having stolen $67.90 and a jacket, for which he was sentenced to twenty years in the Louisiana State Prison, *id.* at 136-38;

- Broxton was sent to the East Louisiana State Hospital in July 1974 and April 1975 for mental problems, *id.* at 139-40;

- Broxton's mother said she had long-known her son needed regular counseling in a mental health clinic, *id.* at 138;

- Broxton was prescribed medications for mental heath issues such as depression, *id.* at 139, 151; *see* DX-59; and

- One of the only jobs held by Broxton outside of prison was when he worked briefly as a tree poisoner which he quit after claiming he was allergic to certain vegetation, 16 R-RR 140.

*See* 16 R-RR 122-52. Defense counsel also published entries from Broxton's records showing that while he was incarcerated, his disciplinary violations have been non-violent and consisted of possessing contraband (such as extra soap, a bag of cookies, a broken radio, and tobacco), refusing to go to medical for insulin, unplugging lights, failing to obey orders, and hanging something outside his cell. *Id.* at 124-35, 143-49; *see* 23 R-RR at SX-260; 25 R-RR at DX-47 to DX-49.

Dr. Walter Quijano, a clinical psychologist and former Chief Psychologist at TDCJ-ID, testified for the defense that he had changed his prior opinion offered in 1992 at Broxton's first trial that Broxton presented a continuing threat to society. 16 R-RR 154-55, 160. When Dr. Quijano previously testified for the State, he based his opinion on his review of the offense reports and Broxton's criminal history. *Id.* at 158-160. Dr. Quijano had now reviewed all of Broxton's disciplinary records, as well as other prison records from Texas and Louisiana for the past twelve years, and found that Broxton had 29 disciplinary cases and all were classified as nonviolent. *Id.* at 161, 165. After reviewing Broxton's records, speaking with Broxton, and taking Broxton's age into consideration, it was Dr. Quijano's present opinion that Broxton no longer presented a future danger within the prison society. *Id.* at 160, 165-168. Dr. Quijano further testified that an individual is less prone to violence as he ages, that it is common for inmates to receive disciplinary referrals, that Broxton had no violent

disciplinary referrals while incarcerated, that Broxton had been work-eligible which allowed him to be outside of his cell and associate with staff and other inmates, and that Broxton told Dr. Quijano that he learned not to be argumentative with those in authority. *Id.* at 162, 164-7. Finally, Dr. Quijano testified that the use of cocaine in large amounts can lead to cocaine-induced psychosis that can cause a person not to remember events that occurred while he was high. *Id.* at 169.[16]

Larry Fitzgerald, a retired TDCJ-ID public information officer, testified that homicide was rare in TDCJ-ID since the inception of administrative segregation. 16 R-RR 174. Fitzgerald stated that he reviewed Broxton's prison records and noted that his disciplinary history reflected minor offenses, that Broxton worked in the garment factory with access to scissors and cutting instruments, that Broxton once accidentally took a knife from the garment factory but brought it back, and that working in the garment factory was a privilege that allowed for freedom. *Id.* at 172, 176-80. He further reported that Broxton was classified as a level one offender, which was the best classification for an inmate because he was eligible to work, and that Broxton was a good citizen convict. *Id.* at 180, 182. Fitzgerald testified that Broxton would go through a diagnostic process to determine proper placement if he were removed

---

[16]     The State reserved its right to cross-examine the doctor and waiter until the defense rested its case before cross-examining Dr. Quijano. 16 R-RR 171.

from death row. *Id.* at 181. On cross-examination, however, Fitzgerald admitted

that it was very difficult for a death row inmate to do violent acts because the

inmates are housed separately, and the safeguards and procedures are so

different than those used in the general prison population. *Id.* at 196-201.

Broxton's half-sister, Mattie Walters, testified that it was important that

Broxton be allowed to live because he was a vital part of her family. 16 R-RR

227. She also testified that Broxton was her youngest sibling, that he left home

at thirteen to live in a state home, that he lived with her in Houston when he

was paroled, that he returned to prison when he was seventeen, and that he was

intelligent, soft-hearted, and giving. *Id.* at 220-27. Broxton's older half-brother,

Terry Wilson, testified that Broxton suffered a lot of bad breaks and that it

would mean a lot to Wilson if Broxton lived. *Id.* at 235-36. Joanna Vaughn

testified that she had been corresponding with Broxton for four to five years,

that she had visited him in prison ten times, and that her friendship with

Broxton was important to her. *Id.* at 238-40.

Finally, Broxton took the stand and testified that his earliest memories

were of being taken to a foster home. 16 R-RR 243. According to Broxton, he was

fifteen or sixteen years old when he was first sent to a juvenile institution. *Id.*

at 245. Since then, Broxton had only spent about twenty months of his life

outside of juvenile or adult prison, including a twelve-year stay in the Louisiana

penitentiary for aggravated robbery. *Id.* at 245-250. Broxton testified that he committed a burglary of a motor vehicle within months of being paroled, causing him to be placed on probation. *Id.* at 246. His probation was revoked only two weeks later when he was arrested for possession of marijuana and carrying a weapon, causing him to return to prison. *Id.* at 246-47. He was again paroled and returned to Louisiana, but then soon committed a robbery and was sentenced to twelve years in Angola Prison. *Id.* at 247-48. Broxton testified that had been illiterate, but that he taught himself to read while incarcerated in Angola. *Id.* at 244. When he was released, he returned to Texas and lived with his girlfriend and her children. *Id.* at 250-51. Broxton reported that he was working but only made $5 an hour and that he broke under the pressure to support his girlfriend, ultimately committing an aggravated robbery and attempted capital murder of a police officer in 1986 for which he again went to prison. *Id.* at 251-52. He testified that when he was released in 1990, he started using crack cocaine and sold drugs to support his habit. *Id.* at 254, 259. Broxton disclosed that he used a lot of drugs and had some gaps in his memory. *Id.* at 255, 260. Broxton said he had only been out of prison for eight or nine months when he was arrested and charged with the underlying capital murder. *Id.* at 259.

On cross-examination, Broxton said that Chris Shook's testimony was a lie. 16 R-RR 282-283. He denied murdering Gary Stuckwisch, John Miller, and

-33-

Sheila Dockens. *Id.* at 282-283. He also denied committing the aggravated robbery and attempted capital murder of Grady Andrews. *Id.* at 283. Broxton claimed that he knew Mr. Stuckwisch and had been in his home and car numerous times. *Id.* at 292-294.

### C.   States rebuttal evidence at punishment

Brian R. Tulloch, an endocrinologist, testified that Broxton was diagnosed with diabetes in 1997, that his diabetes was being treated, and that Broxton should live a normal life. 16 R-RR 298-301.

The State recalled Dr. Quijano who testified that Broxton did not suffer from any mental illness or defect; that Broxton has characteristics of an anti-social personality disorder; that Broxton's criminal history demonstrated an escalation in violence; that Broxton committed the instant capital murder when he was 36 years old,; and that Broxton chose to be a career criminal. 16 R-RR 306, 310-23. Dr. Quijano also acknowledged that Broxton, having spent the last twelve years on death row, had minimal opportunities to be a continuing threat. *Id.* at 322. The doctor further admitted that his original opinion in 1992—that there was a probability that Broxton would commit criminal acts of violence that would constitute a continuing threat to society—had not changed. *Id.* at 323.

On re-direct examination, Dr. Quijano agreed that a person with anti-social personality disorder would follow rules in order to get privileges and that

persons with other mental illnesses and schizophrenia stop acting out as they get older. 16 R-RR 323-24. Dr. Quijano stated that as long as Broxton's society is the prison, then the probability of his being a continuing threat "is very small." *Id.* at 325. He also agreed that "given the reality of this case," the answer to the future dangerousness issue should be negative because the probability of Broxton being a continuing threat to society is very small. *Id.*

However, on further re-cross examination, Dr. Quijano acknowledged that the future dangerousness special sentencing issue is not limited to prison society and that the answer to the special issue would still be "Yes." *Id.* at 326. Following Dr. Quijano's testimony, both sides closed. *Id.* at 327.

## MOTION TO DISMISS FOR LACK OF JURISDICTION

### I.  The Court Lacks Jurisdiction over Moot Claims (part of claim #3c).

"Mootness is a jurisdictional question" and the Court "is not empowered to decide moot questions or abstract propositions." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (citing *United States v. Alaska*, 253 U.S. 113, 116 (1920), quoting *California v. San Pablo & Tulare R. Co.*, 149 U.S. 308, 314 (1893)).

Broxton's "Summary of the Facts Relevant to the Case" includes allegations regarding the original punishment phase proceedings as does part of his claim of ineffective assistance for failure to challenge the State's evidence of extraneous offenses.  Petition 20-28, 86-88.  He asserts that counsel failed to

challenge identification testimony of five "eyewitnesses" at the scene of the capital murder of John Gordon Miller, *id.* at 87, yet only three witnesses testified on retrial (Gardner, Francios, and Baxter). 14 R-RR 14-56.  He also alleges that counsel failed to hire an "identification expert" to contest testimony from two clerks regarding his purported use of stolen credit cards. Petition 22-23 & n.13, 88. While two clerks originally testified (Alexander and Salazar), only one testified on retrial (Alexander). *Compare* 37 RR 75-80, 88-93 *with* 14 R-RR 56-69. Broxton further complains police failed to recover a van and credit cards allegedly stolen by him from "A. Kreeger," Petition 25-26 n. 14, but there was no evidence regarding this offense on retrial. The Court should dismiss these arguments for lack of jurisdiction because Broxton received a new trial on punishment, so his claims are moot.

II.   **The Court Lacks Jurisdiction over Successive Habeas Petition Claims (claims ## 1a, 1b, 1c, 2a, 2b, 3a, part of 4).**

A successive habeas petition is one that (1) "raises a claim challenging the petitioner's conviction or sentence that was or could have been raised in an earlier petition" or (2) "otherwise constitutes an abuse of the writ." *Crone v. Cockrell*, 324 F.3d 833, 836-37 (5th Cir. 2003).

Broxton raises claims challenging the finding of guilt that could have been raised previously to this Court: that the trial court erred in refusing to allow limited use of mental health evidence concerning Christopher Shook (claim #1a),

that counsel ineffectively failed to prepare themselves for the issue (claim #1b), and that he is actually innocent based on such evidence (claim #1c). Petition 28-43. He also raises three claims regarding the recovery of the murder weapon in June of 1992: a *Brady* claim (claim #2a), a *Napue* claim (claim #2b), and a claim of ineffective assistance for counsel's failing to discover that the gun was recovered (claim #3a). *Id.* at 43-58, 65-68. Finally, he alleges he was denied his constitutional right to effective habeas counsel. *Id.* at 97-99 (part of claim #4).[17]

Broxton cannot contend that this is the first opportunity to raise such claims. His original federal petition, filed in March 2000, included three claims alleging error at the guilt-innocence stage. *Broxton*, No. 4:00-cv-01034 at ECF 10 at 10-48. His current claims regarding the post-trial recovery of the murder weapon are initially based on a newspaper article from June 1992 and, thus, could also have been raised previously, especially his claim that counsel failed to discover that the weapon had been recovered (claim #3a). As a result, the Court should construe Broxton's claims as a successive petition.

Section 2244(b) bars the filing of successive federal petitions absent permission by the Fifth Circuit. 28 U.S.C. §§ 2244(b)(2) & (3)(A). Federal law

---

[17]   Any claim of a right to constitutionally effective habeas counsel could have been raised in Broxton's 2000 federal habeas petition (ignoring that such a claim is not cognizable). Broxton's claims challenging the finding of guilt, actual innocence, or recovery of the gun (claims ##1a, 1b, 1c, 2a, 2b, 3a) could have been raised by his state habeas counsel after trial and writ counsel's alleged ineffective assistance in failing to do so could also have been presented in Broxton's 2000 habeas petition.

provides that "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b). The purpose of § 2244(b) is to "eliminate the need for the district courts to repeatedly consider challenges to the same conviction unless an appellate panel first found that those challenges had some merit." *United States v. Key*, 205 F.3d 773, 774 (5th Cir. 2000) (citing *In re Cain*, 137 F.3d 234, 235 (5th Cir. 1998)). A three judge panel of the Court of Appeals will then determine if the petitioner can make a prima facie showing that his application satisfies either of the exceptions under Section 2244(b)(2). 28 U.S.C. § 2244(b)(3); *Felker v. Turpin*, 518 U.S. 651, 657 (1996). Broxton did not seek or obtain the required certificate from the Fifth Circuit.

