UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EUGENE ALVIN BROXTON, §
§
PETITIONER, §
§
v. § NO. 4:11-cv-00315
§ CAPITAL HABEAS PETITION
WILLIAM STEPHENS, DIRECTOR, TEXAS § DEATH PENALTY CASE
DEPARTMENT OF CRIMINAL JUSTICE, §
INSTITUTIONAL DIVISION, §
§
RESPONDENT. §

## PETITIONER EUGENE BROXTON'S UNOPPOSED MOTION TO STAY *HABEAS* PROCEEDINGS PENDING STATE DNA TESTING AND MEMORANDUM IN SUPPORT THEREOF

Petitioner, Eugene Alvin Broxton ("Broxton"), by and through his attorneys of record and for the good cause shown below, respectfully requests that this Court stay his federal *habeas* proceeding to permit him to pursue forensic DNA testing of biological evidence pursuant to TEX. CODE CRIM. PROC. ANN. art. 64.01, *et seq.* (West 2015) and to present related claims that arise from the results of that testing to the state courts.  In support of this request, Broxton sets forth the following:

### LIMITED PROCEDURAL HISTORY

The relevant procedural and factual histories for the state and federal proceedings relating to Broxton's conviction for the capital murder of Sheila Dockens are laid out in detail in Petitioner's Second Amended Application for Post-Conviction Writ of Habeas Corpus by a Person Sentenced to Death and his Motion for Extension of Time for File Motion for Leave to File Third Amended Petition. Dkt. No. [9], pp 1-28; Dkt. No. [35], pp. 3-8.[1]  In summary,

---
[1] References to the first federal habeas proceedings will include the case number, followed by the docket number ("Dkt. No. [__]").  References to documents filed in the current proceedings will be made to the electronic court

1

Broxton was convicted on April 30, 1992, of the murder of Sheila Dockens, based largely on single eyewitness testimony involving several of the factors leading to misidentification[2] and the testimony of a hallucinating drug addict that had most of the proceeds of the crime in *his* possession. *See* 31 RR pp. 32-33; 71- 73; 32 RR pp. 181-184; 34 RR p. 100.  At the conclusion of the punishment phase of the trial on May 6, 1992, Broxton was sentenced to death. 40 RR p. 1-6.  Following an unsuccessful appeal and state habeas petition, Broxton filed his federal Petition for Writ of Habeas Corpus on March 3, 2000, which he later supplemented. 4-00-CV-10103, Dkt. Nos. [10] and [14].  This Court subsequently entered an Order provisionally vacating Broxton's death sentence and granting Respondent's Motion for Summary Judgment on Broxton's other claims. *Broxton v. Johnson*, No. 4:00-cv-01034 (S.D. Tex.), Order dated March 28, 2001, Dkt. No. [25].  On November 14, 2003, at the conclusion of the re-sentencing hearing, during which the defense only presented eight witnesses in the course of four hours, Broxton was sentenced to death again. 16 R-RR pp. 112-298; 17 R-RR pp. 61-64.

On January 24, 2011, Broxton, through his then-counsel, Robert Rosenberg, filed his federal petition for *habeas corpus* relief in this action. Dkt. No. [1].  When Mr. Rosenberg became aware that the State had failed to disclose the fact that the murder weapon used to commit the Dockens' murder had been recovered five weeks <u>after</u> Broxton's conviction, along with close to $900,000 in cash and an unspecified amount of drugs, he immediately amended Broxton's federal *habeas* petition to include claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. People of the State of Illinois*, 360 U.S. 264, 269 (1959).  Dkt. No. [4].

---

filing number ("Dkt. No. [____]").Citations to the transcripts of the original trial court proceedings are "___ RR p. ___" (volume number, followed by "RR" then page number); the retrial transcript will follow the same format, with the proceedings noted as "R-RR."

[2] Such factors include cross-racial identification, weapon focus, high stress, and the passage of time between the event and the identification. *See State v. Henderson*, 27 A3rd 872, 904-910 (New Jersey Supreme Court 2011) (discussing these and other factors leading to misidentifications).  Seventy-two percent of wrongful conviction cases where DNA evidence exonerated the person involved erroneous eyewitness identifications; 18 percent involved "snitch" testimony. *See* www.innocenceproject.org, last visited 10/25/15.

After this action was stayed and Broxton exhausted the newly discovered claims in state court, Broxton returned to this Court and filed his second amended *habeas* petition on July 5, 2011. Dkt. No. [9].  The second *habeas* petition, which is currently pending before this Court, states the following claims[3]:

1. Broxton's constitutional rights were violated during the original guilt/innocence trial by the trial judge's refusal to allow use of the mental health records of the State's key witness, Christopher Shook;

2. Counsel ineffectively failed to prepare themselves for the issues involving the limited use of the mental health evidence concerning Shook;

3. *Brady* violations regarding the State's failure to disclose the discovery of the murder weapon and the circumstances of the recovery;

4. *Napue* violations related to the State's failure to disclose the discovery of the murder weapon and the introduction of misleading evidence at the resentencing hearing in 2003;

5. Actual innocence; and

6. Denial of his constitutional right to effective assistance of trial counsel during the resentencing trial on various grounds.

Mr. Rosenberg later withdrew as counsel for health reasons and James Rytting and Cathryn Crawford were appointed to represent Broxton.  They were later joined by *pro bono* counsel from Quarles & Brady LLP.