Relying on *Magwood v. Patterson*, 130 S. Ct. 2788 (2010), Broxton argues that his claims are not successive because "previously unexhausted claims addressing issues from the original guilt/innocence proceedings may be raised during the habeas proceedings following a resentencing trial" without running afoul of § 2244(b). Petition 8-9. *Magwood* does not stand for this proposition. Instead, the Supreme Court held that a first-in-time habeas petition challenging a new sentence following retrial on punishment was not a "second or successive petition" under § 2244(b). *Magwood*, 130 S. Ct. at 2803. The petitioner did not

-38-

attempt to challenge his underlying conviction and, in turn, the Supreme Court expressly declined to consider whether its holding should extend to such claims. *Id.* at 2802-03. Because Broxton cannot avail himself of the holding in *Magwood*, his claims are a successive habeas petition under § 2244(b). Accordingly, the Court should grant the Director's motion to dismiss for lack of jurisdiction.

## PARTIAL MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

If it is determined that any of the above-described claims is not moot or part of a successive petition, then the Court should summarily deny habeas corpus relief. Considered in their entirety, Broxton's claims are largely time-barred, all are procedurally defaulted, and none has merit.

### STANDARD OF REVIEW

### I.    Summary Judgment

Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The burden is on the movant to convince the court that no genuine issue of material fact exists as to the claims asserted by the non-movant, but the movant is not required to negate elements of the non-movant's case. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the non-moving party who must present "significant probative" evidence indicating that there is a triable issue of fact. *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (citation omitted). The non-moving party may not rest solely on its pleadings, *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992), and must do more than show "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence rebutting the motion is "merely colorable" or not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

While a court ordinarily construes disputed material facts in favor of the non-movant, *Anderson*, 477 U.S. at 255, in habeas cases, 28 U.S.C. § 2254(e)(1) overrides that summary judgment rule. Unless the petitioner can rebut the presumption of correctness accorded the state court's factual findings by clear and convincing evidence, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661,668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## II.   AEDPA Standards

Broxton's federal habeas proceedings are governed by the provisions of AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA was

enacted, in part, to ensure comity, finality, and deference to state-court determinations by limiting the scope of collateral review and raising the standard for federal habeas relief. *See Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (citations omitted).

Consistent with these principles, the AEDPA requires petitioners to first present their claims in state court and exhaust the remedies available. *See* 28 U.S.C. § 2254(b)(1)(A). Federal review is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state-law ground. *Cone v. Bell*, 556 U.S. 449, 465 (2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), and *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). The doctrine of procedural default additionally prevents habeas review when a petitioner has failed to meet state procedural requirements for presenting his federal claims, thereby depriving the state courts of an opportunity to address those claims in the first instance. *See Cone v. Bell*, 556 U.S. at 465 (noting that, "[w]hen a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address those claims in the first instance' and frustrates the State's ability to honor his constitutional rights") (quoting *Coleman*, 501 U.S. at 732).

For claims that have been adjudicated on the merits in state court, a federal court may not grant the writ unless it is shown that the state court's

decision (1) "was contrary to" federal law then clearly established in the holdings
of the Supreme Court or "involved an unreasonable application of" such law; or
(2) "was based on an unreasonable determination of the facts" in light of the
record before the state court. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011)
(quoting 28 U.S.C.§§ 2254(d)(1)-(2), and *Williams v. Taylor*, 529 U.S. 362, 412
(2000)). A review under § 2254(d) is limited to the record before the state court.
*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). AEDPA also provides that a
state court's factual determinations are "presumed to be correct" unless rebutted
by the petitioner with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

For claims not adjudicated on the merits, a federal court's discretion to
consider new evidence is still restricted by 28 U.S.C. § 2254(e)(2). *Pinholster*, 131
S. Ct. at 1401 (citing (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 431-32 (2000)).
If a petitioner fails to exercise diligence in developing the factual record of a
claim in state court, § 2254(e)(2) prohibits an evidentiary hearing unless (1) the
claims rely on a new rule of constitutional law or a factual predicate previously
undiscoverable through the exercise due diligence; and (2) petitioner establishes
by clear and convincing evidence that, but for constitutional error, no reasonable
factfinder would have found him guilty. Nevertheless, overcoming this bar by
showing that a defendant's own action was not the cause of his failing to develop
a factual record does not automatically insure an evidentiary hearing, "it merely

opens the door to one." *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000).

A federal habeas court has discretion to deny an evidentiary hearing if sufficient

facts exist in the record to enable it to make an informed decision on the merits.

*Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

Finally, the AEDPA did not subsume prior precedent which forecloses

relief if a claim (1) is based on rules of constitutional law that have yet to be

announced, or that were announced after a petitioner's conviction became final,

*Teague v. Lane*, 489 U.S. 288, 310 (1989)[18];  or (2) is based on trial error that,

although of constitutional magnitude, did not have a "substantial and injurious

effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507

U.S. 619, 637 (1993).

## ARGUMENT

I.    **The Court Should Deny Broxton's Time-barred Claims (claims ##1a, 1b, 1c, 3a, part of 3c, part of 4).**

The Director has argued for dismissal of claims that are moot or

successive.  However, if the Court determines that jurisdiction exists , then it

should deny relief because the claims are untimely as a matter of law.[19]

---

[18]    For purposes of *Teague*, Broxton's conviction became "final" on February 13, 1996, when the time elapsed for him to petition for certiorari review following the TCCA's November 15, 1995 denial of rehearing on direct appeal. *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994).

[19]    The Director does not assert a time-bar against Broxton's *Brady* and *Napue* claims (claims ##2a & 2b).  Assuming arguendo the evidence regarding recovery

AEDPA establishes a one-year federal filing period, which commences from the latest of four triggering events. 28 U.S.C. § 2244(d)(1)(A)-(D).[20] Broxton's conviction became final before AEDPA was enacted. As a result, his one-year filing period commenced on April 24, 1996, the effective date of AEDPA, and expired one year later. *United States v. Flores*, 135 F.3d 1000, 1005 (5th Cir. 1998). However, Broxton's filing period arguably did not commence until later on December 18, 1996, when the TTCA appointed state habeas counsel, and expired one year later on December 18, 1997.[21] Yet even with this extended time, Broxton's federal habeas petition—filed January 24, 2011 (and amended on February 20th and July 5th, 2011)—was filed more than thirteen years late.[22]

-------------------------------------------------------------

of the weapon was suppressed, then Broxton could argue that a State-created impediment prevented him from timely raising his claims as contemplated by 28 U.S.C. § 2244(d)(1)(B). The Director also does not assert a time-bar against Broxton's claims challenging retrial proceedings (claims ##3b, part of 3c, 3d, 3e, 3f, part of 4) because they were timely raised in his January 24, 2011 petition. Pet., ECF No. 1.

[20]   Broxton does not allege that he qualifies for any of the other triggering events under §§ 2244(d)(1)(B)-(D).

[21]   In *Pyles v. Morales*, No. 396-CV-2838-D (N.D. Tex. Dec. 2, 1996) (Agreed Order of Dismissal Without Prejudice), the Texas Attorney General's office agreed in a class action settlement to toll the time from request until appointment of state habeas counsel in the TCCA, for petitioners who did not have a state writ of habeas corpus pending on December 2, 1996. *See Cantu-Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir. 1998). Broxton did not have a state writ application pending on that date. Since the state habeas record does not include the date on which he requested appointment of counsel, the Director proposes that the limitations period be tolled until the date habeas counsel was actually appointed.

[22]   4785 days elapsed between the end of the filing period (December 18, 1997) and the date Broxton filed his current federal claims (January 24, 2011).

-44-

The one-year statute of limitations is subject to tolling for the period when a properly filed motion for postconviction relief is pending in state court. 28 U.S.C. § 2244(d)(2); *Cantu-Tzin*, 162 F.3d at 298. Yet the only way the limitations period is tolled is if the application for state court collateral review is filed *prior to* the expiration of the one-year federal period for filing.

In this case, using a liberal construction of the *Pyles* agreement, Broxton's federal filing period closed on December 18, 1997, one year following appointment of state habeas counsel. Broxton filed a state habeas application on April 24, 1997, before the one-year window closed. However, tolling ceased on October 27, 1999, when the TCCA denied habeas relief. *Ex parte Broxton*, No. WR-42,781-01. By this time, 127 days had transpired between the appointment of state habeas counsel (December 18, 1996) and the filing of Broxton's state writ application (April 24, 1997), so only 238 days remained on the one-year federal limitations period. Broxton needed to file his federal petition by no later than June 22, 2000, to be considered timely.[23]

Although Broxton did file a federal habeas petition on March 3, 2000, it did not include the claims currently raised to this Court. *Broxton*, No. 4:00-cv-01034 at ECF No. 11. As a result, for the claims now raised, the one-year federal filing period continued to run. Broxton's federal habeas petition did not toll the

---

[23]    June 22, 2000, is 238 days past the TCCA's October 27, 1999 denial of habeas relief. *Ex parte Broxton*, No. WR-42,781-01.

running of the period because "an application for federal habeas corpus review is not an application for State post-conviction or other collateral review within the meaning of 28 U.S.C. § 2244(d)(2)." *Duncan v. Walker*, 533 U.S. 167, 181 (2001) (internal quotation marks omitted). Although a successive state writ will also toll the limitations period under § 2244(d)(2), *Villegas v. Johnson*, 184 F.3d 467, 470 & n. 2 (5th Cir. 1999), that rule did not apply here. Broxton's successive writ applications were not filed until August 2005 and March 2011, long after the federal habeas filing window had closed. Broxton needed to file his current habeas claims, at the very latest, by June 22, 2000, yet he failed to do so. Accordingly, the Court should summarily deny his time-barred claims.

Broxton's case does not present "rare and exceptional circumstances" to warrant equitable tolling. *Felder v. Johnson*, 204 F.3d 168, 170-71 (5th Cir. 2000). A petitioner is entitled to such tolling only if (1) "he has been pursuing his rights diligently," and (2) "some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010) (citation omitted). Broxton cannot make this showing.

In the first place, Broxton has not pursued his rights diligently. His claims regarding the trial court's refusal to allow limited use of mental health evidence at guilt-innocence, counsel's alleged ineffective assistance in handling the matter, and his actual innocence claim based on the same evidence (claims ##

-46-

1a, 1b, 1c) are all record-based issues that could have been timely presented in Broxton's March 2000 federal habeas petition. Broxton should have raised his complaints regarding the original punishment-phase proceedings earlier (part of claim #3c), especially since the claims are now moot. His claim that counsel failed to discover the murder weapon was recovered in June 1992 (claim #3a) could also have been raised in his initial state habeas application. And Broxton's claim regarding state habeas counsel's representation (claim #4), which is unexhausted, could have been raised in his federal habeas petition in 2000 and his second state writ in 2005 following retrial. "Equity is not intended for those who sleep on their rights." *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (quoting *Fisher v. Johnson*, 174 F.3ed 710, 715 (5th Cir. 1999)). Even if Broxton exercised reasonable diligence, he does not allege that any extraordinary factor beyond his control prevented his filing on time. While the illness and death of Broxton's second habeas counsel in 2008 is indeed regrettable, these claims could have been raised by Broxton's first habeas counsel in 1997.[24] As a result, equitable tolling cannot save Broxton's time-barred claims.