## HCSO DISCLOSURE: PHYSICAL EVIDENCE CONTAINING BIOLOGICAL MATERIAL

As this Court is aware, current counsel has engaged in significant efforts to investigate this case fully and obtain all law enforcement files related to this case and those efforts will not be rehashed here.  Relevant to this Motion, on September 14, 2015, the Harris County Sherriff's

---

[3] Undersigned counsel is in the process of preparing a Motion for Leave to Amend, accompanied by the 3rd Amended Petition.  Under the current Scheduling Order (Dkt. No. [52]) Broxton's Motion to Amend is due November 9, 2015, Respondent's Response is due December 9, and the Reply is due December 30, 2015.  Broxton is requesting that this scheduling order be vacated, as the state court proceedings may render the federal habeas petition moot and if they do not, it is highly probable that Broxton would seek to amend his petition at the conclusion of the state proceedings.

Office (HCSO) served counsel with a log listing the location of the physical evidence in this matter. In that log, eighteen items of evidence either confirmed as containing, or likely containing, biological material that the HCSO had previously designated as "SPR DESTROYED" in previous logs were now referenced as located at "0732 Box 2." The property log and accompanying email are attached hereto as Exhibit 1. Subsequent communications with the Harris County attorney, culminating in an in-person visit to the HCSO property room on October 6, 2015, by counsel for Broxton, confirmed that the evidence previously believed to have been destroyed, as well as other evidence whose whereabouts was uncertain is, in fact, present in the property room. *See* Exhibit 2, October 27, 2015, Declaration of Cathryn Crawford.

Nowhere in the hundreds of evidentiary exhibits and photographs introduced at trial or retrial, nor in the testimony of dozens of witnesses, was there any forensic evidence presented to the jury placing Broxton at the scene of Sheila Dockens' murder.[4] At least 48 items of evidence containing possible biological material, including the clothing, rope and pantyhose the offender used to tie up Mr. and Mrs. Dockens, as well as panties and a teddy worn by Sheila Dockens, were recovered from the scene. *See* Exhibit 3, excerpted HCSO supplemental reports, pp. 1-5 *and* Exhibit 2.[5] None of these items were subjected to forensic DNA testing in 1991. Further, in addition to the numerous items of physical evidence recovered at the crime scene that may contain biological materials from the offender, approximately twenty-seven (27) separate items of evidence were collected in relation to the Dockens' murder and subject to fingerprint analysis

---

[4] At the 1992 trial, the State introduced two hundred twelve exhibits, including numerous photographs of, and evidence recovered from, the crime scene and the defense introduced fifty-four. *See* 2 RR pp. 104-140. During the 2003 resentencing proceedings, the State introduced two hundred twenty two exhibits and the defense introduced thirteen. *See* 1 R-RR p. 34-47.

[5] Counsel for Broxton has carefully documented each item listed on the HCSO property chart to establish a credible chain of custody. This effort has included linking each item listed with crime scene photographs, HCSO report(s) documenting the recovery of the evidence, chain of custody forms provided by HCSO and the physical inspection of the evidence undertaken by Cathryn Crawford on October 6, 2015. That effort, described in Exhibit 2 at pp. 2-3 at ¶¶ 10-11, forms the basis for Broxton's good faith belief that the physical evidence in possession of HCSO has been adequately maintained so as to permit forensic DNA testing as requested in this motion.

- all 27 items either had no recoverable prints or the prints that were recovered were not matched to Broxton. *See, e.g.*, Exhibit 3, pp. 7-9.

In September 2003, just before the retrial, the Harris County District Attorney ordered that PCR DNA testing be conducted on five items of evidence on which sperm and blood had been detected and that were susceptible to testing under then current techniques.[6] The District Attorney also asked that these be compared to DNA from Broxton. Based on the testing, Broxton was *excluded* as a possible contributor to the tested material. Exhibit 4, October 18, 2003, DNA Report. Remarkably, the District Attorney did not request that Mr. Dockens' DNA be compared to the recovered sperm and blood samples to establish whether he could be included or excluded as a contributor of that material. In addition, perhaps due to the limitations of DNA extraction and testing techniques in 2003, the District Attorney also did not request forensic DNA testing for the multiple other items of evidence that likely contained biological evidence left behind by the offender, including the bindings. No DNA profiles obtained from evidence in this case have been submitted to national or state offender databases.[7] Similarly, none of the fingerprints obtained from the crime scene have been submitted to national or state offender databases.[8]

**ARGUMENT**

Since 1931, the Supreme Court has consistently recognized a trial court's inherent authority to stay proceedings. *See Kansas City Southern Ry. Co. v. United States*, 282 U.S. 760, 764 (1931) (decision on whether to stay proceedings pending other litigation is within the sound

---

[6] Current counsel did not become aware of the DNA testing and results until July 2015 and it is unclear whether re-trial counsel was informed of the testing and results in 2003.

[7] Almost 50% of all DNA exonerations have resulted in the identification of the real perpetrator. *See* www.innocenceproject.org The Cases: DNA Exoneree Profiles (lasted visited 10/25/15).