Broxton has argued that his "actual innocence" provides a gateway through which the Court can review defaulted claims, so presumably he would

---

[24] Although state habeas counsel would not be expected to raise a claim of entitlement to effective representation of habeas counsel (claim #4), as argued below, such a claim does not exist as a basis for federal habeas relief.

make the same argument against § 2244(d)(1). Petition 8 (citing *Schlup v. Delo*,

513 U.S. 298 (1995)). Indeed, the Supreme Court recently held actual innocence,

if proved, could excuse expiration of AEDPA's statute of limitations. *McQuiggin*

*v. Perkins*, 133 S. Ct. 1924, 1928 (2013). The High Court cautioned, however:

> that tenable actual-innocence gateway pleas are rare: "[A] petitioner
> does not meet the threshold requirement unless he persuades the
> district court that, in light of the new evidence, no juror acting
> reasonably, would have voted to find him guilty beyond a reasonable
> doubt." *Schlup*, 513 U.S. at 329[]; *see House* [*v. Bell*, 547 U.S. 518,
> 538 (2006)] (emphasizing that the *Schlup* standard is "demanding"
> and seldom met). And in making an assessment of the kind *Schlup*
> envisioned, "the timing of the [petition]" is a factor bearing on the
> "reliability of th[e] evidence" purporting to show actual innocence.
> *Schlup*, 513 U.S. at 332 [].

*Perkins*, 133 S. Ct. at 1928. Broxton cannot make this showing.[25] Evidence that

Christopher Shook reported having auditory hallucinations after Broxton was

arrested is not "new" since it was available at trial, nor is it "reliable" evidence

of actual innocence since Waylon never identified any white male assailant.[26]

And "new" evidence that the murder weapon was found in 1992 after trial in the

"possession of others. . . who appear to have been major drug dealers and

---

[25]    In Part III below, the Director argues in the alternative that Broxton's claims do not merit relief. The Director incorporates those arguments here to show that Broxton offers no new and reliable evidence of actual innocence that might serve to allow the Court to excuse the time-bar.

[26]    Broxton argues that Shook was "the most likely suspect, particularly in light of the testimony of Debbie Klinkow, identifying two white males of Mr. Shook's general description being admitted to the Dockens' motel room by Sheila Dockens, followed by what sounded like shots being fired." Petition 30; *see* 32 RR 32-34.

dangerous people," is not "reliable" evidence of Broxton's innocence. As argued in Part III below, the strength of Waylon's identification of Broxton as the black man who singlehandedly forced his way into the motel room, tied up the couple, robbed them at gunpoint, and pistol-whipped Waylon, combined with additional evidence of Broxton's guilt, is not underscored by Broxton's evidence. Accordingly, the Court should deny Broxton's time-barred claims.

## II.   The Court is Foreclosed from Reaching the Merits of Procedurally Defaulted Claims (all claims).

Broxton failed to exhaust claims in state court, and the issues are now defaulted. The remainder of his claims were raised in a successive state habeas application that was dismissed as an abuse of the writ, so those claims are procedurally barred as well.

### A.   Two claims are unexhausted and defaulted (claims ##3a, 4).

AEDPA mandates that relief "shall not be granted" under any circumstances unless it appears "the applicant has exhausted the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(1). To exhaust state remedies, a petitioner must "fairly present[]" the "substance" of his claim to the state courts. *Picard v. Collins,* 404 U.S. 270, 275-76 (1971); *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001). That did not occur here.

Despite the fact that the Court stayed the federal habeas action so that Broxton could pursue state remedies (ECF No. 8), Broxton failed to present his

claims that (1) counsel provided ineffective assistance by failing to discover the State recovered the murder weapon (claim #3a), and (2) state habeas counsel provided ineffective assistance (claim #4). *Compare* Petition 65-68, 97-99 *with* 1 SHCR-03 at 37-95. As a result, the claims are unexhausted.

A procedural default occurs "when a prisoner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (quoting *Coleman*, 501 U.S. at 735 n. 1). Broxton has already filed three state habeas applications. *Ex parte Broxton*, Nos. WR-42,781-01, -02 & -03. If he now tried to file a fourth application to exhaust the claims, the TCCA would surely dismiss it under Article 11.071 § 5(a) of the Texas Code of Criminal Procedure. Therefore, Broxton's unexhausted claims are defaulted. *Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010) (claims are defaulted if petitioner would be barred by Texas's successive writ statute from exhausting the claims).

### B.    All the remaining claims are defaulted as a consequence of the TCCA's Section 5 dismissal.

Federal courts are barred from reviewing questions of constitutional law where the last state court considering the claims expressly relies on a state ground for denying relief and that ground is both independent of the merits of the federal claim and an adequate basis for the court's decision. *Finley v.*

*Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citing *Coleman*, 501 U.S. at 729-30, and *Wainwright v. Sykes,* 433 U.S. 72, 81, 87 (1977)). An independent and adequate state procedural bar applies even if the state court reaches the merits in the alternative. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989).

Except for the two unexhausted claims described above, Broxton presented the rest of his federal habeas claims in a third (or second successive) state habeas application. *Compare* Petition at 28-99 *with* 1 SHCR-03 at 37-95. The TCCA dismissed the application "as an abuse of the writ" because "the allegations fail to satisfy the requirements of Article 11.071, § 5(a)." *Ex parte Broxton*, No. WR-42,781-03. Texas's Section 5 bar has long been held to constitute an "independent and adequate state ground for the purpose of imposing a procedural bar." *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) (citing *Kunkle v. Dretke*, 352 F.3d 980, 988-89 (5th Cir. 2003)).

In determining whether the TCCA's dismissal is independent of federal law when the order does not identify the specific prong of Section 5(a) that was relied upon, a federal habeas court looks to the writ application itself to determine the subsection the petitioner relied upon. *Balentine II*, 626 F.3d at 854. Broxton relied on Section 5(a)(1), which provides that the merits of a subsequent application may be considered if "the current claims and issues have not been and could not have been presented previously in a timely initial

application . . . because the factual and legal basis for the claim was unavailable

on the date the applicant filed the previous application." 1 SHCR-03 at 8-9. To

make this showing, he argued that the factual basis for each of his claims was

previously unknown and, until the Supreme Court issued its decision in

*Magwood*, there was no legal basis for attacking the legitimacy of his original

conviction following retrial. *Id.* at 9.[27] *Magwood* did not create a new legal basis

for Broxton's underlying habeas claims and, as argued above in the Director's

Motion to Dismiss, Broxton's understanding of the holding is incorrect. In any

event, the TCCA's Section 5(a)(1) decision does not turn on federal constitutional

law. As a result, the merits of Broxton's claims remain closed to federal review.

### C.     Broxton fails to overcome the procedural bar.

A federal court may undertake a merits review of defaulted claims if the

petitioner establishes cause and actual prejudice or else shows that failure to

review the merits would result in a fundamental miscarriage of justice. *Coleman*,

501 U.S. at 750.  Broxton cannot make either showing.

###        1.     The Court may consider unexhausted claims but it must deny habeas relief.

---

[27]     Citing *Magwood*, Broxton also argued that his claims should not be barred
as successive under 28 U.S.C. § 2244(b), and that a miscarriage of justice exception
exists to the successive writ provisions of AEDPA. 1 SHCR-03 at 8 (citing *Dretke v.
Haley*, 541 U.S. 386, 393 (2004), and *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).
AEDPA provisions and federal law governing defaults are irrelevant to the TCCA's
determination of whether Broxton's successive state habeas application satisfied an
exception to the Section 5 bar.

Broxtone argues that the Court may consider unexhausted claims for which it would be futile to return to the state courts. Petition 11 (citing *Balentine v. Thaler*, 609 F.3d 729, 743 (5th Cir. 2010) (*Balentine I*)). He also contends that his own first trip through state habeas demonstrates that the process is futile even in the most obvious cases of error such as those involving testimony from Dr. Quijano on racial and ethnic stereotypes, and that federal courts had to intervene to overturn Broxton's sentence. *Id.* at 12 & n.5.

The Court may consider the merits of unexhausted claims, but AEDPA mandates that it deny relief. 28 U.S.C. § 2254(b)(2). Broxton's arguments to the contrary are unavailing. He relies on *Balentine I*, but the decision was withdrawn and superseded on rehearing. 626 F.3d 842 (5th Cir. Nov. 17, 2010) (*Balentine II*), *rhrg & en banc rhrg denied*, 629 F.3d 470 (Dec. 29, 2010), *cert. denied*, 131 S. Ct. 2992 (2011). Broxton also relies heavily on a dissenting opinion from Judge Holcomb regarding Texas law for preserving error, which is of no precedential value to this Court. Petition 12-13 n. 5 (citing *Ex parte Smith*, 185 S.W.3d 477-80 (Tex. Crim. App. 2006)). And while Broxton contends that his own case shows how futile the state habeas process case be, he never raised a claim on state habeas challenging Dr. Quijano's testimony. SHCR-01 at 9-41. Instead, this Court granted the writ after the Texas Attorney General's Office waived exhaustion. *Broxton*, No. 4:00-cv-01034 at ECF Nos. 25, 26.

2. **Broxton cannot show "cause" and "actual prejudice" to excuse the procedural bar (claims ##1a, 1b, 1c, 3a, 3c).**

Cause "must be something external to the petitioner, something that cannot be attributable to him." *Coleman*, 501 U.S. at 750. "Absent a showing of cause, it is not necessary for the Court to consider whether there is actual prejudice." *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996). To show "actual prejudice," a petitioner "must establish not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008).

Broxton argues that potentially meritorious claims were not raised on state habeas when his attorney, Dick Wheelan, became terminally ill and died, and that replacement counsel had no opportunity to modify the writ application. Petition 10. Mr. Wheelan filed the writ on August 12, 2005, and thirty-two months later moved to withdraw as counsel "due to his medical condition" on April 9, 2008. SHCR-02 at 2, 355-57. While it is undisputed that Mr. Wheelan was ill when he withdrew, Broxton has offered nothing to show that counsel was ill when he filed the writ in 2005 or, even if so, that the illness interfered with counsel's ability to review the record and advance necessary claims.[28]

---

[28]    In granting a stay, the Court merely found that "[t]he illness and death of his state habeas counsel appears to constitute good cause[.]" ECF No. 8.

The Director does not propose that Broxton now try to ascertain the medical status of Mr. Wheelan at the time of his filing the state habeas application. Assuming arguendo that counsel's illness did prevent him from pursuing claims, it still would not serve as legal "cause" to excuse the entirety of Broxton's default. Nothing external to Broxton prevented him from complying with state procedural rules or caused him to default claims that could have been raised during state habeas proceedings after trial when Broxton was represented by writ attorney James R. Reed. His claims regarding the trial court's refusal to allow limited use of mental health evidence at guilt-innocence, counsel's alleged ineffective assistance in handling the matter, and his actual-innocence claim based on the same evidence are all record-based issues that could have been raised earlier. Petition 28-43 (claims ##1a, 1b, 1c). Broxton's first state habeas counsel could also have raised Broxton's current complaints regarding the original punishment-phase proceedings. *Id.* at 22-23, 88-90 (part of claim #3c). Similarly, Broxton's claim that counsel failed to discover the murder weapon had been recovered in June 1992 could have been raised in his initial writ in April 1997. *Id.* at 65-68 (claim #3a). The illness and death of Broxton's state habeas counsel does not excuse the default of these claims.

Broxton also argues Mr. Wheelan's failure to provide effective assistance of habeas counsel denied him "his rights of due process to a full and fair hearing

of viable claims that should have been presented in the original state habeas proceedings." Petition 10 (citing *Jefferson v. Upton*, 560 U.S. 284 (2010), *Miller v. Fenton*, 474 U.S. 104 (1985); and 28 U.S.C. § 2254(d)(1)-(8)).  His reliance on two pre-AEDPA cases and the pre-AEDPA federal habeas statute is misplaced because Broxton's habeas proceedings are governed by AEDPA.  His citation to 28 U.S.C. § 2254(d)(1)-(8) is puzzling because it concerns when a state court's factual findings are not presumed correct and there are no state-court factual findings for Broxton's unexhausted and defaulted claims. In any event, Broxton cannot excuse the entirety of his default by attributing it to ineffective representation of state habeas counsel, Mr. Wheelan. Neither Mr. Wheelan's illness nor his alleged ineffective assistance are cause to excuse the default of claims that could be raised in the first state habeas proceedings.