[8] Counsel asked a HCSO fingerprint analyst, Demitri Payavla, if he would run the recovered prints through the state database when she met him and other HCSO employees him on October 6, 2015. He informed her that Mr. Dockens' fingerprints would need to be obtained for purposes of exclusion and then someone with authority would need to tell him to conduct the comparisons and, if Dockens was excluded, run the prints through the state database.

discretion of the court); *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936) ("the power to stay proceedings is incidental to the power in every court to control the disposition of the causes on its docket, with the economy of time and effort for itself, for counsel, and for litigants."); *Rhines v. Weber,* 544 U.S. 269, 276 (2005) (district courts have the authority to issue stays where doing so is a proper exercise of its authority, AEDPA does not deprive courts presiding over federal habeas claims of this authority); and *Ryan v. Gonzalez*, 133 S.Ct. 696, 708 (2013) (decision to issue a stay, like a decision on whether to order an evidentiary hearing, is within the sound discretion of the court, noting "[w]e do not presume that district courts need unsolicited advice from us on how to manage their dockets."); *see also*, *Hernandez v. Spencer*, 780 F.2d 504, 506 (5th Cir. 1986) (affirming order staying Section 1983 claim pending resolution of criminal proceedings in state court, noting "the trial court is the master of its docket").  As outlined below, a stay is appropriate in this case, as Broxton is entitled to DNA testing under Texas State law, the positive results of which would either end or materially affect the current federal *habeas* proceedings.

      A.    <u>Texas law permits a convicted person to seek forensic testing of DNA evidence and Broxton meets both the substantive and procedural requirements to pursue an order for such testing in Texas state court.</u>

In 2001, nine years after Broxton was convicted, the Texas legislature passed its first major bill directly acknowledging the important role DNA testing can play in exposing wrongful convictions. S.B. 3, 77th Leg., Reg. Sess. (Tx. 2001).  Senate Bill 3 amended the Texas Code of Criminal Procedure to permit post-conviction DNA testing upon the request of a convicted person.  *Id.*  The law, which has been amended several times to increase a convicted person's access to DNA testing, sets forth a straightforward set of substantive legal rights and procedural requirements for a convicted person to seek forensic DNA testing of evidence containing

biological material.  TEX. CODE CRIM. PROC. ANN. art. 64.01, et seq. (West 2015).  The process

laid out in the statute permitting motion practice to secure forensic DNA testing requires that the

convicted person establish (a) that the evidence to be tested has a "reasonable likelihood of

containing biological material," (b) that the evidence was "secured in relation to the offense that

is the basis of the challenged conviction," (c) that the State was in possession of the evidence

during the trial of the offense, and (d) that the evidence was either (i) not previously subject to

DNA testing or (ii) can be retested subject to newer testing methods that "provide a reasonable

likelihood of results that are more accurate and probative" than prior results. *Id.*

If the motion establishes each of the four prongs of the threshold requirements of the

statute, the court is then under a mandate to require the attorney representing the state to deliver

the evidence to the Court so that a determination may be made as to the efficacy of the proposed

testing, subject to various criteria. TEX. CODE CRIM. PROC. ANN. art. 64.02 and 64.03.

1.      Broxton can meet the standards for forensic DNA testing.

Broxton can meet each of the threshold requirements necessary to seek forensic DNA

testing of the evidence recently discovered to be in the State's possession.  On September 29,

2015, shortly after learning that potential biological evidence remained in the State's possession,

Broxton engaged the services of an expert in forensic DNA analysis, Anjali Ranadive, to serve as

a consultant.  Ms. Ranadive's initial evaluation and opinions regarding the suitability of further

DNA testing on items of physical evidence collected from the Dockens' crime scene, along with

a copy of her professional curriculum vitae, are attached to this motion as Exhibit 5.

Ms. Ranadive has had an opportunity to review pertinent records and has consulted with

Broxton's counsel, at length, to develop a foundation for her initial opinions.  Exhibit 5, pp. 2-3

at ¶¶ 2-5.   Based on her review of the information and documentation provided to her, Ms.

Ranadive has concluded that:

1.  the evidence appears to be stored in a manner that will allow for it to be tested;

2.  the chain of custody appears to be intact for most, if not all, of the items to be tested;

3.  retesting of evidence items originally tested with older techniques and/or testing of additional items never tested before may yield probative results;

4.  presumptive tests performed earlier in this case suggest the presence of semen, blood, skin cells, hairs and possible other biological material on many of the items of evidence, all of which may be subject to forensic DNA testing;

5.  items of evidence not previously screened for the presence of biological material may now be subjected to current DNA testing to determine whether DNA is, in fact, present, as newer techniques now exist which were not available in 1991 and which are able to detect minute levels of biological material left on items collected from crime scenes;

6.  DNA is a robust molecule and if properly stored the potential to obtain useful results even decades after collection is high; and,

7.  the state of the art for forensic DNA technology is vastly improved over the time period relevant to this case and improved testing methods have evolved since the initial testing of certain items prior to the retrial in 2003.

Exhibit 5, p. 3 at ¶¶ 6-12.