As an additional matter Broxton cannot avail himself of the Supreme Court's recent holdings in *Martinez*[29] and *Trevino*[30] to excuse his default. The Supreme Court has held that ineffective assistance of state habeas counsel "cannot constitute cause to excuse the default in federal habeas" proceedings. *Coleman*, 501 U.S. at 757. However, the Supreme Court recognized an equitable exception to this rule in cases in which the inmate was legally barred from

---

[29]     *Martinez v. Ryan*, 132 S. Ct. 1309 (2010).

[30]     *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

raising ineffective assistance claims on direct appeal from his state conviction, and counsel was ineffective in the initial state habeas proceeding. *Martinez*, 132 S. Ct. at 1315. Recently, the High Court held that the *Martinez* exception is applicable to Texas inmates who had little practical opportunity to raise ineffective assistance claims on direct appeal, despite not being legally barred from doing so. *Trevino*, 133 S. Ct. at 1921. To succeed in establishing cause to excuse the default of his ineffective assistance of trial counsel claims (claims ##1b, 3a - 3f), Broxton must show that (1) his underlying claims of ineffective assistance are "substantial," meaning that he "must demonstrate that the claims have some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present the claims in his first state writ application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

Broxton has never faulted initial state habeas counsel James R. Reed for failing to raise claims regarding trial counsel's handling of the mental-health evidence (claim #1b), failing to discover the murder weapon was recovered (claim #3a), and failing to challenge testimony at the original punishment-phase proceedings (part of claim #3c). Broxton has argued that habeas counsel Dick Wheelan provided ineffective assistance by failing to raise claims on retrial of punishment (claims ##3b, c, d, e, f). However, as argued in Part III below and incorporated herein, Broxton's underlying claims of ineffective assistance of trial

counsel are meritless and thus are not "substantial," and habeas counsel is not ineffective for failing to pursue meritless claims.

Although the Court may stop its procedural default assessment with Broxton's failure to show cause, he also fails to demonstrate "actual prejudice." As argued in alternatively responding to the merits of Broxton's claims, he fails to show constitutional error, much less the type of error that "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore*, 534 F.3d at 463.

### 3. Broxton's claim of actual innocence does not excuse his default (all claims).

Finally, Broxton argues that he is actually innocent of the capital murder of Sheila Dockens such that the Court's failure to address the merits of any defaulted claim would result in a fundamental miscarriage of justice. Petition 8-9; *Schlup*, 513 U.S. at 324.[31] To demonstrate a "fundamental miscarriage of justice," a petitioner must establish "a colorable claim of factual innocence" or "actual innocence." *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). A petitioner "must support his allegations with new, reliable evidence not presented at trial" and show that "it

---

[31]     *Schulp* does not create a claim for federal habeas relief based upon actual innocence, but simply clarified the standard for demonstrating the actual innocence to overcome a procedural bar to review of a claim of a violation of the Constitution. 513 U.S. at 320-21.

was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence,'" *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir.1999) (citing *Schlup ,* 513 U.S. at 327), or "found [him] eligible for the death penalty under the applicable state law,"*Sawyer*, 505 U.S. at 336.   Examples of new, reliable evidence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence. *Fairman*, 188 F.3d at 644 (citing *Schlup*, 513 U.S. at 324; *Sawyer*, 505 U.S. at 340). That showing is not made here.

Broxton's claim of actual innocence is based on his contention that Christopher Shook is a more likely suspect than he is based on Shook's report of having auditory hallucinations.   He also contends that if the killer was not Shook, then it might be one of the "large black males" associated with the apartment where the murder weapon was recovered after trial. *See* Petition 28-58.[32] The evidence of Shook's auditory hallucinations is not new since it was available at trial and defense counsel made a strategic choice not to use it, nor is it reliable evidence of Broxton's innocence because Shook's hallucinations are not evidence of a guilty conscience, as Broxton alleges. While evidence regarding the recovery of the murder weapon is arguably new, it is not reliable evidence

---

[32]   In Part III below, the Director argues in the alternative that Broxton's claims are meritless. The Director incorporates those arguments here to show that Broxton offers no new, reliable evidence of actual innocence that might serve to allow the Court to excuse his procedural default.

of innocence as contemplated by *Schlup*, especially since the "large black males" do not resemble the description of the assailant given by the surviving eyewitness Waylon Dockens.  Additionally, Broxton cannot establish that had the jury considered this evidence, it is "more likely than not that no reasonable juror would have convicted him" of capital murder. *Fairman,* 188 F.3d at 644 (citing *Schlup*, 513 U.S. at 327). Because Broxton cannot establish actual innocence sufficient to justify a fundamental miscarriage of justice exception, his claims remain defaulted on federal habeas review.

## III.   Alternatively, No Claim Merits Habeas Relief.

Even if the Court finds that any claim is not moot, successive, time-barred, or defaulted, or that a procedural bar should be excused, the Court should summarily deny habeas corpus relief for lack of merit.

### A.   Broxton is not entitled to relief on his claims regarding mental health evidence (claims ##1a, 1b, 1c).

Broxton raises three claims concerning the testimony of State's witness Christopher Shook during the guilt-innocence proceedings. Petition 28-43.[33] At trial, Broxton sought to introduce evidence that Shook reported having auditory hallucinations and requested that the State not be allowed to go into Shook's explanation for hearing voices. 32 RR 86-87. When the trial court refused to limit

---

[33]   Shook also testified for the State at both trials on punishment, but Broxton's claim is limited to the original guilt-innocence proceedings.

the State's questioning, Broxton's attorneys chose to not present the evidence. *Id.* at 87-90, 185. He now challenges the trial court's ruling and counsel's arguments regarding the evidence and further alleges that Shook's auditory hallucinations support a claim of actual innocence. Broxton is not entitled to relief as a matter of law because his claims are defaulted, meritless, and not cognizable on federal habeas review.

1.    **Broxton's constitutional claims are barred by his failure to object; regardless, he fails to demonstrate that the state court's evidentiary ruling resulted in a denial of fundamental fairness (claim #1a).**

Broxton argues that the trial judge's refusal to allow limited use of the mental health evidence violated his rights to a fair trial under the Eighth[34] and Fourteenth Amendments and his rights under the Confrontation Clause of the Sixth Amendment. Petition 28-37. He insists that evidence of Shook's auditory hallucinations was constitutionally required because he was unable to present a complete defense at guilt-innocence without such evidence. However, Broxton failed to object on constitutional grounds and thus failed to preserve error.

During a bench conference after the State concluded its questioning of Shook on direct examination, the defense expressed a desire to cross-examine

---

[34]    Broxton fails to include any legal authority for his Eighth Amendment claim, so he has waived or abandoned the issue and it should be summarily dismissed. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (claims "unsupported by specifics are subject to summary dismissal."); *United States v. Thames,* 214 F.3d 608, 612 n.3 (5th Cir. 2000) (holding that unargued and inadequately briefed issues are waived).

Shook about extrajudicial statements made by him to a clinical psychologist several months after Broxton's arrest. 32 RR 86. Shook told Dr. Edward Silverman that he was having auditory hallucinations, which were detailed in a written report. 41 RR at Court's Exhibit (CX-) 1.[35] In addition to the content of the auditory hallucinations, Dr. Silverman's report included Shook's explanation for hearing voices. *Id.* at 2.[36] Broxton's counsel argued that only testimony about the content of Shook's hallucinations should be admitted because Shook's explanation, while relevant, would be unduly prejudicial under Rule 403 of the Texas Rules of Criminal Evidence due to the references to extraneous offenses. 32 RR 88-89.

The prosecutor indicated that he would not object to testimony concerning the hallucinations. 32 RR 87. However, if the defense chose to cross-examine Shook as such, the prosecutor would question Shook on re-direct about the cause of the hallucinations. *Id.* The prosecutor noted the defense's purpose in offering

---

[35]    Shook told Dr. Silverman that about three months prior to the mental health evaluation (approximately August 2011), Shook started hearing Broxton's voice telling him to buy cocaine, but then "to kill people and do crazy things." 41 RR at CX-1 at 2. Shook also said that sometimes able to resist the voice, but sometimes the voice convinced him that these things were not wrong. *Id.*

[36]    The report included statements made by Shook about his experience as Broxton's roommate. 41 RR at CX-1 at 2. Shook stated that shortly after he moved in with Broxton, he discovered that "lo and behold, he turns out to be a mass murderer." *Id.* Shook stated that Broxton regularly brought cocaine back to the apartment; that when they were high, Broxton told him that he (Broxton) had been killing people; and that Broxton threatened to kill Shook if he told anyone about the murders. *Id.*

the evidence was "to show Mr. Shook must have had some guilty conscious and he's the one, one of the two white men, then went inside [the motel] room and actually committed the murder"[37] and argued that the State should be allowed to go into Shook's explanation for hearing voices pursuant to Texas Rules of Criminal Evidence 107 (optional completeness) and 612 (impeachment). *Id.* at 89-90, 185. The trial court ruled in the State's favor and refused to allow Broxton to limit Shook's testimony. *Id.* at 90. Broxton's attorney stated on the record that, based on the trial court's ruling, he would not question Shook about the content of the auditory hallucinations because he did not want the jury to hear the extraneous offense evidence. *Id.*[38]

On direct appeal, Broxton sought to challenge the trial court's ruling as violating his federal and state constitutional rights. Appellant's Brief in *Broxton*

---

[37] During the capital murder trial, Broxton presented testimony from Debbie Klinkow, a guest at the Magnolia Motel, who stated that she saw two white men enter the Dockenses' room on the evening of May 16, 1991. 32 RR 32-34.

[38] Broxton later made a bill of exceptions during which Shook stated that he told the psychologist he heard Broxton's voice telling him to purchase cocaine and to kill people. 32 RR 182-83. Shook admitted that the voice convinced him these things were not wrong and that he felt as though a time bomb were about to explode in his head. *Id.* at 183. Finally, Shook conceded that he was hearing voices as a result of his cocaine addiction and that he was addicted before he met Broxton. *Id.* at 184. Shook did not testify about hearing any voices at any other time during his addiction. *See id.* At the conclusion of the bill, the prosecutor indicated he would not object to the testimony, but argued that if it was presented, it would open the door to Shook's explanation for the voices. *Id.* at 185. After concluding that the rest of Shook's statement has probative value, the trial court again ordered that it may be offered by the State. *Id.*

*v. State*, No. 71,488 at 24-34. However, Broxton's objection at trial was based solely on Texas Rule of Criminal Evidence 403. The TCCA therefore refused to review the merits after concluding that Broxton failed to properly preserve error. *Broxton*, 909 S.W.2d at 918.[39]  Broxton's failure to comply with state procedural rules imposes a procedural default because the Texas contemporaneous objection rule is strictly and regularly applied and constitutes an independent and adequate state law procedural ground that closes the merits of claims to federal habeas review. *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999); *Livingston v. Johnson*, 107 F.3d 297, 310 (5th Cir. 1997).

The Court is additionally restricted from granting relief because the trial court's evidentiary determination is governed by state law.  The Fifth Circuit has made clear that federal habeas courts "do not review state courts' application of state evidence law." *Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010) (citations omitted); *see also Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) ("In habeas actions, this court does not sit to review the mere admissibility of evidence under state law."). A federal habeas court will not grant relief from errors in a state trial court's evidentiary rulings, if any, unless those errors resulted in a "denial

---

[39]      Under Texas law, to preserve error for appellate review, Broxton needed to make a timely, specific objection and obtain a ruling on the objection. Tex.R.App.P. 52(a); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). Also, the point of error must correspond to the objection made at trial. *Turner*, 805 S.W.2d at 431. If the objection at trial is different than the argument on appeal, nothing is preserved for review. *Cravens v. State*, 687 S.W.2d 748, 752 (Tex. Crim. App. 1985).

of fundamental fairness" under the Fourteenth Amendment Due Process Clause. *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (citation omitted).