In summary, the evidence developed through Broxton's investigation to date, along with the initial opinions of Ms. Ranadive demonstrate conclusively that (a) multiple  items of evidence identified on the HCSO property log have a "reasonable likelihood of containing biological material," (b) the evidence was secured and retained by HCSO in specific relation to the Dockens murder, (c) the State was in possession of the subject evidence during the both the original 1991 trial of the offense and the subsequent sentencing retrial in 2003, and (d) the subject evidence was either (i) not previously subject to DNA testing or (ii) is susceptible to be retested subject to newer, evolved testing methods with a reasonable likelihood of more accurate

and probative results. The stay relief sought by this motion will afford Broxton the opportunity to pursue his substantive legal rights with regard to forensic DNA testing and ensure that the current federal *habeas* proceedings are resolved only upon a full consideration of the material issues and evidence.

      2.      Granting a stay of his federal habeas proceedings will also be in accord with the public policy intent of Texas' forensic DNA testing statute.

Prior to 2011 amendments to Chapter 64, which went into effect on September 1, 2012, the Texas Court of Criminal Appeals required a movant seeking post-conviction DNA testing to prove that the evidence in fact contained "biological material" as a prerequisite to obtaining testing. *See Swearingen v. State*, 303 S.W.3d 728, 733 (Tex. Crim. App. 2010) ("record is void of any concrete evidence that biological material existed on the evidence sought to be tested"). The Court of Criminal Appeals noted that its construction of the statute, requiring proof of the existence of even microscopic amounts of biological material, could lead to instances in which probative DNA testing is denied. *See id.* at 732.  But the court held that this was a matter for the Legislature to address. *See id.*  The Court of Criminal Appeals also failed to consider submission of any test results to the CODIS DNA database because Chapter 64—as it existed in 2010—did not provide for such relief. *See id.* at 736 (Chapter 64 provides for testing and retesting of evidence, not for database entry).

Following the *Swearingen* case, the 82nd Legislature amended Chapter 64 to address the deficiencies noted by the *Swearingen* court.  First, the Legislature added a new, broad definition of "biological material" to include "skin cells," "fingernail scrapings," and a catch all provision for "other identifiable biological material that may be suitable for forensic DNA testing." TEX. CODE CRIM. PROC. ANN. Art. 64.01(a)(1) (2011).  Second, the Legislature enacted TEX. CODE CRIM. PROC. ANN. Art. 64.035 to require that unidentified DNA profiles obtained through testing

of biological evidence under Chapter 64 be submitted through available state and federal law enforcement databases (such as CODIS). The Texas Legislature further amended the statute this year to remove overly restrictive proof requirements and, instead, incorporated a more liberal "reasonable likelihood" standard with regard to the potential for extracting credible exculpatory biological evidence. *See* Acts 2015, 84th Leg., ch. 70 (S.B. 487), § 1, eff. Sept. 1, 2015.[9]

B.   Broxton has been diligent in the pursuit of his claims and the recent discovery that HCSO is in possession of physical evidence likely to contain biological material presents the first opportunity Broxton to request DNA testing

Here, it is clear that Broxton could not have pursued forensic DNA testing and raise any related claims for state *habeas* relief during any of his prior trips to the Texas state courts through early 2011. As a threshold matter, Broxton did not learn that DNA testing had been performed on some of the evidence, and that the results were favorable for him, until July 2015. Around that same time, he was told that the samples from that testing had been destroyed. *See* fn.10 below and Exhibit 6, property log produced July 13, 2015, He did not learn that the HCSO was still in full possession of these biological samples and physical evidence potentially containing biological material until September 14, 2015 (just over one month prior to the date of this motion).[10]

---

[9] It is worth noting that there have been at least 52 exonerations based on DNA testing in Texas alone; a majority of those cases involved mistaken eyewitness identifications. *See* www.exonerationregistry.org, last visited 10/25/15 and www.innocenceproject.org The Cases: DNA Exonence Profiles (lasted visited 10/25/15).

[10] The history of the efforts made by Broxton's counsel to obtain a full accounting of the State's records relating to both the Dockens' crime and the weapon recovery is laid out in detail in Petitioner Eugene Broxton's Partially Unopposed Motion for Extension of Time to File Motion for Leave to File 3rd Amended Petition (Dkt. No. [35]); Petitioner Broxton's Unopposed Second Motion for Leave to Issue Subpoenas (Dkt. No. [42]); Petitioner's Motion to Compel Production of Documents Subpoenaed from Harris County Sheriff's Office (Dkt. No. [47]), as well as telephonic court hearings held in mid and late September 2015. In sum, HCSO persistently failed to provide complete responses and gave conflicting and, at times, inaccurate information relating to the case files. On July 13, 2015, counsel for Broxton finally received a property log from the HCSO in the form of a spreadsheet generated on May 14, 2015, purporting to list the location and disposition of 104 items of physical evidence collected and maintained by HCSO during the investigation of the Dockens' murder. Exhibit 6. On this spreadsheet, eighteen (18) items of physical evidence possibly containing biological material were designated as "SPR DESTROYED" on April 9, 2012 - approximately one year *after* Broxton first raised his *Brady* claim and began seeking further documents from HCSO (Rosenberg made his request on 2/24/11). Petitioner's counsel immediately sought further

10

It is also significant that the 2011 amendments to the forensic DNA testing statute, which went into effect after Broxton's State Successor Motion had been disposed of, broadened Petitioner's substantive legal right to pursue such testing by expanding the definition of "biological material" and incorporating a requirement that any unidentified DNA samples be submitted to state and national databases. *See* Acts 2011, 82nd Leg., ch. 366 (S.B. 122), § 1, eff. Sept. 1, 2011.  Equally significant is the latest amendment to create more liberal "reasonable likelihood" standard with regard to the potential for extracting credible exculpatory biological evidence. *See* Acts 2015, 84th Leg., ch. 70 (S.B. 487), § 1, eff. Sept. 1, 2015.