Broxton cannot establish that the trial court's ruling was erroneous, much less that it rendered the guilt-innocence proceedings fundamentally unfair. He argues that without the evidence of Shook's auditory hallucinations, the jury did not learn that Shook reported hearing voices telling him to rob and kill people, that Shook was "only sometimes" able to resist. Petition 29-30. He cites several Supreme Court cases holding that state-court evidentiary or procedural rules cannot be used to prevent a defendant from his right to present a meaningful defense. *Id.* at 34-35.[40] Broxton then alleges that the refusal of the trial court to allow the defense to question Shook regarding auditory hallucinations and pursue other evidence of Shook's role in the robbery and murder violated his Sixth and Fourteenth Amendment rights. *Id.* at 36.

---

[40] *E.g., Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (holding that a defendant was denied his constitutional guarantee of a meaningful opportunity to present a complete defense by a South Carolina rule excluding evidence of third-party guilt); *Rock v. Arkansas*, 483 U.S. 44, 56 (1987) (Arkansas per se rule excluding all hypnotically refreshed testimony infringed impermissibly on a defendant's constitutional right to testify on her own behalf); *Chambers v. Mississippi*, 410 U.S. 284, 300-02 (1973) (state evidentiary rule that excluded hearsay statements by a third party confessing to the murder and state's voucher rule which prevented defense counsel from treating this third party as a hostile witnesses and cross-examining him deprived defendant of a fair trial because he was not allowed to present witnesses in his defense); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (Texas statutes preventing criminal defendants from calling as a witness any co-participant, either charged or convicted, violated a defendant's Sixth Amendment right to compulsory process).

The circumstances of this case are not comparable to the situations where the Supreme Court has ruled the exclusion of evidence to be a violation of the federal constitution. Unlike the cases cited by Broxton, the trial court did not exclude evidence or prevent him from questioning Shook about the reported hallucinations. To the contrary, the trial judge was willing to allow Broxton the opportunity to do so and the State did not object to the evidence. The fact that defense counsel opted not to do so was a strategic decision. However, by seeking to introduce the evidence, defense counsel sought to imply that Shook's hallucinations were indicative of a guilty conscious and lead the jury to infer that Shook murdered Sheila Dockens. Broxton cites no clearly established Supreme Court precedent that would require the State be prohibited from asking questions on redirect examination to rebut such an incorrect inference. A defendant's right to present a defense does not carry with it a right to have his evidence go unchallenged. As a result, the trial court's refusal to restrict the State's questioning did not violate constitutional concerns. Because the Court would need to announce a new rule of criminal law to grant habeas relief, Broxton's claim is barred by *Teague*, 489 U.S. at 310.

Assuming arguendo the ruling was somehow erroneous, Broxton cannot show that the proceeding was tainted by constitutional error that had "substantial and injurious effect or influence in determining the jury's verdict."

*Brecht*, 507 U.S. at 637.   The complained-of mental health evidence, at best, states only that Shook reported having auditory hallucinations several months *after* Broxton was arrested. 41 RR at CX-1 at 2.  Noting in the report indicates that Shook was involved in the capital crime or that he was even hearing voices at that time. *See id.* While Broxton insists this evidence helps build a case for Shook being the real killer, he is mistaken.

Broxton's remaining arguments concerning Shook are equally unconvincing and were largely presented during the original guilt-innocence proceedings. While he argues that Shook had "exclusive possession" of stolen property, Broxton ignores that he (Broxton) was wearing Waylon's watch when he was arrested and that police recovered Sheila's ring, wallet, and purse from Broxton's girlfriend.[41] Broxton relies on trial testimony of defense witness Debbie Klinkow for "identifying two white males of Mr. Shook's general description being admitted to the Dockens[es]' motel room by Sheila Dockens, followed by what sounded like shots being fired." Petition 30; *see* 32 RR 32-34.[42]  However,

---

[41]     The jury was also thoroughly informed about items recovered from Shook's car or from the bag thrown behind the fence by Shook. *E.g.*, 28 RR 153-55, 157-66; 30 RR 124-26; 31 RR 68-75.

[42]     Broxton also argues that Shook may have implicated him in the crimes in order to draw attention away from himself or else to curry favor with a drug dealer named "Red" who "police had been informed matched the description [in] another murder Broxton allegedly committed." Petition 30. While Broxton asserts that "Red" is the same drug dealer from whom Shook purchased drugs at the Econo Lodge, his federal habeas exhibit states that the suspect wanted in the capital murder of John

there can be little doubt that Waylon Dockens identified Broxton, a black man, as the assailant. Even Broxton, in trying to discount the significance of Walyon's identification, states that it was "based largely on the fact that Mr. Broxton was *a black male* and little more." *Id.* at 36 (emphasis added).[43]  Because Broxton fails to show that the guilt-innocence proceedings were rendered unfair as a result of the trial court's ruling, he does not demonstrate a constitutional violation. Accordingly, Broxton is not entitled to a habeas relief on this procedurally barred and meritess issue.

### 2.    Trial counsel did not provide constitutionally ineffective assistance regarding the mental health evidence (claim #1b).

Broxton next argues that trial counsel failed to prepare themselves in order to make correct arguments for seeking limited use of the mental health evidence and that their failure to do so caused a procedural default of an otherwise winnable appellate point.  Petition 37-42.

To prove a claim of ineffective assistance, Broxton must show that (1) counsel's performance was constitutionally deficient and (2) the defense suffered

---

Gordon Miller was described as a "BM, 33-38, 6-foot to 6-foot-2, 160-200 pounds, black short afro." ECF No. 9-2 at 32. Because Shook purchased cocaine from a girl named "Red" a/k/a Sherry, 31 RR 52-54, 67-68, and no one has ever alleged that Sheila Dockens or John Gordon Miller were killed by a female, Broxton's speculative and unfounded complaint must be rejected.

[43]     As argued in Part III.B. below in responding to Broxton's *Brady* claim, Waylon Dockens's identification of Broxton as the actual assailant is based on much more than his simply being "a black man."

prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984). Failure to prove either requirement results in the denial of the claim. *Id.* at 697. To satisfy the first prong, a petitioner must show that his attorney's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In doing so, the petitioner must overcome a strong presumption "that counsel's conduct falls within the wide range of reasonable professional assistance," and that, under the circumstances, the challenged action might be considered "sound trial strategy." *Strickland*, 466 U.S. at 689. To satisfy the "prejudice" prong, a petitioner must establish a reasonable probability—one "sufficient to undermine confidence in the outcome"—that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Id.* at 694. Broxton cannot make this requisite showing.

As set forth in the preceding claim, the trial court refused to limit the State's re-direct of Shook if the defense introduced evidence of his auditory hallucinations. Defense counsel acknowledged that Shook's explanation for hearing voices was relevant, but argued it would be unduly prejudicial under the Texas Rules of Criminal Evidence due to the references to extraneous offenses. 32 RR 88-89. Counsel did not argue that the State's questioning should be limited on federal constitutional grounds and thus failed to preserve error.

To the extent Broxton argues that counsel failed to better prepare for arguing a case for limited use of the evidence, then he fails to satisfy *Strickland.* Broxton's contention that counsel should have raised federal constitutional grounds instead of just relying on the Texas Rules of Criminal Evidence is an argument made with the benefit of hindsight. The Supreme Court cautions that "judicial scrutiny of counsel's performance must be highly deferential," and "every effort must be made to eliminate the distorting effect of hindsight." *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689).

In any event, as argued in the preceding claim, the Supreme Court precedent cited by Broxton is not comparable to the situation faced here because the trial court did not exclude evidence, bar witnesses, or arbitrarily limit testimony. Petition 34-35 (citing, e.g., *Holmes*, *Rock*, *Chambers*, and *Washington*). Broxton presented no clearly established Supreme Court precedent holding that a defendant has a constitutional right to limit the State's re-direct examination under circumstances similar to this case. Trial counsel should not be faulted for failing to advance meritless arguments with little chance of success. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

Yet even if counsel's omission could be considered error, Broxton is not entitled to "error-free" counsel. *Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) ("The Sixth Amendment does not guarantee criminal defendants the right to error free representation."); *Skillern v. Estelle*, 720 F.2d 839, 851 (5th Cir. 1983) ("The constitutional right to effective assistance of counsel guarantees the defendant, not error-free representation, but 'counsel reasonably likely to render and rendering effective assistance.'") (quoting *Martin v. Maggio*, 711 F.2d 1273, 1279, 1281 (5th Cir. 1981)). Standing alone, counsel's erroneous judgment, if any, does not constitute deficient performance unless it is so unreasonable that it rebuts the strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Emery*, 139 F.3d at 197 (quoting *Strickland*, 466 U.S. at 689). Considering counsel's performance as a whole, that presumption is not rebutted by this one identified omission.

Broxton cannot show that counsel provided ineffective assistance by presenting contradictory arguments. In the preceding claim, Broxton argued that the trial court's ruling prevented him from presenting evidence that Shook is the real killer because *inter alia* he reported hearing voices telling him to rob and kill people and that he was "only sometimes" able to resist those voices. Petition 29-30. He also alleged that the trial court's ruling infringed on his right to present evidence of "Shook's actions in response to auditory hallucinations."

-71-

*Id.* at 34. However, Broxton now argues that counsel's failure to successfully obtain limited use of the mental health evidence prevented counsel from impeaching Shook "with his false claims of auditory hallucinations." *Id.* at 40. He also contends that at least one juror might have voted to not convict Broxton if jurors had heard testimony from Dr. Silverman that Shook was malingering. *Id.* at 41. Regardless, Dr. Silverman did not conclude that Shook was malingering. Instead, he opined that "in the context of Mr. Shook's current clinical presentation, his minimal psychiatric history, his extensive history of drug abuse, and his history of anti-social behavior, the possibility that Mr. Shook is malingering must be considered." 41 RR at CX-1 at 3. Because Dr. Silverman's report is not proof of malingering, counsel cannot provide ineffective assistance by failing to present Dr. Silverman's testimony (if indeed he was available and willing to testify). Neither does counsel provide ineffective assistance by failing to impeach Shook with statements that are not proven to be false.

Finally, Broxton contends that he was prejudiced by counsel's failure to obtain limited use of the mental health evidence because counsel could have used it to show that Shook, a white make, is the real killer. Petition 40. As argued in the preceding claim, the jury was aware of Klinkow's testimony and the fact that Shook had in his possession stolen property, and there can be little doubt of Waylon's identification of Broxton as the lone black assailant who forced

his way into the motel room, tied up and robbed the couple, and pistol whipped Waylon. The Court should therefore summarily deny relief for Broxton's failure to prove deficient performance and prejudice under *Strickland*.

### 3. Broxton's claim of actual innocence is not a cognizable ground for habeas relief (claim #1c).

Included with his claims regarding mental health evidence, Broxton alleges that he is actually innocent of the capital murder of Sheila Dockens and all extraneous offenses introduced by the State at punishment. Petition 42. Broxton argues that his actual innocence is supported by evidence the jury did not hear regarding Christopher Shook as a result of the trial court's erroneous ruling. *Id.* at 42-43. He also argues there is "compelling evidence" (in the following claim) of at least three other suspects "who may fit the extremely vague description of the perpetrator" of Sheila Dockens's murder and who have been connected to the murder weapon and appear to have been heavily involved in drug trafficking. *Id.* at 43. In this instance, Broxton is not arguing the claim as a gateway to allow the Court to reach defaulted claims. Instead, he presents it as a freestanding claim of actual innocence. *See id.* In doing so, Broxton fails to raise a cognizable claim on which the Court could grant habeas relief.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal

proceeding." *Herrera v. Collins,* 506 U.S. 390, 400 (1993). The Fifth Circuit does

not recognize freestanding claims of actual innocence. *In re Swearingen*, 556

F.3d 344, 348 (5th Cir. 2009) (citing *Graves v. Cockrell*, 351 F.3d 143, 151 (5th

Cir. 2003) (collecting cases)); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th

Cir.2006). Moreover, Broxton's claim is barred by *Teague*, 489 U.S. at 310.