In other words, even if Broxton had not been prejudiced by HCSO's delay in producing documents regarding the Dockens' crime scene, the substantive right to pursue forensic DNA testing would have been much more circumspect prior to September 1, 2015.  As it is, Broxton first learned of the continued existence of physical evidence reasonably likely to contain biological material just weeks after the 2015 amendments of Chapter 64 became effective.  The actions of the Texas legislature since the Chapter 64 was originally passed into law demonstrate a clear intent to ensure a broad, liberal application of the forensic DNA statute as a matter of public policy.  Broxton should be afforded the opportunity to diligently pursue such an important legal right afforded to him by the very State that seeks to execute him.

C.       The evidence Broxton seeks to have tested is material to his claim of innocence.

Sometime between 10:30 p.m. on May 16, 1991, and 1:30 a.m. on May 17, 1991, Sheila Dockens was fatally shot in her room at the Magnolia Motel with her husband's .44 magnum

---

discovery to determine the circumstances of the destruction of these 18 items of evidence without the notice required by Tex. Code Crim. Proc. Ann. art. 38.43(d) (West 2012).  It was not until the HCSO was under the threat of a pending motion to compel due to HCSO's failure to respond to a subpoena authorized by this Court, the Harris County attorney served another document on Broxton's counsel on September 14, 2015, this time in .pdf format, purporting to identify the location and disposition of every item of physical evidence collected and maintained by HCSO related to the Dockens' murder. *See* Exhibit 1.

revolver. 27 RR pp. 220-22; 32 RR pp. 35-37.  Shortly before 7:43 a.m. on May 17, 1991, Waylon Dockens called the front desk, said that he and his wife had been robbed and injured and he needed help. 28 RR pp. 121-122.  Harris County Sheriff's Office ("HCSO") deputy W.L. "Bubba" Hunton was dispatched to the scene and arrived at approximately 7:50 a.m.  27 RR pp. 133-34.  There he found a woman (Sheila Dockens) who appeared dead on the floor and a male (Waylon Dockens) lying face down on the bed. *Id.* at 137-38; 142-43.  He saw blood everywhere—on the bed, floor, and walls. *Id.* at 137, 170.

Dockens was taken by ambulance to L.B.J. hospital. 27 RR p. 202.  En route, he told one of the ambulance personnel, Benjamin Banta, that a "black man" had come into his room and "hit him as soon as [he] came in the room."  31 RR p. 132.  Dockens also told Banta that he was knocked out by the blow and when "he came to that morning, he found that he was tied up and freed himself from the bindings" before he called for help.  *Id.* at 132-33.  At trial, Waylon Dockens testified that a black man had come into his room the night of May 16, tied both him and his wife up, took possession of several of his and his wife's belongings, and knocked him (Dockens) unconscious with his own (Dockens') pistol. *See* 28 RR pp. 82-113.

On May 20th, almost four full days after Waylon Dockens last saw the man who forced his way into Room 11 at the Magnolia Hotel, HCSO Detectives Muir and Tonry, accompanied by Houston Police Sergeant Belk, went to Dockens' hospital room at Ben Taub Hospital to show him a videotape of a lineup, with Broxton in the first spot. 28 RR p. 195, 30 RR pp. 115, 135.  At this point, the .44 bullet was still lodged in Dockens' neck; his skull and face were fractured; the lining of his brain had been damaged, causing a leak of spinal fluids and bleeding; and he was on morphine for the pain.  SX 128, pp. 1, 15-16, 46, 49; SX 127, pp. 1-2, 17 and 29 RR pp. 28-29. That very morning, Dockens' mother had told the nurses that Dockens had been "confused that

night," SX 127, p. 50.  In this compromised condition, Dockens picked Broxton out of the lineup on the video. 28 RR p. 153.

Numerous items of physical evidence were recovered from the scene of the murder. *See* Exhibit 1 and Exhibit 3.  The evidence that Broxton will seek to have tested falls into the three categories, which are discussed below.

1.    Biological evidence from clothing Sheila Dockens was wearing when she was attacked that has already been determined to contain DNA from a single male that is not Eugene Broxton.

Waylon Dockens testified that when his wife was tied up and he was knocked unconscious, Mrs. Dockens was wearing a pink teddy. 28 RR pp. 78, 172-74.  However, when Mr. Dockens awoke and found his wife dead, the pink teddy was on the bathroom counter next to a pool of blood and his wife was clad in black panties. *Id.* at 172-73, 177; *see* SX 62, 63, 66 (crime scene photographs).  In 2003, just before the retrial, the Harris County Medical Examiner Forensic Laboratory conducted tests on Mrs. Dockens' panties and pink teddy top and obtained DNA from sperm fractions and blood, which it concluded were consistent with a single male. Exhibit 4, p. 1.  The DNA analyst compared the DNA from the undergarments to a sample of Broxton's DNA and excluded him as the possible source.  Inexplicably, the State did not ask Mr. Dockens to submit a DNA sample so that he could be identified or excluded as the contributor of the semen.  If the DNA is compared to Mr. Dockens and he is excluded as the source, Broxton's claim of innocence would be substantially strengthened.  Further, submitting the DNA sample to CODIS and other offender databases might yield a match to the real killer.