> In *Teague*, the Court held that a federal court may not create new
> constitutional rule of criminal procedure on habeas review. A new
> rule is one which was not dictated by precedent existing at the time
> the petitioner's conviction became final. A new rule is created if the
> rule is, in light of [Supreme Court] precedent, susceptible to debate
> among reasonable minds. If reasonable minds could differ in
> whether current law requires relief, [a court] may not grant relief
> without creating a new rule barred by *Teague*.

*Vega v. Johnson*, 149 F.3d 354, 357 (5th Cir. 1998) (internal citations and

quotation marks omitted). Because granting Broxton relief would require the

Court to create a new rule of criminal procedure, his claim is barred by *Teague*.

### B. Broxton is not entitled to relief on his *Brady* and *Napue* claims (claim ##2a, 2b).

Broxton raises two procedurally-defaulted claims regarding the post-trial

recovery of the murder weapon, neither of which alternatively warrants habeas

corpus relief.

### 1. No *Brady* violation occurred here (claim #2a).

In June 1992, Harris County sheriff's investigators found the gun used by

Broxton to kill Sheila Dockens during the course of robbing her in May 1991

robbery. Petition 44. According to a newspaper report, the murder weapon was recovered from a Channelview-area apartment along with nearly $900,000 in cash, a small quantity of cocaine, and another pistol. ECF Doc. 9-2, pp. 99-100. Broxton argues this evidence would have allowed the defense to point the blame towards "large black males" connected with the apartment and the gun and argue that these individuals might match the "extremely vague description of the perpetrator" given by Waylon Dockens. Petition 6-7, 44, 46.[44] Broxton maintains that the State's failure to disclose this exculpatory evidence violates its obligations under *Brady*. *Id.* 43-56.

It is undisputed that the State must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to the defendant's guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Both impeachment material and exculpatory evidence fall within this general rule. *United States v. Bagley*, 473

---

[44]  Broxton's federal habeas counsel, Robert Roseberg, was provided records by the Harris County District Attorney's Office and Harris County Sheriff's Office in response to his open records request for information regarding the recovery of the murder weapon. Petition 45-46. After obtaining the records, Broxton moved the TCCA for leave to expand the record and conduct further discovery, which was denied. ECF No. 9-2, p. 108 to No. 9-6, p.109. Broxton has moved this Court for leave to conduct discovery. Mot., ECF No. 5. In his Petition, Broxton states that he wants to compel discovery to question various individuals, obtain documents not previously provided, and "otherwise investigate the history of the gun from the moment it came into possession of Waylon Dockens through today." Petition 43-44 n. 17. The Court should deny his request because actual innocence claims are not cognizable as a basis for habeas relief and his *Brady* claim is defaulted and, alternatively, meritess.

U.S. 667, 676 (1985). To establish a *Brady* violation, Broxton must demonstrate (1) that evidence was suppressed by the State, either willfully or inadvertently; (2) that the evidence was favorable to the accused, either because it was exculpatory or impeaching; and (3) that prejudice must have ensued. *Strickler*, 527 U.S. at 281-82.

From the outset, the Court could deny Broxton's claim for failing to satisfy *Brady*'s suppression prong. Broxton was represented by Troy McKinnery and Tom Moran during the 1992 capital murder trial. For retrial on punishment in 2003, Broxton was represented by Skip Cornelius and again by Tom Moran. However, Broxton provides no affidavit from any attorney attesting that the State failed to disclose the murder weapon had been recovered.[45]

Yet even if the evidence was not disclosed and even if it was favorable to the defense, the Court should still deny relief because Broxton cannot satisfy *Brady*'s third prong. To prove materiality, Broxton must show that there existed "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *Strickler*, 527 U.S. at 291 (emphasizing that petitioner must show a "reasonable *probability*," rather than "reasonable *possibility*," of different result in order to obtain relief) (emphasis by Supreme Court). A "reasonable probability of a

---

[45]     Broxton does provide an affidavit from trial counsel Troy McKinney but it concerns an entirely different matter. ECF No. 9-2 at 28-29.

different result" is shown when the evidentiary-suppression undermines confidence in the outcome of trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There is no reasonable probability that Broxton would have been acquitted if jurors had been presented evidence establishing that the murder weapon was recovered after trial.

Broxton's evidence does not lessen the strength of the State's case directly linking him to the murder weapon. The evidence at trial established that Broxton forced his way into the Dockenses' motel room brandishing a small caliber gun; that during the robbery, Broxton found Waylon's loaded Smith & Wesson .44 Magnum blue steel pistol lying on the dresser; that Broxton picked up Waylon's gun and pocketed his own smaller caliber pistol; that before shooting Sheila, Broxton pistol-whipped Waylon with the .44 Magnum, exposing his skull and leaving him unconscious; that Broxton shot Waylon in the face; and that afterwards, Broxton bragged to Christopher Shook that he shot both victims after robbing them and tying them up. Police recovered two Remington .44 caliber shell casings (SX-101) from an orange bag behind a fence at Broxton's apartment. After the two casings from the bag were compared with three spent shell casings previously fired from Waylon's gun, it was determined that one of the casings from the bag was consistent with having been fired from Waylon's gun. Although Broxton tries to cloud the issue, whatever happened to the gun

*after* Broxton shot and killed Sheila Dockens is ultimately of no consequence and is not material to the outcome at guilt-innocence.[46]

Equally unavailing is Broxton's contention that he could have used the allegedly undisclosed evidence to raise suspicion about "large black males" associated with the murder weapon post-trial and raise doubt about his guilt. Petition 8, 43, 49-54. Broxton also tries to lessen the significance of Waylon's identification testimony, characterizing it as being a generic description of a black male with a gun. *Id.* at 8; *see id.* at 36 (based largely on the fact that Broxton "was a black male and little more"). However, his arguments are belied by his own exhibits. Notes provided by defense trial counsel Troy McKinney show that Waylon specifically described the suspect as a "black male, 30 years old, [five-foot-ten], 150 pounds, [with] short black hair, unshaven, [and a] mustache." ECF No. 9-2 at 47. Waylon further described the suspect as "[five-foot-ten] tall, weighing about 165 pounds. Short black hair. . . wearing thick framed plastic glasses. Possible burnt orange or brownish in color." *Id* at 55.[47]

---

[46]     Broxton argues that if evidence regarding the murder weapon could be presented at trial, then he would not be convicted because the State would have to show "a clear, unbroken line of possession of the gun" from Broxton to the people who were found with the gun one year later. Petition 55. Under the facts of this case, the State would not have to make that showing, In any event, Broxton's own evidence to this Court that shows one of the "large black males" bought the gun from Broxton after the capital crime. *See* ECF No. 9-3 at 66-67, 69.

[47]     Broxton apparently concedes that Waylon "mentioned the attacker was wearing such glasses." Petition 21.

Waylon also reported "a black male, approximately [five-foot-nine], 150 pounds, dress[ed] in slacks and a nice shirt." *Id.* at 97. Waylon did not identify any large black male as the assailant. Nor did he identify any white male assailant for that matter which eliminates Shook as a suspect, despite Broxton's repeated arguments to the contrary. Petition 3-6, 18-20, 25-26, 28-31, 36, 40-41, 48-49.

Furthermore, the individuals identified by Broxton do not resemble Waylon's description of the suspect aside from the fact they are black males. Broxton's federal habeas exhibit include records showing Derek Anthony Thomas is six-foot-three, 250 pounds, with a heavy build. ECF No. 9-6 at 103. Carl Anthony Smith is larger at six-foot-four, 265 pounds, and a heavy build. *Id.* at 95. And while Thaddius Christopher Goins, Jr. is listed as six-foot tall, he is a whopping 285 pounds with a gold capped tooth. *Id.* at 107. Broxton also includes Kobie Mendenhall as a potential suspect, but then begrudgingly relinquishes that Mendenhall was in custody on the night of the capital crime. Petition 49-50; *see* ECF No. 9-6 at 99. Allegations that are "purely speculative cannot support a *Brady* claim." *Murphy*, 205 F.3d at 814. While Broxton would certainly like to blame the capital murder on someone else, his evidence would not likely make any juror think twice about convicting him.

Not only did Waylon provide a specific description of the suspect, but his identification of Broxton as the actual assailant is solid. At trial, Waylon

testified that Broxton was by himself and that no one else came into the motel room. 28 RR 84. Waylon reported that he did not hear any other voices outside the motel room and that Broxton never said anything to anyone outside nor did anyone outside say anything to Broxton. *Id.* at 84, 100, 185. Waylon also did not recall any blond men running into the motel room or any white males visiting them at the motel that night. *Id.* at 185, 187, 200. Throughout the entire ordeal, Broxton—the lone assailant—made no attempt to hide his face and never wore a mask or anything to cover his face or head. *Id.* at 183-84. Waylon was able to observe Broxton for approximately twenty minutes until he was knocked unconscious. *Id.* at 184. On several occasions, Waylon got a "close and direct look at his face," especially when Broxton was tying him up. *Id.* at 185.

Furthermore, Broxton made no attempt to disguise his voice and Waylon heard him speak on several occasions—*e.g.*, when Broxton ordered Waylon to sit on the bed, 28 RR 84; when Broxton ordered the couple to hand over their jewelry and money, *id.*; when Broxton talked about how nice Waylon's .44 Magnum was and thanked Waylon for leaving the gun loaded, *id.* at 88-89; when Broxton asked Waylon several times about the remote control on the key rings, *id.* at 95-98, 152-53; when Broxton threatened to kill the couple if he found out the alarm went to the car outside, *id.* at 151-52; when Broxton told them he was going to tie their feet and gag them, *id.* at 102; and when Broxton talked on the

telephone for several minutes, *id.* at 104-07. When Waylon viewed the videotaped line up, he immediately picked out Broxton based on his physical appearance and then again picked Broxton based on his audio recording. 3 RR 58-61, 64-65, 107-09. Given the strength of Waylon's identification and the weakness of Broxton's evidence of alternative suspects, he fails to demonstrate materiality under *Brady*. The Court should therefore summarily deny habeas corpus relief.

### 2.    No *Napue* violation occurred here (claim #2b).

Broxton argues that during retrial on punishment, the State "went forward with presenting a case involving testimony concerning the gun that clearly left a false impression with the jury about the possible history of the gun" and thereby violated its obligations under *Napue.* Petition 54.  He alleges that the State presented a "charade" that the gun was still missing in order to hide the fact that it had been recovered "in the hands of someone other than" Broxton. *Id.* at 47. These allegations do not warrant habeas relief.

In *Napue v. Illinois*, the Supreme Court held that a conviction obtained through use of false evidence, known to be such by representative of the State, must fall under the Fourteenth Amendment. 360 U.S. at 269. The High Court also reasoned that the same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Id.*  To

succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question knowing it was false. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

From the outset, the Court must reject Broxton's claim for his failure to identify false testimony.[48] He alleges that the Harris County District Attorney's Office presented false ballistics testimony in two capital cases involving Anibal Rousseau and Nanon Williams where the wrong gun was tested. Petition 56-58. However, these cases are irrelevant to this Court's consideration under *Napue* which asks whether false testimony occurred in this case, not other unrelated cases. Broxton does not allege that a "wrong gun" was tested in his case. Nor could he since the murder weapon was not recovered before his capital murder trial and no subsequent testing was conducted after the gun was located.

---

[48]     In a separate claim, Broxton alleges that given the evidence regarding the post-trial recovery of the gun, the State had a duty to correct "any false impressions that had been made due to the belief that Mr. Broxton had stolen the gun after using it to kill Ms. Dockens." Petition 66. The evidence at trial more than sufficiently establishes that Broxton did steal the gun and there is no false testimony to correct in that regard. The fact that the gun was recovered a year after the crime in the possession of others does not alter Broxton's having stolen the gun on the night of the murder, especially since Broxton apparently sold the gun to one of the men. *See* ECF No. 9-3 at 66-67, 69. He should not reap the benefit of a new trial for his having the foresight to get rid of the murder weapon.