2.    Evidence that the offender handled in such a way that makes it reasonably likely that he left biological material on it.

Mr. Dockens testified that his assailant tied him and his wife up using a variety of items, including socks, stockings, and flannel shirt that the assailant cut into strips. 28 RR pp. 90, 92-93.

All of the bindings that were used to tie up both Dockens, as well as other pieces of the flannel shirt with blood on them, were recovered from the crime scene and stored as evidence.  Exhibit 1 at pp. 2, 4, 7.  In addition, the medical examiner also recovered rope, stockings and a white sock that were used to bind Mrs. Dockens, which, counsel just recently learned, were still stored as evidence. *See* Exhibit 7, photograph of bindings.  Again, excluding Broxton and Dockens as contributors to biological material recovered from these items will advance Broxton's innocence claim.  The more items of physical evidence that contain the same DNA that does not belong to either man (or to Sheila), the stronger Broxton's claim will be. *See Routier v. State,* 273 S.W. 3d 241 (Tex. Crim. App. 2008) (DNA recovered from multiple items that did not match the convicted person would corroborate claim that an unknown intruder entered her house and killed her children).  Further, comparing recovered DNA to items recovered from Shook's car could result in a match— which would make it clear that Shook, and not Broxton, was involved in the crime.  Finally, running recovered DNA through the state and national databases could identify the real killer.

       3.       Other items that may contain the killer's DNA.

Mr. Dockens testified that, after the assailant tied him up, he then knocked him (Dockens) out with Dockens' gun. 28 RR pp. 112-13.  When he regained consciousness, he was still lying on the bed and his wife was on the floor next to him. *Id.* at pp 117-118.  He eventually called for help and, after moving about parts of the room, collapsed back onto the bed. *Id.* at 119 - 124.  Mr. Dockens never stated that he went into the bathroom after he was injured, yet there was a substantial amount of blood there, as well as throughout the motel room, and on various items of clothing and towels.  Because he was unconscious, Mr. Dockens could not state what happened afterwards.  The simple fact is that we do not, and cannot without further testing, know the

source of the blood contained on the items recovered from throughout the Dockens' room. Forensic DNA testing of items not previously subject to testing may resolve that question. Finally, other items recovered from the motel room that are reasonably likely to contain biological material include two syringes, a plastic drinking cup, several tissues and a Fruit Punch Sunkist soft drink..

All told, there are at least 48 pieces of evidence that were collected from the crime scene and stored in the HCSO or the clerk's office, which appear to have been properly maintained, that are reasonably likely to contain biological material that may be tested, compared to Broxton and the Dockens, and run through the national and state offender databases.

D.     <u>Although not a predicate for obtaining DNA testing, Broxton has developed evidence of alternate suspects which further supports the need for this testing</u>.

Broxton is clearly entitled to pursue forensic DNA testing under the law of the State of Texas and any exculpatory DNA evidence may form the basis for a claim of actual innocence. Evidence presented at trial, as well as new evidence developed through the course of undersigned counsels' investigation, strongly suggest that someone other than Broxton robbed and murdered Sheila Dockens.

1.     Two white men seen entering Mrs. Dockens' motel room shortly before the murder

Debbie Klinkow, a guest in the motel the night of the murder, testified that at approximately 11:30 p.m., about 30-45 minutes before she heard gunshots, she saw a woman she later identified Mrs. Dockens wearing "shorts and a little top" admit two white men into her room.  32 RR pp. 31-35; 41.  Mr. Dockens did not corroborate this, which either means that this occurred after he was knocked out or that he was untruthful when he described the events the

night of the murder.  If the DNA on the teddy and / or panties does not match either Broxton or

Dockens, Ms. Klinkow's testimony takes on new significance.

    2.       Men associated with the people in possession of the murder weapon

As the court is aware, the murder weapon was recovered after a shooting incident at 250

Uvalde Rd. in northwest Houston on June 12, 1992 - approximately 14 months after the

Dockens' murder and shortly following Broxton's original conviction and sentencing. *See*

Exhibit 8, Excerpted HCSO Reports.  The apartment in which the weapon was recovered was

rented by Carla Smith, occupied by Kobie Mendenhall and controlled by Thaddius "Cricket"

Goins as part of Goins' drug distribution organization. *See id.*, pp. 6-7, and Exhibit 9, Excerpts

United States Drug Enforcement Agency Reports, at pp. 1-6.[11]  Mr. Goins, who was suspected

by the DEA of being involved in several violent incidents in the early nineties, was convicted in

1995 of conspiracy to distribute in excess of 500 grams of cocaine and possession with intent to

distribute crack cocaine and is currently incarcerated. *See* Exhibit 9, pp. 11-12, 15-16.  Goins

himself is a viable alternate suspect.  In addition, Mr. Goins is connected to two other credible,

alternative suspects - Billy Gibson and Andre Sloan.

*Billy Gibson*

An associate of Goins, Billy Gibson, is a viable alternate suspect.  Christopher Shook,

who possessed a number of items taken from the Dockens, testified that Billy Gibson was his

"dope connection" and someone for whom he did mechanic work from time to time. 31 RR p. 51.

Shook also testified that he was with Mr. Gibson the day of, and the day after, the murder. *Id.* pp.