-82-

While Broxton complains that testimony from the firearms expert "provides no clue" that the actual gun was found after trial, there was no false testimony offered by the State's witness. As set forth in the Statement of Facts, Officer C. E. Anderson, the Houston Police Department firearms examiner, testified in 1992 about his comparison of shell casing found in the bag at Broxton's apartment with shell casings obtained from Waylon Dockens's home and determined that one of the casings from the bag was consistent with having been fired from the same weapon as the casing provided by Waylon. 30 RR 231-34.[49] The State used a revolver similar to the one stolen from Waylon Dockens (SX-108) for demonstrative purposes. *See id.* In 2003, during retrial on punishment, Officer Anderson testified without objection about his prior analysis of casings and again used a gun from the State's vault (SX-108) for demonstrative purposes. 15 R-RR 179-92. He also verified that the particular weapon was never obtained as far as his analysis. *Id.* at 187. Broxton has never alleged that the comparison of casings was unscientific or improper or that the results obtained were somehow falsified. Nor should he do so now.

Finally, Broxton urges that the State has engaged in a charade to hide the fact that the gun had been recovered in order to prevent him from discovering and presenting evidence at trial that the gun was found in the possession of

---

[49]     If the actual weapon had been recovered before trial, it would have allowed the firearms examiner to compare shell casings to the particular weapon.

"large black males." Petition 47. This contention fails for the reasons argued above in responding to the *Brady* claim. Broxton's alternative suspects do not resemble the description of the suspect provided by Waylon and no jury hearing that evidence would doubt the strength of Waylon's identification of Broxton as the assailant. Accordingly, the Court should summarily deny relief.

### C. Broxton is not entitled to relief for his claims of ineffective assistance of counsel ("IAC") (claims ##3a - 3f).

Broxton argues that trial counsel's various acts or omissions fell below an objective standard of reasonableness that likely prejudiced his defense. Petition 58-97. The Director has argued that his claims are all defaulted and the merits are closed to federal habeas review.[50] Even if Broxton could overcome the bar or the Court finds the bar should be excused, it should still deny habeas relief.

As an initial matter, Broxton alleges that his attorneys failed to subject the State's case to meaningful adversarial testing. Petition 84 (citing *United States v. Cronic*, 466 U.S. 648 (1984)). In *Cronic,* the Supreme Court discussed in dicta a narrow category of situations in which prejudice may be presumed. 466 U.S. at 658-61. Such a presumption applies only when there has been an "[a]ctual or constructive denial of the assistance of counsel altogether," when

---

[50]     Broxton's first claim is unexhausted and defaulted, and the remaining claims are defaulted because they were presented in Broxton's successive state habeas application, which was dismissed as an abuse of the writ. 1 SHCR-03 at 58-95; *Ex parte Broxton*, No. WR-42,781-03.

there are "various kinds of state interference with counsel's assistance," or when counsel is burdened by an actual conflict of interest. *Strickland*, 466 U.S. at 692. Broxton does not propose that his case actually falls under any of *Cronic's* limited situations. Nor could he.

Broxton contends that counsel failed to subject the prosecution's case to "meaningful adversarial testing." Petition 64. He then identifies specific issues with trial counsel's representation—namely, that counsel called Dr. Walter Quijano to testify at punishment, failed to limit as much damning testimony concerning the actual crime as possible, failed to hold the State to its burden of proof on each and every extraneous offense, and failed to present evidence to convince the jury his life was worth saving. *Id.* In arguing as he does, Broxton's claim becomes one alleging that counsel failed to oppose the prosecution at specific points. The Supreme Court has never extended *Cronic* to cover this type of complaint. *Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (claims challenging counsel's failure to adduce mitigating evidence or waiver of closing argument "are plainly of the same ilk as other specific attorney errors we have held subject to *Strickland's* performance and prejudice components"). This Court is barred by *Teague* from extending *Cronic* to Broxton's IAC claims.

This Court's review is instead governed by *Strickland's* standard under which Broxton must prove both deficient performance and prejudice. *Strickland*,

466 U.S. at 687-90. To satisfy the first prong, Broxton must show that "counsel's representation fell below an objective standard of reasonableness"and there is a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 688-89. This presumption requires that courts not simply "give [an inmate's] attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [an inmate's] counsel may have had for proceeding as they did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks and citations omitted). In other words, he must negate every possibility of why counsel may have acted as they did.

To satisfy the second or "prejudice" prong, Broxton must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534. Where counsel is allegedly ineffective during punishment, petitioners have the "difficult burden" of showing a reasonable probability "that the jury would not have imposed the death sentence in the absence of errors by counsel." *Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) (internal quotes omitted). Broxton cannot make this showing on any claim.

### 1.   No IAC for counsel's failure to discover that the murder weapon had been recovered (claim #3a).

Broxton argues that state habeas counsel Dick Wheelan and his attorneys on retrial, Skip Cornelius and Tom Moran, should have utilized computer-

assisted research to discover that Harris County sheriff's deputies found the murder weapon in 1992 after trial. Petition 66. However, he then appears to defeat his own claim by stating that it is unclear exactly what avenues of redress may have been available since the evidence goes to the integrity of the original conviction. *Id.* Counsel should not be found ineffective for failing to advance meritless arguments with little chance of success. *Clark*, 19 F.3d at 966.

Broxton alternatively argues that original trial counsel and first state habeas counsel failed to discover and litigate issues regarding the gun and that he was prejudiced because the evidence would have been new and fresh and unspecified leads could have been followed. Petition 67. Trial Counsel's performance cannot be ineffective for failing to discover evidence that did not arise until after trial concluded. State habeas counsel's alleged failure cannot support a claim of ineffective assistance. "The Sixth Amendment does not apply in habeas proceedings." *In re Sepulvado*, 707 F.3d 550, 554 (5th Cir. 2013) (citations omitted), *pet. for cert. filed* (May 8, 2013) (No. 12-10251).

Finally, Broxton alleges that if previous trial counsel learned of the gun evidence in preparation of a re-sentencing trial and if the gun been available, then the State's case would have been much different. Petition 67. He insists that counsel "could have pointed to at least four other potential killers" in addition to Shook and forced the State to establish a chain of custody between

Waylon Dockens and the individuals in the apartment where the gun was recovered post-trial. *Id.* He also contends that armed with such evidence, his attorneys could have successfully challenged the integrity of all the extraneous offense evidence because the jury would have been more receptive to the idea that Broxton was wrongfully convicted. *Id.* at 67-68.[51] It is not clear whether Broxton's claim is directed at trial counsel or appellate counsel. Regardless, Broxton cannot show that counsel's failure to discover the evidence in question "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521. Nor can Broxton show prejudice under *Strickland*. As argued in responding to Broxton's preceding claims and as set forth in the Statement of the Facts, the strength of the State's case at both stages of trial is not altered by Broxton's speculative and contradictory evidence regarding alternative suspects.

### 2.  No IAC for calling Dr. Walter Quijano (claim #3b).

Broxton argues that counsel were "wholly ineffective" in deciding to engage Dr. Quijano to testify on Broxton's behalf and in preparing for his punishment-phase testimony. Petition 68-86. Dr. Quijano testified for the State at Broxton's 1992 capital murder trial and opined that Broxton constituted a future danger

---

[51]   Broxton's assertion that he could successfully challenge all the extraneous offenses is somewhat puzzling. If his evidence is as good as he believes it is, then he would not be convicted in the first place. And if the jury does not believe the evidence and convicts him (which they would in this case given the quality of Broxton's evidence) then it would serve no purpose to use the same evidence at punishment.

to society. *See* 38 RR 89-131. On retrial, Dr. Quijano testified for the defense and explained that he had since changed his prior opinion. 16 R-RR 154-55, 160.[52] Dr. Quijano now believed that Broxton's twelve years of good behavior on Death Row indicated the he did not in fact constitute a future danger inside the prison system. *Id.* at 167. On cross-examination, however, he admitted that his opinion with regard to Broxton's danger to a free society had not changed. *Id.* at 323. The Court should deny relief because Broxton fails to show both deficient performance and prejudice.

There is nothing objectively unreasonable about the decision to retain Dr. Quijano as a defense expert. While several capital murder defendants including Broxton had their sentenced overturned, it was because of Dr. Quijano's testimony regarding racial and ethnic stereotypes. Dr. Quijano's professionalism and expertise was never the subject of the *Saldano*-related legal battles.[53] And there are few clinical psychologists as familiar with Texas's criminal justice system as Dr. Quijano which is why he is frequently called to testify as a expert for the State and the defense. *See* 16 R-RR 154-57. Broxton's contention that Dr.

---

[52]     Dr. Quijano's testimony is summarized in Part II B & C of the Statement of Facts, *supra*.

[53]     Although Broxton states that Dr. Quijano had been described "as a skunk in the jury room," Judge Price's dissenting opinion was referring to the objectionable testimony and not Dr. Quijano personally. Petition 72; *Saldano v. Texas*, 79 S.W.3d 873, 892-93 (Tex. Crim. App. 2002).

Quijano has a personal bias against him as a "defendant of color" and intentionally gave answers that would ensure he received the death penalty is absolutely unsupported. Petition 76.

This Court's evaluation of counsel's performance under the first prong of *Strickland* is an objective one that focuses on the reasonableness of counsel's conduct in view of the information in the possession of counsel and the information which, through the exercise of due diligence, counsel could and should have had at their disposal. *Wiggins*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). Broxton offers no affidavit or statement from either Tom Moran or Skip Cornelius, his attorneys during the retrial proceedings, explaining the reasons for their decision to use Dr. Quijano, the information they had available to them in making the decision, the information they provided to Dr. Quijano for him for to render an opinion, the content of any relevant discussions between counsel and their expert, and the amount of time they spent preparing for his testimony. As such, Broxton fails to demonstrate that counsel's decision to engage Dr. Quijano and counsel's preparation for his testimony were themselves objectively unreasonable—omissions that are a fundamental problem with his complaint.

Furthermore, the majority of Broxton's complaints are based on speculation and conjecture—*e.g.*, suggesting that attorney Tom Moran was unaware of the TCCA's *Saldano* opinion even though Moran was counsel for Saldano, Petition 69, 70; assuming that counsel did little to prepare himself for testimony, *id.* at 73; wondering if there was any discussion between counsel and Dr. Quijano, *id.*; arguing that questions are raised regarding how much work counsel did and what information he provided to Dr. Quijano, *id.* at 76; speculating that attorney Moran did not spend time with Dr. Quijano, *id.* at 77; stating that counsel "apparently" had not taken the time to reacquaint himself with Dr. Quijano before calling him, *id.* at 79; and arguing that Dr. Quijano's testimony demonstrates that counsel put forth no effort to learn about Dr. Quijano's testimony, *id.* at 85. As a matter of law, such allegations fail to prove ineffective assistance. *Kinnamon v. Scott*, 40 F.3d 731, 734-35 (5th Cir. 1994) (finding "speculation" of ineffective assistance to be no basis for habeas relief); *Barnard v. Collins*, 958 F.2d 634, 643 n.11 (5th Cir. 1992) (holding that "conclusory allegations" of ineffective assistance are without merit "[i]n the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial").

The presentation or non-presentation of evidence through experts is purely a matter of trial strategy. *Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir. 1993);

*Smith v. Black,* 904 F.2d 950, 979 (5th Cir. 1990). In ths case, defense counsel called expert witnesses Dr. Quijano and Larry Fitzgerald and presented numerous records from Broxton's time in prison and jail in order to build a case at punishment to show that he did not present a future danger in prison and that there was little chance of his ever being released.[54] "[C]ounsel's decision to pursue one course rather than another is not to be judged by hindsight." *Gray v. Lucas*, 677 F.2d 1086, 1094 (5th Cir. 1982) (citing *Winfrey v. Maggio*, 664 F.2d 550 (5th Cir. 1981)). And the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance." *Id.* (citing *Winfrey, supra.*).