51, 68.  Shook also testified that Billy Gibson showed up at the Econolodge (which was across

---

[11] Exhibit 9 will be filed under seal pursuant to an agreement with the Drug Enforcement Agency. *See* Dkt. No. [38], Exhibit 1 and Dkt. [39].  The voluminous DEA file relating to Goins that was tendered to counsel pursuant to stipulation details the scope of the Goins drug operation and several probable criminal acts committed by Goins and/or his associates.  For the purposes of this Motion, we are only providing the most relevant excerpts of the DEA file.

the street from the Magnolia Motel) on the evening of the murder, after Shook had completed a drug transaction.  31 RR pp. 56-57.

On information and belief, Billy Gibson grew up with and went to school with Thaddius "Cricket" Goins and they knew one another until Mr. Gibson was murdered during a drug transaction in August of 1991.[12]  As Billy Gibson was connected to Shook, the Dockens' crime scene and the individual (Goins) who came to be in possession of the murder weapon, it is reasonable to conclude that forensic DNA testing of the physical evidence in this case should be tested to determine whether Mr. Gibson contributed to any of the biological material contained within that evidence.[13]

*Andre Sloan*

Andre Sloan, another known associate of Goins, is also a viable suspect.  Records obtained from the United States Drug Enforcement Agency "DEA" establish that it was reported that "Cricket" Goins was the "mastermind" behind the April 7, 1992, murder of three Hispanic individuals during a drug transaction at a motel in Houston by his associate Andre Sloan. Exhibit 9 at pp 8-9.  Andre Sloan was arrested for the offense on June 18, 1992 (6 days after Dockens murder weapon was recovered from the Uvalde apartment) and convicted of that crime on September 3, 1993. *See id.* and Exhibit 10 (excerpts from HCSO reports and news article). Significantly, in 2010, the Harris County Sheriff's Office ran DNA from an unsolved 1990 robbery murder eerily similar to the Dockens offense through the CODIS database and matched it to Andre Sloan.  *Id.* at pp. 3-5.  Sloan was charged and ultimately convicted of breaking into a

---

[12] Investigators for the defense learned this through multiple witness interviews. *See* Exhibit 2, ¶ 13.
[13] Counsel obtained the autopsy report for Gibson and is in the process of determining whether the Medical Examiner or HCSO has any biological material from Gibson.  Because Mr. Gibson's death was ruled a homicide, which resulted in the conviction of at least one offender, counsel is hopeful that such material, for which they will need a court order, does in fact exist.

couple's house at night, tying them up, robbing them, and shooting both in the head. *Id.* at pp 8.

The husband died, but the woman survived. *Id.*

E.    Favorable Results from DNA and fingerprint testing will lead to new claims for relief in State Court.

Broxton, who has always maintained his innocence of this crime, is confident that the forensic DNA (and fingerprint) testing will yield favorable results.[14]   Assuming that he is correct, he will promptly file a Subsequent Petition for Post-Conviction Relief in State court, pursuant to the Texas Code of Criminal Procedure, Article 11.071 § 5. *See Ex Parte Holloway*, 2013 WL 541974 (Tex. Crim. App. 2013 (unpublished)) (acknowledging that post-conviction petition is proper mechanism for obtaining relief from conviction following Chapter 64 proceedings).   The Texas Court of Criminal Appeals has specifically recognized that a claim of Actual Innocence as an independent ground for relief that may be raised in state habeas proceedings.   *See State ex. Rel. Holmes v. Court of Appeals*, 885 S.W.2d 389 (Tex. Crim. App. 1994); *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1997).   Under *Elizondo*, Broxton will be required to show, by clear and convincing evidence, that no reasonable juror would have convicted him of capital murder in light of all the evidence now available. *Elizondo*, 947 S.W.2d at 209; *also Herrera v. Collins*, 506 U.S. 390 (1993).   In reviewing this claim, the court assumes the trial was error-free, but that new facts establish the Petitioner's innocence. *Ex parte Elizondo*, 947 S.W.2d 202, 208 (Tex. Crim. App. 1997).   In order to grant relief on the claim, the state habeas court must be convinced that the new facts establish the petitioner's innocence. *Id.* at 209.   Thus, an Applicant raising a *Herrera*-type claim must demonstrate innocence by clear and convincing evidence. *Id.* at 209.   Broxton is confident that favorable DNA results, combined with the other evidence developed through the most recent investigation, will enable him to meet this standard.

---

[14] In the very first interview with police, Broxton, who was fully cooperative, denied robbing or killing anyone. *See* 5 RR pp. 11, 18-19.   He has consistently proclaimed his innocence.

Favorable results will also permit Broxton to file a claim based on the fact of the 2003 testing.  At present, it is unclear whether the State tendered the report containing the results of the DNA comparison to defense counsel prior to the 2003 trial.  If the State did not, then Broxton has a *Brady* claim; if the State did disclose the report to defense counsel, then Broxton will likely pursue an ineffective assistance of counsel claim.  Favorable testing results would be relevant to 1) establishing prejudice and 2) overcoming any procedural bar to raising the claim. *See* TCCP 11.071 § 5 (b) (permitting consideration of a previously available claim if the petitioner can establish, by a clear and convincing evidence, that but for the *Brady* violation or ineffective assistance of counsel, no rational juror would have answered one of more of the special issues that lead to the death sentence).