Even if Broxton could show that counsel's decision rendered his performance objectively unreasonable, Broxton fails to show prejudice under *Strickland*. As summarized in the Statement of Facts, the State's case against Broxton included three capital murders, two attempted capital murders, an attempted capital murder of a police officer for which he was convicted, several aggravated robberies, and previous criminal convictions. Because there is no reasonable probability Broxton's jury would have voted to not impose a death

---

[54]    Relying on an affidavit of Dr. David Axelrad, Broxton asserts that Dr. Quijano violated professional clinical standards by failing to conduct a thorough clinical interview utilizing standardized testing procedures. Petition 79-80; see ECF No. 9-1 at 2-23. His complaint ignores the issue for which Dr. Quijano was engaged which was for future dangerousness. Indeed, Dr. Quijano testified that "testing was not called for in the question I was asked."16 R-RR 163.

sentence had counsel omitted Dr. Quijano's testimony, the Court must deny
habeas relief on this claim.

### 3.   No IAC for allegedly failing to challenge the State's case (claim #3c).

Broxton argues that his attorneys failed to challenge the State's case in a
meaningful way that would have prevented irrelevant, immaterial, and highly
prejudicial evidence from being used against him on retrial. Petition 86. The
Court should not hesitate to deny relief because he fails to prove deficient
performance and prejudice.

First, Broxton alleges that counsel failed to object to "gruesome photos and
witness after witness" regarding the capital murder of Sheila Dockens. Petition
87. He fails to identify the specific evidence or testimony *with appropriate
citation to the record*, fails to set forth the grounds for objecting, fails to explain
how counsel's omission fell below an objective standard of reasonableness, and
makes no attempt to show how it prejudiced his defense. *See id.* Allegations
unsupported by specifics are subject to summary dismissal. *Blackledge*, 431 U.S.
at 63; *Barnard*, 958 F.2d at 643 n.11 (holding that petitioner must make a
specific showing of how the alleged errors and omissions were constitutionally
deficient, and how they prejudiced his right to a fair trial)

Broxton additionally challenges counsel failure to explore the issue of
identification testimony concerning the John Gordon Miller extraneous capital

murder. Petition 87-88. He includes allegations that are moot because they concern the original trial on punishment—that five eyewitnesses at the scene of the murder testified (only three did on retrial), that two gas station clerks testified (only one did on retrial), that counsel failed to question unnamed officers in an unspecified manner about a videotape (no surveillance videotape was admitted on retrial). *Id.* at 87-89. The Court has no jurisdiction to reach moot claims. *North Carolina v. Rice*, 404 U.S. at 246 (citation omitted).

Broxton complains that counsel failed to call an unnamed "identification expert" to challenge testimony offered in the extraneous offenses. Petition 88, 90. He also contends that counsel should have employed an unidentified forensic expert to conduct DNA testing. *Id.* at 91. For claims of deficient investigation, a petitioner "'must allege with specificity what the investigation would have revealed and how it would have altered the outcome of trial.'" *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)). Similarly, where counsel is faulted for failing to call a particular witness, the petitioner must name the witness, prove that the witness would have been available to testify, allege what the witness's testimony would have been, and explain how the proposed testimony would have been beneficial. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). These requirements are "not a matter of mere

formalism" and all must be met in order to obtain habeas relief. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). These requirements apply equally to uncalled expert and/or lay witnesses. *Id.* Because Broxton fails to make this showing, the Court should summarily deny his claim.

Finally, Broxton suggests that counsel could raise issues about the character of the victims even though the approach is sometimes "counterproductive." Petition 89. He speculates about why John Gordon Miller, "a middle-aged TV Guide salesman [and] devoted husband," was sitting in a vehicle in an "unsavory part of town" *Id.*[55] He also speculates that there may be a girlfriend or ex-girlfriend connected to Gary Stuckwisch's murder. *Id.* at 91. Counsel cannot perform deficiently for taking this inflammatory approach, nor can Broxton demonstrate a valid IAC claim based on speculation. *Blackledge*, 431 U.S. at 63; *Barnard*, 958 F.2d at 643 n.11

### 4.  No IAC for allegedly failing to investigate and present meaningful mitigation evidence (claim #3d).

Broxton argues that counsel's engagement of Dr. Quijano as a "mental health expert" was "clearly inappropriate" and there can be no reasonable explanation for presenting his testimony. Petition 94. He speculates that if counsel had carefully considered the psychiatric evidence available to them and

---

[55]   Broxton's federal habeas exhibit states that Mr. Miller was "a route manager who goes from store-to-store" and that "he was working the East End"on the day he was killed. ECF No. 9-2 at 33.

used it to convey a narrative of his life history, then the result at retrial would have been different. *Id.* These assertions do not warrant habeas relief.

When a reviewing court evaluates the performance of trial counsel against a claim of failure to investigate, the relevant inquiry focuses on what counsel did to prepare, what evidence counsel accumulated, what additional leads counsel had, and the results counsel might reasonably have expected from those leads. *Cf. Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002). Broxton offers nothing to show how much time and effort counsel put into the mental health investigation or to describe the evidence available to counsel. Instead, he merely speculates that if counsel had carefully considered the evidence, they could have presented a more convincing case. Petition 94. In doing so, he fails to prove that counsel's investigation and consideration of the evidence was itself objectively unreasonable.

To the extent Broxton argues that counsel provided ineffective assistance by failing to locate a different mental health expert, his argument is of no avail. His attorneys designated Dr. Fred Faison, a psychiatrist, as an expert for trial. R-CR 1292. Presumably Dr. Faison would testify as a "mental health expert," but counsel did not present his testimony. The presentation or non-presentation of evidence through experts is purely a matter of trial strategy, *Yohey*, 985 F.2d at 228, that is "not to be judged by hindsight," *Gray*, 677 F.2d at 1094.

Broxton's contention that counsel should have used unspecified psychiatric evidence to "convey the narrative" of Broxton's life history also fails. Petition 94. He fails to name any witness who would convey the narrative, fails to prove that the witness was available to testify, fails to allege the substance of the narrative that would be conveyed, and fails to explain how the proposed testimony would have been beneficial. The Court must reject his uncalled witness claim as a matter of law. *Day*, 566 F.3d at 538.

The Court should also deny relief for Broxton's failure to show prejudice. As detailed in the Statement of Facts above, defense counsel introduced numerous exhibits and published entries from the records that highlighted aspects of Broxton's background, childhood, neglect, mental health issues, extensive criminal history beginning at a young age. 16 R-RR 122-52; *see* 25 R-RR at DX-47 to DX-59. Because the trial record reflects that counsel presented the very type of evidence that is considered mitigating, Broxton cannot show that counsel's alleged omission prejudiced his defense.

### 5.   No IAC for allegedly failing to make better use of Broxton's siblings as mitigation witnesses (claim #3e).

Broxton next complains of counsel's presenting testimony from Terry Wilson and Mattie Walters, Broxton's half-siblings. Petition 95. In assessing the deficient performance prong of *Strickland*, a Court must "affirmatively entertain the range of possible reasons [an inmate's] counsel may have had for proceeding

as they did." *Pinholster*, 131 S. Ct. at 1407 (internal quotation marks and citations omitted). Broxton makes no attempt to negate any of the possibilities for why counsel may have acted as they did. Instead, he speculates that "no discernable trial strategy" can be found in counsel's decision. Petition 95. Once again his claim will not afford him habeas relief because he fails to that trial counsel's decision was itself objectively unreasonable. While counsel could perhaps have elicited more compelling details from these witnesses or decided against calling them to testify, the objective reasonableness of counsel's performance is not evaluated in hindsight. And the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance." *Gray*, 677 F.2d at 1094 (citation omitted).

Additionally, Broxton argues that instead of calling his family members, counsel should have called "witnesses who would generate some empathy" for Broxton "by helping tell the story of his life." Petition 95. As a matter of law, Fifth Circuit precedent requires that Broxton name the witness, prove that the witness would have been available to testify, allege what the witness's testimony would have been, and explain how the proposed testimony would have been beneficial. *Day*, 566 F.3d at 538 (citing *Alexander*, 775 F.2d at 602). His failure to do so precludes the Court from granting relief.

### 6.   No IAC for presenting Broxton's record of mental illness and prison conduct (claim #3f).

As his final IAC claim, Broxton argues that counsel should have presented a coherent narrative based on Broxton's records instead of "simply summariz[ing] the mountain of records and invit[ing] the jury to sort through it themselves." Petition 97. Broxton's claim is not really a deficient-investigation claim, but one concerning whether to present existing evidence in a different or better manner.   This is even a harder standard to overcome. *See  Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) ("We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." (quoting *Dowthitt* v. Johnson, 230 F.3d 733, 743 (5th Cir. 2000)).

Broxton cannot show that counsel's performance fell below an objective standard of reasonableness or that he was prejudiced as a result. In the first place, the trial record refutes Broxton's contention that counsel merely piled up records.  As argued above and summarized in the Statement of Facts, counsel published numerous entries from the records highlighting aspects of Broxton's background, childhood, neglect, mental health issues, and criminal history. 16 R-RR 122-52; *see* 25 R-RR at DX-47 to DX-59. Broxton also fails to provide any details regarding the specific content of the narrative and how that evidence

would have been beneficial to his defense. *Day*, 566 F.3d at 538 (citation omitted). Consequently, he cannot complain of counsel's failure to do a better job or present more compelling details because he has offered nothing to compare with the actual summary that was provided by counsel at trial.

### D.   Broxton is not entitled to relief for his claim of ineffective assistance of state habeas counsel (claim #4).

As his last claim for habeas relief, Broxton argues that he was denied effective assistance of counsel during his state habeas proceedings in violation of the Sixth and Fourteenth Amendment.   Petition 97-99. Broxton has never raised this claim in state court and, thus, it is unexhausted and defaulted. Regardless, the claim is not a cognizable basis for federal habeas relief.[56]

The Supreme Court has held that "there is no constitutional right to an attorney in state post-conviction proceedings . . .consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551(1987), *Murray v. Giarratano*, 492 U.S. 1 (1989), and *Wainwright v. Torno*, 455 U.S. 586 (1982)).   In fact, the federal habeas corpus statute itself specifically provides that the ineffectiveness or incompetence of habeas counsel shall not be a ground for relief. 28 U.S.C. § 2254(i).

---

[56]      To the extent Broxton may raise the claim to excuse the procedural bar of his defaulted claims, then the Director has addressed the arguments in Part II.B. and incorporates that briefing herein.

In *Martinez v. Ryan*, *supra*, the Supreme Court issued a limited equitable exception to this rule to excuse certain procedural defaults. The High Court's ruling did not abrogate AEDPA nor did the Court create a right to constitutionally effective assistance of habeas counsel. Even in the wake of *Martinez* and *Trevino*, the Fifth Circuit continues to hold that "[t]he Sixth Amendment does not apply in habeas proceedings." *In re Sepulvado*, 707 F.3d 550, 554 (5th Cir. 2013) (citations omitted), *pet. for cert. filed* (May 8, 2013) (No. 12-10251). The Court must deny relief as a matter of law.

## CONCLUSION

The Director requests that the Court dismiss Broxton's claims for lack of jurisdiction, grant the Director's partial motion for summary judgment, and deny habeas corpus relief on the claims for which the Court has jurisdiction.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

-101-

s/Katherine D. Hayes
KATHERINE D. HAYES*
*Attorney-in-Charge                     Assistant Attorney General
                                        Criminal Appeals Division
                                        TX Bar No. 00796729
                                        Southern District No. 22698

                                        Office of the Attorney General of Texas
                                        P. O. Box 12548, Capitol Station
                                        Austin, Texas 78711
                                        (512) 936-1400; (512) 320-8132 fax
                                        katherine.hayes@texasattorneygeneral.gov

                                        ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I certify that on August 30, 2013, I filed an electronic copy of this pleading

with the Clerk of the Court using the ECF system.  Service of the pleading on

the following attorney of record was automatically accomplished through the

Notice of Electronic Filing:

Robert M. Rosenberg
Attorney at Law
3303 Main Street, Suite 305
Houston, Texas 77002
(832) 816-2955; (713) 528-4888 fax
attyrose3@gmail.com

                                        s/Katherine D. Hayes
                                        KATHERINE D. HAYES
                                        Assistant Attorney General
                                        Attorney-in-Charge for Respondent