F.      The evidence developed, and findings made, in State will materially affect federal habeas proceedings.

Obviously, if the Texas Court of Criminal Appeals were to grant Broxton relief, the proceedings in this Court would be rendered moot.  However, even if the State court rejects these claims, the evidence developed and findings made in State court would have a direct bearing on Broxton federal habeas claims.  Upon returning to this Court, Broxton would seek to file an Amended Petition that incorporates the evidence and findings from the State Court proceedings, as they would be relevant to his pending *Brady* claim relating to the failure of the State to disclose the fact and circumstances of the recovery of the murder weapon, and to his innocence claim.[15]  In addition, having exhausted his *Brady* or ineffective assistance of counsel claim

---

[15] Broxton's failure to meet the exacting "clear and convincing" standard of proof for actual innocence in State court would not foreclose his meeting the lower burden of proof  under *Schlup v. Delo*, 513 U.S. 298 (1995), which would enable this Court to consider any constitutional claims that are otherwise procedurally barred. *See McQuiggin v. Perkins*, 133 S.Ct. 1924, 1931-32 (U.S. 2013) (under the miscarriage of justice exception "a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims … on the merits notwithstanding the existence of a procedural bar to relief").

relating to the 2003 testing, Broxton would seek leave to amend his Petition to include the new claim.

G.   The relief requested by Broxton incorporates reasonable time limitations on his pursuit of forensic DNA testing.

When granting a stay to permit a litigant to return to state court, a district court should place reasonable time limits. *Rhines,* 544 U.S. at 278 (2005) (citations omitted).  Broxton is requesting that the Court enter an Order granting him 90 days to file a Motion for DNA Testing in State court.  This time period accounts for the time it will take to permit his consulting DNA expert the opportunity to fully review the evidence in the case and prepare a comprehensive affidavit of opinions in support of Broxton's motion and for counsel to prepare the Motion and attempt to convince the State to consent to it prior to filing. *See* Exhibit 5 at ¶ 13.  Further, the fact that the holiday season is upon us as this motion is filed necessitates this request for a slightly expanded schedule on the front end following entry of the requested stay.  Within 30 days of entry of a final order disposing of Broxton's motion for forensic DNA testing, and the exhaustion of any state level, Broxton proposes, if necessary, to promptly return to this Court on his *habeas* proceedings.

In summary, Broxton is seeking a stay to pursue a substantive legal right under a process afforded by Texas state law for the purpose of establishing the foundation for additional claims, including an actual innocence claim.  To date, the only efforts made by the State to examine the biological material recovered from the Dockens' scene have resulted in the exclusion of Broxton as a contributor. *See* Exhibit 4.  To date, the State has not submitted the DNA profiles developed in 2003, or any of the fingerprints recovered from the crime scene, through any state or national offender database.  To date, the State has not sought to include or exclude any other persons identified in the investigative documents as contributors to the biological material recovered

from the scene.  Lastly, to date, the State has made no effort to recover additional biological material from any of the physical evidence maintained in the HCSO property room.  In that regard, Broxton has the legal right to pursue forensic DNA testing under Texas law and he should be afforded an opportunity to exercise that right to resolve open issues that may have a direct bearing on his claims.

### CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Petitioner Eugene Alvin Broxton respectfully requests that this Honorable Court enter an order vacating the current Scheduling Order and staying his federal *habeas corpus* proceeding to permit him to file a Motion for DNA testing with the state trial court pursuant to TEX. CODE CRIM. PROC. ANN. art. 64.01, *et seq.*, requiring that he file his motion in the state courts no later than ninety (90) days from the date of the order granting stay and abey, and requiring that he return to this Court within thirty (30) days of the final disposition of the state proceedings, along with such other and further relief as the Court may deem just and proper.  A proposed order is attached.

Respectfully submitted,

Hilder & Associates, P.C.

/s/ *James G. Rytting*
James G. Rytting
State Bar of Texas No. 24002883
819 Lovett Blvd.
Houston, TX  77006-3905
Tel. (713) 655-9111
Fax (713) 655-9112
james@hilderlaw.com

Cathryn S. Crawford
State Bar of Texas No. 24077980
510 S. Congress, Suite 208
Austin, TX  78704
Tel. (512) 637-5225
Fax (512) 637-5224
cathryncrawford5@gmail.com

Quarles & Brady, LLP.
Kenneth H. Haney
Florida Bar No. 190561
Admitted *pro hac vice*
1395 Panther Lane, Suite 300
Naples, Florida  34109

Tel.  (239) 659-5050
Fax: (239) 213-5406
kenneth.haney@quarles.com

COUNSEL FOR EUGENE BROXTON

## CERTIFICATE OF CONFERENCE AND NO OPPOSITION

I hereby certify that on October 26, 2015, I had a phone conversation with counsel for Respondent, Assistant Attorney General Katherine Hayes regarding this Motion.  Ms. Hayes stated that the Attorney General does not oppose this motion.

/s/ Cathryn S. Crawford
Cathryn S. Crawford

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of October 2015, a true and correct copy of the foregoing documents, excepting Exhibit 9, which will be filed under seal and served on Respondent, was filed with the Court's CM/ECF system, effectuating service on all counsel of record in this case.

/s/ *James G. Rytting*
James G. Rytting